E-FILED
Friday, 20 July, 2007  07:14:54 PM
Clerk, U.S. District Court, ILCD

1    A    Yes, Your Honor.

2    Q    I've already described these charges in detail to

3    you.  If these charges went to trial, the Government would

4    be required to prove certain elements beyond a reasonable

5    doubt.

6              Concerning Count 1, the receiving a bribe count,

7    the Government would be required to prove, first, that at

8    the time in question you were a public official.  Second,

9    that you corruptly accepted or received something of value

10   personally.  And, third, that you knew that what you

11   accepted or received was accepted or received in return

12   for being influenced in the performance of some official

13   act.  Do you understand what they would have to prove

14   concerning Count 1?

15   A    Yes, Your Honor.

16   Q    Count 2, they would have to prove, first, that you

17   did in fact knowingly conceal on your person, that is in

18   some article of clothing or luggage or backpack or other

19   container worn or carried by you, 7 than $10,000 in

20   currency.  Second, they would have to prove that you did

21   so -- that you knowingly transported or transferred such

22   U.S. currency, concealed U.S. currency, from a place

23   outside the United States to a place inside the United

24   States.  Third, they would have to prove that you did so

25   with the intent to evade a U.S. currency reporting

1   requirement under Title 31, Section 5316.  Do you

2   understand what the Government would have to prove

3   regarding Count 2?

4   A     Yes, Your Honor.

5   Q     Then it doesn't actually say it in here in the plea

6   agreement, but as to Count 3 the Government would have to

7   prove your guilt beyond a reasonable doubt as to the way

8   it's worded as to Count 1, I believe, and then prove that

9   because of that they are entitled to $50,000 in cash or

10  property equivalent.  Do you understand that?

11  A     Yes, Your Honor.

12  Q     Any questions concerning what the Government would

13  have to prove if this case went to trial?

14  A     No, Your Honor.

15  Q     I need to talk to you about what you did here to

16  satisfy myself that you are in fact guilty as charged.

17  Let's talk about your military status.  First of all,

18  you're a Chief Warrant Officer; is that correct?

19  A     Yes, sir.

20  Q     So how long have you been in the military?

21  A     Right at 22 years, sir.

22  Q     As I understand it, the warrant officers pretty much

23  run the military?  They kind of -- there may be officers

24  there, but the warrant officers make a lot of the real

25  decisions; is that correct?

1    A    Yes, Your Honor.

2    Q    At the time in question, where were you stationed?

3    A    I was at Camp Arifjan in Kuwait, Your Honor.

4    Q    And what were your responsibilities at that time?

5    A    To oversee the food service program for the theatre

6    in Iraq, Afghanistan and Kuwait.

7    Q    You were involved in seeing that the proper contracts

8    were created and carried out so that the men and women in

9    the military would receive appropriate dining facilities

10    and food?

11    A    On an advisory position, but not authoritative.

12    Q    And in what sense was it advisory?

13    A    In the sense to the command who made the decision.

14    Q    So the Commander would make the decision, but you

15    would advise the Commander?

16    A    That's correct.

17    Q    So is it fair to say that you were in a position to

18    influence the decision?

19    A    Yes, Your Honor.

20    Q    And you're familiar with this -- what is it called --

21    LOGCAP III contract?

22    A    Yes, Your Honor.

23    Q    And that was the prime contract that was involved

24    with the stuff you were responsible for?

25    A    Yes, Your Honor.

1    Q    And were you aware during this period of time, or at

2    some part of that period of time, that the services in

3    question, products in question, were being provided by

4    Kellogg, Brown & Root Services, KBR?

5    A    Your Honor, in Kuwait, it was run different.  There

6    was a level of -- when you say "prime contractor" and

7    "subcontractor", in Kuwait they didn't run that type of

8    service.  It was only Iraq and Afghanistan.

9    Q    So in Iraq and Afghanistan, were you aware that KBR

10   had this contract?

11   A    Yes, Your Honor.

12   Q    And had you at some point given advisory opinions to

13   the command concerning that contract before we get into

14   this other stuff?

15   A    Yes, Your Honor.  My advice to the command was to get

16   rid of LOGCAP and go to the other contract so we would

17   save a lot of money, which we did in Kuwait.  That was my

18   plan before we left is to go all --

19   Q    Well, at some point did you recommend this Kuwaiti

20   company?  Was it a Kuwaiti company?

21   A    It was a Saudi company.

22   Q    At some point did you recommend the Saudi company to

23   the Commander to replace the KBR contract?

