DAVID MICHAEL, CA State Bar # 74031
414 Gough Street, Suite Two
San Francisco, CA
Telephone: (415) 621-4500
Facimile: (877) 538-6220

LEWIS O. ROMERO, CA State Bar # 197231
PAUL L. ALAGA, CA State Bar # 221165
885 Bryant Street Second Floor
San Francisco CA 94103
Telephone: (415) 581-0885
Facsimile: (415) 581-0887

Attorneys for Defendant Peleti Peleti

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>PELETI PELETI JR., a/k/a "Pete,"<br><br>Defendant | Case No. 06-40117 MMM JAG<br><br>DECLARATION OF PELETI PELETI, JR. IN SUPPORT OF MOTION TO WITHDRAW GUILTY PLEA<br>     (Fed. R. Crim. P. 11(d)2(B))<br><br>Date: August 17, 2007<br>Time: 11:00 a.m.<br>Dept: Hon. Michael M. Mihm |

DECLARATION OF PELETI PELETI JR.

I, Peleti Peleti, Jr., hereby declare, under penalty of perjury, as follows:

1.     In 2005, I was a member of the United States Army, and was deployed in Kuwait. I was assigned to the Theatre Food Advisor with responsibility for monitoring food service contracts. This included food services and plastic utensils.

2.     I did not work alone. I worked in concert with a Menu Board, which was composed of between 15 to 50 people, depending upon the situation. The Menu Board would make

recommendations to the Army Center of Excellence based in Fort Lee Virginia, under the supervision of the Quartermaster School.

3. Through my responsibilities I came into contact with an individual named Ibrahim, whom I believe the government refers to as "Company A" in the Information. In the Fall of 2005, Mr. Ibrahim made presentations to various members of the Menu Board, and also made a presentation to the full Menu Board of approximately 35 individuals. The Menu Board recommended to the Army Center of Excellence that they use Mr. Ibrahim's plastic utensils as these utensils were sturdier and a better quality than the Army was using at that time.

4. The Army Center of Excellence responded negatively to the Menu Board's recommendation because the Army had an existing contract for these items. After I received the Army Center of Excellence's negative response, I took no further actions to promote Mr. Ibrahim's company or products. I received the Army Center of Excellence's response prior to December 5, 2005.

5. On December 15, 2005, my deployment to the Mideast ended and I returned back to the United States. After December 15, 2005, I had no further duties with regard to the Theatre Food or provisions for the Mideast.

6. On February 9, 2007, I entered a plea of guilty before the Honorable Michael M. Mihm, in United States District Court, Rock Island, Illinois. At the time I entered the plea of guilty, I did my best to respond truthfully to all the questions posed by Judge Mihm. I entered the plea of guilty solely based upon the advice of my counsel, Donovan S. Robertson, who advised me that I had virtually no defenses to my case, and that I would receive little time in custody if I fully cooperated with the US Attorney and entered this plea of guilty.

7.  At each and every one of the four (4) face-to-face meetings I had with my attorney, Mr. Robertson, he stressed that the only option I had was full cooperation with the United States Attorney. My understanding, based upon conversations with Mr. Robertson, was that full cooperation with the government would lead to little or no incarceration time and my being able to stay in the military. And in fact, I made myself fully available whenever the government requested. Even after the entry of my plea, Mr. Robertson advised me my sentence would be reduced, stating in an e-mail dated March 7, 2007:

> "… I am operating on the assumption that your cooperation with the government, to date, has been fruitful, and would eventually qualify you for a motion to reduce sentence pursuant to U.S.S.G. 5k1.1 or a similar provision of the criminal code or rules."

Mr. Robertson stated that his efforts in this case were primarily to "…maximize the benefits of the cooperation….It is the reason you are talking to the government."

8.  I met with Mr. Robertson twice in August, 2006, once at his office, and once at the Grand Jury hearings in Peoria. I met with Mr. Robertson once in November, and then just before my plea on February 9, 2007.

9.  At no time prior to my entry of a guilty plea on February 9, 2007, did Mr. Robertson ever explain or even discuss with me the potential risks or benefits of proceeding to trial. Mr. Robertson never discussed with me the possible defenses to the charges I faced, or the strengths and weaknesses of the government's case against me. Mr. Robertson never discussed with me the elements of the possible charges against me or what facts supported any of those elements of the charges against me. Mr. Robertson's recommendation of full cooperation began at our very first meeting, although it was my understanding from my discussions that the only evidence that the government had with which to accuse me of any kind of criminal conduct was the initial interview I had on July 25, 2006 with the Army's criminal investigation division.

