**E-FILED**
Friday, 10 August, 2007  03:21:39 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**AT ROCK ISLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 06-40117 |
| v. | ) | |
| | ) | |
| PELETI PELETI, JR., a/k/a "PETE," | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' RESPONSE**
**TO MOTION TO WITHDRAW GUILTY PLEAS**

The United States of America, by and through Rodger A. Heaton, United States

Attorney for the Central District of Illinois, and the undersigned Assistant U.S. Attorney,

hereby responds in opposition to defendant Peleti Peleti, Jr.'s Motion to Withdraw Plea,

and states:

## I. BACKGROUND[1]

### A. Investigation of Peleti

1.      On July 25, 2006, the defendant, U.S. Army Chief Warrant Officer Peleti

Peleti, Jr., was interviewed by Special Agents of the Defense Criminal Investigative Service

and the Army Criminal Investigation Command assigned to Rock Island, Illinois.  The

interview was conducted following the receipt of information from a cooperating

defendant that Peleti had taken a bribe in his capacity as the Army's Chief Food Service

Advisor for the Middle East.  The interview was conducted at Peleti's duty station  in

Hawaii.

---

[1]Pages 1-21 of this response consist of a summary of the facts and proceedings
relating to this matter.  The government's responses to Peleti's specific claims begin on
page 22.

2.    Before this non-custodial interview, which had been scheduled in advance with Peleti, the agents advised him of his *Miranda* warnings through an Army form entitled, "Rights Warning Procedure/Waiver Certificate."  Peleti stated that he understood his rights, initialed on the form next each to each of the enumerated rights, and signed the form.

3.    During the ensuing interview, Peleti acknowledged that he, while deployed in his capacity as theater-wide Food Service Advisory for the Army's Coalition Forces Land Component Command (CFLCC), had been approached by numerous vendors and offered bribes in exchange for his influence in the awarding of contracts.  Peleti detailed having engaged in money exchanges with one Army food service subcontractor in Kuwait, attending off-post parties hosted by vendors, accepting meals provided by food service vendors, and receiving a sport utility vehicle for his personal use from a food service vendor following the award of a subcontract.  Peleti further stated that throughout his many deployments, he had accepted money, gifts, and meals from vendors, and also attended parties wherein subcontractors provided alcohol and food.  Peleti acknowledged that these activities constituted violations of Army regulations and criminal law.

4.    Later during the interview, Peleti handwrote a statement summarizing his above-described activities on pages one through three of a four-page Army form entitled "Sworn Statement."[2]  The last segment of Peleti's statement consisted of questions and

---

[2]This statement was appended to Peleti's motion to withdraw his guilty plea as Exhibit A under  Docket Entry (D. E.) 22.

answers handwritten by one of the agents. Peleti thereafter signed the statement just under the "Affidavit" portion which stated that Peleti had read the statement, fully understood it, and declared that it was true. It further reflected that Peleti was making the statement freely and voluntarily.

5. Among other things in the statement, Peleti admitted the following:

a. As the [Contracting Officer's Technical Representative] I've experienced numerous approaches from the contractor themselves for monies and gifts. I've received several gifts from folks working with [a company]. [A company employee] provided me with gifts probably totaling $300.00. My mindset was not clear judgement at the time and feel sorry for what I've done.

b. At the that time [a company] approached me with a vehicle (Montero) SUV to ride around in throughout the base. They've also provided me with gifts such as souvenirs that valued up to $500.00. Again this is something that should not have been tolerated on my part.

c. My next assignment was with CFLCC in Kuwait as I was the Theater Food Advisor responsible for Iraq, Afghanistan, Kuwait. I was the advisor to the commanders on facets of the Food Service Program in theater . . . as a part of my position. I was approached by [a company employee] during a meeting we had in Kuwait. He of course wanted to gain my trust and had asked if he could take me out to dinner. I agreed and this was the start of our relationship. I have gone to [the company's Party House]. I've spent approximately 10-12 different times attending parties with other contractors and military personnel. . . . I've been approached by [that company employee] on several occasions for bribery and gifts and Iraqi Dinars. I received a total of approximately $8,000.00 Iraqi Dinar in exchange for new contracts. I originally wanted to pay him for the currency. I gave [him] a total of $800 American dollars in which I was given more in return. I've also received gifts from [that company employee] . . . .

- 3 -

d. [An employee of another company] and I for the record did not have illegal transaction[s] in terms of bribery.

e. I've met another contractor that was a CEO for [a company] by the name of [the CEO]. Again like the other contractors I came in contact with, I had a meeting with him to discuss the possibilities of setting a contract for all flatware and paper products for Iraq. Initially the intent was establish a new contract. We energized the contract and developed a working relationship. I was given $50,000 American dollars from [the employee] by form of cash. I stored all the cash in my barracks in Camp Arifjan. I redeployed back to the states in Dec 05 to the 25th ID Div here in Schofield barracks, HI. As I returned back to the states, I've done nothing but toying with this situation in my own mind and regret I even deployed. I sincerely conducted myself in such a manner that should have never materialized. I honestly done this for one reason and that was due to financial difficulties and was separated from wife. I fully realize that this is no excuse for my actions. I would also like to note that I will fully cooperate with the investigation at hand.

6.  The following questions and answers were thereafter included in Peleti's

Sworn Statement:

Q: What did you do with the $50,000 dollars?

A:  I spent about 30,000 dollars on credit card bills, about10,000 dollars on jewelry for my wife and the rest I spent on vacations and my family.

Q: Were you ever able to influence any contracts for anyone that was illegal?

A: No because I tried to get [the company] a contract, but was unable.

Q: Did you have any contact with [the company CEO] or any other contractor since you received bribes?

- 4 -

A: No. [The CEO] would not return my calls and I never spoke with anyone else about contracts since I came to Hawaii.

* * *

Q: Do you understand that the behavior you exhibited was against the law and military law?

A: Yes.

* * *

Q: Do you have anything else to add?

A: I want to help in the investigation as much as I [can].

7.      Based upon all of the foregoing, on August 2, 2006, the prosecutor faxed a letter to Peleti with an accompanying grand jury subpoena for Peleti's appearance in the Central District of Illinois at Peoria on August 16, 2006.  The letter explained to Peleti the grand jury subpoena, and also warned that he was "a target of the Grand Jury's investigation."  The letter also advised Peleti of his constitutional rights, including the right to appointed counsel if he was qualified for such.  It also provided Peleti with contact information for the U.S. District Court Clerk's Office at Rock Island in the event that he had questions concerning the attorney appointment process or other issues with respect to his representation.

8.      On August 4, 2006, a Financial Affidavit by Peleti was filed under seal with the Clerk's Office (D.E. 1).  That same date, the Court found that Peleti was qualified for appointed counsel and appointed CJA panel attorney Donovan S. Robertson to represent Peleti.

- 5 -

9.    On and before August 10, 2006, Mr. Robertson contacted the prosecutor regarding Peleti.  During detailed discussions between Mr. Robertson and the prosecutor, all of the information summarized above was discussed at length with Mr. Robertson.  Mr. Robertson was advised that it was the government's intentions that Peleti would be charged with bribery and other federal criminal offenses, but that his cooperation might significantly mitigate whatever sentence was ultimately imposed upon Peleti.  On August 10, 2006, Mr. Robertson was also provided with Peleti's written statement dated July 25, 2006, a copy of the target letter faxed to Peleti on August 2, 2006, and a proposed cooperation agreement providing Peleti with direct use immunity during his cooperation.

**B.  Peleti's agreement to cooperate**

10.    In and after July 2006, the agents conducted investigation in an effort to corroborate the statements made by Peleti on July 25, 2007.  Bank and credit card records were sought and obtained.  Also sought and obtained was the U.S. Customs declaration that Peleti had completed upon his arrival at Dover, Delaware from the Middle East on December 14, 2005.

