E-FILED
Tuesday, 16 October, 2007  12:49:31 PM
Clerk, U.S. District Court, ILCD

1               IN THE UNITED STATES DISTRICT COURT
                FOR THE CENTRAL DISTRICT OF ILLINOIS
2

3

4   UNITED STATES OF AMERICA,            )
                                         )
5                     Plaintiff,         ) Criminal No.
                                         ) 06-40117
6          vs.                           ) Peoria, Illinois
                                         ) October 5, 2007
7   PELETI PELETI, JR.,                  )
                                         )
8                     Defendant.         )

9

10        HEARING ON MOTION TO WITHDRAW GUILTY PLEA

11

12                      BEFORE:

13              HONORABLE MICHAEL M. MIHM
                United States District Judge
14

15                    APPEARANCES:

16               JEFFREY LANG, ESQ.
             Assistant United States Attorney
17               1830 Second Avenue
             Rock Island, Illinois  61201
18        (Appeared on Behalf of the Government)

19

20               LEWIS O. ROMERO, ESQ.
                 PAUL ALAGO, ESQ.
21            885 Bryant Street, Suite 202
             San Francisco, California  94103
22        (Appeared on Behalf of the Defendant)

23              Karen S. Hanna, C.S.R.
                U.S. District Court Reporter
24              Central District of Illinois
    Proceedings recorded by mechanical stenography, transcript
25  produced by computer

1                          **I N D E X**

2

     WITNESS                                          PAGE

3

     PELETI PELETI, JR.
4        Direct Examination by Mr. Romero              26
         Cross Examination by Mr. Lang                 60

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Good morning.  This is the case of

2     the United States of America vs. Peleti Peleti, Jr.,

3     criminal number 04-40017.  The defendant is in court

4     represented by his attorneys, Lewis Romero -- and where is

5     Mr. Alaga?

6          MR. ROMERO:  Your Honor, he will be coming in

7     shortly.

8          THE COURT:  The United States is represented by

9     Jeff Lang.  The matter is set today for a hearing on the

10    motion to withdraw the defendant's guilty plea.  What is

11    the status of this?

12         MR. LANG:  Your Honor, apparently it's going to

13    go to a hearing.

14         THE COURT:  Okay.  Let's go.

15         MR. LANG:  Your Honor, I have a suggestion.

16    Just to clarify, there are two parts to this as far as

17    we're concerned.  First are the legal issues.  If the

18    legal issues result in the Court setting aside his plea,

19    then there would be no need to proceed to the ineffective

20    assistance claim, so --

21         THE COURT:  I understand.  I've read all the

22    pleadings and I think I've read all the cases cited.  So

23    can we proceed, Mr. Romero?

24         MR. ROMERO:  Yes, Your Honor, and I would concur

25    with my colleague's assessment.

1              THE COURT:  Well, it's your motion to withdraw,

2      it's your claim that there was no adequate factual basis

3      under the law for him to withdraw -- or for him to enter a

4      plea to Counts 1 and 2, so if you have an argument to

5      make, make it.

6              MR. ROMERO:  Your Honor, the argument that there

7      was not a factual basis as pertains to Count 1 simply goes

8      to the absence of a quid pro quo factual basis aspect.

9      The plea colloquy, while it might provide a basis for an

10     inference that there was an exchange that may have been

11     intended to create a more favorable business environment

12     or other favor, there was no specific quid pro quo as

13     required by the particular statute to which Mr. Peleti

14     pled guilty and on that basis we find that we believe

15     there is no factual basis.

16             With respect to the second count, the facts on

17     which the Court relied were facts that should have been

18     immunized.  If that was a failure of the defendant's

19     counsel to prevent such facts being part of the record,

20     then our argument necessarily relies on the Sixth

21     Amendment issue.

22             THE COURT:  All right.  Well, I have a few

23     questions.  I realize this is not a case, but the Seventh

24     Circuit jury instruction for 18 U.S.C. 201 says:  "It is

25     not necessary that the public official have the power to

1    or did perform the act for which he was promised something

2    of value.  It is sufficient if the matter was one that was

3    before him in his official capacity."

4         Then the second paragraph says:  "Nor is it

5    necessary that the defendant in fact intend to be

6    influenced.  It is sufficient if the defendant knew that

7    the thing of value was offered with the intent to

8    influence official action."

9         Do you accept -- I should state for the record,

10   by the way, that Mr. Alaga is now present.  Is it your

11   position that that jury instruction is right or wrong?

12        MR. ROMERO:  Your Honor, I think that it's

13   right, but I think that the Government's reliance on that

14   jury instruction to make its case is misplaced.  The jury

15   instruction does not dispose of the requirement of the

16   particular specific intent.  The Government's assertion,

17   we agree with.  The fact that the act could not be

18   performed does not create a defense for someone who

19   receives a bribe.  We agree.  And I think the jury

20   instruction makes that abundantly clear, that we want to

21   prevent people from making that claim in trial or

22   elsewhere.  The salient legal issue, however, is whether

23   or not there are facts to support that a bribe in fact has

24   taken place in this case.

25        THE COURT:  Well, at the time he took the money,

1    as I understand it, he had already told the guy that the

2    decision had been made, there had been contract decisions

3    made that were beyond his influence or control that

4    couldn't be changed and he couldn't help them.  It was

5    after that that he was handed the $50,000.

6            And I'm trying to find the exact quote here from

7    the record, but at that time, even in spite of the fact

8    that the guy had been told, he said something to the

9    effect of, "Well, do what you can", or something like

10   that.  "See what you can do", something like that.  The

11   defendant took the money after that statement was made.

12           And in the plea colloquy -- it's quoted in one

13   or both of the briefs, but let me restate that.  "At the

14   time you received the money, actually got it in your hand

15   from him, was it your belief that he was giving this to

16   you for the purpose of influencing official actions?"  And

17   his response was:  "Yes, Your Honor."  That's at pages 36

18   and 37.

19           Now that seems to suggest to me a couple of

20   things.  First of all, when the person prior to giving --

21   at the time that he gave the money said in effect, "See

22   what you can do", that would seem to be very strong

23   evidence that the money was being given to him in spite of

24   what he said in an effort to influence his official action

25   and the fact that he took the money at that time, seems to

1    me that arguably he completed the act when he took the

2    money.  Whether or not he believed at the time that he

3    could do anything to influence the contract decision I'm

4    not really sure is legally relevant at this point.  Go

5    ahead.

6              MR. ROMERO:  I think Your Honor is focused on

7    the right aspect of the plea colloquy and be assured that

8    counsel have spent much time in this particular area.  But

9    I think that really this brings to light the importance of

10   the Sun-Diamond Grower's distinction between 201(c)(1)(B)

11   and the charge, the bribery statute my client is charged

12   under.

13             The facts, Your Honor, in that scenario which

14   Your Honor took his colloquy no doubt would give rise to a

15   finding that there existed a factual basis under

16   201(c)(1)(B).  201(c)(1)(B) eliminates the requirement

17   that he specifically intend a particular act.  It punishes

18   the receipt of money intended for a more general or future

19   benefit and that's what's happening here in the light most

20   favorable to the prosecution.  We of course believe that

21   it was not our client's intent to communicate to the Court

22   that he intended to be influenced because the colloquy --

23             THE COURT:  But let me -- I'm sorry for

24   interrupting, but that second paragraph of the jury

25   instruction that I read seems to me exactly on point.

1    "Nor is it necessary that the defendant in fact intended

2    to be influenced.  It is sufficient if the defendant knew

3    that the thing of value was offered" -- which would seem

4    to suggest that the focus is on the person paying, not

5    that he actually intended to be influenced by it or that

6    after receipt of the money he would even do anything to

7    earn the money.  That's what that jury instruction says.

8          MR. ROMERO:  And, Your Honor, I agree.  I think

9    that where we're not fully in line yet hopefully is that

10   in this scenario, what is the criminal culpability that

11   the Court or the Government did attach to an individual

12   under this scenario.  And because there's an absence of a

13   quid pro quo, then the appropriate statute is

14   201(c)(1)(B).

15         THE COURT:  Well, I guess the Government would

16   say the guy said as he's handing him the money, "Do what

17   you can", and in that environment your client accepted the

18   money.

19         MR. ROMERO:  And --

20         THE COURT:  So at the time that he accepted that

21   money, according to the wording of this jury

22   instruction -- I mean, it's pretty clear here that -- and

23   I even mentioned this, I think, somewhere in the plea

24   colloquy.  I mean, this money was not given to him just

25   because he was a nice guy or congratulations on your war

1   efforts.  It was given to him because of the position that

2   he had, although he was soon to give it up and go back to

3   the United States, but he was given that money in an

4   effort to influence his decision.  Would you agree with

5   that, that the money was paid to him for the purpose of

6   influencing his decision?  Can you answer that "yes" or

7   "no"?

8           MR. ROMERO:  No is the answer.

9           THE COURT:  Then why was it given to him

10  according to your theory?

11          MR. ROMERO:  May I say this, Your Honor, that --

12          THE COURT:  No.  I would like you to answer that

13  question.

14          MR. ROMERO:  Judge --

15          THE COURT:  Why did this guy -- according to

16  your theory and according to this record, why did that man

17  give your client $50,000?

18          MR. ROMERO:  I can tell the Court what I have

19  been informed and believe so I don't engage --

20          THE COURT:  Okay.

21          MR. ROMERO:  What's absent from the plea

22  colloquy --

23          THE COURT:  I'm not asking you what's absent

24  from it.  I would appreciate it if you would answer my

25  question.  The question is why did he give that money to

 1 | your client?

 2 | MR. ROMERO:  I suspect that the reason he gave

 3 | that money to my client, even though he was told that he

 4 | couldn't perform a particular act, was because he had an

 5 | interest, one, in recruiting my client upon his

 6 | retirement, which he was aware of.  Two, he was interested

 7 | in investing in a private business venture that was

 8 | pending in Western Samoa.  That's two.  And --

 9 | THE COURT:  That's not in this record.

10 | MR. ROMERO:  Correct, and that's what I was

11 | going to start to tell the Court.

12 | THE COURT:  I am limited to the record.

13 | MR. ROMERO:  And, third, having to do with a

14 | variety of personal issues surrounding his family

15 | situation, recent death of his mother and other things

16 | that strained his family.  I think this billionaire was

17 | generous.  And, Judge, this is where -- this is why the

18 | Supreme Court has given us the duty to have pause when a

19 | defendant did not specifically intend to receive money for

20 | a specific act.  But if it has the color of impropriety,

21 | it might amount to a 201(c)(1)(B).  We have a defense to

22 | it.  But there is no specific quid pro quo.

23 | That doesn't mean the jury instruction isn't

24 | applicable.  For example, if the Government had charged

25 | Mr. Peleti with a 201(c)(1)(B), he could not take the

1    stand and use as a defense that fact, the failure of --

2    the impossibility of performance, and I think that's the

3    salience of the jury instruction as it applies to that

4    particular statute.  No specific intent, the cornerstone

5    of our criminal law.  What was his intention?  Not to

6    deliver on the contract.  Is it a crime to receive the

7    money therefore?  It might be and, if it is, it's a

8    201(c)(1)(B).

9          THE COURT:  All right.  Thank you.  What's the

10    response?

