**E-FILED**
Friday, 15 February, 2008  10:03:10 PM
Clerk, U.S. District Court, ILCD

LEWIS O. ROMERO, CA State Bar # 197231
PAUL L. ALAGA, CA State Bar # 221165
885 Bryant Street Second Floor
San Francisco CA 94103
Telephone: (415) 581-0885
Facsimile: (415) 581-0887

Attorneys for Defendant, Peleti Peleti Jr.

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## ROCK ISLAND DIVISION

UNITED STATES OF AMERICA,

     Plaintiffs,

     vs.

PELETI PELETI JR., a/k/a "Pete,"

       Defendant.                    /

Case No. 06-cr40117 MMM JAG

**SENTENCING MEMORANDUM**

# TABLE OF AUTHORITIES

**Cases**

*Koon v. United States,*
518 U.S. 81, 92 (1996) ................................................................................................ 10

*United States v Crouse,*
145 F.3d 786, 790 (6th Cir. 1998) ............................................................................... 12

*United States v. Barry,*
938 F.2d 1327, 1333 (D.C.Cir.1991) ............................................................................ 6

*United States v. Canova,*
412 F.3d 331 (2d Cir. 2005) ......................................................................................... 15

*United States v. Dunnigan*
507 U.S. 87, 92 (1993) ............................................................................................... 6, 7

*United States v. Lopinski*
240 F.3d 574, 576 (7th Cir. 2001) ................................................................................. 9

*United States v. Polland*
994 F.2d 1262 (7th Cir. 1993) ....................................................................................... 6

*United States v. White*
240 F.3d 656, 662 (7th Cir. 2001) ................................................................................. 6

*United States v. Woods,*
*159* F.3d 1132 (8th Cir. 1998) ..................................................................................... 15

*United States v. Yates*
973 F.2d 1, 4-6 (1st Cir. 1992) ...................................................................................... 7

*US. v. Ward,*
814 F. Supp. 23 (E.D. Va. 1993) ................................................................................. 12

**Statutes**

18 U.S.C. § 3353(b) ..................................................................................................... 10
18 U.S.C. § 3553(a) ................................................................................................ 10, 16
18 U.S.C. § 666(a)(l)(B) ............................................................................................. 17
18 U.S.C. §201(b)(2)(A) ............................................................................................... 2

**Rules**

Sentencing Guidlines § 3E1.1 ................................................................................... 8
Sentencing Guidlines § 5H1.11 ........................................................................ 12, 15
Sentencing Guidlines § 5H1.l0 ................................................................................ 11
Sentencing Guidlines §3C1.1.............................................................................. 6, 7
Sentencing Guidlines§ 5K.20 ................................................................................. 10

LEWIS O. ROMERO, CA State Bar # 197231
PAUL L. ALAGA, CA State Bar # 221165
885 Bryant Street Second Floor
San Francisco CA 94103
Telephone: (415) 581-0885
Facsimile: (415) 581-0887

Attorneys for Defendant, Peleti Peleti Jr.

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiffs,<br>   vs.<br>PELETI PELETI JR., a/k/a "Pete,"<br><br>   Defendant.       / | Case No. 06-cr40117 MMM JAG<br><br>SENTENCING MEMORANDUM<br><br>Date: February 20 2008<br><br>Time: 8:30<br><br>Dept: Rock Island |

## I. INTRODUCTION

1.     The following facts are those as represented in an investigative statement made by Defendant Peleti, a Grand Jury transcript and a Plea Hearing transcript, all a part of the record in this case:

2.     On July 24, 2006, defendant Peleti Peleti, Jr., signed a four page statement for the military's Defense Criminal Investigative Service.  On August 14, 2006, Peleti was granted limited immunity in writing by the office of the U.S. Attorney.  On August 16, 2006, under a grant of immunity, Peleti testified before a Grand Jury in Peoria, Illinois.  On January 12, 2007, the office of the U.S. Attorney for the Central District of Illinois filed an Information with this Court, charging Peleti with three counts of violating federal law related to Peleti's earlier statements.  On February 9, 2007, in a plea hearing, Peleti pled guilty to all 3 counts of the previously filed Information.  The plea hearing was held pursuant to a Plea Agreement and

1

Stipulation of Facts, filed that same date on February 9, 2007.

3.      Count One of the Information alleges that defendant Peleti, a Chief Warrant Officer acting for and on behalf of the United States Department of the Army, received $50,000 in United States Currency, in return for "an effort to steer a U.S. Army contract for food service supplies from an existing government contractor under the LOGCAPP III prime contract, to a Kuwait business referred to as 'Company A' all in violation of Title 18 United States Code, Section §201(b)(2)(A)."

4.      Count Two of the Information alleges that defendant Peleti "with intent to evade a currency reporting requirement under Title 312, United States Code Section 5316, knowingly concealed more than $10,000 in currency....and knowingly transport said concealed currency from a place outside the United States to...Dover, Delaware, all in violation of Title 31, United States Code Section 5332."

5.      Count Three is a forfeiture allegation referencing the funds set out in Count One.

6.      The undisputed facts in this case show that in the fall of 2005, Chief Warrant Officer Peleti Peleti (W4) was a Theatre Food Service Adviser in the US Army in Kuwait, with the responsibility for monitoring food contracts, including contracts for paper products and plastic utensils.  Peleti, as part of the Menu Board composed of approximately 35 individuals, had recommended to the Army Center of Excellence under the Quartermaster School in Fort Lee Virginia, that the Army utilize the products provided by a Mr. Ibrihim.(Grand Jury Transcript (hereinafter referred to as "GJT") 20: 7-16; 35: 10-15.  The recommendation was made because the products offered by Mr. Ibrihim were "a lot more sturdier" than those currently in use and for no other reason. (GJT 22: 6-16; 37: 15-19)  Defendant Peleti testified that there were no kickbacks (GJT 30:1)

7.      The Army Center of Excellence's did not support the recommendation by Peleti because

2

the Army had an existing contract with the Halliburton subsidiary Kellogg Brown and Root. Defendant Peleti testified that, despite his belief that Ibrihim's products were superior, the contract was already under LOGCAP, and any contract with Ibrihim was not going to happen. (GJT 36: 6-25; 37: 1-4). Most importantly, before Peleti had any idea that Ibrihim would give him any money, Peleti told Ibrihim that the contract could not go to Ibrihim because it was a part of a contract for another company and that there was no way to get around it. (GJT 37: 20-24; 40: 7-14). It was only after Peleti told Ibrihim that there was no way he could go forward with any contract for Ibrihim's products that Ibrihim gave Peleti a bag with $50,000 in U.S. currency in it. (GJT 39: 2-15)

8.     On December 15, 2005, five days after Peleti met with Ibrihim, Peleti's official duties with Theatre Food in the Mid-East concluded because his deployment to Kuwait ended, and he returned to the United States for further duties there.