24   A    No, I did not.

25   Q    Well, what was it you did then?

1   A    It was talk between me and the contractor.  It was

2   discussed between me and the contractor itself.  I did

3   not --

4   Q    Which contractor?

5   A    The contractor in question.

6   Q    KBR or the one from --

7   A    No.  It was a subcontractor.

8   Q    Who was that?

9   A    Company A.

10  Q    Referred to as Company A?

11  A    Right.

12  Q    So you had conversations with personnel from this

13  Company A?

14  A    Yes, Your Honor.

15  Q    Right?

16  A    Yes, Your Honor.

17  Q    What was it you told them?

18  A    I told them that the contract was already in place,

19  so we could not move forward with these paper products and

20  I had made reference to him that I had called our DA

21  level, the Department of the Army level decision-makers at

22  Virginia, and they in turn told me that, yeah, that's in

23  fact true, that the contract is already in place.

24  Q    The contract with KBR?

25  A    The contract with KBR, which Company A was a

1    subcontractor of KBR.

2    Q    So what happened then?

3    A    We had another meeting, sir, and at that time I was

4    provided the funds.

5    Q    You had another meeting with who?

6    A    The contractor, Company A.

7    Q    And they provided you with what funds?

8    A    The $50,000.

9    Q    And what was that for?  What were you supposed to do

10    in return for that?

11    A    Well, we had a discussion that he wanted to get the

12    paper products contract and I informed him that there was

13    no way.  Well, at that last meeting we had, that's when he

14    provided me with the cash.

15    Q    Well, I'll ask the question again.  You took the

16    cash; is that correct?

17    A    That's correct.

18    Q    And under what circumstances?  What did you tell them

19    you were going to do for the $50,000?

20    A    Your Honor, I did not tell them that I was going to

21    give them the contract because I already knew, one, that

22    it was already in place and he was just one of the many

23    subcontractors, so it would be a joint effort, not just a

24    single one contractor.

25    Q    So you told him you were going to take the $50,000

1   and do nothing in return?

2   A    Yes.

3   Q    And they gave it to you anyway?

4   A    That's correct.

5           THE COURT:  I don't think we have a plea here if

6   this is the case.

7           MR. LANG:  Your Honor, I think a follow-up

8   question -- and there's a footnote on the elements of the

9   offense on page 3 which discusses the intent requirement.

10  As a follow-up question, I would suggest the Court ask the

11  defendant if he believed when the president of Company A

12  gave him the money, did Company A expect him to do

13  something.

14          THE COURT:  I thought I had asked that question.

15  BY THE COURT:

16  Q    What did they expect you would do?  I thought you

17  said nothing.

18  A    Right, because I came back -- sir, I came back to

19  them, told them there was no way that they could receive

20  that contract because it was already in place, but he

21  still provided me with the cash, sir.

22  Q    So you took the $50,000?

23  A    Yes.

24  Q    Sounds like he almost forced it on you.  Why did he

25  give you $50,000?

1   A    Well, presumably he thought he would get the contract

2   at some point and --

3       MR. ROBERTSON:  Your Honor, I think it's key

4   here, and my understanding of the law is that it's

5   necessary that my client had to know that that bribe was

6   offered to him with the -- that the person offering the

7   bribe had the intent to influence his action.  That's my

8   understanding of the law.

9       THE COURT:  Well, the third element says "in

10  return for being influenced in the performance of any

11  official act".  So I mean if -- I'm not sure he's

12  admitting to that.

13      MR. LANG:  Well, again, under the Seventh

14  Circuit instruction, it's not necessary that the defendant

15  in fact intended to be influenced when he received the

16  money.  Again, I think if the defendant was asked did he

17  believe at the time that he took the money that the

18  president of Company A still wanted him to try to get the

19  contract --

20      THE COURT:  Well, but I still haven't heard that

21  from him.  I mean, I don't disagree with you, but it seems

22  to me there has to be some showing here that he believed

23  that he was being given this money by the person from

24  Company A for the purpose of influencing his official

25  conduct.  The only thing he has told me so far is that

1    they knew exactly that he was not in a position to do

2    that.  So maybe you can --

3    A    Yes, Your Honor, the intent -- the intent, I believed

4    that the -- Company A, he wanted the contract.  We did

5    discuss it.  We did discuss it.  This was prior before I

6    received the cash.  I went back to him and told him and

7    said there's no way because I had made phone calls and --

8    BY THE COURT:

9    Q    Let me stop you there for a minute.  You took the

10   money, right?