10.     My first meeting with Mr. Robertson occurred on August 14, 2006, two days before the Grand Jury hearing. I met with Mr. Robertson in his office at approximately 9:00 am. During this brief meeting, we did not review possible charges, or possible criminal exposure, the law, or any of the potential consequences of my Grand Jury testimony. What Mr. Robertson told me was that a Grand Jury was composed of a number of people, and that the U.S. Attorney would ask me questions. I asked Mr. Robertson about the application of the 5th amendment. Mr. Robertson stated that I should not plead the 5th. Mr. Robertson stated that my only option was full cooperation with the government and I should answer all the questions at the Grand Jury. I told Mr. Robertson that I wanted to fully cooperate if nothing went on my record, and I stayed in the military. Mr. Robertson then said that he had set up an appointment with Jeff Lang, the Assistant US Attorney handling this matter, to discuss a Cooperation Agreement. Mr. Robertson stated that "you're treading water". He said "what you need to do is fully cooperate." After this short discussion, Mr. Robertson escorted me down the block to the Federal Building in Rock Island. In a conference room we met with Mr. Lang the Assistant U.S. Attorney and three other individuals, Jesse St. Amant, Michael Todd Bishop, and an FBI agent whose name I don't recall. I believed that all three agents were investigators with various federal departments. I was presented with the Cooperation Agreement dated August 10, 2006. This was the first time I saw this document.

11.     With all six (6) of us sitting together Mr. Robertson directed that I read the document and ask questions. I am not a lawyer. I have had no legal training. I have never had any legal experience of this type. Prior to the present case, I have had no interactions with lawyers. I had no idea and still have no idea as to what are appropriate questions to ask regarding legal documents. As a career soldier, I am trained to trust my superiors. So, the only thing I knew to

ask was to ask Mr. Robertson how this Cooperation Agreement would affect me. Mr. Robertson responded to the effect that the Cooperation Agreement contains normal "verbiage." At no time did Mr. Robertson suggest that we have a private conversation to go over the Cooperation Agreement. Mr. Robertson did not explain what conditional use immunity was. He did not explain that there were other types of immunity. Mr. Robertson did not explain what a Kastigar hearing was. I then asked Mr. Lang about immunity. Mr. Lang stated something to the effect that "we'll work together," and however much I cooperate will determine the outcome. Prior to my signing the Cooperation Agreement, Mr. Robertson did not explain to me my potential criminal exposure, or how the execution of the Cooperation Agreement would affect any possible criminal exposure I face. Mr. Robertson told me that signing the Cooperation Agreement would help me in the long run.

12. Based upon Mr. Robertson's counsel, I signed the Cooperation Agreement on August 14, 2006. The meeting with the six (6) of us lasted approximately 20-30 minutes. Right after the document was signed, Mr. Lang left the room. My recollection is that this meeting with the six (6) of us ended at approximately 10:15 am, one hour and fifteen minutes after I had first met Mr. Robertson in his office.

13. Right after Mr. Lang left, Mr. St. Amant and Mr. Bishop commenced interrogation. This interrogation lasted for approximately one hour and forty-five minutes, and then we broke for lunch around noon. After lunch, the interrogation continued for another 4 hours. I don't recall that Mr. Robertson interjected any comments during this entire interrogation.

14. The next time Mr. Robertson and I scheduled to meet was prior to the Grand Jury hearing. We had agreed to meet one hour before the Grand Jury was to start. Mr. Robertson was late, and did not arrive until after the Grand Jury was already in session and I had been sworn in.

15. In mid-October, 2007, Mr. Robertson sent me a copy of the government's proposed plea agreement, and disclosed for the first time that I faced possible incarceration. I had a phone conversation with Mr. Robertson where I told him, I would not accept the plea agreement, because I would not agree to incarceration. I asked, "When we go to court, what will we plead?" Mr. Robertson stated, "Don't put the cart before the horse," and laid out for me the process by which things happen. He explained that first there had to be an indictment, and then there is an opportunity for a plea. Mr. Robertson stated that when that time came, we would plead "not guilty."

16. I had a phone conversation with Mr. Robertson on November 2, 2006. I asked Mr. Robertson "what is our defense", "what is the possibility of immunity", "what are they looking as far as restitution", "what is the appeals process", "what is the trial process", "What is Title 18", "what are our options", "what is the timeline", "what is the possibility of staying in the military"? I made notes of the list of questions I asked. I asked Mr. Robertson if he would put his responses in writing, with details and explanations, so that I could slowly read his responses to understand the answers fully. Mr. Robertson agreed to do so, but failed to do so prior to the entry of my plea of guilty. I asked Mr. Robertson if he would write a letter to Jeff Lang asking about the possibility of diversion. Mr. Robertson agreed to write this letter, and I believe such a letter was written.