11.    Mr. Robertson subsequently reported to the prosecutor that based upon the detailed verbal and written confessions made by Peleti, the fact that he would likely have no success in seeking the suppression of Peleti's confessions, and the existence of other financial and related evidence corroborating Peleti's guilt of bribery and other offenses if the case went to trial, he would be recommending that Peleti assist the government in the investigation of other persons to the greatest extent possible.  Mr. Robertson reported that

- 6 -

he considered this to be a fascinating case regarding which a trial would be interesting and challenging to him personally, but that taking the case to trial in light of the strength of the government's case already would not be in Peleti's best interest, which was his primary concern. He stated that he believed based on his experience in federal criminal cases, Peleti stood to gain a great deal in terms of mitigating his sentence through cooperating with the government. Similarly, Mr. Robertson reported that in his professional opinion, he had concluded that Peleti stood much to lose if he announced to the prosecutor that Peleti would not be cooperating and instead would be taking his case to trial.

12.    On August 14 and 15, 2006, Peleti was interviewed by agents at the U.S. Attorney's Office in Rock Island. Mr. Robertson was present during the interview. Prior to questioning, Peleti, with Mr. Robertson, entered into a cooperation agreement, which was in the form generally used in the Rock Island Branch of the U.S. Attorney's Office for the Central District of Illinois.[3] During the interview, Peleti repeated and clarified details concerning his acceptance of the $50,000 bribe from the business ultimately referred to in court documents as "Company A." He also provided details concerning his knowledge of other illegal activities in connection with Army procurement activities.

---

[3]This cooperation agreement was appended to Peleti's motion to withdraw his guilty plea as Exhibit B under D. E. 23. While it provided for direct use immunity, it specifically stated, ". . . any statement made or information provided pursuant to this agreement may be directly or indirectly used to obtain leads to other evidence, which evidence may be used against him in any criminal, civil, forfeiture, or administrative proceeding, including the sentencing hearing."

13.     On August 16, 2006, Peleti appeared before the federal grand jury at Peoria, Illinois.  The transcript of his testimony was appended to Peleti's motion to withdraw his guilty plea as Exhibit C, and is currently filed under seal as D. E. 24-28.

14.      On September 15 and 18, 2006, Peleti met with agents in order to further facilitate his cooperation in the investigation of other persons who Peleti alleged may have been involved in criminal activity.  During their meetings, Peleti asked the agents about his status in terms of being prosecuted and how his cooperation would affect his prosecution.  Agents advised him that he needed to speak with Mr. Robertson concerning those issues.

## C.  Peleti's prosecution and plea agreement

15.     On and before October 4, 2006, Mr. Robertson and the prosecutor met to discuss Peleti's prosecution. After reviewing the facts and considering the Seventh Circuit's pattern jury instructions, the prosecutor concluded, and Mr. Robertson ultimately conceded, that Peleti had committed a bribery offense under 18 U.S.C. § 201(b)(2)(A) and a bulk cash smuggling offense under 31 U.S.C. § 5332.  Mr. Robertson agreed that the prosecutor should go ahead and prepare a plea agreement for consideration by him and Peleti as opposed to the risk of Peleti being indicted in the Central District of Illinois and perhaps elsewhere.

16.     On October 4, 2006, the prosecutor prepared a plea agreement in the form generally used in the Rock Island Branch of the U.S. Attorney's Office.  It was virtually identical to the version ultimately filed with the Court on February 9, 2007, and included

the following as subparagraphs 24(n) through (s) in the "Factual Basis" segment of the plea agreement:

> n.    During or about the first week in December 2005, the president of Company A contacted the defendant and asked him to come alone to the office of Company A in Kuwait City. The defendant did so. There the president of Company A handed to the defendant a plastic bag in which was an envelope containing $50,000 in U.S. $100 bills. The president of Company A told the defendant that this was his payment for helping the president out in the event that Company A received a contract for food service supplies.

> o.    The defendant accepted the $50,000 cash from the president of Company A, but told him that Company A would not be receiving a contract for the food service supplies because they were already covered by the LOGCAP III contract. The president of Company A encouraged the defendant to keep trying to help him obtain a contract with the Army.

> p.    The defendant left Company A's premises with the $50,000 cash, and stored most of the money at Camp Arifjan until his departure from Kuwait on or about December 13, 2005. Prior to December 13, 2005, the defendant either spent or mailed to the United States about $10,000 of the $50,000 cash that he received from Company A's president.

> q.    The defendant left Kuwait on or about December 13, 2005 by contract commercial airline. The defendant concealed on is person and in his hand-carried belongings approximately $40,000 of the cash that he had received from Company A's president.

> r.    On December 14, 2005, the defendant arrived at Dover, Delaware, and entered the United States with the $40,000 still concealed on his person and in his hand-carried belongings. There he presented to a U.S. Customs official a "Customs Declaration" form that he had completed. In response to item 12 on the Customs Declaration, the defendant had checked the "No" box following the statement, "I am (We

- 9 -

are) carrying currency or monetary instruments over $10,000 U.S., or foreign equivalent." The defendant intentionally checked this "No" box in order to falsely declare to U.S. Customs officials that he was not carrying over $10,000 in U.S. currency, and to conceal the fact that he was actually carrying approximately $40,000 cash in $100 bills on his person and in his hand-carried belongings.

s.     The defendant acknowledges that his above-summarized conduct constituted bribery and the smuggling of U.S. currency, and was against the law.

17.     During the plea negotiations, Mr. Robertson had requested that Peleti be considered for pretrial diversion instead of prosecution in light of his background and other factors. Mr. Robertson requested the opportunity to submit a letter to the U.S. Attorney's Office considering such, and he was assured that the United States Attorney would personally review this request.

18.     By letter of November 27, 2006, Mr. Robertson submitted a formal request for pretrial diversion for Peleti. On December 8, 2007, after having reviewed all of the circumstances surrounding Peleti's background and facts, including the information set forth in Mr. Robertson's letter, the United States Attorney concluded that pretrial diversion was not an appropriate or acceptable disposition of this matter. Mr. Robertson was notified of the U.S. Attorney's decision on December 11, 2007.

19.     Also on December 11, 2007, Mr. Robertson and the prosecutor agreed that Peleti's plea hearing before the Court would occur on January 12, 2007 at Rock Island, Illinois. However, because of logistical considerations, the hearing was initially postponed until January 16, 2007, and then was ultimately scheduled for February 9, 2007.

20.    On January 11, 2007, the final version of Peleti's plea agreement and the information to be filed in the case were mailed to Mr. Robertson.

**D.  The guilty plea hearing**

21.    On February 9, 2007, Peleti and Mr. Robertson appeared before the Court at Rock Island for Peleti's waiver of indictment and guilty plea hearing.  The defendant was placed under oath by the Deputy Clerk. (Tr.2)  Peleti acknowledged that his answers to the Court's questions were subject to penalties of perjury and giving a false statement if he did not answer truthfully. (Tr.2)

22.    Peleti reported that he had 23½ years of schooling, was not under the care of a physician or psychiatrist, had not been treated for narcotics addiction, and had not consumed any drugs, medicine, pills or alcohol within the past 24 hours.  (Tr.3)

23.    The Court then read the entire Information filed in the case.  In response, Peleti stated that he understood what the term "knowingly" meant and had no questions regarding what he was charged with. (Tr.8)

24.    Following the Court's recitation of Peleti's right to indictment, Peleti stated that he had discussed such with Mr. Robertson, understood what it meant, and indeed wished to waive his right to indictment. (Tr.10)

25.    The Court thereafter had the following exchange with Peleti:

Court:    I believe you told me that you have previously received a copy of the information; that is, the written charges that I just described to you. Have you fully discussed those charges and the case in general, including any possible defenses