11          MR. LANG:  Your Honor, I'll be very brief.  The

12    jury instruction does apply.  It focuses on what the

13    defendant believed when the --

14          THE COURT:  Well, there's more than one section

15    under 201.

16          MR. LANG:  Yes.  201(c) is a lesser included

17    offense which says that a defendant -- a person who takes

18    money on account of an official act is guilty of that

19    crime.  That could be a past act, a future act or

20    whatever.  This is more specific.

21          When Mr. Peleti, as he admitted throughout the

22    colloquy and as we put on the record in terms of the

23    Government's colloquy and as this Court was satisfied,

24    Mr. Peleti was making a promise to try to do something

25    when he accepted the $50,000.  We have been down that

 1    road.  We heard nothing in the plea colloquy about

 2    alternative reasons for the acceptance of the money.  We

 3    heard --

 4              THE COURT:  That's true.  I dwelled on this

 5    quite a bit actually because I was troubled by the fact

 6    that he had informed the man there was nothing that he

 7    could do and so that gives rise to the obvious question,

 8    so then why was he given the money?

 9              MR. LANG:  Correct.  As is in the record, he was

10    the chief food advisor for the U.S. Army.  He was a chief

11    warrant officer.  He wasn't disappearing on a horse across

12    a mountain somewhere.  He remained in Kuwait for a while.

13    He got the money.  He still had influence.  And, Your

14    Honor, as the defendant admitted in his written statement,

15    the defendant tried to call him after the fact.  And, Your

16    Honor, when someone -- as the Court focused on, Mr. Peleti

17    stood here and admitted that he didn't get that money for

18    some --

19              THE COURT:  My recollection -- I could be wrong,

20    but my recollection is that, yes, the defendant in fact

21    did talk to him on one occasion.  It was after he accepted

22    the money.

23              MR. LANG:  Right.

24              THE COURT:  And the guy basically said, "Where

25    are we?"  And he said, "Where are you?"  I'm --

1          MR. LANG:  I don't recall those details being in

2     the record, but the bottom line --

3          THE COURT:  I think they are.

4          MR. LANG:  The bottom line, Your Honor, is that

5     Mr. Peleti told this person, "No, I can't help you."  This

6     person called him and said, "Come alone", hands him a bag

7     and says, "See what you can do."  And Mr. Peleti didn't

8     say "Oh, thank you for the gift for my family."

9     Mr. Peleti didn't put on the record that, "Oh, this is for

10    our business venture."  And the Court grilled him on why

11    exactly did he give you the money.  And whether or not

12    Mr. Peleti felt he could do anything, whether or not

13    Mr. Peleti intended to do anything is irrelevant.  He knew

14    that by taking that money he was promising to try to do

15    something.  That constitutes a crime under section (b).

16         THE COURT:  Well, at one point I said -- I think

17    this is at pages 31 and 32 -- "Sounds like he almost

18    forced it on you.  Why did he give you the money?"  I'm

19    asking the defendant.  He says:  "Presumably he thought I

20    would get the contract at some point."  I take that to

21    mean not now, later.

22         MR. LANG:  Your Honor, I guess our point is

23    Mr. Peleti now has changed his mind.  The pre-sentence

24    report is out.  He's changed his mind about pleading

25    guilty and now his new lawyers can conceive up a defense

1    and, Your Honor, the case law supports the notion that

2    that's not a valid reason for this Court to set aside a

3    guilty plea after the lengthy and involved colloquy that

4    the Court had and we strongly believe that the record is

5    solid, we're very happy to go to the Seventh Circuit with

6    it, and the jury instructions were proper.  The proper

7    focus is on what the defendant thought the guy wanted when

8    he gave him the money and by taking it, it was an implicit

9    promise to try to do something.

10              THE COURT:  Is there a reply?

11              MR. ROMERO:  Briefly, Your Honor.  First, it's

12   important for the Court to remember that 35 uniformed

13   officers who sat on this menu board gave Ibrihim the

14   thumbs up and said, "We like your product.  We are going

15   to recommend it.  You should have this contract."

16   Somewhere down the line in the states someone says, "No.

17   It remains with LOGCAP KBR.

18              THE COURT:  I don't see why that's relevant at

19   all.

20              MR. ROMERO:  Because it's relevant for the Court

21   to understand what this meeting was about.  This is

22   Mr. Peleti, who was one of 35 people going back to meet

23   with this individual who wants to know, "How is it that

24   when 35 people say I have the better product and it's

25   going to save taxpayers millions of dollars, why don't I

1    have this work?"  And Peleti is telling him, "We like the

2    way you present.  We like what you do with our soldiers in

3    the areas where you do have the contracts.  Your employees

4    dress well.  You have a good product."  This is not some

5    meeting in a dark, smoky room with someone trying to stuff

6    a bag with $50,000 in his pocket.  This is a soldier

7    carrying out his duty to be professional with the

8    contractor who the United States has regular business

9    with.

10              THE COURT:  With all due respect, in the context

11    of what I'm considering, I don't think that's relevant.

12              MR. ROMERO:  Judge --

13              THE COURT:  Whether he could actually ultimately

14    control the decision or influence the decision is

15    substantially irrelevant as far as I'm concerned.  He was

16    a public official.  He was officially related to that

17    group.  And it is also true that different people in

18    different groups have different levels of influence

19    concerning the decisions that are made.

20              MR. ROMERO:  The importance, Your Honor, is that

21    during the colloquy my client said 99 percent of the time

22    when asked by you, "I told him I couldn't do anything.  I

23    don't know why he gave me the money.  I made it clear.  I

24    told him I was reassigned.  I'm leaving in two weeks."

25    Your Honor, I'm not -- it wasn't a long time as suggested

 1 │ by the Government.  Two weeks.

 2 │         THE COURT:  What is that language that I'm

 3 │ trying to find in here and can't right now?  What was it

 4 │ the guy said when he gave him the money?  "Do what you

 5 │ can" or "See what you can do"?

 6 │         MR. ROMERO:  With respect to what time period,

 7 │ Your Honor?

 8 │         THE COURT:  When he was actually handing him the

 9 │ money as I understand it.

10 │         MR. LANG:  "See if you can continue" --

11 │         THE COURT:  "See if you can continue."

12 │         MR. LANG:  -- "to try to get it."

13 │         MR. ROMERO:  Your Honor, even in the phone call

14 │ that follows, he reminds him again, "I can't do anything

15 │ for you."  And this is why I think the Sixth Amendment

16 │ questions are relevant in the inquiry about what was

17 │ really going on.

18 │         But with respect to what's before Your Honor as

19 │ a legal matter, does Your Honor have evidence that there

20 │ was a contract, an understanding between A and B that the

21 │ money was for a specific act?  And the answer is no.  Can

22 │ the Court infer it was for some unlawful purpose?  Yes.

23 │ But without making a finding that it was for a specific

24 │ quid pro quo, then it can only support a finding for a

25 │ 201(c)(1)(B).

```
 1              THE COURT:  But, unfortunately for your
 2   position, I think that that reasonable inference is there.
 3              MR. ROMERO:  I'm sorry?
 4              THE COURT:  I said unfortunately to your
 5   position, I think that reasonable inference is there based
 6   on the wording that occurred at the time that the
 7   transaction -- the money was passed to your client.  I
 8   think it's -- it's very clear to me anyway -- and I've
 9   been wrong before -- but it seems very clear to me that
10   when he took that money, he was in effect saying to that
11   guy, "In spite of what I've said concerning this
12   situation, you're asking me to continue seeing what I can
13   do to try to influence this decision and I'm accepting
14   this money under those conditions."  That seems to me to
15   be a reasonable inference.
16              MR. ROMERO:  Well, I think that's where we get
17   into the fact of impossibility.
18              THE COURT:  I'm not talking about possibilities
19   here.  I don't play horseshoes in the courtroom.
20              MR. ROMERO:  I understand, Your Honor, and I
21   apologize for --
22              THE COURT:  No, not at all.  I'm being a little
23   bit flippant.  But it's more than a possibility I think.
24   The question is whether or not that conclusion is a
25   reasonable inference that would give rise to a belief
```

1    beyond a reasonable doubt that this crime occurred.

2                MR. ROMERO:  I think though that the question

3    from our perspective is for what purpose was the money

4    given, what particular purpose.  In the absence of the

5    exchange being for a particular act, it cannot follow

6    under the rubric of the charges to which my client --

7                THE COURT:  I appreciate that that's your

8    position and it's not a frivolous -- it's not a frivolous

9    position, but I simply think that the Government's

10   position is the correct one.

11               And the Court of Appeals might disagree with me.

12   I mean in all candor, this is the kind of question that I

13   would look at quite seriously at the time of sentencing,

14   if we ever get to sentencing, on the issue of whether or

15   not he should be out on appeal bond pending appeal because

16   I think people can substantially disagree over what the

17   proper result is here.  But it's my finding that there was

18   an adequate record created, that there was a crime

19   committed, that your client knowingly pled guilty to that

20   crime and I think the plea colloquy supports that, so I'm

21   going to deny the motion to withdraw concerning Count 1.

22               Now as to Count 2, it's the defendant's position

23   that, as I understand it, the factual basis somehow wasn't

24   adequate because of the prior agreement that existed with

25   the Government.  Would you agree with that, Mr. Lang?

 1              MR. LANG:  Yes, Your Honor.  Are you asking me?

 2    I understood the question.  You're asking me?

 3              THE COURT:  Could you give me your response to

 4    that, please?

 5              MR. LANG:  Yes, Your Honor.  The defendant

 6    admitted that he arrived in the United States with $40,000

 7    on his person and that he presented to a U.S Customs

 8    official --

 9              THE COURT:  What page are you looking at?

10              MR. LANG:  That's page 31 of our brief.  It's

11    paragraph 24(R) of the plea agreement, pages 18 and 19.

12              THE COURT:  Hold on a minute.  Where is it in

13    the transcript?

14              MR. LANG:  I'll have to look for that.  It's at

15    pages 37 and 38.

16              THE COURT:  All right.  Let me get that.  All

17    right.  You're saying that his admissions during the plea

18    colloquy are not barred by any other agreement that he had

19    with the Government.

20              MR. LANG:  Your Honor, I'm lost on what their

21    real argument is here.  There was a direct use immunity

22    only agreement provided.  The defendant then --

23              THE COURT:  I'm having a little trouble with it

24    myself because I don't understand, according to their

25    logic as I understand it, how if you had that agreement to

1 | begin with the person could ever come into court and plead

2 | guilty.

3 |       MR. LANG:  That's correct.  The defendant

4 | admitted that in the plea agreement, exactly what the plea

5 | colloquy was.  We have the customs declaration.  There is

6 | nothing to prohibit us from gathering evidence of what he

7 | admitted to and by signing the plea agreement he's waived

8 | any type of argument that the cooperation agreement

9 | precluded the inclusion of that information.  There was

10 | nothing different in the plea colloquy or my colloquy from

11 | what's in the plea agreement.

12 |       THE COURT:  Well, let me ask Mr. Romero.  I

13 | don't understand why pages 37 and 38 of the transcript are

14 | not sufficient to establish his guilt on Count 2.  Am I

15 | missing something?

16 |       MR. ROMERO:  No, you're not, Judge.  I think

17 | that it is sufficient.  I think the argument is that its

18 | submission as the basis for the conviction violates the

19 | Sixth Amendment for the reasons laid out.