9.     Prior to his Grand Jury testimony, Peleti had signed a four page statement on July 24, 2006 for the military's Defense Criminal Investigative Service. In this statement, defendant admitted receiving $50,000 from Ibrihim.

10.     Peleti received his subpoena to testify before the Grand Jury on August 2, 2006. That Grand Jury hearing was to be held in Peoria, Illinois, on August 16, 2006. Peleti first met attorney Donovan Robertson on August 14, 2006, only two days before his Grand Jury appearance. Prior to meeting with Peleti, attorney Robertson had already set up a meeting with AUSA Jeffrey Lang, in order for Peleti to sign a limited immunity agreement.

11.     On August 14, 2006, after a brief initial meeting with defendant, Mr. Robertson escorted defendant to meet with Mr. Lang and three federal agents. The immunity agreement was first presented to defendant at that meeting.

12.     Defendant signed the immunity agreement on advice of counsel, and was then immediately was questioned by the three federal agents for approximately 6 hours. Defendant

3

fully cooperated with the government in these discussions and in his full testimony before the Grand Jury on August 16, 2007. In addition, Peleti traveled to Rock Island, Illinois in November 2006 for 4 to 5 days of additional interrogation, as well as further interrogation by federal agents following defendant's entry of a plea of guilty on February 9 of 2007.

13.    On February 9, 2007, at defendant's plea hearing, defendant Peleti's responses to the Court's query pursuant to Rule 11 was consistent with defendant's Grant Jury testimony. With the Honorable Michael M. Mihm presiding, on February 9, 2007 the following exchange occurred:

> "Q. So you told him you were going to take the $50,000 and do nothing in return.
>
> A: Yes.
>
> Q. And they gave it to you anyway?
>
> A: That's correct.
>
> Q: "I don't think we have a plea here if this is the case."

(Plea Hearing Transcript (hereinafter "PHT" 31: 5-6 )

14.    After the plea hearing Mr. Peleti had concerns regarding the transaction. Attorney Robertson informed Mr. Peleti that he would need to seek outside counsel regarding the withdrawal of the plea given the potential conflict of interest.

15.    Subsequent to the taking of the plea, Mr. Peleti filed a motion to withdraw his plea based on Ineffective Assistance of Counsel. The Court conducted a hearing wherein Mr. Peleti and Mr. Robertson testified. After which, the Court denied the motion.

## II. OBSTRUCTION OF JUSTICE.

16.    The PSR reflects an adjustment for Obstruction of Justice. The basis for this upward adjustment stems from testimony regarding Mr. Peleti's motion to withdraw his plea based on a

claim of ineffective assistance of counsel. There are no allegations that Mr. Peleti attempted to or succeeded in misrepresenting material facts about these charges.

17.    Paragraph 34 of the PSR states that Mr. Peleti "falsely claimed (1) that at no time prior to his entry of a guilty plea on February 9, 2007, did his attorney, Donovon Robertson, ever explain or even discuss with him the potential risks or benefits of proceeding to trial; (2) that Mr. Robertson never discussed with him the possible defenses to the charges he faced, or the strengths or weaknesses of the Government's case against him; (3) that Mr. Robertson did not explain anything about the contents of the Plea Agreement; and (4) that the defendant did not have any substantive or meaningful discussions with Mr. Robertson regarding the context of the Plea Agreement."

18.    Paragraph 35 of the PSR states that during Mr. Peleti's testimony in support of his motion to withdraw his plea he falsely stated that (1) he did not believe he had seen a Plea Agreement prior to February 9, 2007 (p.66,1. 15-17), (2) he never had a discussion about the Plea Agreement and the guidelines with Mr. Robertson until he received the Plea Agreement one or two minutes before the plea on February 9, 2007 (p. 67: 15-21), and (3) that he only had probably seven telephone calls with Mr. Robertson to discuss his case (p.78,1. 3-19).

19.    However, Mr. Peleti during the first segment of the hearing acknowledged, prior to the plea agreement, having conversations with Mr. Robertson concerning the plea agreement, sentencing guidelines, and even the potential of a deferred prosecution. (p. 67-68.) Mr. Peleti never testified that "he never had a discussion about the Plea Agreement and the guidelines with Mr. Robertson until he received the Plea Agreement one or two minutes before the plea on February 9, 2007." Rather, when asked by the United States attorney if he had a discussion, Mr. Peleti answered that the discussions were not thorough. (p.67: 15-19). Separately, Mr. Peleti acknowledges that Mr. Robertson sent him a letter that purportedly explained the sentencing ramifications of the charges leveled against him. He did clarify to the court and to the United

States Attorney that the letter initially sent to him at that time discussed sentencing ramifications for unspecified drug offenses (which were not at issue). (p. 67-68).

20.      Paragraph 36 of the PSR contrasts Mr. Peleti's testimony with that of Mr. Robertson. The PSR reflects that Mr. Robertson testified that he (1) sent Mr. Peleti the Plea Agreement and correspondence regarding such dated October 4, 2006; (2) had discussed with the defendant the Plea Agreement and the sentencing guidelines well before February 9, 2007; and (3) had spoken with the defendant by telephone at least 30 times (and perhaps as many as 40) about the case.

21.      Although there are discrepancies in the testimony between the defendant and that of Mr. Robertson, such discrepancies cannot be used as the basis for a §3C1.1 upward adjustment. An increase of two offense levels may be given if the court finds that the defendant has willfully obstructed justice. *United States v. Dunnigan* 507 U.S. 87, 92 (1993). In the context of perjury, obstruction of justice occurs when a defendant "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Id.* at 94. Beyond the establishment that the defendant intentionally provided false testimony, the testimony must involve matters "crucial to the question of the defendant's guilt." *United States v. White* 240 F.3d 656, 662 (7th Cir. 2001); *see also United States v. Polland* 994 F.2d 1262 (7th Cir. 1993), stating that the conduct must relate to the offense being prosecuted. The perjury of the defendant will not support the adjustment "except where such conduct actually resulted in a significant hindrance to the investigation or prosecution of the instant offense." *See United States v. Barry,* 938 F.2d 1327, 1333 (D.C.Cir.1991); *see also United States v. Yates* 973 F.2d 1, 4-6 (1st Cir. 1992).