11   A    Yes, Your Honor.

12   Q    And then you left?

13   A    That's correct.  I left like two weeks after I

14   received it.

15   Q    But what I'm really focusing on right now is what

16   happened as of the time you left the first time.  You said

17   you came back and told him that you couldn't do it?

18   A    The original intent was to see if he can get that

19   contract, paper product contract, which I did.  I went

20   back and talked to my sources.

21   Q    You took the money?

22   A    No.  This is after we had the discussion in the first

23   meeting.  I went back to him and told him there's no way

24   because it's already in the contract, under the LOGCAP

25   contract.  Now the intent originally was try to get him

1    the contract, yes.

2    Q    I'm talking about when he gave you the money.

3    A    When he gave me the money, I already told him that

4    there was no way, no way he could receive that contract.

5    It was already in place.  I knew that and I had confirmed

6    that.  And our last meeting is when he gave me the cash.

7    So, yes, originally the intent was to try to get him the

8    contract, but it did not come through.

9    Q    But the question remains then, if he knew at the time

10   that he gave you the money that there was no hope, no

11   chance, no possibility that you could somehow influence

12   the decision, I don't understand why the money was given

13   to you.

14   A    Correct.  And that's what I had told the agents, yes.

15   The intent was for him to receive that contract, paper

16   products and flatware contract, but at our last meeting I

17   told him there was no way.  Now he did make a comment,

18   "Well, see if you can continue."  Well, because I left

19   Kuwait, I was not now the theater food advisor, so,

20   therefore, I had stated to him that there was no way he

21   could receive the contract.  So, yes, he did give me the

22   money and I did take it.

23              MR. ROBERTSON:  And I think -- you know, again,

24   for what it's worth, I think the relevant question at that

25   point is when the money is received, did the defendant

1    understand that it was given to him with the intent on the

2    part of the person giving the money to influence the

3    official act.  In other words --

4    A    Yes.

5          MR. ROBERTSON:  In other words, I think that's

6    the question, Your Honor.  Maybe I phrased it --

7          THE COURT:  I agree with you.  I'm not satisfied

8    that's been -- I'm not convinced that's been satisfied.

9          MR. LANG:  Your Honor, I think, again, the key

10   question to ask the defendant, if I may, is when he handed

11   you the $50,000, did he expect you to keep trying to get

12   that?

13   A    At some point, but I told him -- again, I told him

14   and that was it.  That was -- he was not going to get the

15   contract.

16          MR. LANG:  Your Honor, it's sufficient if the

17   defendant knew that the thing of value was offered with

18   the intent to influence his official action.  If we want

19   to skip ahead, the evidence would establish that the

20   president of Company A was not happy with his answer,

21   saying, "no, I can't do anything for you", so he gave him

22   $50,000 cash.  The evidence would further show that the

23   defendant had several phone calls with the president of

24   Company A or trying to get in touch with him to explain

25   that he still after the fact was unable to do anything

1    and --

2    BY THE COURT:

3    Q    Is that correct?  Did you have phone calls with him

4    after you received the money?

5    A    Yes, Your Honor.  One of the conversations still to

6    him was that, you know, "I told you you were not going to

7    get the contract when I left Kuwait and you still -- I'm

8    not -- you still are not going to receive the contract."

9    And that was the extent of the telephone call.

10            MR. LANG:  Your Honor, we believe that the

11    payment of the $50,000 was a culmination of the

12    discussions with the defendant, his efforts to try to get

13    the contract shifted away from LOGCAP III.  And when the

14    defendant said, "No, it's not going to happen", the

15    president of Company A said, "Here's $50,000."  And,

16    again, the evidence would establish that the company

17    president still wanted that contract and felt that the

18    defendant was in a position to influence it.

19    BY THE COURT:

20    Q    Let me ask you this question.  Was it your

21    understanding at the time that you accepted this $50,000

22    that you were being given the $50,000 in the expectation

23    or the hope that you would do what you could to get the

24    contract?