17. What Mr. Robertson did tell me during the November 2, 2006 phone call was that there were two judges I could face, Judge Mihm or Judge McDade. He told me I would not get a speedy trial, although he did not explain what that meant. And he emphasized that I needed to continue to cooperate. Mr. Robertson also told me that the government had further interrogation, and wanted me to make some phone calls at the request of the government.

18. In November, 2006, I traveled to Rock Island, Illinois and stayed for four to five days for additional interrogation and made phone calls at the request of the government. I met with Mr. Robertson once for approximately half an hour. My understanding in November, 2006, was that we were still planning on entering a plea of not guilty. Mr. Robertson's response was to continue with the cooperation.

19. In December, 2006, I tried several times to reach Mr. Robertson, to find out what was going on with my case. The first call from Mr. Robertson was early January, to tell me that we were going to be entering a guilty plea, and to be present at a hearing in less than two weeks. I asked Mr. Robertson, "Why are we pleading guilty?" "Why all of sudden are plans changed from a not guilty to a guilty plea?" "Why haven't you explored all my options?" Mr. Robertson's response was, "We can argue all day. Our intent all along was cooperation. We are embarking on uncharted territory. We have to move forward." And he changed the subject and began telling me about the process for the pre-sentencing report. The court date was continued to February, as I had received such short notice of the January hearing.

20. I received a copy of the 25 page plea agreement on February 5, 2007. The time and date for my entry of a plea was 9 a.m., February 9, 2007. I met with Mr. Robertson at 8 a.m. in the cafeteria of my hotel on February 9th. The meeting was approximately half an hour, as my hotel was approximately a 15 minute drive to court. We drove separately. Robertson did not ask me if I had read the plea agreement. He did not explain anything about the contents of the plea agreement. What he explained was the process. He told me I would go into court, sign the agreement in court, be sworn in, the judge would ask me a series of questions, and when it came time for the plea, he told me to plead guilty. Then he asked me if I had any questions. I asked Mr. Robertson, why was I pleading guilty. I asked why hadn't we explored all our options. Mr.

Robertson responded that we had explored our options. He said "we're cooperating" and told me to plead guilty. At no time did Mr. Robertson go over the plea agreement with me in any detail or with any specificity.

21.    On February 9, 2007, at the time of my plea, it was not until Judge Mihm expressed reluctance to accept my plea that I was aware that there was something terribly wrong with the advice I had been given. After the hearing was over, I specifically asked Mr. Robertson, "What just happened in there?" My brother, Richard Peleti had accompanied me to this plea hearing, and was also present. Both of us heard Mr. Robertson say, "I think we made a fundamental mistake." Mr. Robertson then went on to say that if I wished, he would prepare a motion to withdraw my guilty plea to a not guilty plea. I was unable to have a longer discussion with Mr. Robertson because the U.S. Marshals approached me for fingerprinting and photos. At that moment, Mr. Lang also approached Mr. Robertson and informed him that they wanted to conduct further interrogations with me in the next hour. Upon completion of the fingerprinting and photos, I was immediately rushed over to Mr. Lang's office to conduct further interrogations with three federal agents and Mr. Lang. At one point, I was pulled into another room where Mr. Lang, Mr. Robertson and I went over Mr. Lang's theory of Judge Mihm's interpretation of the law and why he was reluctant to accept my plea. Mr. Lang made a comment that Judge Mihm did not know the law in this regard and that was the reason he was reluctant to accept my plea. Mr. Robertson nodded his head in agreement to Mr. Lang's statement.

22.    When Judge Mihm asked me during the plea hearing; "Did you have a reasonable opportunity to read this plea agreement and discuss it with your attorney before you signed it, my response was truthful. I answered "yes." I had had an "opportunity", to read and discuss the plea agreement. But, the fact was I did not have any substantive or meaningful discussion

regarding the contents of the plea agreement with my attorney. It is only now, after my advisements by this court and my discussions with other counsel that I realize what the case against me is really about and what the rights are that I have and what burden is placed on the government in these kind of proceedings and whether or not my conduct was a violation of any law. Before, my entry of a plea, I had no idea regarding those matters and felt that if my government said I had done something wrong, then maybe I did.

I declare under penalty of perjury that the foregoing is true and correct and that this Declaration was executed on July 20, 2007 at Wahiwa, Hawaii.

s/<u>PELETI PELETI, JR</u>
PELETI PELETI, JR, Defendant