- 11 -

|         | that you might have, with Mr. Robertson as your attorney? |
|---------|-----------------------------------------------------------|
| Peleti: | That's correct, Your Honor. |
| Court:  | Are you fully satisfied with the counsel, representation and advice given to you in this case by Mr. Robertson? |
| Peleti: | Yes, Your Honor. |
| Court:  | Do I understand correctly that your willingness to plead guilty here this morning is due, at least in part, to the discussions that you and your attorney have had with the attorney for the Government leading up to the execution of this written plea agreement? |
| Peleti: | Yes, Your Honor. |
| Court:  | Did you have a reasonable opportunity to read this plea agreement and discuss it with your attorney before you signed it? |
| Peleti: | Yes, Your Honor. |
| Court:  | Does the plea agreement represent in its entirety every understanding that you have with the Government? |
| Peleti: | Yes, Your Honor. |
| Court:  | Do you understand the terms of the agreement? |
| Peleti: | Yes, Your Honor. |

(Tr.10-11)

26.    The Court then summarized the plea agreement. (Tr.11-20) On at least eight different occasions, Peleti answered "yes" to the Court's questions about whether he understood specific terms of the plea agreement. (Tr.12, 12-15, 17, 19, 20) Peleti also

responded, "No, Your Honor," regarding whether he had any questions concerning the waiver of the rights to appeal and collaterally attack his conviction (Tr.14-15)

27.    Regarding the factual basis in the plea agreement, which is paragraph 24 running from page 13 into the middle of page 19, Peleti responded to the Court's inquiries that he read the factual statement carefully before he signed it and that this is an accurate statement. (Tr.17)

28.    Following that, Peleti declared that no one had made any different promise or assurance of any kind to him in an effort to induce him to plead guilty, that no one had attempted in any way to force him to plead guilty, and that he was pleading of his own free will because he is guilty. (Tr.20)

29.    Peleti then stated that he was aware of the various consequences of his guilty plea, including being deprived of certain civil rights, maximum penalties, the concept of supervised release, and the financial penalties he would be facing. (Tr.21)

30.    Peleti also acknowledged that he and Mr. Robertson had discussed how the Sentencing Guidelines might apply to his case, that the Court would not be able to determine the advisory guidelines range for his case until the pre-sentence report (PSR) process was completed, and that the sentence imposed might be different from any estimate provided to him by Mr. Robertson. (Tr.21-22) Peleti also confirmed that he and Mr. Robertson engaged in a discussion about the worst-case scenario for him under the sentencing guidelines. (Tr.22) The Court added, "What you need to understand about that today is that at the time of sentencing if your sentencing came in higher than that, you

would not have the right to withdraw your plea. Do you understand that?" Peleti replied,

"Yes, Your Honor." (Tr.22)

31.    Peleti had earlier in the hearing demonstrated his knowledge of the advisory

nature of the sentencing guidelines when he stated, "Your Honor, how I understand it, it's

not guaranteed. The guidelines are not guaranteed." (Tr.16)

32.    The Court then painstakingly advised Peleti of his rights to a trial:

> Court:    Do you understand that you have a right to
> plead not guilty to any offense charged against
> you and to persist in that plea, that you would
> then have the right to a trial by jury, that at trial
> you would be presumed to be innocent and the
> Government would have to prove your guilt
> beyond a reasonable doubt, that you would have
> the right to the assistance of counsel for your
> defense, the right to see and hear all the
> witnesses and have them cross-examined in your
> defense, the right on your part to decline to
> testify unless you voluntarily elected to do so in
> your own defense and the right to the issuance of
> subpoenas or compulsory process to compel the
> attendance of witnesses to testify in your
> defense. Do you understand all those rights?
>
> Peleti:    Yes, Your Honor.
>
> Court:    Do you understand that at such trial, should you
> decide not to testify or not to put on any
> evidence, those decisions cannot be used against
> you?
>
> Peleti:    Yes, Your Honor.
>
> Court:    Do you further understand that by entering a
> plea of guilty, if that plea is accepted by the
> Court, there will be not trial and you will have
> waived or given up your right to a trial as well

> as those other rights associated with a trial as I've just described them?

> Peleti:        Yes, Your Honor.

33.     The Court thereafter discussed the elements of the offenses to which Peleti was pleading guilty. They included those for the bribery count:

> Concerning Count 1, the receive a bribe count, the Government would be required to prove, first, that at the time in question you were a public official. Second, that you corruptly accepted or received something of value personally. And, third, that you knew what you accepted or received was accepted or received in return for being influenced in the performance of some official act.

(Tr.25)

34.     The Court's recitation of these elements tracked the elements for "Count One" set forth on page 3 of Peleti's plea agreement. (D.E.9, p.3) Although not discussed at that point, Peleti's plea agreement had also included as Footnote 1 to these elements the following definition of "Intent to Influence" for 18 U.S.C. § 201 taken directly from page 148 of the Seventh Circuit's pattern criminal jury instructions:

> It is not necessary that the defendant had the power to or did perform the act for which he received something of value; it is sufficient if the matter was one that was before him in his official capacity. Nor is it necessary that the defendant in fact intended to be influenced. It is sufficient if the defendant knew that the thing of value was offered with the intent to influence official action.

(D.E. 9, p. 3)

35.     Following a discussion of the elements for Count Two and Count Three (Forfeiture), the Court turned to the facts surrounding Peleti's offenses and engaged in a discussion of those facts with Peleti. (Tr.26-38)   First, Peleti acknowledged that he was a

- 15 -

public official at Camp Arifjan in Kuwait, and was in "an advisory position, but not authoritative" position to influence a decision concerning Army dining facilities and food. (Tr.27) Peleti noted that his "advice to the command was to get rid of LOGCAP and go to the other contract so we would save a lot of money . . . ." (Tr.28) Peleti stated that he had talked with "Company A" and had called Department of the Army-level decision-makers in Virginia about a paper product contract with Company A, but was told "that the contract [for such products] was already in place." (Tr.29)

36.     Peleti then stated that he had another meeting at which time Company A provided him with $50,000. When the Court asked what Peleti was supposed to do in return, he stated, "Well we had a discussion that he wanted to get the paper products contract and I informed him that there was no way. Well, at that last meeting we had, that's when he provided me with the cash." (Tr.30) The Court then asked, "So you told him you were going to take the $50,000 and do nothing in return?" (Tr.30-31) Peleti answered, "Yes." (Tr.31) The Court continued, "And they gave it to you anyway?" (Tr.31) Peleti responded, "That's correct." (Tr.31)

37.     The following exchange subsequently occurred:

| Court: | What did they expect you would do? I thought you said nothing. |
|---|---|
| Peleti: | Right, because I came back – sir, I came back to them, told them there was no way that they could receive that contract simply because it was already in place, but he still provided me with the cash, sir. |
| Court: | So you took the $50,000? |

| Peleti: | Yes. |
|---|---|
| Court: | Sounds like almost forced it on you. Why did he give you $50,000? |
| Peleti: | Well, presumably he thought he would get the contract at some point . . . ." |

(Tr. 31-32)

38.    Mr. Robertson, the Court and the prosecutor then briefly discussed the Seventh Circuit jury instruction's definition of "Intent to Influence" under 18 U.S.C. § 201, *i.e.*, that "[I]t's not necessary that the defendant in fact intended to be influenced when he received the money." (Tr.32-33)   In response, Peleti stated:

> Yes, Your Honor, the intent – the intent, I believed that the – Company A, he wanted the contract. We did discuss it. This was prior before I received the cash. I went back to him and told him and said there's no way because I had made phone calls . . . .

(Tr.33)

39.    The Court then attempted to clarify what Peleti had said, observing that, ". . . I don't understand why the money was given to you."  Peleti then explained:

> Correct. And that's what I had told the agents, yes. The intent was for him to receive that contract, paper products and flatware contract, but at our last meeting I told him there was no way.  Now he did make a comment, "Well, see if you can continue."  Well, because I left Kuwait, I was not now the theater food advisor, so, therefore, I had stated to him that there was no way he could receive the contract. So, yes, he did give me the money and I did take it.