20 |       THE COURT:  But according to that logic, you

21 | could never -- a client could never come in and plead

22 | guilty then if there was an immunization agreement.  I

23 | don't know how -- I mean, that's not the Government's use

24 | of it.  That's me talking to him as part of the plea

25 | dialogue.  I don't see how that even implicates the

1      immunization agreement that you had with the Government.

2                  MR. ROMERO:  I think defense counsel had a duty

3      to tell his client that, "Aside from your immunized

4      statement made at the grand jury indictment, there is no

5      way for the Government to prove this case.  They don't

6      have the independent evidence and they won't find

7      independent evidence and you shouldn't plead guilty to

8      something that they can't prove."

9                  THE COURT:  Maybe that does get into the second

10     part, but as I understand it they have a form that he

11     signed, that he filled out apparently fraudulently when he

12     re-entered the country saying he didn't have more than

13     $10,000.

14                 MR. ROMERO:  But the form doesn't prove a wrong,

15     Your Honor, and I think it's better --

16                 THE COURT:  It doesn't?

17                 MR. ROMERO:  I think we need evidence on it.

18                 THE COURT:  I reject that.  I think the plea

19     colloquy itself is sufficient to establish his guilt.

20     That's why we have the plea colloquy.  I tell them -- I'm

21     sure I did in this case -- "Now I need to talk to you

22     about what you did here to satisfy myself that you are in

23     fact guilty."  And then I go through with them and ask

24     them exactly what it was they did.

25                 The argument concerning Count 1, as I said, it's

 1   not -- I believe I'm making the right decision on it, but

 2   reasonable people could disagree.  This argument on

 3   Count 2 I don't think has a lot of wings.

 4              MR. ROMERO:  Judge, so I'm clear, our argument

 5   on Count 2 really goes to the voluntariness aspect and

 6   it's our position that in the absence of his Sixth

 7   Amendment right to effective representation of counsel --

 8              THE COURT:  I'm not ruling on that aspect of

 9   what you're saying.  I'm just -- part of your motion

10   seemed to suggest that there simply wasn't an adequate

11   basis in here that wasn't immunized and I don't agree with

12   that.

13              Okay.  Now we're ready on Count 2 -- or on the

14   other part of it concerning effective assistance of

15   counsel.  Are you ready to proceed?

16              MR. ROMERO:  Yes, Judge.  What I would suggest,

17   one, is our declaration in support of the Sixth Amendment

18   argument is uncontroverted by any countervailing

19   declarations and, first request, would ask the Court to

20   rule on the issue on our declaration.

21              THE COURT:  I'm not sure exactly what you mean.

22   You're entitled to be represented by effective counsel.

23   And obviously anytime a matter like this is before the

24   Court, that's exactly what the Court looks to, whether or

25   not under the applicable case law the defendant received

1    effective assistance of counsel.  There's no disagreement

2    that the defendant is entitled to that.  If you're asking

3    me to acknowledge that, I acknowledge that.  The question

4    is whether or not that was provided in this case.

5          MR. ROMERO:  And my suggestion is that what's

6    before the Court is our declaration and we have not

7    received a declaration challenging that, so --

8          THE COURT:  You mean as to what the law is?

9          MR. ROMERO:  As to what took place between

10   Mr. Peleti and his attorney.

11         THE COURT:  Well --

12         MR. LANG:  Your Honor --

13         THE COURT:  I would be surprised if that's true.

14   I mean, not whether there was something filed, but -- are

15   you admitting everything that they say in their

16   declaration?

17         MR. LANG:  Absolutely not, Your Honor.  In our

18   response we stated we would be calling defense counsel to

19   refute each of these and --

20         THE COURT:  Where does it say that?  Hold on.

21         MR. LANG:  In our brief.  It's at the end.  Let

22   me find it.

23         THE COURT:  That was the clear understanding

24   that I had when I read the response, but --

25         MR. LANG:  On page 36 I list out all these

1    allegations.  Paragraph 76 on page 38 says:  "The

2    Government has no information that any of Peleti's

3    complaints concerning Mr. Robertson's performance are

4    accurate and has concluded otherwise based upon the

5    prosecution's discussions with Mr. Robertson as the case

6    progressed that they are not true.  It appears to the

7    Government that Mr. Robertson has advocated for Mr. Peleti

8    throughout the case.  However, the Government is not in a

9    position for the purpose of this response.  Instead, at a

10   hearing resulting from Mr. Peleti's motion, Mr. Robertson

11   will be subpoenaed by the Government to testify."

12            THE COURT:  Yes.  So why isn't that -- I don't

13   understand why that isn't telling you they deny it.

14            MR. ROMERO:  Well, I think that it might just be

15   a cultural practice distinction.  I'm not under the

16   assumption that either party is entitled to an evidentiary

17   hearing.  It's my understanding that it's the declarations

18   that create potentially an issue of fact that the Court

19   may want to further explore.

20            THE COURT:  In paragraph 76 they are denying it.

21   They are denying your claims.

22            MR. ROMERO:  I think the Government --

23            THE COURT:  Are you saying they had an official

24   duty to file a formal response?  I don't understand what

25   you're saying.

 1              MR. ROMERO:  I think that the Government has a

 2      duty to seek the declaration of witnesses who might offer

 3      competing information or to put at issue -- to put that

 4      fact at issue.

 5              THE COURT:  Do you have Seventh Circuit case law

 6      that says that duty exists?

 7              MR. ROMERO:  No, Judge.

 8              THE COURT:  I'm not aware of any.

 9              MR. LANG:  It's a little difficult, Your Honor,

10      too, for the record --

11              THE COURT:  Just a moment.  I'm ready to

12      proceed.

13              MR. ROMERO:  The next procedural question is if

14      Your Honor would like to have Mr. Lang cross my client on

15      the declaration or like me to have Mr. Peleti --

16              THE COURT:  No.  I want you to have Mr. Peleti

17      testify.

18              MR. ROMERO:  We'll go through it.  Okay.

19              THE COURT:  Thank you.

20              MR. ROMERO:  Where would you like him to be

21      seated for the testimony?

22              THE COURT:  I would like him to come up, be

23      sworn, take the witness stand.  By the way, one other

24      point before we start.  As I understand it, there is a

25      third attorney who had planned to be here today but isn't.

1    Is that Mr. Michael?

2              MR. ROMERO:  Yes, Your Honor.

3              THE COURT:  And I was told by my secretary

4    before I came out that everyone agreed that we could

5    proceed without Mr. Michael being present.  Is that

6    correct?

7              MR. ROMERO:  Correct.

8              THE COURT:  Is that correct, sir?

9              MR. PELETI:  Yes, sir.

10             THE COURT:  Okay.  Let's go.

11                       **PELETI PELETI, JR.**

12   Having been first duly sworn, was examined and

13   testified under oath as follows:

14                       **DIRECT EXAMINATION**

15   BY MR. ROMERO:

16   Q    Mr. Peleti, could you state how it is you are

17   employed?

18   A    The United States Army.

19   Q    In August of 2006 what was your title?

20   A    I was the theater food advisor.

21             THE COURT:  You're going to have to keep your

22   voice up.

23   A    I was the theater food advisor.

24   Q    What's your rank in the military?

25   A    Chief Warrant Officer III.

1    Q    When did you first learn that you were the subject of

2    a criminal investigation?

3    A    I received a phone call from Mr. St. Amat who said

4    that he wanted to have an interview with me in Hawaii

5    where I'm stationed.

6    Q    Did you participate in that interview?

7    A    Yes, I did.

8    Q    At some later point did you learn that the United

9    States U.S. Attorney was interested in getting your

10    testimony at a grand jury hearing?

11    A    Can you repeat that question?

12    Q    When did you first learn that the United State's

13    Attorney had an interest in prosecuting you?

14    A    Not until I met with Mr. Robertson.

15    Q    Under what auspices did you come to meet with

16    Mr. RObertson?

17    A    Did you say what office?

18    Q    How did you come to meet Mr. Robertson?

19    A    I originally received a phone call from him saying

20    that he would represent me as the defense -- a defense

21    attorney.

22    Q    How long was that phone conversation?

23    A    Very brief.  Probably 10, 15 minutes.

24    Q    Did you pay him to represent you?

25    A    No, I did not.

1  Q    Do you know how it is that he agreed to represent

2  you?

3  A    I had spoke to the agents, Mr. St. Amat and Mr. Todd

4  Bishop, and I had requested information on the possibility

5  of being represented by a defense attorney.

6  Q    After you had the initial phone call with

7  Mr. Robertson, when did you next speak with Mr. Robertson?

8  A    I spoke with him at our first meeting in his office.

9  Q    How long was that meeting?

10  A    Approximately 10 or 15 minutes.

11  Q    Did you review any documents with him at that

12  meeting?

13  A    Because it was so brief, basically we went over the

14  fact that he had spoke to Mr. Lang and he informed me that

15  I was basically treading water and if I cooperate, that

16  would be the best avenue of approach and that I should

17  consider going that route.  And he then informed me that

18  he spoke to Mr. Lang about this and that we would go to

19  his office and talk to him and he had some agents there

20  waiting for us for questioning.

21  Q    Who was in the meeting with you with Mr. Robertson

22  when you got to his office?  Was it just the two of you?

23  A    Yes.

24  Q    And at the conclusion of that meeting, where did you

25  go next?

1    A    We went directly over to Mr. Lang's office building.

2    Q    Did you go there with Mr. Robertson?

3    A    Yes, I did.

4    Q    What do you remember happening when you arrived at

5    Mr. Lang's office?

6    A    We were greeted by the agents Todd Bishop and

7    St. Amat and we walked into the conference room.

8    Q    Did you discuss the case there in front of Mr. Lang?

9              MR. LANG:  I couldn't hear the question.

10             THE COURT:  I'm sorry?

11             MR. LANG:  I couldn't hear the question.

12             THE COURT:  Would you restate it, please?  Use

13    the microphone.

14    Q    Did you discuss the case in front of Mr. Lang there

15    with your attorney?

16    A    Well, originally it was just the agents and then

17    Mr. Lang came in and basically did his briefing and it was

18    in reference to the cooperation agreement and then he

19    touched briefly on what was going to happen.  And I don't

20    recall a lot of it, but then he stepped out and then

21    that's when we were questioned by the agents.

22    Q    Were you presented a cooperation agreement there in

23    that setting?

24    A    Yes.

25    Q    Had you seen this document prior to this date?

1    A    No, I didn't.

2    Q    Did you read it?

3    A    Briefly.

4    Q    Did your attorney read it to you?

5    A    It's my best recollection -- of course I was under a

6    lot of pressure and I was waiting for Mr. Robertson to

7    provide me some detailed information on what the pros and

8    cons were.

9              MR. ROMERO:  Judge, may I mark for

10   identification Defendant's Exhibit --

11             THE COURT:  Sure.  Just mark it yourself.  Do

12   you have some stickers?  She has some stickers.  You can

13   put them on, mark it yourself.

14             MR. ROMERO:  May I approach the witness, Your

15   Honor, with the exhibit?

16             THE COURT:  You may.

17   Q    Mr. Peleti, I have handed you what is marked for

18   identification purposes as Defendant's Exhibit 1.  Do you

19   recognize this document?

20   A    Yes, I do.

21   Q    What is this document?

22             THE COURT:  Does someone have an extra copy of

23   this?