22.      Assuming *arguendo* that Mr. Peleti intentionally testified falsely, the §3C1.1 upward adjustment is not applicable because the testimony at issue was regarding a collateral matter to his guilt or innocence of the charge. Mr. Peleti's statements contained in his declaration or in his testimony concerned his communications with his prior attorney, Mr. Robertson, regarding the

6

decision to enter a guilty plea. None of the statements or testimony set forth in the PSR concern material matters which are relevant to the question of guilt. He spoke, without hesitation or counsel, to military personnel (giving a handwritten statement) regarding the conduct at question and he spoke to the United States Attorney and Government agents concerning the conduct at issue on multiple occasions throughout this process. Mr. Peleti never testified that he did not receive the fifty thousand dollars or that he did not transport the same into the United States without satisfying the reporting requirements. The discrepancies alluded to in the PSR concern Mr. Peleti's perceptions of his counsel's performance and his understanding of the technical legal procedures. The discrepancies are not related to his guilt of the allegations. Each time Mr. Peleti has been questioned by the United States he has always admitted accepting the fifty thousand dollars. He has never denied this fact.

23.     Furthermore, discrepancy in testimony is not *ipso facto* conclusive evidence that a person has committed perjury; it therefore should not be considered in this case. Mr. Peleti testified to the best of his own recollection and in no way intended to mislead the court or falsify his testimony. As the Supreme Court has observed, not every accused who testifies and is not believed should incur an enhancement under §3C1.1 for committing perjury—"an accused may give inaccurate testimony due to confusion, mistake, or faulty memory." *United States v. Dunnigan* 507 U.S. 87, 95 (1993).

24.     Paragraph 37 of the PSR incorrectly states that the Court indicated that the defendant has lied during his own testimony. The PSR should reflect that the Court found Mr. Peleti's testimony to be incredible. The Court never made a ruling the Mr. Peleti committed perjury.

25.     The prosecution has failed in their burden of proof and as such the two level enhancement is unwarranted.

### III. ACCEPTANCE OF RESPONSIBILITY

26.     The government seeks to deny Mr. Peleti the credit due for his early acceptance of responsibility. Mr. Peleti has, from the inception accepted responsibility and has given the government substantial assistance in gathering additional information regarding other military and contract personnel involved in illicit activity. Perhaps most telling is the fact that Mr. Peleti's acknowledgment of wrongdoing and cooperation was immediate, even before being confronted with law enforcement. His initial cooperation was not the product of negotiation between his counsel and the government nor was it predicated on a plea agreement, promises or other inducements. Rather he talked to military personnel without any request for counsel or other protections or inducements. Soon after cooperating with the military, Mr. Peleti flew to Illinois from Hawaii in order that he testify at a grand jury wherein he was the subject and focus. It was only at this time that he was appointed counsel. Even after meeting with counsel, Mr. Peleti continued to cooperate with federal law enforcement. He gave them repeated interviews. Both this initial cooperation and his subsequent unequivocal substantial assistance more than justify the promise of the government to acknowledge Mr. Peleti's acceptance of responsibility which would support a two-level reduction in accordance with § 3E1.1.

27.     Mr. Peleti's motion to withdraw his guilty plea was predicated upon his belief that he was not fully advised by his attorney regarding the charges and possible defenses thereto. It was not based on a belief that the offer of the government was inappropriate or of his unwillingness to accept responsibility. It is uncontested that on the same day of Mr. Peleti's initial meeting with his attorney that he agreed to cooperate with the US Government and that in fact he did cooperate on the same day. Moreover he met with government agents thereafter as well—as much and as often as they requested. In a case where a motion to withdraw a plea is extensive and utilizes a large amount of government resources (in some cases as much government resources as it takes to prosecute a trial), it may warrant the non-application of the early

8

acceptance of responsibility credit. *United States v. Lopinski* 240 F.3d 574, 576 (7th Cir. 2001). The case at bar is not such a case.

28.     The government used few resources to oppose the motion. The factual basis behind the motion was not complex and in fact was limited to the examination of only two witnesses—the defendant and his prior counsel. Separately, Mr. Peleti's request to withdraw his plea did not require the government to engage in any discovery or investigation. As such Mr. Peleti is still entitled to the early acceptance of responsibility credit based on his plea of guilty entered on February 9, 2007.

### IV. A DOWNWARD DEPARTURE IS APPROPRIATE FOR MR. PELETI.

29.     The Sentencing Guidelines provide that "sentencing courts are to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes." U.S.S.G. Ch. 1, Pt.A (4)(b). However, while the Sentencing Guidelines are intended to ensure "a more honest, uniform, equitable, proportional, and therefore effective sentencing system," U.S.S.G. Ch.. 1, Pt.A (3), they must not be interpreted as eliminating judicial discretion. *Koon v. United States,* 518 U.S. 81, 92 (1996). Thus, in imposing sentences, courts must comply with Congress' unequivocal directive that they "impose a sentence sufficient but not greater than necessary to comply with the purposes of criminal sanctions." 18 U.S.C. § 3553(a) (emphasis added).

30.     In keeping with this mandate, Congress provided for judicial departure from the Sentencing Guidelines whenever a "court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b). In the same way that the Sentencing Commission could not have foreseen every type of criminal case, it could not have foretold every potential ground for

9

justifying departure from the Guidelines. *See Koon,* 518 U.S. at 83 ("Commission chose to prohibit consideration of only a few factors, and not otherwise to limit, as a categorical matter, the considerations which might bear upon the decision to depart."); *see also* U.S.S.G. § 5K.20 ("Circumstances that may warrant departure from the guidelines pursuant to this provision cannot, by their very nature, be comprehensively listed and analyzed in advance."). Except for a few limited grounds that the Commission has expressly eliminated as reasons for departing— race, sex, national origin, creed, religion, and socioeconomic status—the Commission has made it clear that it "does not intend to limit the kind of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure in an unusual case." U.S.S.G. Ch. 1, Pt. A (4)(b).