25    A    Sir, originally, yes.

```
1    Q    I'm not talking about originally.  I'm talking when
2    you were handed the money.
3    A    Yes, Your Honor.
4    Q    What?  "Yes" what?
5    A    Yes, sir, that I was going to get the contract for
6    him.
7    Q    Let me restate it.  At the time that you received the
8    money, actually got it in your hand from him, was it your
9    belief that he was giving this to you for the purpose of
10   influencing your official actions?
11   A    Yes, Your Honor.
12   Q    Okay.  Concerning the smuggling count, at some
13   point -- let's see here.  So you had this $50,000.  Then
14   did you bring the $50,000 -- strike that.  Where were you
15   when you were given the $50,000?
16   A    Sir, in Company A's office.
17   Q    Where?
18   A    In Kuwait.
19   Q    All right.  And then when was it that you received
20   that money?  Early December?
21   A    Around, I would say 10th of December of '05.
22   Q    And then you left shortly after that for the United
23   States?
24   A    That's correct, sir.
25   Q    And where did you land?
```

1    A    Dover, Delaware.

2    Q    And did you have this money with you at that time?

3    A    Sir, I had approximately close to $40,000.

4    Q    And where did you have that $40,000?

5    A    On my person or in my luggage, sir.

6    Q    Well, was it hidden?  Did you declare the money when

7    you came in?

8    A    No, sir.

9    Q    Were you asked to declare money --

10    A    Yes, sir.

11    Q    -- when you came in if you had over $10,000?

12    A    Yes, sir.

13    Q    So at the time that you brought it in, did you

14    understand that you were supposed to declare if you had 7

15    than $10,000?

16    A    Yes, sir.

17    Q    And so then is it fair to say that you understood

18    that you were concealing this money?

19    A    Yes, Your Honor.

20    Q    And were you successful in that respect?

21    A    Yes, Your Honor.

22    Q    So it wasn't discovered when you returned back?

23    A    Yes, Your Honor.

24         THE COURT:  All right.  Now I'm going to ask

25    Mr. Lang to tell us or make a proffer of what he believes

1    the Government's proof would be if this case went to

2    trial.  I want you to listen carefully as he does that

3    because when he finishes, I will ask you if this is an

4    accurate statement of what happened.  Mr. Lang?

5            MR. LANG:  Thank you, Your Honor.  If this case

6    proceeded to trial, the evidence would in fact establish

7    that the defendant was the Army's food service advisor for

8    the theatre.  In other words, he was the eyes and ears of

9    the Commander at Camp Arifjan, which was the command base

10   and a contracting facility.

11           The evidence would show that in 2005, Your

12   Honor, this Company A, the president of Company A and

13   other Company A representatives, came to the defendant and

14   said, "Our flatware is better and we would like for you to

15   use our flatware."  The defendant told the president of

16   Company A that the -- it was already under contract, under

17   LOGCAP, and so there wasn't any possibility that that

18   could happen.

19           The defendant proceeded to have a series of

20   meetings with the president of Company A, sometimes at his

21   residence where they had dinner and drinks, sometimes at

22   the Company A's office and even at one time the defendant

23   and members of the Army's Food Service Board met with

24   Company A and actually looked at the flatware and the

25   paper products.

1          As a result, the defendant both telephoned and

2    e-mailed the Army Center For Excellence For Subsistence at

3    Fort Lee, Virginia, several contacts, in an effort to

4    convince the Army that the food service products that

5    Company A was offering should be bought by the Army.  The

6    defendant actually felt they were better products, but

7    they were 7 expensive than what was already contracted for

8    under LOGCAP III.  The Army's response was "no".

9          The defendant reported that to the president of

10   Company A, but Company A persisted.  At one point the

11   president of Company A called the defendant and said, "I

12   need to see you."  The defendant and his driver went to

13   Company A at its office in Kuwait City.  The defendant

14   told his driver to wait outside.  The defendant went

15   inside.  During further discussions about Company A's

16   desire to get -- continuing desire to get this food

17   service contract for flatware and paper products, the

18   president of Company A handed the defendant a paper sack

19   with $50,000 in it and basically said, "See what you can

20   do."  The defendant did.  The evidence would show that the

21   defendant said, "I can't do anything", but the president

22   of Company A still said, "See what you can do."  The

23   defendant took the cash.  He hid it on his person so his

24   driver wouldn't see it.  He didn't tell anybody about it.

25   This happened in about the first week of December of 2005.

1          Then the defendant was rotating back to the

2    United States and on about December 13, 2005, the

3    defendant boarded flights which ultimately landed at

4    Dover, Delaware.  The evidence would show that the

5    defendant declared that he had less than $10,000 in cash

6    at the time that he entered the United States according to

7    his written signed declaration, when in fact the evidence

8    would show that the defendant had about $40,000 in cash on

9    his person.