(Tr.34)

- 17 -

40.     After Peleti explained making telephone calls to Company A after having

received the money, the following discussion took place concerning the bribery count:

| | |
|---|---|
| Court: | Let me ask you this question.  Was it your understanding at the time you accepted this $50,000 that you were being given the $50,000 in the expectation or hope that you would do what you could to get the contract? |
| Peleti: | Sir, originally, yes. |
| Court: | I'm not talking about originally.  I'm talking when you were handed the money. |
| Peleti: | Yes, Your Honor. |
| Court: | What? "Yes" what? |
| Peleti: | Yes, sir, that I was going to get the contract for him. |
| Court: | Let me restate it.  At the time that you received the money, actually got it in your hand from him, was it your belief that he was giving this to you for the purpose of influencing official actions? |
| Peleti: | Yes, Your Honor. |

(Tr.36-37)

41.     The colloquy then turned to the issue of the bulk cash smuggling count.  (Tr.

37-38)  Peleti told the Court that he traveled to the United States in December 2005 shortly

after having received the cash from Company A, that he landed in Dover, Delaware with

approximately $40,000 on his person or in his luggage, that he did not declare the money,

that he understood that he was concealing it, and that he was successful in avoiding the

discovery of the money when he arrived. (Tr.37-38)

42.     The Court then asked the prosecutor to describe the Government's proof if

this case went to trial, and directed Peleti to listen carefully because he would be asked "if

this is an accurate statement of what happened." (Tr.39)  With respect to the bribery count,

the prosecutor reported that the Army had said "no" to Peleti's overtures to contract with

Company A for the plastic flatware and the paper products. (Tr.40)   The prosecutor

continued:

> The defendant reported that to the president of Company A,
> but Company A persisted.  At one point the president of
> Company A called the defendant and said, "I need to see you."
> The defendant and his driver went to Company A at its office
> in Kuwait City.  The defendant told his driver to wait outside.
> The defendant went inside.  During further discussions about
> Company A's desire to get – continuing desire to get this food
> service contract for flatware and paper products, the president
> of Company A handed the defendant a paper sack with
> $50,000 in it and basically said, "See what you can do."  The
> defendant did.  The evidence would show that the defendant
> said, "I can't do anything," but the president of Company A
> still said, "See what you can do."  The defendant took the cash.
> He hid it on his person so his driver wouldn't see it.  He didn't
> tell anybody about it.  This happened in about the first week of
> December of 2005.

(Tr.40)

43.     The prosecutor subsequently stated:

> Your Honor, the evidence would reflect that the competition
> for these types of food service and other contracts in the
> Middle East under both LOGCAP III and other contracts with
> the Army was competitive, that subcontractors offered Mr.
> Peleti bribes.  In this case, he took the bribe, kept the money.

- 19 -

He didn't do what he was supposed to.  He knew at the time
when he received the cash that Company A still expected him
to do something.  As a result, the defendant reached out for the
president of Company A, despite being back in the United
States, to further discuss whether or not he could do anything
on this issue that Company A and the president of Company
A had paid him the $50,000 for.  Your Honor, that's the
evidence that the Government would expect to offer.

(Tr.41)

44.     During his proffer, the prosecutor also summarized the facts that the
government would anticipate proving concerning the bulk cash smuggling count and the
forfeiture allegation if the case had proceeded to trial. (Tr.41-42) The Court thereafter
asked, "This statement that Mr. Lang has just made, is that an accurate statement of what
happened?" (Tr.42)  Peleti responded, "Yes Your Honor." Peleti then entered his pleas of
guilty. (Tr.42)

45.     The Court concluded:

It is the finding of the Court in the case of the United States of
America vs. Peleti Peleti, Jr. that the defendant is fully
competent and capable of entering an informed plea, that the
defendant is aware of the nature of the charges and the
consequences of the plea and that his pleas of guilty are
knowing and voluntary pleas supported by independent bases
in fact containing each of the essential elements of the offense.
His pleas are, therefore, accepted and he is now adjudged
guilty of those offenses.

(Tr.42-43)

46.     The Court directed that a PSR be prepared, and scheduled the sentencing
hearing for June 15, 2007.  The initial draft of the PSR for Peleti was completed by the U.S.
Probation Office and sent to Mr. Robertson and the prosecutor by letter of May 14, 2007.

- 20 -

On May 21, 2007, the prosecutor informed Mr. Robertson and the U.S. Probation Office that the government had no objections to the PSR. Revisions to the PSR and the addendum were sent to the parties on June 1, 2007. The advisory sentencing guidelines range of imprisonment recommended by the PSR was slightly lower than the 36-month worst case scenario estimated by Mr. Robertson during Peleti's guilty plea hearing on February 9, 2007. (Tr.22)

## II.   PELETI'S MOTION TO WITHDRAW HIS GUILTY PLEAS

47.    Peleti has now changed his mind about having pleaded guilty.  On July 20, 2007, after the PSR had been disclosed, he filed a motion to withdraw his guilty pleas. While he does not deny that he received an illicit $50,000 payment from Company A and smuggled most of  the cash into the United States, he contends that his guilty plea hearing was flawed, in large part because he was abandoned and duped by his attorney, Mr. Robertson.  Specifically, Peleti contends that there was an insufficient factual basis for his guilty pleas to the bribery offense alleged in Count One of the Information and the bulk cash smuggling offense set forth in Count Two, and that Mr. Robertson provided ineffective assistance of counsel in his case.  However, Peleti's current claims ignores both the record and the applicable case law and are therefore without merit.  He has not provided a fair and just reason for this Court to allow him to withdraw his guilty pleas.

**A.    The factual basis for Count One established a bribery crime under 18 U.S.C. § 201(b)(2)(A).**

48.    When a defendant enters a guilty plea, Federal Rule of Criminal Procedure 11 requires a court to determine whether the defendant "understands the nature of the charge against him" and "is aware of the consequences of his plea."  *McCarthy v. United States*, 394 U.S. 459, 464 (1969).  In order to facilitate the court's determinations along these lines, a court is required to advise and question the defendant in accordance with Rule 11(b)(1), to ensure that the plea is voluntary (Rule 11(b)(2)), and to determine that a factual basis exists for the plea (Rule 11(b)(3)). This approach, which involves the court making a "constitutionally required determination that a defendant's guilty plea is truly voluntary,"

- 22 -

and "produc[ing] a complete record at the time the plea is entered of the factors relevant
to this voluntariness determination," protects against the defendant being bound by less
than a voluntary and informed plea.  *Id.*

49.    While the test to determine whether a defendant's admissions have a
sufficient factual basis is subjective, *United States v. Musa*, 946 F.2d 1297, 1303 (7th Cir. 1991),
a court should nevertheless (1) "make . . . clear exactly what the defendant admits to," (2)
identify specific factual allegations that support each element of the charged offense, and
(3) determine whether the admitted conduct "constitutes the offense charged in the
indictment or information or an offense included therein to which the defendant has
pleaded guilty. *United States v. Fountain*, 777 F.2d 351, 356 (7th Cir. 1995).  The best method
for doing so involves the Court having a direct colloquy with the defendant. *McCarthy,* 394
U.S. at 467.    Furthermore, while many facts may appear in the plea agreement, the
defendant's plea colloquy, and other parts of the record, "only the factual elements of the
offense must be established for the judge's determination of guilt." *United States v. Knorr*,
942 F.2d 1217, 1220 n.1 (7th Cir. 1991).

50.    Peleti contends that to be convicted under 18 U.S.C. § 201(b)(2)(A), he must
have had the specific intent to be influenced in an official act by virtue of the $50,000 that
he received from Company A, and that the factual basis currently in the record establishes
no such intention.  Specifically, Peleti claims that the elements of the offense relied upon
by this Court to determine that a factual basis existed for Count One were wrong and were
insufficient to establish Peleti's guilt under that section.  However, Peleti's position is

- 23 -

incorrect; under Seventh Circuit precedent and pattern jury instructions, the plea agreement and Peleti's colloquy with the Court satisfied the elements of the offense charged in Count One.