24             MR. ROMERO:  I'm getting it out now.

25             MR. LANG:  For the Court, Your Honor?

1          THE COURT:  Well, if somebody has an unmarked

2     copy handy, just give it to me, please.  If not, Connie

3     can make a copy.  Do you have a copy?  Is that your copy?

4     We'll make a copy real quick.  Go ahead.  You can start

5     your questioning.

6     BY MR. ROMERO:

7     Q    Mr. Peleti, did you read through the entirety of this

8     document that morning when it was presented to you?

9     A    No.

10    Q    Your attorney, did he read it to you?

11    A    No.

12    Q    How long have you served in the military?

13    A    Close to 24 years.

14    Q    In those 24 years have you had any legal training?

15    A    No, I haven't.

16    Q    Did you sign this document on that day?

17    A    Yes, I did.

18    Q    What did you believe you were signing?

19    A    I believed what I was signing was to assist the

20    federal government to capture these folks that were

21    submitting bribes to the Government and that by me helping

22    the Government that I would not receive any punishment for

23    cooperation, cooperating with the Government.

24    Q    Who told you that?  Who told you that you wouldn't

25    receive any punishment?

1    A    Actually when we sat in Mr. Robertson's office, my

2    understanding from him was that the cooperation agreement

3    was to assist the Government in trying to, like I said,

4    capture these folks that were doing illegal acts and that

5    I would be a vital asset to them.

6    Q    You were given this document.  It's three pages long.

7         THE COURT:  I'm not sure he answered the

8    question you asked.  Could you clarify that with him right

9    now, please?

10   Q    What led you to believe that you would not receive

11   punishment in exchange for your cooperation?

12   A    Well, my recollection, talking to the agents,

13   specifically Mr. St. Amat, at our previous interview we

14   had walked outside after the interview, just him and

15   myself, and I had asked him -- I said, "What's the

16   possibility of me cooperating with the Government that

17   nothing happens to me?"  He says, "Well, that's not up to

18   me, but you can present that to Mr. Jeff Lang and that's

19   for him to decide."  So that being said, then when I had a

20   meeting with Mr. Robertson, because it was so brief, in my

21   mind I thought that was what we were going to do, go

22   cooperate with the Government and that no punishment would

23   be brought down towards me.

24   Q    When you're handed this three page document and prior

25   to signing it, did Mr. Robertson invite you to have a

1   private conversation with him concerning the contents of

2   this document before you signed it?

3   A    No, he didn't.

4   Q    When you were presented this document, did the United

5   State's Attorney invite you to have a private meeting with

6   your attorney so that you could go over the contents of

7   the agreement?

8   A    Not to my recollection.

9   Q    Do you recall how long you spent on this document --

10  strike that.  Do you recall how long it took you to read

11  the document before you signed it?

12  A    I can't -- it was brief.  It was brief.  I cannot

13  tell you I read this in its entirety.

14          THE COURT:  I'm sorry?

15  A    It was brief.

16          THE COURT:  What did you say?

17  A    It was very brief.  You know, I don't think I read

18  the whole thing in its entirety.

19  Q    Prior to going to Mr. Lang's office with your

20  attorney, did your attorney ask you, "Mr. Peleti, are you

21  willing to plead guilty to a crime"?

22  A    Would you please repeat that question?

23  Q    Did your attorney ask you prior to going to

24  Mr. Lang's office whether you were willing to plead guilty

25  to bribery?

1  A    No.

2  Q    If he had asked you that question, what would your

3  answer have been?

4            MR. LANG:  Objection.

5            THE COURT:  What's the objection?

6            MR. LANG:  Speculation.

7            THE COURT:  Overruled.

8  A    No.

9            MR. LANG:  Also relevance.

10           THE COURT:  Overruled.

11 BY MR. ROMERO:

12 Q    Did your attorney ask you if you were willing to

13 plead guilty to any felony?

14 A    No.

15 Q    If your attorney would have asked you if you were

16 willing to plead guilty to any felony, what would your

17 answer have been?

18           THE COURT:  I'll show a continuing objection.

19 You may answer.

20 A    No.

21 Q    After you signed this document, what happened in the

22 meeting?

23 A    Mr. Lang stepped out of the office and then I was

24 introduced to the FBI agent that's sitting in the back,

25 the back there, I forget her name, and then that's when

1    the interview process took place.

2    Q    How long was the interview?

3    A    We started approximately 9:30, 10:00, and it went on

4    to about lunchtime and then we broke for lunch and came

5    back for more interview and probably three or four more

6    hours in the afternoon.

7    Q    Was your attorney present during this interview?

8    A    Yes, he was.

9    Q    Prior to -- just so that I'm clear, there is the one

10   phone call you had with Mr. Robertson prior to your

11   initial meeting with him, correct?

12   A    Yes.

13   Q    And then the next time you speak with him privately

14   is in his office for 15 minutes, correct?

15   A    Yes.

16   Q    And then you go to Mr. Lang's office and you execute

17   this cooperation agreement, correct?

18   A    Yes.

19   Q    And then you're questioned by Mr. Lang's agents for a

20   series of hours?

21   A    Yes.

22   Q    After this date concludes, when do you see

23   Mr. Robertson next?

24   A    We went back to his office and I basically, you know,

25   discussed with him what the plans were in the future and

1    the response was to cooperate.

2    Q    Did he tell you then that Mr. Lang would be preparing

3    a document charging you with a crime?

4    A    No.

5    Q    When did you first learn that the Government was

6    going to charge you with a crime?

7    A    When I was indicted, approximately -- I would say end

8    of December, beginning of January.

9    Q    After your meeting in August that you have described

10    to the Court, when did you next speak with Mr. Robertson?

11    A    Because of difficulties of the distance and

12    locations -- I live in Hawaii and of course here, he lives

13    here in Illinois -- I had difficulties making contact with

14    him.  Several times I left messages.  Of course it was

15    hard.  It was very difficult to try to make contact with

16    him.  But I would probably say a month after our first

17    live visit.

18    Q    Was that a telephone conversation or an in-person

19    meeting?

20    A    Telephone conference.

21    Q    How long was it?

22    A    I would say three to four weeks.

23    Q    I'm sorry.  How long was the phone call?

24    A    Oh, probably 10 or 15 minutes.

25    Q    When did you next speak with Mr. Robertson?

1           THE COURT:  Can you find out what was said

2     during that phone call so we don't have to go back to it?

3     Q     Sure.  Do you recall what the subject of that

4     telephone conversation was, the 15-minute conversation?

5     A     We spoke about several things, but the main thing

6     that we spoke about was me coming back to Rock Island to

7     meet with the agents so we could make some phone calls to

8     different service members that were potentially in

9     violation of certain crimes.

10    Q     Did he discuss with you on that occasion that

11    Mr. Lang would be charging you with a crime?

12    A     No.

13    Q     Did he ask you then if you would be willing to plead

14    guilty to a felony?

15    A     No.

16          THE COURT:  Do I understand correctly that this

17    phone call occurred before the indictment came down?

18          MR. ROMERO:  Correct.

19          THE COURT:  Thank you.

20          MR. LANG:  Could we have some kind of time frame

21    on it though, Judge?

22          THE COURT:  Well, the time frame that I have is

23    that he spoke with him a month after they were together in

24    Rock Island, whenever that was.  Go ahead.

25

1  BY MR. ROMERO:

2  Q    When did you next speak with Mr. Robertson?

3  A    I spoke to Mr. Robertson several times, but very

4  brief.  "What do I need to be concerned about?"  Like I

5  said, every conversation we had was very brief.  It was,

6  like I said, very difficult to make contact with him, so

7  it was very brief.  But the majority of it was pertaining

8  to my visit back to Rock Island to meet with the agents.

9  Q    When did you next meet with Mr. Robertson in person?

10 A    Did you say in person?

11 Q    Correct.

12 A    The next time I met with Mr. Robertson, on or about

13 November time frame.

14 Q    Was that in Rock Island?

15 A    Yes.

16 Q    You met with him at his office?

17 A    Yes.

18 Q    How long?

19 A    Well, actually I was picked up by his secretary and

20 brought over to the hotel and he met me at the hotel and

21 that's where I also met the agents, but we didn't go to

22 his office until lunchtime.  I met with the agents prior

23 to meeting with him in his office.

24 Q    How long did you meet with him in private?

25 A    I would say probably 10 or 15 minutes.

1    Q    What did you discuss during that 10 or 15 minutes?

2    A    We discussed where we were at with my case.  We also

3    discussed the fact that in no way, shape or form was I

4    going to plead guilty and we agreed to that.  That's the

5    route we were going to take if we were handed down the

6    indictment and the charges, that we were going to plead

7    not guilty.  But he made reference to, "Hey, don't let

8    the, as I say, the carriage before the horse.  Let's deal

9    with what's at hand first and that will follow later."

10    Q    Let's talk a little bit about what you just said.

11    The subject of an indictment was discussed between you and

12    Mr. Robertson?

13    A    Yes.

14    Q    What did you understand that to be?  What did it mean

15    to have an indictment potentially coming your way?

16    A    To be quite honest, I do not know because at the time

17    in my mind and discussing it with Mr. Robertson in length

18    when in person it was, you know, regardless of what's

19    going to happen, you know, if I was handed down the

20    indictment, I was going to plead not guilty.

21         Furthermore, we also had discussed the fact that

22    I stated I wanted to write a letter to Mr. Lang which

23    talked about my background, background history, military,

24    so forth, and present that, and I believe it's called a

25    proffer letter, and present that to Mr. Lang.  And while I

1   was there, I drew the letter up in the hotel and I

2   provided it to him before I left.  But as far as the

3   indictment, I was not too sure about whether it was coming

4   down or, you know, really any detail about the indictment.

5   Q    Did he tell you what charges you could be facing?

6   A    Briefly, yes, he did.

7   Q    What did he tell you?

8   A    We talked about the possibility of the bribery

9   charges and to what extent as far as what the sentencing

10  guidelines were.  Basically I just told him, "We don't

11  want to go that route.  We don't want to think about

12  that."  But that's all we talked about.

13          THE COURT:  I'm sorry.  Who said that, "We don't

14  want to go that route", you or him?

15  A    I, Your Honor.

16  Q    When did you next speak with Mr. Robertson?

17  A    Because I felt that -- because I felt that he was not

18  giving me enough face time, because I was -- I was there

19  for approximately a week and I spent more time with the

20  agents than I did my own attorney, so I felt that -- I

21  felt that I needed to talk to him to get, you know, the

22  grasp of what was coming up in the future with me and so

23  we met at the bar at my hotel in the evening time frame.

24  Q    Did Mr. Robertson ask you at this time details around

25  how it is that you came in possession of $50,000?

1    A    No.

2    Q    Did he ask you details around how the menu board

3    selects vendors for possible contracts with the United

4    States military?

5    A    No.

6    Q    Did he ask you details about what your specific

7    military assignment was in the military food theater?

8    A    Briefly.

9    Q    Did he ask you details about what existing contracts

10   Ibrihim had with the United States military?

11        THE COURT:  I'm sorry.  Say that again.

12   Q    Did he ask you any details about what existing

13   contracts Ibrihim had with the United States military?

14   A    No.

15   Q    Did Mr. Robertson ask you details around your

16   conversation with Mr. Ibrihim the last time you saw him?