31.    Mr. Peleti is an extraordinarily compelling candidate for downward departure. His case presents the following circumstances warranting a departure from the proposed guideline range:

      1.  Facts of the case or Actual Criminal Conduct;

      2.  Mr. Peleti's lack of criminal history;

      3.  Mr. Peleti's extraordinary public service.

32.    Mr. Peleti's case is not within the "heartland" anticipated by the Sentencing Commission because: (1) the offense conduct falls outside the heartland of bribery violations; (2) a man who lived his entire life before he committed his first criminal offense; and (3) he is a man who has dedicated his life to public service. In this case, a sentence that does not include imprisonment, or includes a very short time in prison, is adequate to deter, reflects the seriousness of the offense, and takes into account the extraordinary circumstances warranting departure.

8 *See* U.S.S.G. § 5H1.l0.

## A.  Present Offense

33.    The Presentence Report outlines the offense in this case. It must be noted, however, that Mr. Peleti was not the architect of the scheme, did not himself request anything from Ibrahim,

did not use his position with the Army in any manner to influence any government contract. None of these facts are described in an effort to justify in any manner the conduct or detract from his prompt and unconditional acceptance of responsibility. Rather, it is submitted that these circumstances can appropriately be considered in mitigation of the sentence.

34.    The undisputed facts of this case are that Mr. Peleti never provided any services in exchange for the receipt of the $50,000. Although ostensibly falling within the ambit of the bribery statute, the acts supporting Mr. Peleti's plea are more in line with conduct governed by the gratuity statute. As such, Mr. Peleti's offense level should be adjusted to reflect that the conduct was a less serious bribery violation.

### B. Criminal History

35.    Mr. Peleti did not commit his first criminal offense until the instant offense. At that time, Mr. Peleti was nearly 45 years old. The Guidelines fail to take into account the fact that Mr. Peleti lived this amount of time without committing any criminal offenses. See *US. v. Ward,* 814 F. Supp. 23 (E.D. Va. 1993). Forty Five years with no criminal convictions shows the activity which brings Mr. Peleti before the Court today is an aberration and he presents a very low risk of being a recidivist.

### C. Mr. Peleti's Extraordinary Public Service Merits a Downward Departure.

36.    As with the Guidelines discussing departures for age, physical condition, and family ties and responsibilities, "civic, charitable, or public service ... and similar prior good works are not ordinarily relevant in determining whether a departure is warranted." U.S.S.G. § 5H1.11. Thus, a court may depart when a defendant's public service is extraordinary or exceptional. *See, e.g., United States v Crouse,* 145 F.3d 786, 790 (6th Cir. 1998). As demonstrated below and in the numerous letters submitted to the Court, Mr. Peleti has led an extraordinary and exemplary life. That extraordinary and exemplary life merits a departure pursuant to U.S.S.G. § 5H1.1l.

11

37.    As demonstrated by the letters submitted to the Court by personnel from the United States military, Mr. Peleti had led a live of honesty, integrity, and was committed to public service and his country.

38.    Mr. Peleti has been in the United States Army for nearly 24 years, having enlisted in February of 1984. Mr. Peleti's military career has been, by any measure, exemplary. He was assigned to the Rangers after enlistment, and was initially deployed to Italy as an airborne infantryman. He was selected as "Soldier of the Quarter" in 1985 as a Private First Class (PFC). Promotion to Specialist came shortly thereafter, and to Sergeant (E-5) on a fast track basis in 1986. Mr. Peleti was on his way to his goal of becoming a Sergeant Major as he advanced through the enlisted ranks to Staff Sergeant (E-6) and First Sergeant (E-7) in 1988 and 1992, respectively. At one point, he became the enlisted aide to the commanding General of his division while maintaining his jump status as a paratrooper. Mr. Peleti was accepted to Warrant Officer Candidate School and successfully competed that school in April of 1996. He was stationed with the 82nd Airborne Division at Fort Bragg following this promotion, and was advanced to Chief Warrant Officer Two (CW2) in 1998. Promotion to CW3 followed in 2003. During this time, Chief Peleti was assigned to food service support for his brigade. He was deployed to Kuwait pursuant to the 82nd's move to that theatre.

39.    During his deployment to the Middle East he endured a number of familial losses: his sister Nerisa's death (December 2003) and his beloved mother's sudden and unexpected death (July 2004). Also, while deployed in Afghanistan, Mr. Peleti received an email from his wife notifying him of her desire to separate from their marriage.  These losses were all exacerbated by his long service overseas and extreme exhaustion resulting from continuous work without time off. During this particular overseas deployment it was typical of him to work seven days a week, fifteen to twenty hours a day.

40.    His decorations are many, and include the Bronze Star, Army Commendation medal,

Meritorious Service medal, Achievement medal, as well as several campaign ribbons and

proficiency badges—German Parachutist Badge, German Rifle Marksmanship Badge in Silver,

German Fitness Badge in Gold, 4AAM, Army Accommodation Medal (ARCOM) and numerous

letters of commendation from superior officers.

41.    To illustrate Mr. Peleti's character and service to this nation the following are excerpts

taken from letters written in support.

> In my professional opinion, CW3 Peleti's character is impeccable and beyond
> reproach. I have worked directly, and at times, indirectly with CW3 Peleti for
> over seven years. He always displayed a high degree of integrity, responsibility,
> and ambition....I relied totally on him to keep my soldiers fed and to keep the
> money accounts straight....His professional knowledge, character, and ability to
> get the job done were the traits I needed to help get food operations under control.
> I brought him back from Afghanistan in December because by Brigade was about
> to deploy to Iraq...Priorities for the other Brigade commanders were shoot, move,
> and communicate. I had one more which involved food service operations.
> "Armies move on their stomachs." I purposely deployed CW3 Peleti early with
> me to establish food operations...When we arrived in Kuwait...we were eating
> nothing but Meals Ready to Eat (MREs). I gave Chief Peleti one order. Get hot
> meals on the menu now. Within a week's time frame we were eating one hot
> meal a day. I then turned over all food operations to CW3 Peleti because I trusted
> him completely and knew he would do the right thing. Once again, his character
> and trustworthiness were second to none...I trusted him at all times and never
> doubted his ability to get the job done correctly or his integrity. Had there been a
> combat missions that I needed him to be wit me, I would have trusted my life with
> him. He is a true leader and trusted officer.

(Michael J. McKinley, Colonel, Ret. United States Armey).

> Peleti is one of the stellar performers, an individual everyone could count
> on....Chief Peleti always strived for the best in everything for the Soldiers.
> Working late nights and weekends was not a problem to him, just part of the
> job...If a mission or tasking came up, he was always the first to volunteer...Chief
> Peleti is one of the most dedicated, loyal, and hard working professionals I have
> worked with in my career. He has my complete trust.