10          Your Honor, the evidence would reflect that the

11   competition for these types of food service contracts and

12   other contracts in the Middle East under both LOGCAP III

13   and other contracts with the Army was competitive, that

14   subcontractors offered Mr. Peleti bribes.  In this case he

15   took the bribe, kept the money.  He didn't do what he was

16   supposed to.  He knew at the time when he received the

17   cash that Company A still expected him to do something.

18   As a result, the defendant reached out for the president

19   of Company A, despite being back in the United States, to

20   further discuss whether or not he could do anything on

21   this issue that Company A and the president of Company A

22   had paid him the $50,000 for.  Your Honor, that's the

23   evidence that the Government would expect to offer.

24          THE COURT:  All right.  And in relation to the

25   forfeiture count, the specific items listed there, what's

1    the proof on that?

2         MR. LANG:  The evidence would show that the

3    defendant bought a Rolex watch for his wife, which was

4    something close to $10,000, maybe $8,000, and the other

5    items that are listed with some of the cash that he got

6    from the president of Company A.

7         THE COURT:  All right.  Thank you.

8    BY THE COURT:

9    Q    This statement that Mr. Lang has just made, is that

10   an accurate statement of what happened?

11   A    Yes, Your Honor.

12   Q    How do you now plead to the charge of receiving a

13   bribe as contained in Count 1 of the indictment, guilty or

14   not guilty?

15   A    Guilty, Your Honor.

16   Q    How do you now plead to the charge of bulk cash

17   smuggling as charged in Count 2 of the indictment, guilty

18   or not guilty?

19   A    Guilty, Your Honor.

20   Q    And how do you plead to the forfeiture count as

21   contained in Count 3, guilty or not guilty?

22   A    Guilty, Your Honor.

23        THE COURT:  It is the finding of the Court in

24   the case of the United States of America vs. Peleti

25   Peleti, Jr. that the defendant is fully competent and

1    capable of entering an informed plea, that the defendant

2    is aware of the nature of the charges and the consequences

3    of the plea and that his pleas of guilty are knowing and

4    voluntary pleas supported by independent bases in fact

5    containing each of the essential elements of the offense.

6    His pleas are, therefore, accepted and he is now adjudged

7    guilty of those offenses.

8         The Court directs the probation office to

9    prepare a written pre-sentence report in this case.  You

10   will be asked to give information for this report.  Your

11   attorney will be with you during that process if you want

12   him to be.  Once the report is prepared, copies will be

13   made available to everyone, including you.  You will be

14   expected to read the report carefully, review it carefully

15   with your attorney and then tell us whether you believe

16   the report is accurate and complete.  If there are any

17   disputes concerning the accuracy or completeness of the

18   report, I will resolve those at a sentencing hearing that

19   I would recommend occur on Friday, June 15, at 9:00 a.m.

20   here in Rock Island.  Will that date and time work for

21   both sides?

22         MR. LANG:  That's fine with the Government, Your

23   Honor.

24         MR. ROBERTSON:  Fine with the defense.

25         THE COURT:  As I understand it, the defendant is

1    already on bond?

2        MR. LANG:  Your Honor, this is a bond that was

3    not perfected, I guess is the best way to put it.  Judge

4    Shields set a $100,000 OR bond.  The defendant has yet to

5    sign it.

6        THE COURT:  Okay.  Well, I understand the

7    reasons for that, but he'll have to execute the bond

8    papers before he leaves here today.  Okay.  Anything else?

9        MR. ROBERTSON:  Nothing further from the

10    defendant, Your Honor.

11        THE COURT:  There is a provision in this bond

12    that his travel is restricted to Hawaii and the Central

13    District of Illinois.  Is it still your feeling that's

14    proper?

15        MR. ROBERTSON:  We would like to have that

16    amended to include the Continental United States.  I don't

17    think the Government has an objection.

18        MR. LANG:  That's fine.

19        THE COURT:  So I'll order that that adjustment

20    occur.

21

22                * * * HEARING CONCLUDED * * *

23

24

25

1

2                              **REPORTER'S CERTIFICATE**

3              I, Karen S. Hanna, certify that the

4    foregoing transcript constitutes a true and accurate

5    transcript of the original shorthand notes of the

6    proceedings had at the time and place aforesaid

7    before the HONORABLE MICHAEL M. MIHM, U.S. District

8    Judge.

9

10                              _Karen S. Hanna_

11                              Karen S. Hanna, C.S.R.
                                License #084-001760

12

13

14

15

16

17

18

19

20

21

22

23

24

25