51.    Conviction for an offense under 18 U.S.C. § 201(b)(2)(A), as charged against Peleti in Count One of the Information and set forth on page 3 of Peleti's Plea agreement, requires that the following elements be satisfied:

> First, that the defendant was a public official;
>
> Second, that the defendant corruptly accepted or received something of value personally; and
>
> Third, that the defendant knew that what he accepted or received was accepted or received in return for being influenced in the performance of any official act.

*United States v. Arroyo*, 581 F.2d 649, 652 (7th Cir. 1978).

52.    Regarding these elements, Peleti argues that the decisions Supreme Court in *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404 (1999), and those of other lower courts require that the defendant have an *actual* intent to be influenced in order to be guilty of receiving a bribe under 18 U.S.C. §201(b)(2)(A).   Memorandum, p.9. However, Peleti is mistaken; actual intent is not required.   The government recognizes and agrees with Peleti that § 201(b)(2)(A) and the elements listed above implicate and require a *quid pro quo*[4] concerning the $50,000 provided by Company A to Peleti. The Supreme

_____

[4]*Quid pro quo* means, according to Black's Law Dictionary, "What for what; something for something.   Used in law for the giving one valuable thing for another.   It is nothing more than the mutual consideration which passes between the parties to a contract, and which renders it valid and binding."   Black's Law Dictionary, Fourth Edition.

Court, in comparing the requirements for a gratuities conviction under 18 U.S.C. § 201(c),

wherein *quid pro quo* is not required, with a bribery offense under § 201(b) which requires

such, defined *quid pro quo* as "a specific intent to give or receive something of value *in

exchange* for an official act." *Id*. at 404-405 (emphasis in original). This *quid pro quo* principle

is consistent with the language of the Seventh Circuit's pattern definition of "Intent to

Influence" for the purposes of 18 U.S.C. § 201, which was derived directly from *Arroyo*, 581

F.2d at 652. This definition, found at page 148, Seventh Circuit Federal Criminal Jury

Instructions (1999), was set forth as footnote 1 on page 3 of Peleti's plea agreement:

> It is not necessary that the defendant had the power to or did
> perform the act for which he received something of value; it is
> sufficient if the matter was one that was before him in his
> official capacity.
>
> Nor is it necessary that the defendant in fact intended to be
> influenced. It is sufficient if the defendant knew that the thing
> of value was offered with the intent to influence official action.

53.     The Seventh Circuit in *Arroyo* also recognized, " Section 201[(b)(2)] has been

held applicable to a situation where the advice and recommendation of the Government

employee involved would be influential even though the employee did not have the

authority to make the final decision." *Id*. at 652.

54.     The language in *Sun-Diamond Growers of California* concerning *quid pro quo*

and the Seventh Circuit's pattern definition of "Intent to Influence" derived from *Arroyo*

are not mutually-exclusive concepts. Thus, while an actual intent by Peleti to be influenced

upon his receipt of the $50,000, if that was the case, would obviously have satisfied the *quid

pro quo* requirement, so too does the fact that Peleti knew when he accepted the cash that

- 25 -

he was expected to continue to use his influence to try to obtain a contract for Company

A, whether he could or could not, and ultimately did or did not.   Peleti admitted in both

his plea agreement and in his plea colloquy with the Court that he knew Company A

intended and expected him to continue to assist Company A in getting the contract:

> The defendant accepted the $50,000 cash from the president of Company A, but told him that Company A would not be receiving a contract for the food service supplies because they were already covered by the LOGCAP III contract.   The president of Company A encouraged the defendant to keep trying to help him obtain a contract with the Army.

(Plea agreement, p.18, ¶ 24(o))

> Court:     Let me ask you this question.   Was it your understanding at the time you accepted this $50,000 that you were being given the $50,000 in the expectation or hope that you would do what you could to get the contract?
>
> Peleti:    Sir, originally, yes.
>
> Court:     I'm not talking about originally.   I'm talking when you were handed the money.
>
> Peleti:    Yes, Your Honor.
>
> Court:     What? "Yes" what?
>
> Peleti:    Yes, sir, that I was going to get the contract for him.
>
> Court:     Let me restate it.   At the time that you received the money, actually got it in your hand from him, was it your belief that he was giving this to you for the purpose of influencing official actions?
>
> Peleti:    Yes, Your Honor.

(Tr.36-37)

55.    Peleti's above responses to the Court were consistent with his earlier description of what he was told and what he understood at the time he accepted the $50,000 from Company A:

> The intent was for him to receive that contract, paper products and flatware contract, but at our last meeting I told him there was no way. **Now he did make a comment, "Well, see if you can continue."** Well, because I left Kuwait, I was not now the theater food advisor, so, therefore, I had stated to him that there was no way he could receive the contract. So, yes, he did give me the money and I did take it.

(Tr.34 )(emphasis added)

56.    These admitted facts, along with other admissions made by Peleti in his plea agreement and in his colloquy with this Court, established that Peleti had tried to obtain the contract in question for Company A but had been unsuccessful, and thereafter reported the results of his efforts to Company A. The president of Company A was not satisfied with Peleti's answer, so he had Peleti come alone to his office where the president gave Peleti $50,000 in $100 bills. Peleti clearly knew that this cash was being given to him so that he would continue to keep trying to get Company A the contract. Under the Seventh Circuit's precedent and jury instructions, those events as established in the record constituted a factual basis for a bribery conviction under 18 U.S.C. § 201(b)(2)(A).[5] Simply

---

[5]In his Memorandum (*e.g.*, p.6, ¶18), Peleti quibbles that information proffered by the prosecutor was immunized information improperly presented to the Court. His characterization is incorrect. The prosecutor did not quote as admissions Peleti's immunized statements during the prosecutor's proffer. Peleti's cooperation agreement provided for the government to make derivative use of all of the information he provided under his limited direct-use-immunity-only agreement. Thus the information

stated, Peleti's "illegal conduct [was] taking or agreeing to take money for a promise to act in a certain way." *United States v. Meyers*, 692 F.2d 823, 841 (2nd Cir. 1982).

57.     In *Meyers*, the defendant, a Congressman, defended a bribery charge on the ground (similar to that being raised now by Peleti) that he intended to keep the bribe but not the promise that he made to the bribe payer.  The court analyzed at length whether the promise given by the public official must be one that he intends to carry out.  After examining the language of the statute and its legislative history, the court concluded that the public official need not intend to carry out the promise made in connection with the payment in order to be convicted of the receipt of a bribe. The Second Circuit recognized that the receipt-of-a-bribe prohibition under § 201, which before 1962 had required intent to be influenced as an element, was revised in 1962 to delete that intent from the description of the conduct specifically proscribed.  Instead, the revised statute requires that the overall offense be committed "corruptly." *Id*.  The Second Circuit, quoting from the House Committee on the Judiciary when it acted to revise the language of bribery statute, agreed that the deletion of the requirement of an actual intent to be influenced "emphasizes that it is the purpose for which the recipient knows the bribe is offered or given when he

---

proffered by the prosecutor concerning what the government anticipated being able to establish if the case was to proceed to trial was based on admissions by Peleti prior to the cooperation agreement, evidence the prosecutor expected to prove from independent investigation, or information derived from Peleti's information provided under the cooperation agreement.  Regardless, the issue is moot; the factual basis requirements for Peleti's plea as described herein were fully satisfied by Peleti's admissions in his plea agreement and in his colloquy with the Court when he entered his guilty pleas.

solicits, receives, or agrees to receive it which is determinative of criminality." *Id.,* H.R. Rep. No. 748, 87th Cong., 1st Sess. 18 (1961).