17   A    No.

18   Q    When was next time you spoke with Mr. Robertson?

19   A    I believe we spoke on the phone.

20   Q    Do you know around what time frame?

21   A    It was probably a day or two after the meeting at the

22   bar.

23   Q    When was the next time you saw Mr. Robertson?

24   A    I didn't see him after that because he was tied up

25   and then once we couldn't meet.  We were supposed to meet

 1   that morning and somehow it just didn't pan out.  So I got

 2   back on a flight and went back to Hawaii.

 3   Q    At some point you saw Mr. Robertson again, correct?

 4   A    No, not physically.

 5   Q    That was last time you saw Mr. Robertson?

 6   A    Until the plea hearing.

 7   Q    So the next time you saw Mr. Robertson was the day on

 8   which you entered a plea of guilty to this Court, correct?

 9   A    Yes.

10   Q    Prior to entering your plea of guilty, where did you

11   meet Mr. Robertson?

12   A    I was supposed to meet Mr. Robertson the day prior to

13   the plea hearing because I flew in, I want to say, on

14   Wednesday, Wednesday evening, and I was supposed to meet

15   with him the next day, which was a Thursday.  And I made

16   several phone calls to him and he said he would meet me

17   sometime that day and I called back several times and he

18   said we would meet that evening.

19         Then he called me back, said, "Hey, listen, what

20   I need you to do is I need you to meet with the probation

21   officer."  And I just felt that that was kind of strange.

22   Why was I meeting with the probation officer prior to the

23   plea hearing?  So I had asked him -- I said, "Why am I

24   meeting with the probation officer?"  And he made a

25   comment, "That's normal business.  Don't worry about it.

1    He's all right.  He's an all right guy basically."

2            So I went to meet with the probation officer.  I

3    did not meet Mr. Robertson until -- I talked to him later

4    that evening and I said, "Hey, we need to meet before the

5    hearing."  So we agreed that we would meet at 8:00 o'clock

6    at my hotel.  So that was the next time that I saw him

7    physically.

8    Q    What did you think was going to take place at the

9    plea hearing?

10   A    In my mind, I thought we would go and plead not

11   guilty.

12   Q    What caused you to believe that?

13   A    Because all along I wanted to plead not guilty and

14   again, in my mind, when we cooperated I felt that if I

15   helped, again if I helped the Government, then no

16   punishment would come down upon me.

17   Q    When did you first learn that you were going to plead

18   guilty to a felony?

19   A    Me and Mr. Robertson had spoke prior to the plea

20   hearing.  Apparently the indictment came down and --

21            THE COURT:  I'm sorry?

22   A    The indictment -- we had the -- I guess the

23   arraignment.  That's what it was.  The arraignment over

24   the phone.  So after the -- after the teleconference, I

25   had called Mr. Robertson and asked him, "Hey, what's going

1   on?"  And he basically said that, "Well, you're going to

2   be charged.  You're going to be charged.  You will be

3   indicted."  I'm sorry.  "You're going to be indicted."  So

4   at that point I was like, "Hey, you know, we're still

5   going along with this, you know, with pleading not

6   guilty."

7            So we had talked a couple more times and

8   basically we had a disagreement or argument because what

9   had transpired was I didn't speak to him through the month

10  of December because I was calling his office and e-mailing

11  him and telling him, "Hey, you know, what do I need to be

12  prepared for?"  And he never returned my phone calls for

13  over a month.  I finally got ahold of his secretary who

14  told me and informed me that I had a hearing like the

15  second week of January.  I said, "Well, that's great

16  hearing from you, you know.  Why didn't I hear this from

17  my own attorney?"

18           Well, on or about the 2nd of January, I had

19  finally got ahold of Mr. Robertson and at that time he had

20  told me that -- we had some disagreements over the phone

21  and I told him, you know, "Why am I just finding out that

22  I have a hearing in like two weeks?  You know, I'm in the

23  military.  I need time to prepare for my travels.  And, by

24  the way, we need to sit down, talk about my case."  Well,

25  that's when he made the comment about, you know, "Hey,

1    we're -- you know, we can sit and argue all day, you

2    know."  And that's when he mentioned that we would be

3    pleading guilty.  I said, "Wait a minute.  You know, we

4    talked about pleading not guilty all along and all of a

5    sudden you're pleading guilty."  Then he made a comment,

6    "Well, we're embarking on unchartered territory."

7            So we weren't getting no where.  So basically

8    then I had to deal with -- because at this point the

9    Department of Justice wasn't going to pay for my travels,

10    so that was another added stress.  But at that time was

11    the first time that we discussed about pleading guilty.

12    Q    Did you discuss with him your right to a trial, "him"

13    being Mr. Robertson?

14    A    At some point I did.  I can't tell you at which time,

15    but yes.

16    Q    Do you have any memory about that conversation?

17    A    No, I don't.

18    Q    Do you believe as you sit here today you have been

19    indicted?

20    A    Now I do.

21            MR. LANG:  Object.  I think, for the record,

22    there was an information filed just before his plea,

23    Judge.

24            THE COURT:  I'm sorry?

25            MR. LANG:  I think, just to keep the record

1    straight, there was an information filed.  There has never
2    been an indictment.

3              THE COURT:  Okay.  Thank you.  Go ahead.
4    BY MR. ROMERO:
5    Q    Did you discuss with Mr. Robertson your right to a
6    grand jury?
7    A    The only thing I recall is I made a comment to him
8    about pleading the Fifth going into the grand jury and he
9    informed me that that wasn't going -- that wasn't the
10   thing to do.
11   Q    What gave you the notion of pleading the Fifth at the
12   grand jury?
13   A    I had seeked counsel through the military JAG office
14   and informed him of what had transpired as far as
15   interviews and that I was going to be summoned to a grand
16   jury and he had asked -- I had asked him what my rights
17   were and he said, "Well, you can plead the Fifth."  I
18   said, you know, "So is that what you're recommending?"  He
19   says, "Yes."  So that's what I kept in my mind and
20   presented that to Mr. Robertson.
21   Q    Were you told at a certain point by Mr. Robertson
22   that you needed to waive your right to a grand jury
23   indictment?
24   A    I don't believe we ever seriously went over it.
25   Q    Do you remember on what day you signed your plea

1  agreement?

2  A    Yes.

3  Q    When was that?

4  A    On or about the 5th of February.

5         MR. LANG:  The plea agreement is already in the

6  file.  No objection to giving to it him, referring him to

7  it.

8         THE COURT:  I'm sorry?

9         MR. LANG:  No objection to him showing him the

10  plea agreement.  It's already in the file.  It's public

11  record.

12         THE COURT:  Go ahead.

13  BY MR. ROMERO:

14  Q    Mr. Peleti, I'm going to hand you what appears to be

15  a 25-page document entitled "Plea Agreement".  Do you

16  recognize this document?

17  A    Yes.

18  Q    Do you recognize your signature on the last page on

19  the signature line?

20  A    There's no signature here, but I recall signing it

21  though.

22  Q    Can you turn to page 25?

23  A    Yes.

24  Q    Does your signature appear on that page?

25         MR. LANG:  They are redacted in the court file.

1    We stipulate that he signed it.

2    Q    Do you recognize a date on that last page?

3    A    Yes.

4    Q    What is that date, Mr. Peleti?

5    A    February 9.

6    Q    Do you remember the day you pled guilty before this

7    Court?  Do you remember that day?

8    A    I thought it was the 5th of February.

9         MR. LANG:  We'll stipulate he signed the plea

10   agreement just before the plea hearing on February 9,

11   2007.

12        THE COURT:  Thank you.

13   Q    Mr. Peleti, how much time did you spend reading this

14   25-page document before you signed it?

15   A    Not much time at all.

16   Q    Could you give us a reasonable estimate?

17   A    A minute, two maybe, a minute or two minutes.

18   Q    What did your lawyer tell you about this document

19   before you signed it?

20   A    That we were pleading guilty to these charges.

21   Q    Did he explain the contents of these 25 pages to you?

22   A    No, he didn't.

23   Q    How much time did your lawyer spend with you on

24   February 9 with this document before you signed it?

25   A    Not much time at all.

1    Q    Could you give us a reasonable estimate?

2    A    Again, a minute or two.

3    Q    Did you understand what was in here?

4    A    No, I didn't.

5    Q    Mr. Peleti, you're a grown man.  You're given a

6    25-page document.  It's a legal document.  Why are you

7    signing it if you don't understand it?

8    A    Bottom line is I was relying on my attorney to

9    represent me.

10   Q    Did you view him as an authority figure in this

11   relationship?

12   A    Yes.

13   Q    Is it your custom and habit to defer to authority?

14   A    Yes.

15   Q    Did you trust your lawyer?

16   A    Yes.

17   Q    Did you think that when you were signing this --

18            THE COURT:  Please don't ask leading questions

19   at this point.

20   Q    Did you realize you were agreeing to plead guilty to

21   a felony?

22   A    Would you please repeat that question?

23   Q    Did you realize that you were actually being asked to

24   plead guilty to two felony counts?

25   A    Yes.

1  Q    You realized that?

2  A    Yes.

3  Q    Is that what you wanted to do?

4  A    No, not at all.

5  Q    What did you believe that your sentence was going to

6  be in return for signing this agreement?

7  A    Well, I read an affidavit.  Like 15 years.  The

8  second charge was like 5 years.  Total of 20 years for

9  both Counts 1 and 2.

10  Q    What was your understanding of what the agreement was

11  when you signed it?

12  A    That I was going to plead guilty.

13  Q    What about what you were going to get in return for

14  pleading guilty?  What was your sentence going to be?

15  A    It was going to be harsh.  It was going to be harsh

16  for both counts.

17  Q    How much time elapsed between the time you were

18  handed this document and the time you actually were called

19  before the Court to enter your plea?

20  A    Maybe five, ten minutes.

21  Q    Did Mr. Robertson tell you you had a right to have an

22  investigator help you prepare your defense?

23  A    No, he didn't.

24  Q    Did Mr. Robertson tell you that you didn't have to

25  sign that agreement?

1    A    No, he didn't.

2    Q    Did you feel pressured?

3    A    Yes, I did.

4    Q    Did you feel like you had a choice?

5    A    No.

6    Q    Did you ever discuss the possibility of immunity with

7    Mr. Robertson?

8    A    Yes, we did discuss immunity.

9    Q    What was your understanding?

10         THE COURT:  Can we have a time, place, who was

11    present?

12         MR. ROMERO:  Thank you, Your Honor.

13    Q    To the best of your recollection, when did you have

14    that conversation discussing the concept of immunity with

15    Mr. Robertson?

16    A    This is when I first met him and we had walked over

17    to the -- to Mr. Lang's office.

18    Q    What do you remember that conversation to include?

19    What did you guys talk about?

20    A    I had -- I was the one that brought it up as far as

21    immunity because how I understood immunity was whatever

22    you -- however much cooperation you provide the

23    Government, that it can be used against you.  You know,

24    all the statements you made could be used against you.

25    Q    Were you surprised that you were pleading guilty on

1  February 9 when you thought you were going to plead not

2  guilty?

3  A    Yes.

4  Q    Why did you want to plead not guilty?

5  A    Because I believed what took place didn't warrant --

6  did not warrant the fact that, one, that it should ever

7  have been tooken to trial or to a plea hearing and the

8  fact that I, for one, felt later that I was not

9  represented by my attorney.