(Clinton B. Ford, SGM, USA)

> Though I was his superior, I considered him a colleague who was carefully
> selected to serve in his particular position...having only so many hours in the day
> to get these jobs done, he always made time to assist, coach, mentor, teach and
> reward his subordinates. This permeated throughout the Division and other Food

13

Service operations on Fort Bragg resulting in a more cohesive, responsible and strong installation Food Service Team envied by others I our business world wide.

(CW5 Michael O. Gillis, Food Service Advisor, US Army Special Operations Command)

I think very highly of CW3 Peleti; my initial impressions of him were that he was a dedicated professional, extremely loyal and hard working, and always eager to volunteer for the toughest missions…I couldn't help but think to myself what a dedicated Soldier and patriot he was, having been apart from his family for almost three out of the previous five years, always ready to serve his country. I trusted him completely and knew that he would go out of his way and make personal sacrifices—literally give the shirt off his back—to ensure the mission and Soldiers received the best possible support. Bottom line, I think very highly of CW3 Peleti and can not stress enough his dedication and selfless service to out unit and nation, which is a true testament of his character.

(Teresa L. Rae, LTC, LC Commanding)

Chief Peleti's hard work and dedication produced significant results that directly improve the health and moral of the 21D soldiers…An expert in the field, he developed the DISCOM Commanders best DFAC competition for each quarter. As a result, three of those DFAC's went on to win the 21D Commanding General's DFAC of the quarter award. He also developed and implemented policies to provide after hours dining to support the DISCOM mission and ensure that BBQ meals were available at the DISCOM DFAC's throughout each weekend. He is a true morale builder and an individual that always had the best interests of the soldiers for whom he serves…Peat Peleti is a terrific warrant officer that never failed to emulate the Army values as a Second to None soldier and leady. His ability to teach and mentor soldiers in the food service industry will have a lasting effect on soldiers throughout the Army for years to come.

(Steven M. Anderson, Brigadier General, US Army)

42.     Mr. Peleti's lifelong service to the people of the United States is nothing short of extraordinary and warrants a departure pursuant to U. S. S .G. § 5H 1.11. Other cases in which downward departure has been allowed based upon civic, charitable, and public service demonstrate why Mr. Peleti's service qualifies as extraordinary.

43.     In *United States v. Woods, 159* F.3d 1132 (8th Cir. 1998), the defendant pled guilty to bankruptcy fraud and money laundering and sought a downward departure based on her charitable activities of (1) taking in two troubled young women, one of whom was her niece, and paying for their education; and (2) caring for an elderly friend. *Id.* at 1136-37. The United States

14

Court of Appeals for the Eighth Circuit upheld the downward departure, stating that "the district court thought these efforts by [defendant] were exceptional, and we have no basis for holding that they were not." *Id.* at 1137. *United States v, Huber,* 462 F.3d 945 (8th Cir. 2006), is also instructive. There, the court affirmed the district court's decision to allow a downward departure based upon the defendant's acts of loaning money to neighbors and others in need, which helped finance the start-up and continuation of businesses in the local community. *Id.* at *952. See also United States v. Canova,* 412 F.3d 331 (2d Cir. 2005) (district court did not abuse its discretion by granting downward departure on basis of defendant's public service and good works, including past and present military and volunteer service).

44.     The deeds found sufficient to warrant departures in *Woods, Huber,* and *Canova* pale in comparison to the civic and charitable deeds Mr. Peleti has performed throughout his lifetime. Mr. Peleti's exemplary and extraordinary life, best demonstrated by his selfless commitment to the United States Army and to the People of the United States certainly merits a departure.

## V. SENTENCES FOR SIMILAR CONDUCT

45.     The goal of every court is to treat those who appear before it fairly and consistently. The sentence Mr. Peleti receives should be significantly lower than sentences other defendants have received for much more egregious conduct. Congress has mandated in 18 U.S.C. § 3553(a)(6) that courts should avoid unwarranted sentencing disparities.

### A. Sentences of Other Public Officials Guilty of More Egregious Conduct

46.     A review of the recent sentences given to other public officials shows that Mr. Peleti is facing a sentence that is far more severe than others who have committed even more egregious crimes. A review of the sentences of several political figures reveals the following.

(1.) <u>John Rowland</u> (District of Connecticut): the former Governor of the State of Connecticut was sentenced on March 20, 2005 to one year and one day in prison for taking

private chartered trips to Las Vegas at no charge, vacationing alone with his family at no charge in a Vermont vacation home, having construction work performed on his own vacation home at no charge, and accepting over $100,000 in bribes and gratuities for introducing multiple pieces of legislation and approving retroactive tax breaks for several of the companies that provided the benefits and money. Rowland also allocated money and approved bond agendas for the companies that had provided him with the bribes. This was all done while Rowland served as the top elected official in the state of Connecticut.

(2.) Bob Ney (District of Columbia): the former United States Congressman, was at the center of the Jack Abramoff investigation and took part in what many have called the largest bribery scandal ever involving federal officials. Ney was sentenced on January 19, 2007 to 30 months in prison for accepting, *inter alia,* lavish trips to Scotland, a trip to the Superbowl, trips to the Northern Marianas Islands, with trip costs exceeding $170,000, thousands of dollars worth of gambling chips, for accepting $10,000 in campaign contributions as a bribe to enter statements into the federal record, and for accepting substantial campaign contributions from Abramoff's clients for whom Ney had agreed to perform official acts.

(3.) Alvin Thomas, Jr (Middle District of Louisiana): the former county commissioner in Ascension Parish, Louisiana pleaded guilty to violating Title 18 U.S.C. § 666(a)(l)(B) by accepting bribes from businessmen to support those businessmen's sewer contracts with the Parish. Since Thomas' case involved a true bribe and there was a direct quid pro quo between the bribes and the sewer contracts awarded to the companies that provided the bribes, the court sentenced Thomas to a term of 21 months in prison. Thomas solicited these bribes and even told one of the businessmen "how to bribe a politician without being too overt."

(4.) Randy "Duke" Cunningham (Southern District of California): the former United States Congressman from California's 50th Congressional District pleaded guilty to accepting at least $2.4 million in bribes. Cunningham listed out the bribes he required and the monetary

16

rewards associated with the amounts of each bribe,. As an example, a $50,000 bribe would mean the defense contractor would receive a 19 million dollar contract instead of a 18 million dollar contract. On March 30, 2006, Cunningham was sentenced to eight years and four months in prison. Cunningham received the longest jail term ever given to a former United States Congressman in what the government called "unparalleled corruption."