58.    Along those same lines, "[t]he phrase ['in return for'] brings into play the purpose of the bribe and thus the mind of the bribe-payor." *Meyers*, 692 F.2d at 842, quoting *Arroyo*, 581 F.2d at 649.    The *Meyers* court concluded that under the revised bribery statute, the defendant Congressman "being influenced" did not describe his true intent, rather it described the intention he conveyed to the briber in exchange for the bribe. *Meyers*, 692 F.2d at 841.  Furthermore, "[w]hether the corrupt transaction would or could ever be performed is immaterial.  We find no basis for allowing a breach of warranty to be a defense to corruption." *Meyers*, 692 F.2d at 842 (*quoting United States v. Hood*, 343 U.S. 148, 151 (1952)).

59.    Here, Peleti, like the Congressman in *Meyers*, need not have intended to take the action requested by Company A.  It was enough that he knew the bribe was offered in order to influence him and he accepted the bribe with this knowledge.  In other words, he accepted the money corruptly, that is, "having an improper motive or purpose." United States v. Quinn, 359 F.3d 666, 674 (4th Cir. 2004).  Thus, Peleti indeed committed an offense under § 201(b)(2)(A).

60.    The fact that Peleti's conduct constituted a bribery crime is further illustrated by the Second Circuit's recent comparison of 18 U.S.C. § 201's bribery-receipt prohibitions to that under 18 U.S.C. § 666, which prohibits the taking of bribes in connection with programs receiving federal funds.  In *United States v. Ford*, 435 F.3d 204 (2nd Cir. 2006), an

officer of a New York State employee's union that received federal funds was convicted

under § 666 for accepting a bribe.  That section applies to any person falling within the

jurisdictional purview of § 666(b) who:

> corruptly solicits or demands for the benefit of any person, or
> accepts or agrees to accept, anything of value from any person,
> **intending to be influenced** or rewarded in connection with
> any business, transaction, or series of transactions of such
> organization, government, or agency involving any thing of
> value of $5,000 or more . . . .

18 U.S.C. § 666(a)(1)(B) (emphasis added).

61.     In *Ford*, the court reviewed the jury instructions used by the district court for

the § 666 bribery allegation, and concluded:

> The recipient's "awareness" that the donor gave something of
> value for the purpose of influencing the recipient might well
> constitute strong circumstantial evidence that the recipient
> acted with the requisite culpable state of mind in accepting the
> item, but a jury should be clearly instructed that it is the
> recipient's intent to make good on the bargain, not simply her
> awareness of the donor's intent that is essential to establishing
> guilt under Section 666.

*Id.* at 213-214.

62.     The *Ford* court then contrasted the plain language of § 666(a)(1)(B), which

"makes clear that a recipient's knowledge of a donor's intent to influence is insufficient to

support conviction," *Id.* at 213, n.5, with the provisions of the receipt-of-a-bribe statute, §

201(b)(2). *Id.* at 213, n.6:

> . . . *Meyers* involved, *inter alia*, a prosecution under 18 U.S.C. §
> 201(b)(2), a statute whose language differs from that of Section
> 666(a)(1)(B) in an important respect.  In 1962, Congress revised
> Section 201(b)(2) to delete explicitly an "intent to be

influenced" element, requiring instead that the "overall act be committed 'corruptly.'" (citation omitted) In contrast, under Section 666, "intending to be influenced" is an explicit element of the crime.

*Ford*, 435 F.3d at 213, n.6.

63.    Accordingly, as was recognized in *Ford*, Peleti need not have actually intended to be influenced by his receipt of $50,000 in order to be guilty of an offense under 18 U.S.C. § 201(b)(2)(A).  His conduct as established in the record on February 9, 2007, satisfied each of the required elements of the offense for his conviction for receiving a bribe.  For all of the foregoing reasons, Peleti's motion to withdraw his guilty based upon his claim that no factual basis existed for his guilty plea to Count One of the information should be rejected by this Court.

**B.    The factual basis for Count Two established a bulk cash smuggling crime under 31 U.S.C. § 5332.**

64.    Peleti also briefly argues for his motion that there was no factual basis for defendant's guilty plea to Count Two of the Information, *i.e.,* the violation of 31 U.S.C. § 5332 charged in Count Two of the Information.  Peleti Memorandum, p.13.  Peleti's claim is baseless.

65.  Paragraph 24(r) on pages 18-19 of Peleti's plea agreement stated:

> On December 14, 2005, the defendant arrived at Dover, Delaware, and entered the United States with the $40,000 still concealed on his person and in his hand-carried belongings. There he presented to a U.S. Customs official a "Customs Declaration" form that he had completed.  In response to item 12 on the Customs Declaration, the defendant had checked the "No" box following the statement, "I am (We are) carrying currency or monetary instruments over $10,000 U.S., or foreign

- 31 -

equivalent." The defendant intentionally checked this "No" box in order to falsely declare to U.S. Customs officials that he was not carrying over $10,000 in U.S. currency, and to conceal the fact that he was actually carrying approximately $40,000 cash in $100 bills on his person and in his hand-carried belongings.

66.     Furthermore, during his colloquy with the Court, Peleti detailed his arrival

into the U.S. from the Middle East at Dover, Delaware in December 2005:

Court: All right. And then when was it that you received that money? Early December?

Peleti: Around, I would say 10th of December of '05.

Court: And then you left shortly after that for the United States?

Peleti: That's correct, sir.

Court: And where did you land?

Peleti: Dover, Delaware.

Court: And did you have this money with you at that time?

Peleti: Sir, I had approximately close to $40,000.

Court: And where did you have that $40,000?

Peleti: On my person or in my luggage, sir.

Court: Well, was it hidden? Did you declare the money when you came in?

Peleti: No, sir.

Court: Were you asked to declare money --

Peleti: Yes, sir.

- 32 -

Court:  – when you came in if you had over $10,000?

Peleti: Yes, sir.

Court: And so then is it fair to say that you understood that you were concealing this money?

Peleti: Yes, Your Honor.

Court: And were you successful in that respect?

Peleti: Yes, Your Honor.

Court: So it wasn't discovered when you returned back?

Peleti: Yes, Your Honor.

(Tr.37-38)

67.    The prosecutor thereafter provided a proffer of what the government anticipated establishing with respect to Count Two if the case proceeded to trial:

> Then the defendant was rotating back to the United States and on about December 13, 2005, the defendant boarded flights which ultimately landed at Dover, Delaware.  The evidence would show that the defendant declared that he had less than $10,000 in cash at the time that he entered the United States according to his written signed declaration, when in fact the evidence would show that the defendant had about $40,000 in cash on his person.

(Tr.41)

68.    The elements of the offense of bulk cash smuggling as set forth in Peleti's plea agreement, which Peleti does not now challenge, were as follows:

> First, that the defendant knowingly concealed on his person, that is, in any article of clothing worn by the defendant or in any luggage, backpack, or other container worn or carried by the defendant, more than $10,000 in currency;

- 33 -

Second, that the defendant knowingly transported or transferred such concealed currency from a place outside the United States to a place within the United States; and

Third, that the defendant did so with the intent to evade a currency reporting requirement under Title 31, United States Code, Section 5316.

(Plea agreement, p.3)

69.     Based on all of the foregoing, it can hardly be claimed that this Court did not require and receive an adequate factual basis for Peleti's guilty plea on Count Two.

70.     Peleti's further claim – that "[t]he government provided no documentary evidence that Peleti executed a customs declaration stating that he did not possess more than $10,000 at the time of his entry or that he was ever questioned by a customs officer regarding his entry . . . ." (Memorandum, p.13) is disingenuous at best.  First of all, it is unclear to whom Peleti now claims that the evidence should have been presented; evidence is generally not provided to the Court during a guilty plea hearing.  The government is left to speculate that Peleti is now lodging a belated discovery complaint.