10  Q    Were there any other collateral concerns that you

11  had?  For example, your military pension, was that a

12  factor in your consideration?

13  A    Yes, this was a big factor.

14  Q    Can you explain to the Court why that's a big factor?

15  A    It's no secret that I have approximately 23 years in

16  the service and I think I've displayed a sincere --

17  provided a service not only to foreign countries but to

18  the United States.  And for me to lose all that that I've

19  worked hard for, which is a lot -- I've been to a lot of

20  places, been in danger, seen a lot of action, seen -- you

21  know, come in contact with a lot of people and touched a

22  lot of lives.  And for me to lose all that I've worked so

23  hard for meant a lot and I just felt that I was not

24  receiving that in return in terms of representation.

25  Q    Were you told on February 9 that as a result of your

1 | pleading guilty you would lose your 25-year pension?

2 | A    We did not discuss that.

3 | Q    When did you learn that that would be a consequence

4 | of your plea of guilty?  When did you first learn that you

5 | were going to lose your pension as a result of your guilty

6 | plea?

7 |          MR. LANG:  Your Honor, I'm going to object.

8 | What does this have to do with Mr. Robertson's

9 | representation?  I think we're drifting far afield.

10 |          THE COURT:  Overruled.

11 | A    I just received that information this morning.

12 | Q    Okay.  There was some discussion this morning with

13 | Mr. Lang and I.  Did you receive some documentation, some

14 | letters from the military concerning possible sanctions

15 | against your pension at any point?

16 | A    No.

17 | Q    Did you receive a letter from the military -- strike

18 | that -- from the executive branch concerning a collateral

19 | consequence to your ability to contract with the federal

20 | government?

21 | A    Oh, yes.  Yes.  I received a letter in the mail, a

22 | statement from the Department of the Army that I would be

23 | removed from any future contracts or dealings with any

24 | type of contracts.

25 | Q    For how long?

```
 1   A     Forever.

 2   Q     Did you know on February 9 --

 3              THE COURT:  Well, I don't know when he received

 4   that.  Obviously the timing on that is -- if it has

 5   relevance, it's only relevant if he received that prior to

 6   the time he -- after the time he pled guilty.

 7   BY MR. ROMERO:

 8   Q     When did that letter come to you?

 9   A     This was after the plea hearing.

10   Q     When you were entering your guilty plea, did

11   Mr. Robertson tell you that in addition to things laid out

12   in this document that you would also be barred for the

13   rest of your life from contracting with the United States

14   Government?

15   A     No.

16              MR. ROMERO:  One moment, Your Honor.

17              THE COURT:  I think this would be a good time to

18   take a ten minute recess.  We'll be in recess for ten

19   minutes.  The witness may step down.

20                       (Recess taken)

21              THE COURT:  You may proceed.

22   BY MR. ROMERO:

23   Q    Mr. Peleti, I want to show you this.  Mr. Peleti, I'm

24   going to hand you a document which appears to be a

25   declaration that you signed.  If I could just draw your
```

1  attention to the top of paragraph -- top of the page

2  there, paragraph 15.

3              MR. LANG:  For the record, that's docket

4  entry 32; is that correct?

5              MR. ROMERO:  Correct.

6              MR. LANG:  It's docket entry 32, I believe,

7  Judge.

8              THE COURT:  What page are you on?

9              MR. ROMERO:  Paragraph 15, Your Honor, top of

10  the page.  Have you had a chance to look at that,

11  Mr. Peleti?

12              THE COURT:  I assume this is not

13  mid-October 2007.  It's 2006; is that right?

14              MR. ROMERO:  Yes, Your Honor.  I wanted to go

15  over some details on the dates.

16              THE COURT:  I'm sorry.  Were you going to ask

17  him a question about paragraph 15?

18              MR. ROMERO:  I am, Judge.

19  BY MR. ROMERO:

20  Q    In your declaration, it appears that you received at

21  least some copy of a proposed plea agreement in about

22  October of '06.  Is that correct?

23  A    Yes.

24  Q    Did you receive that via mail?

25  A    I don't recall.

1    Q    You had a conversation -- did you have a conversation

2    with Mr. Robertson after receiving the proposed plea

3    agreement in October of '06?

4    A    Yes.

5    Q    What did you tell him about the proposed plea

6    agreement?

7    A    I remember specifically telling him that if we were

8    going to plead, we would plead not guilty and that I would

9    not accept anything or do time.

10   Q    What did he say to you in return?

11   A    I just remember him telling me that we need to stay

12   the course and continue to fully cooperate.

13   Q    What did Mr. Robertson tell you your defenses were to

14   the bribery charge?

15   A    Basically he told me there was basically no defense

16   and that our only defense would be to cooperate.

17   Q    What did he tell you your defenses were to the

18   allegations that you failed to disclose bringing in in

19   excess of $10,000 to the United States?

20   A    Could you please repeat that question again?

21   Q    With respect to Count 2, what did he tell you your

22   defenses were?

23   A    Basically, again, there was no -- you know, there was

24   nothing discussed about defenses for Count 2.

25   Q    Did he tell you that the Government needed to prove

1    Count 2 independent of what you said at the grand jury

2    hearing?

3    A    No.

4    Q    Did you ever discuss with Mr. Robertson the

5    distinction between the bribery statute and the gratuity

6    statute?

7    A    I think briefly, yes.

8              MR. ROMERO:  One moment, Your Honor.  I think

9    I'm about done.

10   Q    Mr. Peleti, I want to jump back a little bit before I

11   finish up with my questioning of you to the grand jury

12   questioning of you.  Did you consult with Mr. Robertson

13   prior to testifying against yourself in the grand jury?

14             MR. LANG:  I object to the characterization,

15   but --

16             THE COURT:  Object to the characterization?

17             MR. LANG:  The characterization of him

18   testifying against himself in the grand jury.

19             MR. ROMERO:  I'll rephrase, Your Honor.

20             THE COURT:  Thank you.

21   BY MR. ROMERO:

22   Q    Did you meet Mr. Robertson before going into the

23   grand jury?  Did you have a meeting with your attorney

24   before you went into the grand jury room?

25   A    No.

1   Q    Did you want to meet with your attorney before going

2   into the grand jury room?

3   A    Absolutely.

4   Q    Did you communicate that interest to your attorney?

5   A    Yes, I did.

6   Q    How did you do that?

7   A    Telephonically.

8   Q    What did you tell him?

9   A    I told Mr. Robertson that I wanted to discuss with

10  him prior to going into the grand jury to ensure that I

11  was prepared and the fact that I was coming from, you

12  know, from Hawaii and that I wanted at least to touch base

13  with him prior to going in to be questioned by the grand

14  jury.

15  Q    What did he say to this?

16  A    Basically he said that he would meet with me prior to

17  that.

18  Q    This is the same conversation where you raised the

19  issue of your right to take the Fifth Amendment?

20  A    No, it wasn't.

21  Q    Do you know why it is you didn't meet with

22  Mr. Robertson prior to the grand jury questioning?

23  A    No, I don't.

24  Q    Did you try to get ahold of him?

25  A    Yes, I did.

1    Q    In what way did you try to get ahold of him?

2    A    When I arrived at the hotel, I tried to communicate

3    with him to possibly link up prior to the grand jury, so

4    it was the same day I was supposed to meet in front of the

5    grand jury.

6    Q    Did he eventually arrive?

7    A    Yes, he did.

8    Q    When?

9    A    After the grand jury had started.

10   Q    How did you come to learn that he actually arrived?

11   A    I believe Mr. Lang had informed me that he just

12   arrived and this is while I was in the grand jury.

13   Q    So prior to going into the grand jury, you did not

14   have the benefit of a conversation with your attorney,

15   correct?

16   A    That's correct.

17   Q    When Mr. Robertson arrived, did you then have a

18   private meeting with your attorney?

19   A    I don't recall.  No.  I believe -- no, I did not.  I

20   did not.

21   Q    I'm sorry?

22   A    I did not.

23   Q    Did you speak with Mr. Robertson after the grand jury

24   examination was done?

25   A    Yes.

1    Q    Were you told by Mr. Robertson that this grand jury

2    did not return an indictment?

3    A    Can you please rephrase that?

4    Q    Were you told by Mr. Robertson that this grand jury

5    did not return an indictment?

6    A    No.

7              MR. ROMERO:  Nothing further, Judge.

8              THE COURT:  All right.  Thank you.  You may

9    cross-examine.

10                        **CROSS EXAMINATION**

11   BY MR. LANG:

12   Q    Mr. Peleti, do you understand the notion that you

13   have to tell the Judge here today the truth and that means

14   the whole story and not just bits and pieces taken out of

15   context?  Do you understand that?

16   A    Yes, I do.

17   Q    All right.  The grand jury.  The day that you came

18   down, you had agreed previously to testify in the grand

19   jury under the cooperation agreement, right?

20   A    Can you please rephrase that?

21   Q    You had a cooperation agreement and you agreed to

22   testify in the grand jury.  This was no surprise to you,

23   right?

24   A    Yes.

25   Q    It was a surprise or not a surprise?

```
 1   A     Not a surprise.

 2   Q     That's correct.  You had gotten a subpoena in the

 3   mail or faxed to you well before that, hadn't you, right?

 4   A     Yes.

 5   Q     All right.  And on the day of the grand jury,

 6   Mr. Robertson had court or something, didn't he, before

 7   the grand jury session; isn't that correct?

 8   A     He did what?

 9   Q     He had court or some other obligation and was running

10   a little bit late; isn't that correct?  Isn't that the

11   truth?

12   A     I don't recall.

13   Q     All right.  You do recall --

14   A     He was late.  That's all I recall.

15   Q     You do recall when you got there, I met with you,

16   right, and got Mr. Robertson on his cell phone?

17              MR. ROMERO:  Objection, compound.

18   Q     Is that correct?  Do you remember this or not?

19              MR. ROMERO:  Objection.  That question is

20   compound, Judge.

21              THE COURT:  I'm sorry?

22              MR. ROMERO:  The question is compound.

23              THE COURT:  Overruled.

24   Q     Do you remember --

25              THE COURT:  Just a moment.  Overruled.  Answer
```

1  the question.

2  Q    Do you remember, Mr. Peleti, that Mr. Robertson

3  talked to you on his cell phone?  Apparently not.  You

4  don't remember?

5  A    I don't recall.

6  Q    All right.  Well, do you remember that we agreed that

7  to save your time and the grand jury's time, we would put

8  you into the grand jury just to introduce you until such

9  time as Mr. Robertson arrived?  Isn't that correct?

10  A    Yes.

11  Q    And you said that was fine, didn't you?

12  A    Yes.

13  Q    And then when Mr. Robertson arrived, we broke before

14  we asked you any substantive questions and you met with

15  him privately in an office across the hall from the grand

16  jury for several minutes, maybe up to half an hour; isn't

17  that correct?

18  A    I met with him, but -- I met with him, but --

19  Q    You don't remember how long?

20  A    No, it was not half an hour, but it was after we had

21  already started the grand jury.

22  Q    That's correct.  I asked you who you were and how old

23  you were and what you did for a living per our agreement;

24  isn't that correct?

25  A    Yes.

1   Q    And we asked you nothing about food service or

2   anything until you conferred with counsel privately; isn't

3   that correct?