     (5.) <u>Ray Liberti</u> (Southern District of Florida): the former West Palm Beach City Commissioner was sentenced on October' 19, 2006 to 18 months in prison for receiving $68,000 in bribes and for ordering law enforcement officials to inspect businesses in an attempt to drive down the price of real estate in certain areas.

47.    These examples show that public officials that have recently been found guilty of committing far more egregious acts than those Mr. Black is charged with, including soliciting for bribes, received significantly lighter sentences than what is being recommended in this case. Mr. Peleti's correctly calculated guidelines sentence of 41 to 51 months is far more than what public officials who have committed worse crimes have received and such a sentence would frustrate Congresses' intent of eliminating disparities between similarly situated defendants.

///

///

///

///

///

## VI. THE SENTENCE

48.     Under all these circumstances, and considered in light of Mr. Peleti's substantial

assistance to the government, the split sentence requested by Peleti is surely reasonable.  Finally,

a recommendation by this Court that he be designated to a minimum security Federal prison

camp, particularly, the one located at Lompoc, is warranted by the non-violent nature of the

offense, Mr. Peleti's  lack of criminal history, his cooperation, and his family circumstances.


Dated: February 15, 2008                                    Respectfully submitted,



                                                            /s/ Paul L. Alaga
                                                            ————————————————

                                                            Paul L. Alaga,
                                                            Attorney for Pete Peleti

# LETTERS IN SUPPORT OF MR. PELETI

# EXHIBIT A



**DEPARTMENT OF THE ARMY**
OFFICE OF THE DEPUTY CHIEF OF STAFF, G-4
500 ARMY PENTAGON
WASHINGTON DC 20310-0500

REPLY TO
ATTENTION OF

DALO-OR                                                      31 January 2008

MEMORANDUM FOR

SUBJECT: Character Reference Letter for CW3 Pete Peleti

1. The purpose of this letter is to provide a character reference for CW3 Pete Peleti. During the time that he worked for me and the 2nd Infantry Division Food Advisor from June 2000-January 2001, he proved himself as an officer with unquestionable integrity, loyalty and trustworthiness. Chief Peleti's hard work and dedication produced significant results that directly improved the health and morale of the 2ID soldiers.

2. An expert in his field, he developed the DISCOM Commanders best DFAC competition for each quarter. As a result, three of those DFAC's went on to win the 2ID Commanding General's DFAC of the quarter award. He also developed and implemented policies to provide after hours dining to support the DISCOM mission and ensure that BBQ meals were available at all DISCOM DFAC's throughout each weekend. He is a true morale builder and an individual that always had the best interests of the soldiers for whom he serves.

3. Pete Peleti is a terrific warrant officer that never failed to emulate the Army values as a Second to None soldier and leader. His ability to teach and mentor soldiers in the food service industry will have a lasting effect on soldiers throughout the Army for years to come.

4. Please do not hesitate to email or call me with any questions about Chief Peleti. I can be reached at steven.m.anderson1@conus.army.mil or (703) 697-8468.

STEVEN M. ANDERSON
Brigadier General, U.S. Army
Director, Operations and Logistics
Readiness

Printed on Recycled Paper

11 January 2008

Character Reference Letter for Peleti Peleti Jr

To whom it may concern:

I am SGM Clinton B Ford, currently assigned to the United States Army Special Forces Command, Ft Bragg, North Carolina. I have served 29 years in the Army, with over 23 years in the 82d Airborne Division, where I have served at every level in food service from the newest cook on the street to the Division Food Service Supervisor. I say this because the group of Airborne Food Service Personnel is small, the job very demanding, and everyone in our field quickly knows who the stellar performers are.

CW4 Peleti is one of the stellar performers, an individual everyone could count on. I knew Chief Peleti before 2000, and worked with him from 2000-2004 when I was selected as the 82d Airborne Division Food Service Supervisor. Chief Peleti was the 3rd Brigade Food Advisor, and my office was the link above his in the food service chain. He was responsible for the brigades' food service program, three dining facilities and the brigades Soldiers. He excelled at this and was moved to serve as the Division Support Command (DISCOM) Food Advisor, which is basically where the most motivated and experienced Food Advisor, after the Division Food Advisor, is placed. Chief Peleti was responsible for the four DISCOM units and six separate Battalions, basically one third of the Division and again, he excelled.

It was a pleasure working with Chief Peleti. He always had an upbeat attitude, and always a team player. Though sometimes hard headed, he always had one thing on his mind that drove him, and that was taking care of the Soldiers, from mentoring Dining Facility Managers, correcting cooks, setting up the feeding cycle for large field training exercises (FTX's) or real world deployments, setting up accounts, making recommendations for dining facility building designs, and evaluating units. Chief Peleti always strived for the best in everything for the Soldiers. Working late nights and weekends was not a problem to him, just part of the job. He was always doing something to better his units' food service program. He supported and pushed his units to always compete in the incentive programs such as the Best Dining Facility Competition, Cook of the Quarter Competitions, Thanksgiving Competition, Philip A. Connelly Competition, (which his units consistently placed in) and always supported the Ft. Bragg Culinary Arts program.

If a mission or tasking came up, he was always the first to volunteer. One tasking came up and we had a Division FTX at Ft Stewart, GA. The Division Food Advisor and I took approximately 50 Food Service Personnel to open up and run four Dining Facilities and mermited to several sites. Chief Peleti wanted to take the lead and do it himself and was heart broken because we went. The Division had a field training exercise at the National Training Center at Ft Irwin, CA, and Chief Peleti was the first one to volunteer to be the Food Advisor for the mission, was given the mission and received nothing but laudatory remarks for his efforts. This is his standard

With any mission Chief Peleti was on, from day to day operations, feeding at green ramp for Soldiers deploying or redeploying, FTX's, a Brigade Change of Command, to solving any problem that came up, if Chief Peleti said "I got it" he had it. He is one of the few people that you did not have to go back and check or double check on and have nothing fall through the cracks. He stayed on top of every issue, which positively effected the whole Division, not just his third, for it gave my Food Advisor and I more time to do our jobs and to work on other issues to better the Division's Food Service Program.

Character Reference Letter for Peleti Peleti Jr (cont.)

From what I had observed, Chief Peleti was always fair in his actions, from evaluating Dining Facilities to managing personnel. It was black and white, no grey areas. Part of my job when I evaluated his units was I also evaluated how well he conducted his evaluations on the units. They were fair and balanced; Chief Peleti called a spade a spade.