71.     Regardless, Peleti's "Customs Declaration" for his return to the U.S. from the Middle East on December 14, 2005 was obtained by the agents involved in Peleti's investigation, and it was discussed with Mr. Robertson well before October 4, 2006, when the plea agreement was first sent for review by him and Peleti.  As is reflected below, paragraph 24(r) on pages 18-19 of the plea agreement sent to Mr. Robertson in October 2006 detailed the defendant's completion of his Customs Declaration.  Despite that, Peleti's Memorandum baldly asserts, ". . . it is likely that servicemen returning from the Mideast

- 34 -

did not, in fact, complete any customs declaration." Memorandum, p.18. This appears to be a diluted effort to assert a defense of actual innocence to Count Two. Curiously, Peleti does not now explicitly claim that he is *actually* innocent of that offense; he only implies that he now wishes to challenge the evidence concerning the Customs Declaration. It is significant that Peleti makes no further offer of proof with respect to Count Two; he fails in his motion to identify any new evidence or explain how his defense to Count Two has changed since he elected to enter his guilty plea on February 9, 2007.

72.     The government recognizes that legal innocence may indeed be a fair and just reason to withdraw a guilty plea. *United States v. Salgado-Ocampo*, 159 F.3d 322, 326 (7th Cir. 1998) (*citing United States v. Groll*, 992 F.2d 755, 758 (7th Cir. 1993). "However, claims of innocence alone do not mandate permission to withdraw a plea. Assertions of innocence must be buttressed by facts in the record which support a claimed defense." *Id.* (citations omitted).

73.     In *United States v. Knox*, 287 F.3d 667 (7th Cir. 2002), the Seventh Circuit considered (in the context of a claim of ineffective assistance of counsel) the difference between a defendant's statements under oath during his plea colloquy and his claims in a subsequent court filing. The Seventh Circuit observed:

> This story conflicts with what Knox said in open court, where he told the judge that he was pleading guilty to all three counts because he did what the indictment alleges and thus is guilty. A defendant's assertion that he committed perjury in the judge's presence is a poor reason to start anew.

*Id.* at 671.

74.  Here, Peleti's attempt to raise a question about the existence of a customs declaration conflicts with what he said in open court.  Thus, his assertion now that it likely did not exist is tantamount to an admission that he committed perjury in this Court's presence concerning Count Two, and "is a poor reason to start anew." *Id.*

## C.  Mr. Robertson effectively represented Peleti

75.  Peleti now contends that he received ineffective assistance of counsel from Mr. Robertson.  Peleti argues that Mr. Robertson failed to ascertain if any independent evidence existed to support the government's cases underlying  Counts One and Two.  (Memorandum, pp.16, 17) In his declaration filed in support of his motion (D.E. 32), Peleti claims that he entered his guilt pleas solely on the advice of Mr. Robertson (¶6); Mr. Robertson advised him that he had virtually no defenses to his case (¶6); at each of Mr. Robertson's four meetings with him, Mr. Robertson stressed that the only option he had was full cooperation (¶7); Mr. Robertson told him that full cooperation would lead to little or no incarceration time and him being able to stay in the military (¶7); at no time prior to his entry of a guilty plea on February 9, 2007 did Mr. Robertson ever explain or even discuss with him the potential risks or benefits of proceeding to trial (¶9); Mr. Robertson never discussed with him the possible defenses to the charges he faced, or the strengths or weaknesses of the government's case against him (¶9); Mr. Robertson never discussed with him the elements of the possible charges against him or what facts supported any of those elements of the charges against him (¶9); his understanding was that the only evidence the government had with which to accuse him of criminal conduct was his interview with

- 36 -

agents on July 25, 2006 (¶9); during their initial meeting on August 14, 2006, Mr. Robertson

never reviewed with him possible charges, or possible criminal exposure, the law, or any

of the potential consequences of his grand jury testimony (¶10);

he told Mr. Robertson that he wanted to fully cooperate if nothing went on his record and

he stayed in the military (¶10); Mr. Robertson did not suggest that they have a private

conversation to go over the cooperation agreement (¶11); Mr. Robertson did not explain

what conditional immunity was (¶11); Mr. Robertson did not explain that there were other

types of immunity (¶11); Mr. Robertson did not explain what a Kastigar hearing was (¶11);

Mr. Robertson did not explain to him his potential criminal exposure or how the execution

of the cooperation agreement would affect any possible criminal exposure he was to face

(¶11);  Mr. Robertson told him, that signing the cooperation agreement would help him in

the long run (¶11); in mid-October 2006, he told Mr. Robertson he would not accept the

plea agreement because he would not agree to incarceration (¶15); Mr. Robertson told him

that when the time came, they would plead "not guilty" (¶16); he asked Mr. Robertson to

answer his questions in writing concerning hjs defense, immunity, restitution, appeals

process, trial process, Title 18, his options, the time line, and the possibility of staying in the

military (¶16); Mr. Robertson failed to answer his questions in writing (¶16); Mr. Robertson

told him he would not get a speedy trial and did not explain what that meant (¶17); his

understanding in November 2006 was that he was still planning on entering a plea of not

guilty (¶18); he unsuccessfully tried to reach Mr. Robertson in December 2006 (¶19); he

asked Mr. Robertson, "Why haven't you explored all my options?" (¶19); on February 9,

2007, Mr. Robertson did not ask if he had read the plea agreement (¶20); Mr. Robertson did

not explain anything about the contents of the plea agreement (¶20); Mr. Robertson told

him to plead guilty (¶20); Peleti asked Mr. Robertson why he was pleading guilty (¶20);

Peleti asked Mr. Robertson why they hadn't explored all their options (¶20);

at no time did Mr. Robertson go over the plea agreement with me in any detail or with any

specificity (¶20); after the plea, Mr. Robertson said, "I think we made a fundamental

mistake" (¶21); and despite his statement to the Court that he had a reasonable opportunity

to read the plea agreement and discuss it with his attorney, Peleti did not have any

substantive or meaningful discussion with Mr. Robertson regarding the contents of the plea

agreement (¶22).

76.     The government has no information that any of Peleti's complaints

concerning Mr. Robertson's performance are accurate, and has concluded otherwise, based

upon the prosecutor's discussions with Mr. Robertson as the case progressed, that they are

not true.  It appears to the government that Mr. Robertson has advocated for Peleti – in

Peleti's best interest – throughout the case.  However, the government is not in a position

to further evaluate Peleti's current ineffective assistance claims for the purposes of

submitting this Response.  Instead, at a hearing resulting from Peleti's motion, Mr.

Robertson will be subpoenaed by the government to testify as to his efforts in representing

Peleti, including his private communications with Peleti, since Peleti has now waived the

attorney-client privilege concerning the issues that he has raised in his motion.  After all,

litigants cannot hide behind the privilege if they are relying upon privileged

communications to make their case. *United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir. 1991) (attorney-client privilege cannot at once be used as both a shield and a sword); *In re Lott*, 424 F.3d 446,452-454 (6th Cir. 2005) (because petitioner asserts he was denied effective assistance of counsel, he has implicitly waived his attorney-client privilege as it relates to his claim); *Tasby v. United States,* 504 F.2d 332, 336 (8th Cir. 1974); *Bittaker v. Woodford,* 331 F.3d 715 (9th Cir. 2003) (by alleging that his attorneys provided ineffective assistance of counsel in their choice of a defense strategy, petitioner put at issue – and thereby waived – any privilege that might apply to the contents of his conversations with those attorneys to the extent those choices bore on his attorneys' strategic choices); *Johnson v. Alabama*, 256 F.3d 1156, 1178 (11th Cir. 2001)  (implied waiver of the attorney-client privilege when petitioner "injects into litigation an issue that requires testimony from its attorneys or testimony concerning the reasonableness of its attorneys' conduct).