4   A    Again, yes.  Yes.

5   Q    All right.  Do you have -- for the record,

6   Mr. Peleti, do you understand, read and write in the

7   English language fluently?

8   A    Yes.

9   Q    Do you have any hearing problems?

10  A    I have a speech impediment.

11  Q    All right.  Have you ever had any problems

12  communicating with Mr. Robertson?

13  A    We had some disagreements.

14  Q    I'm just talking about ability to understand what he

15  was telling you and him understanding what you were

16  telling him.  Ever a problem there?

17  A    Yes.  A lot of times I did not understand the legal

18  jargon.  So, yes, we did have some --

19  Q    I understand about the legal jargon.  I'm just

20  talking about some kind of hearing or speech deficiency.

21           MR. ROMERO:  Your Honor, may I interpose an

22  objection?  I would ask that my colleague allow the

23  witness to complete his answer before posing the next

24  question.

25           THE COURT:  Sustained.

1            MR. LANG:  I'll be glad to do that, Judge.  Just
2    trying to move this along.
3    BY MR. LANG:
4    Q    Let's talk about the plea agreement.  You said you
5    got to see it for one to two minutes before the plea
6    hearing; is that right?  February 9, 2007, you testified
7    to His Honor here that you only got to see that plea
8    agreement for a minute or two before you signed it; is
9    that right?
10   A    That day, yes.
11   Q    And -- that day.  It was a 24, 25-page document,
12   right?
13   A    Yes.
14   Q    And were you trying to tell the Judge that that was
15   the first time you had ever seen those words and you
16   didn't know what was in it and only had a minute or two to
17   digest it and then sign it?
18   A    To the best of my recollection, yes.
19   Q    Okay.  Mr. Peleti, I'm going to show you what has
20   been marked Government Exhibit 2.  I previously provided
21   it to counsel and I also have copies for the Court.  If I
22   can approach, I'm going to show you what is marked
23   Government Exhibit 2.  Do you recognize it?  Do you
24   recognize it, sir?
25   A    Yes.

1    Q    It's a letter you got.  It's dated October 14, 2006,

2    correct?  Right?

3    A    Yes.

4         MR. LANG:  At this time I would offer Government

5    Exhibit 2 unless there's an objection.

6         THE COURT:  Any objection?

7         MR. ROMERO:  No.

8         THE COURT:  All right.  It's admitted.

9  BY MR. LANG:

10   Q    This letter transmitted a plea agreement; isn't that

11   correct?  Doesn't it say, Mr. Peleti, "I enclose the plea

12   agreement which I have received from Jeff Lang", right?

13   A    Yes.

14   Q    "I want you to review the agreement closely."  Isn't

15   that correct?

16   A    Yes.

17   Q    Mr. Peleti, isn't it true that except for filling in

18   a couple of blanks on the forfeiture part, that's

19   virtually the identical plea agreement that you signed on

20   February 9, 2007; is that correct?

21   A    I look at this as a two-page document versus a

22   25-page document.  That's significantly different.  That's

23   significantly different.

24   Q    "I enclose the plea agreement."  It was enclosed,

25   wasn't it?

 1          MR. ROMERO:  Assumes facts not in evidence, Your

 2   Honor.

 3          THE COURT:  Overruled.  Was there a plea

 4   agreement, sir?  Did you receive a plea agreement in

 5   October of '06 with this letter?  That's the question.

 6   A    I don't recall receiving it.  I receive a lot of

 7   documents, but I don't know what it means again.

 8   BY MR. LANG:

 9   Q    I understand.  It wasn't important, so you don't

10   remember whether you received it or not in October on this

11   matter that's so important to you?

12          MR. ROMERO:  Objection, argumentative.

13          MR. LANG:  I withdraw that.

14          THE COURT:  Sustained.

15   Q    Mr. Peleti, did you see a plea agreement prior to

16   February 9, 2007?

17   A    I don't believe I did.

18   Q    All right.  So you got surprised with a plea

19   agreement slid in front of you a couple of minutes before

20   the plea hearing and you only had one to two minutes to

21   look at it before you stood up there and said, "I reviewed

22   it, Your Honor"; is that correct?  Is that what you're

23   telling the Judge?

24   A    Mr. Lang, if I may, if you look at page 2 of this

25   document, the last paragraph, it says:  "There is no

1    particular rush to this, but I do think that you need --

2    you and I should schedule a time when we can have a

3    lengthy phone conversation, perhaps late a.m.  I look

4    forward to hearing from you soon."

5    Q    That's the last paragraph, right?

6    A    Right.

7    Q    The first paragraph goes on, doesn't it, says "I want

8    you to review the agreement closely", doesn't it?

9    A    Yes, but -- I'm sorry.  If you look up above that, it

10   goes on to say:  "I know you're going to have difficulties

11   with the contents of this letter."  Okay?  And which I

12   did.  It was very confusing.  I do not know the legal

13   jargon.  That's what I was hoping for him to explain.

14   That's why when I read this, this meant nothing to me.

15   Q    So are you saying that you never had a discussion

16   about this plea agreement and the guidelines with

17   Mr. Robertson after you received this until one or two

18   minutes before the plea on February 9?

19   A    Not thoroughly, no.

20   Q    Not thoroughly.  I have no idea what that means.

21   A    No, I did not.

22   Q    Okay.  No discussions.  You do see in the second

23   paragraph there's a discussion about a deferred sentence,

24   isn't there?

25   A    Yes.

1   Q    Deferred prosecution.  All right.  Third paragraph,

2   details about the sentencing guidelines, right?

3   A    Yes.

4   Q    Never had any discussions with Mr. Robertson about

5   that third paragraph?

6   A    Yes, we did.

7   Q    When?

8   A    When I met with Mr. Robertson the first time.

9   Q    You talked about the guidelines in, what, August of

10  2006?

11  A    Either the first or second time I met with him, yes.

12  Q    So four to six months before your plea, you talked

13  about the guidelines with Mr. Robertson, correct?

14  A    Yes.

15  Q    Four months before your plea he sent you a letter

16  detailing the guidelines calculations for the charges that

17  he anticipated you would be -- that would be filed against

18  you, didn't he?

19  A    What he sent me was the -- was not the -- it was not

20  to the bribery charges.  It was for the drug offenses.

21  And I called back to his office because he sent me the

22  wrong sentencing guidelines.

23  Q    But you said -- I thought you said you didn't talk to

24  him about this stuff after you got this letter.

25  A    Not in detail, no.

1    Q    To put this into context, Mr. Peleti, did you provide

2    a written statement to agents in Hawaii on July 25, 2006?

3    A    Yes, I did.

4    Q    And in that written statement you admitted that you

5    had taken a $50,000 bribe, didn't you?

6                MR. ROMERO:  Objection.  Misstates the facts and

7    it's beyond the scope and it calls for a legal conclusion.

8                THE COURT:  Overruled as to it being beyond the

9    scope.  You may wish to rephrase what it was he admitted.

10               MR. LANG:  I will be glad to, Judge.

11   Q    First, in your written statement you talked about a

12   particular company having given you gifts totaling $300,

13   right?

14               MR. ROMERO:  Your Honor, may I have a continuing

15   objection on beyond the scope and Fifth Amendment grounds

16   as to this?

17               THE COURT:  Absolutely.  We'll show your

18   objection.  Please continue.

19   Q    Did you talk about getting gifts of $300 from

20   somebody?

21   A    Yes.

22   Q    All right.  And did you talk about another company

23   giving you an SUV, a Montero to ride around in, and also

24   providing you with gifts valued up to $500?

25   A    Yes.

1    Q    Right.  That was in that written statement, right?

2    A    Yes.

3    Q    And then you talked about in your written statement

4    another company, Tamimi, and Shabbir Khan, and you put in

5    there, "Of course wanted to gain my trust and had asked if

6    he could take me out to dinner."  Do you remember that --

7    A    Yes.

8    Q    -- in your written statement?  And you said, "I have

9    been approached by Shabbir Kahn on several occasions for

10   bribery and gifts", didn't you --

11   A    Yes.

12   Q    -- in your written statement.  Then you talked about

13   receiving a total of approximately 8,000 U.S. dollars in

14   equivalent of Iraqi dinars in exchange for new contracts,

15   didn't you, right?

16            MR. ROMERO:  I believe that misstates the

17   statement.

18            THE COURT:  Well, I'm primarily interested in

19   the $50,000.  I'm not interested in --

20            MR. LANG:  Your Honor, I'm doing this to show

21   the context of what Mr. Robertson knew when he met with

22   the defendant.

23            THE COURT:  I understand.

24   BY MR. LANG:

25   Q    Then in the statement you also said you discussed the

1    possibility of setting a contract for all flatware and

2    paper products for Iraq, right?

3    A    Yes.

4    Q    And then you said, "I was given 50,000 American

5    dollars from Ibrihim by form of cash."  Right?

6    A    Yes.

7    Q    All right.  And then at the end of this you said, "I

8    honestly done this for one reason and that was due to

9    financial difficulties and was separated from my wife.  I

10   fully realize that this is no excuse for my actions.  I

11   would also like to note that I will fully cooperate with

12   the investigation at hand."  You said that, right?

13   A    Yes.

14   Q    In your signed written statement, right, Mr. Peleti?

15   A    Yes.

16   Q    You know, don't you, that as soon as Mr. Robertson

17   was appointed to represent you, he asked and we provided a

18   copy of your written statement to Mr. Robertson, right?

19   A    Yes.

20   Q    You knew that.  You knew he had the statement.  You

21   knew that he knew what you had admitted to, right?

22   A    Yes.

23   Q    He knew through this statement that you had been

24   given your Miranda warnings before you signed this

25   voluntary statement, right?

1           MR. ROMERO:  Objection.  Calls for legal

2    conclusion, calls for speculation.

3           THE COURT:  Sustained as to the last part of it.

4    I'll allow the part about the Miranda warnings.  Were you

5    given Miranda warnings, sir?

6    A    Yes.

7    BY MR. LANG:

8    Q    So you knew that Mr. Robertson knew that before he

9    ever met you, didn't you?

10          MR. ROMERO:  Judge, objection.  He can't make a

11   judgment on whether the Miranda warnings were appropriate.

12   Also calls for speculation as to what Mr. Robertson may

13   have been thinking about.

14          THE COURT:  The objection to this question is

15   overruled.  You may answer the question if you know.

16   A    I don't know.

17   Q    You knew Mr. Robertson knew what you had said in this

18   statement and he knew the form it was in before he ever

19   met with you?

20          MR. ROMERO:  Objection.  Calls for speculation.

21          THE COURT:  Well --

22   Q    Do you know that or not?

23          THE COURT:  If there are facts that he can

24   answer the question on, he should do that.  If not, he

25   should say so.

1  Q    Did Mr. Robertson have your written statement the

2  first time you met with him?

3  A    Yes.

4  Q    Then the cooperation agreement.  You signed the

5  cooperation agreement in the U.S. Attorney's Office,

6  correct?

7  A    Yes.

8  Q    Let me show you -- well, it's already in as

9  Defendant's Exhibit 1.  I'll offer the same thing as

10  Government Exhibit 102 for consistency.  But showing you

11  what has been marked Exhibit 102 --

12         THE COURT:  There's no reason to have two

13  exhibits.