One reference to Chief Peleti's dedication and determination is on one occasion, getting some new food products for our soldiers was an issue especially when the companies were not listed with our prime vendor. We had two companies' products Soldiers (diners) wanted added to the Dining Facilities shopping catalog. We can and did have products added to the shopping catalog, but this time we had gotten the impression the Installation Food Program Manager (FPM) and prime vendor didn't want the additional items added, for it was very difficult every step we took to incorporate the new products. Most people would have given up. It took a lot of hard work and determination to get the Installation FPM to add the two company's items to the shopping catalog so our managers could order the product and Chief Peleti led the way. The Managers and Soldiers (diners) wanted the items, he wasn't giving up. It was a long hard struggle, but the items were added to the shopping catalog. Without Chief Peleti's hard work and efforts, the products would not have been added to the shopping catalog.

If something wasn't right during one of the monthly Installation Menu Board Meetings, Chief Peleti would be the first one asking questions. Chief Peleti constantly volunteered for events, like staying up all night and cooking the pigs for the annual Warrant Officers Picnic.

I saw Chief Peleti briefly again in Kuwait in January of 2005. I was on a detailed duty with V Corps and he was the CFLCC Food Advisor. Like always, he was busy, besides his regular duties he had the Mobile Training Team (MTT), which included the Army Food Advisor and his team from Ft. Lee, VA. visiting and was also escorting Bo Jackson around.

I know he is charged with receiving a bribe. What I know about Chief Peleti, these charges do not change my opinion of him in the least. Chief Peleti is one of the most dedicated, loyal, and hard working professionals I have worked with in my career. He has my complete trust. As I stated in the opening paragraph, being in food service in the 82d Airborne Division is a lot of hard work. It is not uncommon when food service personnel get a permanent change of station (PCS) away from the 82d Airborne Division to terminate jump status so they would not be sent back, because of the hardwork, long hours, and discipline. Others return for the hardwork and discipline, for that in all we do, it has to be right, black or white, no grey areas. If it is not someone's life could be at risk. Every time Chief Peleti would PCS from the Division, he would come right back, with over a decade and a half in the 82d Airborne Division. That right there speaks volumes about Chief Peletis' character. I would be more than willing to testify in court regarding Chief Peleti's character.

Clinton B Ford
SGM, USA

23 January 2008

MEMORANDUM FOR Whom It May Concern

Subject: Character Reference of CW3 Peleti "Pete" Peleti

I am CW5 Michael O. Gillis. I currently serve as the Command Food Advisor and Technician for the United States Army Special Operations Command at Fort Bragg, North Carolina. I have served as a Soldier in the US Army for 34 plus years and in Pete's specialty, Food Service, for over 31 years as a cook, Non Commissioned Officer and Warrant Officer with over 27 years in the latter and with almost 32 years in the Airborne, Air Assault and Combat Support communities. Of those years, and as Chief Peleti, I have served primarily in contingency units, deployable world-wide within 18 hours and without notice. Serving in units as such is extremely challenging and demanding emotionally, mentally and physically, especially when one is overall responsible for the basic life (food) support of each and every soldier within the command as well as the whole logistics package that accompanies this small but dynamic facet of the Army's total package. Beginning with the fact that cooks are the first into work and the last to leave at night virtually continuously throughout a calendar year with little or no breaks is the way I, CW3 Peleti and the rest of the Food Service Warrant Officers and Soldiers in our command were expected to operate and especially while assigned to the 14,500 Paratrooper strong and elite 82D Airborne Division.

Of the 7 Warrant Officers authorized, the Division had only 5 on hand. Mine being one of them was at the Division Staff level. This meant that there were only 4 Food Service Warrants left for 6 brigades. Being the strongest and most able of 4, the then CW2 Peleti was chosen to ensure that of the food service missions were successful for two of the Division's most diverse combat support and maneuver brigades [Division Support Command (DISCOM) & Combat Aviation Brigade (CAB)], plus 7 separate combat support and maneuver battalions and one separate company supported by 5 of our 15 total Division consolidated garrison dining facilities, 37 battalion and 60 company level field kitchens operated by 181 of the Division's 419 food service personnel and serving approximately 4 million meals annually. That not being enough, he was responsible for ensuring that all fixed food service facilities, garrison/field equipment, rations and monies earned (thousands of dollars daily) were properly maintained, accounted for and secured. This being said, his responsibilities also encompassed the staff and "hands-on" supervision, training and oversight of all organizational food service personnel assigned, to include the execution and monitoring of their incentive awards programs. Pete had the additional duties for the accountability and monitoring of the Division's 14 -- days (approx 500,000 meals) of Go-To-War Class I supplies as well. Not shying away at all, he performed the aforementioned duties and responsibilities flawlessly.

Chief Peleti, as the DISCOM Food Services Technician, played an integral part Class I and Food Service operations planning plus oversight of their execution in support of the Division's real world missions. CW3 Peleti's team building approach, directly translated into top quality C lass I and Food Service operations supporting thousands of Paratroopers during the Command's fly away Emergency Deployment, 18th Airborne Corps and 82D Airborne Division War Fighter exercises, as well as, brigade /

battalion field training exercises. The aforementioned also included planning for and supporting rotations to the Joint Readiness Training Center at Fort Polk, Louisiana and National Training Center at Fort Erwin, California, while focusing on smoothly transitioning his units for contingency operations in Afghanistan and Iraq at the same time. Through all of this, Pete never complained or ceased to have a sense of humor. This coupled with his always "can do" attitude and tenacity in maintaining the "Service" in Food Service while constantly seeking ways of improving his units' programs earned him the respect of his peers, subordinates and superiors alike.

I have touched only on a portion of his accomplishments and capabilities since our working together as Food Advisors/Technicians on Fort Bragg and in the 82d Airborne Division. Did say together? Yes I did, even though I was more than a decade senior to him both in rank and time in service. Though I was his superior, I considered him a colleague who was carefully selected to serve in his particular position so as in the event of my extended absence, Chief Peleti was next in line to take my place. Lastly having only so many hours in a day to get the job done, he always made time to assist, coach, mentor, teach and reward his subordinates. This permeated throughout the Division and other Food Service operations on Fort Bragg resulting in a more cohesive, responsive and strong installation Food Service Team envied by others in our business world wide.