77.    The government is mindful that "[i]neffective assistance of counsel can render a plea agreement involuntary, and is therefore a valid basis for withdrawing a guilty plea." *United States v. Lundy*, 484 F.3d 480, 484 (7th Cir. 2007).  To demonstrate ineffective assistance of counsel in this context, a defendant must show: (1) that counsel's performance was objectively unreasonable; and (2) that, but for counsel's errors, the defendant would not have pled guilty.  *Id.*  "The test is 'highly deferential' to counsel and presumes reasonable judgment and effective trial strategy."  *United States v. Carroll*, 412 F.3d 787, 793 (7th Cir. 2005).

78.    Here, the only information that the government is aware of reflects that Mr. Robertson represented Peleti using reasonable judgment and implementing sound strategy to achieve what was in Peleti's best interest.  The government disputes the allegations that Peleti was prejudiced by Mr. Robertson's representation of him.

## III.    STANDARDS FOR WITHDRAWAL OF GUILTY PLEAS UNDER RULE 11(d)

79.    "A plea of guilty is a 'grave and solemn act.' " *United States v. Loutos*, 383 F.3d 615, 619 (7th Cir.2004), *quoting United States v. Ellison*, 798 F.2d 1102, 1006 (7th Cir.1986). A guilty plea admits, in legal effect, the facts as charged. *Loutos*, 383 F.3d at 619. "The purpose of a Rule 11 colloquy is to expose coercion and mistake, and the district judge must be able to rely on the defendant's sworn testimony at that hearing." *Loutos*, 383 F.3d at 619. Representations and admissions made by a defendant during a change of plea hearing are entitled to "a presumption of verity." *Loutos*, 383 F.3d at 619, *quoting United States v. Pike*, 211 F.3d 385, 389 (7th Cir.2000). "In fact, the fundamental interest in the finality of guilty pleas should be recognized." *United States v. Ray*, 828 F.2d 399, 404 (7th Cir. 1987) (internal quotations omitted).

80.    Once the factual elements for conviction are deemed sufficient by the Court, and a plea is entered and accepted in accordance with all of the Rule 11 requirements, Rule 11(d)(2)(B) provides that the defendant may withdraw a guilty plea on a showing of a fair and just reason for requesting the withdrawal.  However, "[t]his 'is not a free-swinging backdoor.'" *United States v. Hodges*, 259 F.3d 655, 660 (7th Cir. 2001).  A defendant does not have an absolute right to withdraw his guilty plea once it has been accepted by the Court.

*United State v. Wallace*, 276 F.3d 360, 366 (7th Cir. 2002).  Instead, he must bear a heavy burden of persuasion, *United States v. Underwood*, 174 F.3d 850, 852 (7th Cir. 1999).  In other words, after a knowing and voluntary Rule 11 colloquy, the defendant faces an uphill battle in demonstrating a fair and just reason.  *Hodges*, 259 F.3d at 660.

81.     " '[A] district court is generally justified in discrediting the proffered reasons for the motion to withdraw and holding the defendant to [his] admissions' during the plea colloquy." *Lundy*, 484 F.3d at 484, *quoting Pike*, 211 F.3d at 389.  In particular, "a defendant's bare protestations of innocence – especially after a knowing and voluntary guilty plea in a thorough Rule 11 colloquy – will not suffice." *Carroll,* 412 F.3d 787, 792 (7th Cir. 2005); *Hodges*, 259 F.3d at 661) (district court does not have to conduct a hearing based on "naked claims of innocence").

82.     Importantly, a defendant's subsequent belief that the government lacks evidence against him does not justify withdrawing a guilty plea. *Underwood*, 174 F.3d at 854 ("a guilty plea entered by a defendant who does not see the prosecution's hand in advance will still be voluntary if, as was true in this case, the plea follows disclosure of an adequate factual basis"); *United States v. Silva*, 122 F.3d 412, 415 (7th Cir.1997) (defendant not entitled to withdraw guilty plea "because he has misapprehended the strength of the government's case or, upon reevaluation of the situation, can conceive of an arguable defense").  Rule 11 "does not require the trial judge at the plea hearing to air all of the government's evidence." *Underwood*, 174 F.3d at 854, *quoting United States v. Seybold*, 979 F.2d 582, 587 (7th Cir.1992).

83.     In addition, a district court can be understandably skeptical of a claim of innocence which comes after the defendant has seen the PSR. *Carroll*, 412 F.3d at 792.

84.     "The standard for withdrawing a guilty plea is stringent because society has a strong interest in the finality of guilty pleas, and allowing withdrawal of pleas not only undermines confidence in the integrity of our judicial procedures, but also increases the volume of judicial work, and delays and impairs the orderly administration of justice." *United States v. Schmidt*, 373 F.3d 100, 102-03 (2nd Cir. 2002).

85.     The validity of a Rule 11 colloquy is based upon the totality of the circumstances, including such factors as "the complexity of the charge, the defendant's level of intelligence, age, and education, whether the defendant was represented by counsel, the judge's inquiry during the plea hearing and the defendant's statements, as well as the evidence proffered by the government." *Loutos*, 383 F.3d at 619, *quoting United States v. Blalock*, 321 F.3d 686, 688-89 (7th Cir.2003).

86.     Here, the totality of the circumstances surrounding Peleti's plea colloquy on February 9, 2007, establishes that his plea was knowingly and voluntarily entered.  Peleti was 44 years old, had undergone 23½ years of schooling, was a Chief Warrant Officer in the Army, was not under the care of a physician or psychiatrist, had not been treated for narcotics addiction, and had not consumed any drugs, medicine, pills or alcohol prior to his entry of his guilty pleas. (Tr.3) This Court painstakingly established that Peleti  was satisfied with his representation by Mr. Robertson as of February 9, 2007, was aware of all of the terms of the charges against him and his plea agreement, and that no one forced him

into pleading guilty; he went into the plea hearing with his eyes wide open and it was his voluntarily decision to enter his guilty pleas.

87.    In summary, the facts concerning Peleti's conduct as set forth in his plea agreement, which was signed by him and ratified under oath during the plea hearing, coupled with Peleti's sworn statements to the Court during his plea colloquy, collectively satisfied the requirements of Rule 11(b)(3). Furthermore, nothing more than Peleti's bald allegations currently exist to establish that Mr. Robertson provided ineffective assistance of counsel. Accordingly, no basis exists to disturb his guilty pleas under the standards summarized above.

## IV. CONCLUSION

88.    Peleti has had change of heart about having previously pleaded guilty. It appears he now believes that the government lacks evidence against him. However, as is reported above, the courts have concluded that this argument does not justify withdrawing guilty pleas. Peleti may not have fully appreciated the strength of the prosecution's hand in advance of his plea hearing, and, upon reevaluation of the circumstances now with new counsel, can conceive of arguable defenses. But on February 9, 2007, an adequate factual basis was placed in the record when Peleti knowingly and voluntarily elected to plead guilty. At and before that time, he was effectively represented by Mr. Robertson, who was working to obtain for Peleti a resolution which would be in Peleti's best interest. No basis exists to disturb Peleti's guilty pleas.

**WHEREFORE**, the United States respectfully requests that Peleti's motion to withdraw his guilty pleas on the ground that factual basis for his convictions were lacking be **DENIED**, and that this Court convene an evidentiary hearing at which time Peleti's claim of ineffective assistance of counsel by Mr. Robertson can be heard and resolved by this Court.

Respectfully submitted,

RODGER A. HEATON
UNITED STATES ATTORNEY

BY:    /s/ Jeffrey B. Lang
JEFFREY B. LANG
ASSISTANT U.S. ATTORNEY
1830 Second Avenue, Third Floor
Rock Island, Illinois  61201
Telephone (309) 793-5884

## CERTIFICATION OF SERVICE

I hereby certify that on August 10, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification to the following:  Donovan S. Robertson, Lewis O. Romero, Paul Leland Alaga, David M. Michael.

/s/ Jeffrey B. Lang
JEFFREY B. LANG
ASSISTANT U.S. ATTORNEY

- 44 -