14         MR. LANG:  All right.  Defendant's Exhibit 1.

15  That's fine.

16  Q    That's the cooperation agreement, right?  All right.

17  Mr. Peleti, you had discussions with Mr. Robertson and

18  also with me about what this cooperation agreement was,

19  didn't you, when you first saw it?

20  A    At our first meeting, yes.

21  Q    And you were told that this was being provided and

22  offered for your own protection, weren't you?

23         MR. ROMERO:  Objection.  Vague as to the source

24  of the statement, "you" were told.

25  Q    Were you told by anyone that this was in order --

1    this was being offered to you to protect you during this

2    interview?

3              MR. ROMERO:  Vague and relevance.

4              THE COURT:  Overruled.

5    A    Yes.

6    Q    All right.  It was explained to you paragraph by

7    paragraph, wasn't it?

8    A    That I don't recall.  I don't remember going through

9    each paragraph.

10             THE COURT:  I'm sorry?

11   A    No.  The answer to that question is no.

12   Q    It wasn't explained paragraph by paragraph?

13   A    Not to my recollection paragraph by paragraph.

14   Q    Okay.  Well, on page 2 of that agreement, if you will

15   flip to it, I believe it's paragraph 10, what does it say?

16   What does it say?

17   A    "At this time the Government is not making and has

18   not made any promises of any kind to your client regarding

19   the prosecution of any offense or the sentence in any

20   case."

21   Q    Nobody told you then that you had to plead guilty or

22   anything like that, right?

23   A    No.

24   Q    In fact, this says just the opposite, that we made no

25   representations, nobody was agreeing to anything having to

1    do with your prosecution or sentence at that time, right?

2    A    Yes.

3    Q    But your attorney recommended to you that you

4    cooperate; is that correct?

5    A    Yes.

6    Q    Nobody stood there with a gun or anything else

7    telling you or forcing you to sign this, did they?

8    A    No.

9    Q    And you're a chief warrant officer in the United

10   States Army, correct?

11   A    Yes.

12   Q    How many people do you supervise?

13   A    Probably three to five.

14   Q    How many people report to you or are under you?

15   A    Now three to five.

16   Q    I understand now, but back when you were the chief

17   food service advisor for the United States Army for the

18   entire Middle East theater, how many people reported to

19   you?

20   A    I don't know.  When you talk about reporting --

21   Q    How many people were subordinate to you within your

22   organization?

23            MR. ROMERO:  Vague as to "organization".

24            THE COURT:  Sustained.

25   Q    Whatever organization you were affiliated with, unit

```
 1   whatever, I'm just -- Mr. Peleti -- I'll withdraw the

 2   question.  Are you telling the Court that you signed this

 3   document against your will?

 4   A    No.

 5   Q    You read it before you signed it, didn't you?

 6   A    Again, briefly.

 7   Q    Did you read it or not?  I don't understand what

 8   "briefly" means.

 9        MR. ROMERO:  Argumentative.  He has answered the

10   question.

11        THE COURT:  Overruled.

12   A    Yes, I did read it, but I didn't understand it.

13   Q    What part didn't you understand?

14   A    To be frank with you, all of it.

15   Q    Okay.  Now you testified that you spoke with the

16   agents, Agent St. Amat, during a break or something about

17   the prosecution, right, what was going to happen to you,

18   what your sentence was going to be, right?

19   A    Yes.

20   Q    And we're talking about back in August, right?

21   A    August and also November time frame.

22   Q    And he told you that you would have to talk to your

23   attorney who would talk to me about that; isn't that

24   correct?

25   A    What time are you talking about?  I wasn't appointed
```

1   an attorney.  Your name was the only name that came up.

2   We didn't talk about my attorney first.  He referred to

3   you, that it would have to go through you, because at that

4   time I wasn't appointed an attorney.

5   Q    So this was back in Hawaii you asked that question?

6   A    Yes.

7   Q    Okay.  So it was before August?  It was the July 25

8   meeting?

9   A    Yes.

10  Q    You were already talking about what was going to

11  happen to you in terms of prosecution; is that right?

12  A    I was -- what I was referring to, yes.

13  Q    You knew that what you had done was wrong and

14  criminal?

15        MR. ROMERO:  Objection, Your Honor.

16  Argumentative, calls for legal conclusion.

17        THE COURT:  I'm not sure what relevance that has

18  to my decision.  Ask another question.

19  Q    You testified earlier that the first time that you

20  knew that there was a crime being charged, that Mr. Lang

21  was preparing charges, was in January of 2007; is that

22  correct?

23  A    Yes.

24  Q    What did you think the plea agreement was related to

25  back in October?  It talked about charges and crimes,

1  didn't it?

2  A    Yes.

3  Q    You talked about calls with Mr. Robertson.  How many

4  telephone calls did you have with Mr. Robertson to discuss

5  this case?

6  A    This entire case?

7  Q    Yes.  As you sit here today, how many calls have you

8  had with Mr. Robertson?

9  A    I would probably say six or seven.

10 Q    Six or seven total?

11 A    Telephonically.

12 Q    Total, start to finish from August or so, July 25

13 time to as you sit here today, six or seven?

14 A    No.  There's more times I called than what we made

15 contact with, if that's what you're referring to.

16 Q    I'm referring to how many times your voice and your

17 ears communicated with Don Robertson's voice and ears as

18 you sit here today.

19 A    Probably seven times.

20 Q    And have you had e-mails with him too?

21 A    Yes.

22 Q    How many?

23 A    I would say probably five, five e-mail transactions.

24 I have more e-mails sent to him with no response than we

25 made contact with.

1    Q    Okay.  You said you sought the advice of a JAG

2    officer in Hawaii; is that correct?

3    A    Yes, sir.

4    Q    You knew that on February 9 if you followed that JAG

5    officer's advice, you could plead not guilty, right?

6    A    Yes.

7    Q    You knew you had a Fifth Amendment right from talking

8    to the JAG officer to even speak with the agents; is that

9    correct?

10   A    Yes.

11   Q    You just don't think that a $50,000 bribe taken by a

12   public official in order to try to get a food service

13   contract is something that we in the federal government

14   should be trying to prosecute because of your background;

15   is that correct?

16            MR. ROMERO:  Objection.  Relevance,

17   argumentative, calls for --

18            THE COURT:  Overruled.

19            MR. ROMERO:  Judge --

20            THE COURT:  It's in response to a comment you

21   brought up.

22            MR. ROMERO:  But the characterization as a legal

23   bribe is not established, Your Honor, and he's asking my

24   client to affirm a legal characterization.

25            THE COURT:  I understand your objections.  You

1   may answer the question.

2   A     Can you ask the question again, please?

3   BY MR. LANG:

4   Q     You testified earlier that you just didn't think you

5   ought to be prosecuted for this because it's just a

6   $50,000 payment, right?

7   A     Yes.

8   Q     In light of your career, because of your career, even

9   though you were a public official and taking a $50,000

10  payment in exchange for your official action, you don't

11  think --

12              MR. ROMERO:  Objection.

13  Q     You don't think that we ought to be prosecuting you;

14  is that right?

15              MR. ROMERO:  Objection, Your Honor.  Assumes

16  facts not in evidence.  My client has never stated he has

17  taken this for an official action.  That's at issue.

18              MR. LANG:  Let me withdraw it and rephrase it.

19              THE COURT:  Thank you.

20  BY MR. LANG:

21  Q     You think we're picking on you here over a $50,000

22  payment; is that right?

23              MR. ROMERO:  Argumentative, Your Honor.

24              THE COURT:  Overruled.

25  A     I don't know what you mean by picking on me.

1    Q    Do you --

2    A    I think that's not the issue, picking.  I think --

3    Q    You testified on direct that you just don't want to

4    be -- you don't think you should be prosecuted in light of

5    your background, right?

6              MR. ROMERO:  Your Honor, could I have the

7    attorney admonished to allow the witness to complete his

8    answer before the next question?

9              THE COURT:  Well, it depends on whether he asks

10   an open-ended question or leading question.  It's

11   cross-examination.

12             MR. ROMERO:  But he shouldn't be able to cut off

13   my witness.

14             THE COURT:  Well, if he's starting to give a

15   none -- something beyond "yes" or "no" to a leading

16   question, then it's not inappropriate.

17             MR. LANG:  I'll leave the question alone, Judge.

18   We have the statement on direct.

19             THE COURT:  Thank you.  How much do you have

20   left?

21             MR. LANG:  I'm looking to make sure I have no

22   other questions.

23             THE COURT:  All right.

24   BY MR. LANG:

25   Q    You have had some legal training, haven't you,

1   Mr. Peleti?

2   A    Not to this extent, no.

3   Q    Again, I don't know what that means, "not to this

4   extent."

5   A    Well, it depends what you're referring to.  Legal

6   training, one, is basically like power of attorney, wills,

7   stuff of that nature, not anything to do with criminal

8   matters.

9           MR. LANG:  I have nothing else, Judge.

10           THE COURT:  Thank you.  How extensive is your

11   re-direct?  The reason -- well, we're not going to finish

12   this today in any event.  It's just not going to happen.

13   You have a witness?

14           MR. LANG:  I have to put Mr. Robertson on, yes.

15           THE COURT:  I'm also -- I have two other cases

16   I'm supposed to be hearing.  But I guess the question is

17   maybe we should try to finish this witness today if we

18   can.  How much do you have left?

19           MR. ROMERO:  Judge, I'm happy to break here if

20   it helps the Court move its schedule along today.

21           THE COURT:  All right.  When you're all done, I

22   have several questions that I want to ask, so I think it's

23   still going to take a while to finish this witness.  I've

24   been given a new date of Thursday, October 25, at

25   9:00 o'clock.  Would that work?

1            MR. LANG:  Here?

2            MR. ROMERO:  Judge, is it possible to get a

3    couple of suggestions and may counsel briefly confer with

4    Mr. Michael and return either this afternoon or in a few

5    minutes to --

6            THE COURT:  That's fair.  Why don't you go

7    ahead -- why don't you go into my chambers and confer with

8    my secretary and the schedule and when I'm done with these

9    other two matters, I'll ask you to come back out.  Can you

10   do that?  Okay.

11                     (Recess taken)

12           THE COURT:  All right.  Let's go back on the

13   record for a minute on the Peleti case.  Counsel, have you

14   conferred about -- as I understand it, perhaps this is the

15   date, October 26, at 9:30.  Does that work for everybody?

16   Great.  I definitely expect we'll finish it at that time,

17   but I'll leave the rest of the morning open, so however

18   much time it takes.  Does either side anticipate any -- do

19   you have any intention of calling anyone other than

20   Mr. Robertson for example?

21           MR. LANG:  I think at this stage we don't need

22   to.

23           THE COURT:  Are you calling anyone other than --

24           MR. ROMERO:  I don't intend to either, Judge.

25           THE COURT:  Great.  Thank you.  We'll see you on

1    the 26th then.   Thank you.

2

3                    * * * HEARING CONCLUDED * * *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        **REPORTER'S CERTIFICATE**

2

3            I, Karen S. Hanna, certify that the foregoing

4    transcript constitutes a true and accurate transcript of

5    the original shorthand notes of the proceedings had at the

6    time and place aforesaid before the HONORABLE MICHAEL M.

7    MIHM, U.S. District Judge.

8
                                     s/Karen S. Hanna
9                            _____
                                     Karen S. Hanna, C.S.R.
10                                   License #084-001760

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25