I understand the charge against CW3 Peleti Peleti of allegedly receiving a bribe; however that does not change my opinion of him. There are but a few Soldiers with whom I would share a foxhole during combat or have inspect my equipment prior to an airborne operation. CW3 Peleti Peleti is one of those few to whom I have and would again entrust my life to. Without hesitation, I would proudly testify in court as to his character.

CW5 Michael O. Gillis
Food Service Advisor
US Army Special Operations Command
COMM: (910) 432-3746
CELL: (910) 261-5622
gillism@soc.mil or
michael.o.gillis@us.army.mil

Colonel (Retired) Michael J. McKinley
298 Juniper Creek Blvd
Pinehurst, NC 28374-6819
Home Phone: 910-255-6941
Cell Phone: 910-603-7535

January 22, 2008

TO WHOM IT MAY CONCERN:

I am writing this character letter in reference to Chief Warrant Officer Three (CW3) Peleti. I retired from the United States Army on 1 November 2006 after serving over twenty eight years and attaining the rank of Colonel. I know people and I know character. I have commanded soldiers and civilians ranging in numbers from 150 to over 2,000. It was my responsibility to determine one's character in making command decisions. I am an expert in determining character.

In my professional opinion, CW3 Peleti's character is impeccable and beyond reproach. I have worked directly, and at times, indirectly with CW3 Peleti for over seven years. He always displayed a high degree of integrity, responsibility, and ambition. From June 2001 until June 2003, Chief Peleti worked directly for me as my food and subsistence advisor. I was the Brigade Commander of the Division Support Command in the 82nd Airborne Division, Fort Bragg, North Carolina. I relied totally on him to keep my soldiers' fed and to keep the money accounts straight. He did this in an outstanding manner with little or no supervision from me. Over a short period of time, I let CW3 Peleti run all food operations on his own. His character traits and unending devotion to duty led me to trust him in all aspects of food operations.

In May of 2002, a request went out from the Division Headquarter's asking for a Warrant Officer to deploy to the National Training Center (NTC) from June to July 2002 to oversee food operations for over 2,000 soldiers. I hesitantly, because I needed him desperately in my own unit, nominated CW3 Peleti for this mission because of his no nonsense manner and ability to get the job done. He was selected and did an outstanding job while he was deployed. I received many positive comments from other commanders and leaders indicating that his presence was of great assistance.

I personally sent CW3 Peleti to Afghanistan, with the 407th Forward Support Battalion, from October to December 2002 to assist their Food Service Sergeant in establishing food service operations for the deployed Brigade. I did this on my own because I trusted him in getting food operations up and running. His professional knowledge, character, and ability to get the job done were the traits I needed to help get food operations under control. I brought him back from Afghanistan in December because my Brigade was about to deploy Iraq.

TO WHOM IT MAY CONCERN
January 22, 2008
Page 2

From December 2002 through May 2003, I deployed my Brigade first to Kuwait and then into Iraq during Operation Iraqi Freedom (OIF). Priorities for the other Brigade commanders were shoot, move, and communicate. I had one more which involved food service operations. "Armies move on their stomachs". I purposely deployed CW3 Peleti early with me to establish food operations. When we arrived at Kuwait International Airport (KIA), there was no food operations set up. We were eating nothing but Meals Ready to Eat (MREs). I gave Chief Peleti one order. Get hot meals on the menu now. Within a week's time frame we were eating one hot meal a day. I then turned over all food operations procedures to CW3 Peleti because I trusted him completely and knew he would do the right thing. Once again, his character and trustworthiness were second to none. The only time I had to get involved in food operations was when a senior officer complained about something. The complaint was always resolved within a twenty-four timeframe. CW3 Peleti ran the operations with Brown and Root Corporation. This involved ensuring money accounts were correct and that Third Country Nationals (TCNs) were complying with all legal food service operations.

I never once questioned CW3 Peleti's character traits. I fully entrusted him with all food service matters. He always ensured that operations were legal and done by Army Regulations. I trusted him at all times and never doubted his ability to get the job done correctly or his integrity. Had there been a combat mission that I needed him to be with me, I would have trusted my life with him. He is a true leader and trusted officer.

I am writing this character reference letter because CW3 Peleti told me that he is being charged with bribery. The mere fact that he is under investigation for bribery caught me completely off guard. This is not the CW3 Peleti that I know and respect. The fact that he has been arrested and charged with bribery does not; I say again, does not change my mind about him. He is trustworthy, has no character flaws, and I regard him as the best Food Service Officer I have ever had the opportunity to work with.

If requested, and I hope I get the chance, I would fly from North Carolina to Hawaii at my own expense, to testify on behalf of CW3 Peleti's outstanding character traits.

Sincerely,

Michael J. McKinley
Colonel, Retired
United States Army

**DEPARTMENT OF THE ARMY**
HEADQUARTERS, SPECIAL TROOPS BATTALION
45ᵀᴴ SUSTAINMENT BRIGADE
Schofield Barracks, HI 96857

REPLY TO
ATTENTION OF

APVG-WZB-CO                                                    29 January 2008

MEMORANDUM FOR RECORD

SUBJECT: Character Reference for Chief Warrant Officer Three Peleti

1. I am writing this character reference for CW3 Peleti after knowing him for almost two years.
Initially, he and I both served in the same section, however about six months into our working
relationship, he was moved under my control and worked directly for me for over a year. I think
very highly of CW3 Peleti; my initial impressions of him were that he was a dedicated
professional, extremely loyal and hard working, and always eager to volunteer for the toughest
missions. One of my first conversations with him was about the number of times he had deployed;
at the time, he was coming off of his third deployment and headed into possibly his fourth. I
couldn't help but think to myself what a dedicated Soldier and patriot he was, having been apart
from his family for almost three out of the previos five years, always ready to serve his country.
While he worked for me, I was always impressed by him; he accomplished the mission with very
little guidance, always went the extra mile to accomplish a task to standard, and remained focused
on his duties. I trusted him completely and knew that he would go out of his way and make
personal sacrifices - literally give the shirt off his back - to ensure the mission and Soldiers
received the best possible support. Bottom line, I think very highly of CW3 Peleti and can not
stress enough his dedication and selfless service to our unit and nation, which is a true testament of
his character.

2. I have been in the Army for almost 16 years, have commanded Soldiers at almost every level,
and pride myself on a good judge of character, and CW3 Peleti possesses great moral character. I
would fight to serve with him again.

3. If you have any questions, please feel free to contact me at 808-655-0324.

TERESA L. RAE
LTC, LB
Commanding