E-FILED
Thursday, 20 March, 2008  10:44:43 AM
Clerk, U.S. District Court, ILCD

1                    THE UNITED STATES DISTRICT COURT
                  FOR THE CENTRAL DISTRICT OF ILLINOIS
2

3   UNITED STATES OF AMERICA,          )
                                       )
4                    Plaintiff,        ) Criminal No.
                                       ) 06-40117
5           vs.                        ) Peoria, Illinois
                                       ) October 26, 2007
6   PELETI PELETI, JR.                 )
                                       )
7                    Defendant.        )


8
        CONTINUED HEARING ON MOTION TO WITHDRAW GUILTY PLEA
9
                              BEFORE:
10                    HONORABLE MICHAEL M. MIHM
                      United States District Judge
11

12                          APPEARANCES:

13                      JEFFREY LANG, ESQ.
                 Assistant United States Attorney
14                      1830 Second Avenue
                  Rock Island, Illinois  61201
15            (Appeared on Behalf of the Government)

16
                      DAVID M. MICHAEL, ESQ.
17                Law Office of David M. Michael
                    414 Gough Street, Suite 2
18                San Francisco, California  94102
                            -- and --
19                    LEWIS O. ROMERO, ESQ.
                      PAUL L. ALAGA, ESQ.
20                       ROMERO & ALAGA
                  885 Bryant Street, Suite 202
21                    San Francisco, California
              (Appeared on Behalf of the Defendant)
22

23                    Karen S. Hanna, C.S.R.
                   U.S. District Court Reporter
24                   Central District of Illinois
    Proceedings recorded by mechanical stenography, transcript
25  produced by computer

1                              **I N D E X**

2

3       **WITNESSES**                                           **PAGE**

4

5       PELETI PELETI, JR.
          Examination by the Court                              4

6       DONOVAN ROBERTSON
          Cross Examination by Mr. Michael                      13
7         Direct Examination by Mr. Lang                        34
          Re-Cross Examination by Mr. Michael                   57
8         Re-Direct Examination by Mr. Lang                     68
          Examination by the Court                              69
9         Further Re-Direct Examination by Mr. Lang             82
          Further Re-Cross Examination by Mr. Michael           82

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  This is the case of the United

 2   States of America vs. Peleti Peleti, Jr., criminal number

 3   06-40117.  The defendant is here represented by his

 4   attorneys, David Michael, Lewis Romero and Paul Alaga.

 5   The United States is represented by Jeff Lang.

 6              The matter is set for a continuation of the

 7   hearing on the motion to withdraw the plea of guilty.  I

 8   think when we stopped the last time, the defendant was on

 9   the stand and we were having some cross-examination.  Is

10   that correct?

11              MR. LANG:  That's correct.  We had just finished

12   cross-examination, Judge.

13              THE COURT:  Right.  Okay.  Would you take the

14   stand again, please?

15              MR. MICHAEL:  Your Honor, David Michael.  I do

16   not intend to give any re-direct examination of Mr. Peleti

17   at this time.

18              THE COURT:  Okay.  That's fine, but I had some

19   questions that I wanted to ask.  Take the stand, please.

20   You're still under oath, sir.

21

22

23

24

25
```

1                           **PELETI PELETI, JR.**

2    Having been previously sworn, was examined and

3    testified under oath as follows:

4                      **E X A M I N A T I O N**

5    BY THE COURT:

6    Q    Mr. Peleti, in looking at my notes here from your

7    testimony, one of the things I had some problems with

8    during your testimony was your testimony concerning what

9    you received from your attorney in October before the

10   charges were filed.  If I recall correctly, and I could be

11   mistaken, initially you didn't make any reference at all

12   to receiving certain information from your attorney.  I

13   think it had to do with even a possible plea agreement.

14             MR. LANG:  That's correct.  It's Government

15   Exhibit 2, Judge.

16   Q    It's very hard for me to understand that.  Did you or

17   did you not receive this draft plea agreement in October?

18   A    Your Honor, during the last hearing two weeks ago, as

19   I was going through my mind, I'm trying to remember when I

20   received that information, whether I got it by mail.

21   Q    The Government presented some exhibits that suggest

22   that you received it in the mail in October.

23   A    So, Your Honor, to answer that question, I do not

24   know or recall if that was by mail or a discussion I had

25   with --

1    Q    Well, you didn't seem to have much of any idea or

2    memory that your attorney had ever suggested the

3    possibility of a plea prior to like the day that you

4    actually entered the plea.  I'm having a lot of trouble

5    with that.  I wonder if you have some further explanation.

6    A    Your Honor, again, I'm trying to recall when I

7    received that paperwork, whether it be by mail, fax or

8    what-not.  At this time I just can't recall when, Your

9    Honor.

10              THE COURT:  All right.  Thank you.  You may step

11   down.

12                   (Witness excused)

13              MR. MICHAEL:  Your Honor, the Court was

14   referring, I believe, to the October 14 letter sent from

15   Mr. Robertson to Mr. Peleti.

16              THE COURT:  That's correct, yes.  Who is the

17   next witness?  Do you have any other evidence?

18              MR. MICHAEL:  Your Honor, what I would like to

19   do is I want to briefly ask the Court if it would

20   reconsider its initial ruling regarding the factual basis

21   for the plea component of this motion, especially

22   regarding the bribery and evading currency report, and

23   then after that brief argument to the Court.

24              THE COURT:  I will give you a very brief

25   opportunity to do that.

 1              MR. MICHAEL:  I appreciate that, Your Honor.  I

 2      appreciate that.

 3              THE COURT:  I assume that you're going to be

 4      giving me some arguments that I haven't heard previously

 5      because I have no interest in hearing the same arguments

 6      again.

 7              MR. MICHAEL:  I will try not to do that, Your

 8      Honor.  Your Honor, I think that this case -- even this

 9      Court can see that this case is somewhat problematic

10      regarding this whole thing about an official act and I

11      believe that the problem is that in this case Mr. Peleti

12      had made it very, very clear to Mr. Ibrihim that he could

13      not perform any official act for Mr. Ibrihim, that it had

14      already been decided and he had gone through all the

15      efforts to promote Mr. Ibrihim's product to the government

16      in the proper way.  He had Mr. Ibrihim appear before the

17      merit board, about 35 people, and during that whole

18      process there was no talk about Mr. Ibrihim giving

19      Mr. Peleti any kind of money for that.  Mr. Peleti then

20      told Mr. Ibrihim it could not be done.  It absolutely was

21      not going to be done.  The contract had already gone to

22      the Halliburton subsidiary, Kellogg, Root & Brown, and it

23      was only after that that Mr. Ibrihim offered Mr. Peleti

24      the money.

25              Now I appreciate the Court had its own problems

1   with this in terms of at the time of the entry of the plea

2   and the plea colloquy and it seemed to me that the Court

3   relied on a statement that Mr. Peleti made to the Court at

4   that plea colloquy and the Court referenced it again in

5   the hearing earlier.  It was a statement.  I really looked

6   at that statement and I was deeply troubled with it myself

7   because in our research of the cases and the cases that

8   were presented to the Court, even the cases presented by

9   the Government, in every single case there had to have

10   been an official act that's involved.  The only case that

11   even deviated from that was a case where the defendant

12   misled the briber into thinking there was an official act

13   and received the bribe in exchange for that

14   misrepresentation.  But every single one, there was a bad

15   act on the part of the defendant, some criminal conduct on

16   the part of the defendant, either taking the money to

17   perform the official act or leading the person to believe

18   that he could perform the official act.  That was only one

19   isolated case.  Every single case involved an official

20   act.

21        Now when the Court looked at the jury

22   instruction and inquired of Mr. Peleti regarding the

23   particular jury instruction, I think that also troubled

24   the Court.  There were two paragraphs to that jury

25   instruction, but the first paragraph is that the matter --

1  the subject matter has to be one before the defendant in

2  his official capacity, an official act before the

3  defendant in his official capacity.

4           And then the Court quoted from the next sentence

5  after that particular paragraph and said, "Well, what

6  about this other paragraph that says it's sufficient if

7  the defendant knew that the thing of value was offered

8  with the intent to influence official action?"

9           My reading of the discussion between the Court

10  and Mr. Peleti at the time of the plea and also at the

11  last hearing is that if that's there, then you don't need

12  to have the official action, but I don't think that that's

13  a proper interpretation that the Courts have given to that

14  particular statute, Your Honor.  I think the Courts have

15  given the interpretation that there must in fact first be

16  an official act.  Now the second part that --

17           THE COURT:  Are you saying the person has to

18  perform an official act or he must be acting in an

19  official capacity?

20           MR. MICHAEL:  He must be --

21           THE COURT:  I think if you're saying he has to

22  actually perform an act, I don't think the cases support

23  that at all.

24           MR. MICHAEL:  Well, what the statute says is

25  that there has to be -- there has to be a matter before

1    the defendant in his official capacity, but there must

2    be --

3                THE COURT:  Well, he was still acting in his

4    official capacity at the time he took that money.

5                MR. MICHAEL:  But there was no matter before him

6    in his official capacity.

7                THE COURT:  I understand your point.

8                MR. MICHAEL:  I don't want to belabor that, Your

9    Honor.  I think the Court was concerned also regarding

10   that.

11               THE COURT:  I'm very concerned about it, but I

12   still haven't heard anything that you've said so far that

13   makes me change my mind.  If you have any final comments

14   to make, make them.

15               MR. MICHAEL:  The comment about that, Your

16   Honor, is that everything -- the cases say it, the statute

17   says it, the jury instruction says it, even the

18   Government's representation says that, and I think that

19   what happened is you asked Mr. Peleti a question and the

20   question was a very, very difficult question for anyone to

21   really answer.  You asked Mr. Peleti, "Did you believe

22   that Mr. Ibrihim's intention at the time he gave you the

23   money was to influence an official act?"  And if you look

24   at that question, it's a question that really is asking

25   Mr. Peleti to speculate.

 1              THE COURT:  I don't see anything difficult about
 2    that at all.  That's exactly what they had been talking
 3    about, both of them.  Not just one of them, but both the
 4    person who ended up giving him the money and Mr. Peleti.
 5    And he didn't take the money until after the man said
 6    something to the effect, "Well, see what you can do."  So
 7    I don't know how there could possibly be any question.  I
 8    don't know why it's difficult at all to --

 9              MR. MICHAEL:  I think --

10              THE COURT:  -- for him to know what the other
11    person was referring to at that time.

12              MR. MICHAEL:  Well, maybe know what he was
13    referring to, but I think that the fact of the matter is
14    that there was no matter before him in his official
15    capacity at that time and that does not comport with the
16    bribery statute.  That's the main point.

17              THE COURT:  I understand that's your point.
18    It's preserved.  Is there anything else you would like to
19    say for purposes of the record at this point?

20              MR. LANG:  No, Your Honor.

21              MR. MICHAEL:  Yes, Your Honor.  Also in regards
22    to the second charge, the evading the currency report
23    requirement, I don't see in the record where there was any
24    evidence at all submitted that Mr. Peleti brought $50,000
25    into the U.S. at the time of his entry.

1                THE COURT:  He admitted doing it.

2                MR. MICHAEL:  In the plea colloquy?

3                THE COURT:  Yes.

4                MR. MICHAEL:  In the plea colloquy?  That's

5        where the Court is finding the basis?

6                THE COURT:  Isn't that normally where I would

7        find the basis for it?  That's why we have this dialogue

8        with the defendant.

9                MR. MICHAEL:  And we're probably going to segue

10       into the issue in terms of the ineffective assistance

11       issue, but I would say it's rather unusual for the facts

12       that determine the potential guilt of a defendant to be

13       only the facts developed at the time of the plea colloquy

14       and not be facts that are within --

15               THE COURT:  Are you suggesting the Government

16       had some duty to present evidence during the plea

17       colloquy?

18               MR. MICHAEL:  No.  No.  I'm not suggesting that,

19       Your Honor.  I'm not suggesting that at all.  I'm

20       suggesting that prior to the plea colloquy there existed

21       no evidence to support that charge or the prior charge,

22       the prior count.  That's all I was suggesting.

23               THE COURT:  Well, thank you.  Your comments are

24       part of the record and the motion to reconsider is denied.

25               MR. MICHAEL:  Thank you, Your Honor.

 1              THE COURT:  What's next?

 2              MR. MICHAEL:  Your Honor, then I think the Court

 3    -- the issue before the Court now has to do with the

 4    ineffective assistance of counsel issue.  Correct?

 5              THE COURT:  That's correct.

 6              MR. MICHAEL:  In that regard, I would like to

 7    call to the stand Mr. Donovan Robertson.

 8              THE COURT:  Okay.  Mr. Robertson, would you come

 9    forward?

10              MR. LANG:  Your Honor, before he testifies,

11    there's no solid case law on waiver of the privilege when

12    the defendant makes a claim like this.  I would just ask

13    the Court to make a short finding that the defendant has

14    waived the privilege before Mr. Robertson testifies.

15              THE COURT:  Well, I mean as far as I'm

16    concerned, he has waived the privilege.  I thought that

17    was a given.  When someone, either through a habeas or

18    this type of proceeding -- when the defendant, the client,

19    raises the question of the adequacy of their

20    representation and makes allegations claiming that the

21    representation in various ways was inadequate, then it's

22    my understanding of the law that that effectively waives

23    the attorney/client privilege as to anything directly or

24    indirectly relating to that issue.  Do either of you have

25    any different thinking on that point?

 1              MR. MICHAEL:  I agree completely, Your Honor.  I

 2   think it's a limited waiver, but I think the Court defined

 3   the boundaries of that waiver.

 4              THE COURT:  All right.  Please proceed.

 5                    **DONOVAN ROBERTSON,**

 6   Having been first duly sworn, was examined and

 7   testified under oath as follows:

 8                    **CROSS EXAMINATION**

 9   BY MR. MICHAEL:

10   Q    Good morning, Mr. Robertson.

11   A    Good morning.

12   Q    We had a chance to briefly talk this morning,

13   correct?

14   A    Correct.

15   Q    I indicated to you, Mr. Robertson, that in examining

16   you on the stand I wasn't in any way attacking your

17   abilities or your skills or your reputation as an attorney

18   in this court, correct?

19   A    That's what you said.

20              MR. LANG:  I'm going to object to leading.  It's

21   his witness.

22              THE COURT:  He's obviously an adverse witness.

23   Under the circumstances I don't see any problem with

24   cross-examination.

25              MR. MICHAEL:  I appreciate that.

1  BY MR. MICHAEL:

2  Q    I will tell you the focus of my examination of you

3  has to do with what investigations you made regarding the

4  defenses and facts and circumstances of the Government's

5  case against Mr. Peleti at the onset, okay?  So to get

6  some background on it, have you reviewed your case file

7  regarding this matter?

8  A    Yes, I have.

9  Q    It's my understanding that you were appointed to

10  represent Mr. Peleti prior to any charges being brought

11  against him?

12  A    That's correct.

13  Q    And that was on August 2 or 4?

14  A    Yes, it was early August of '06.

15  Q    If I say it was August 4, does that sound correct to

16  you?

17  A    Yes, it does.

18  Q    The Court appointed you to represent Mr. Peleti for

19  what purpose?

20  A    Defending him against potential criminal charges that

21  were pending in the Central District.

22  Q    At that time of your appointment did you become aware

23  that the Government had sent a letter to Mr. Peleti

24  regarding an appearance before a grand jury?

25  A    Yes.  I spoke with Mr. Lang about that.

1  Q     So your initial representation of him was to address

2  his appearance before the grand jury?

3  A     That's correct.

4  Q     Did you know when that appearance was scheduled?

5  A     Yes, I did.  It was later on in the week.  I believe

6  it was the same week I was appointed, the end of the week.

7  Q     If I told you it was around the 16th of August in

8  2006, would that sound right?

9  A     That sounds right.

10  Q     So you were appointed on the 4th and you have this

11  grand jury appearance on the 16th?

12  A     Yes.  It was a week, week and a half later.

13  Q     Now between your appointment on the 4th and your

14  review of the Government's letter to Mr. Peleti regarding

15  his grand jury appearance -- and I presume that that

16  letter was the standard kind of letter that the Government

17  sends out to a witness regarding grand jury?

18  A     It appeared to me to be a form type letter.

19  Q     And did that letter advise Mr. Peleti that he in fact

20  was a target of the Government's investigations?

21  A     I don't think it used the word "target", no.

22  Q     Let me ask another question before I get back to

23  that.  Subsequently after August 4 of last year and his

24  grand jury appearance on August 16, did you receive a

25  letter from the Government after they knew about your

1    representation of Mr. Peleti?

2    A    Yes, I did.

3            MR. MICHAEL:  If I may, Your Honor, can I have

4    an exhibit marked in that regards?

5            THE COURT:  Well, in this court counsel marks

6    your own exhibits.  So if you want some stickers, she'll

7    be happy to give them to you.

8            MR. MICHAEL:  I have an exhibit marked

9    Defendant's Exhibit 2.  I have a courtesy copy for the

10   Court and also a copy for the Government.  May I approach,

11   Your Honor?

12           THE COURT:  You may.

13           MR. MICHAEL:  Do I need to ask each time?

14           THE COURT:  No.

15   BY MR. MICHAEL:

16   Q    Mr. Robertson, I'm going to hand you what's now been

17   marked Defendant's Exhibit 2.

18           MR. LANG:  No objection to its admission.

19           MR. MICHAEL:  Thank you.  I think it may be part

20   of the record anyway.

21           THE COURT:  Defendant's 2 is admitted.

22   BY MR. MICHAEL:

23   Q    Do you recognize that package with a cover letter to

24   you of August 10 from AUSA Jeffrey Lang to be the package

25   you were referring to in your testimony that you received

1    from him prior to the grand jury appearance?

2    A    Yes, I do.

3    Q    If you look, there's a cover page letter, one-page

4    letter from Mr. Lang to you, then what we've come to know

5    in this courtroom and in this case to be the five-page

6    document that memorializes the interview of Mr. Peleti by

7    the criminal division of the United States Army, correct?

8    A    Correct.

9    Q    And then after that five-page interview of

10   Mr. Peleti, there's a two-page letter from Mr. Lang to

11   Mr. Peleti dated August 2 regarding his grand jury

12   appearance?

13   A    Yes.

14   Q    And that's the letter you referred to as a standard

15   grand jury appearance letter, correct?

16   A    Yes.  It appears to be like other letters I've

17   received in that regard.

18   Q    Along with --

19   A    Or been apprised of.

20   Q    And attached to that are all the typical grand jury

21   documents that we often see --

22   A    Right.

23   Q    -- in this business?  Now looking at the first page

24   of the August 2 letter from Mr. Lang to Mr. Peleti prior

25   to your representation, the last paragraph, it says, "You

 1    are advised that you are a target of the grand jury's

 2    investigation", correct?

 3    A    Right.

 4    Q    So that alerted you at the time you received this

 5    letter sometime after August 10 that Mr. Peleti was in

 6    fact a target, correct?

 7    A    I knew he was a target before that because I had

 8    talked to Mr. Lang about it.

 9    Q    When did you talk to Mr. Lang about it?

10    A    I would have talked to him probably a day or two

11    before August 10.  Every time that I take a case in this

12    court, if it's a criminal case, I generally call the

13    prosecutor and chat with them about the case and where

14    we're headed and try to get my feet on the ground a little

15    bit that way.  I find it helpful.

16    Q    Okay.  I agree.  In fact, you knew that the

17    Government would in fact charge Mr. Peleti with two

18    criminal offenses, correct?

19              MR. LANG:  Your Honor, I'm going to object

20    again.  It's his witness.  He can ask him what he knew.

21    But he's leading.  He's doing cross-examination of his own

22    witness.

23              THE COURT:  Well, the fact he called the witness

24    doesn't mean that the witness is not adverse.  Under the

25    rules, if the witness is adverse, it's appropriate to

1    conduct the examination by way of leading questions.  Your

2    objection is overruled.  We'll show a continuing

3    objection, but he's obviously an adverse witness.

4              MR. LANG:  I understand that, Judge.  I

5    subpoenaed Mr. Robertson to be here.  I intend to get the

6    full story out.  We'll do that.  They called him.

7              THE COURT:  Well, you will have an opportunity

8    to go over anything you want with him.

9              MR. MICHAEL:  I'm not covering anything that's

10   controverted, Your Honor.

11             THE COURT:  Go ahead.

12   BY MR. MICHAEL:

13   Q    You also knew, let's say around August 10, that

14   Mr. Peleti was going to be charged with two criminal

15   charges, right?

16   A    That was my understanding, that charges would be

17   brought, yes.

18   Q    Mr. Lang told you that?

19   A    I don't recall a specific conversation, but I

20   certainly couldn't deny that.

21   Q    If Mr. Lang represented in a pleading to the Court

22   that he advised you that Mr. Peleti would be charged with

23   bribery and other federal criminal offenses, does that --

24   do you agree with that representation of Mr. Lang?

25   A    Yes, I do.

1    Q    And would that have been on or about August 10?

2    A    Or before, yes.

3    Q    Or before.  Somewhere between the 4th and the 16th?

4    A    Yes.

5              MR. MICHAEL:  Thank you.  Your Honor, my

6    reference to Mr. Lang's representation is on page 6 of the

7    Government's opposition to our motion to withdraw plea.

8              THE COURT:  Thank you.

9    Q    Now when did you first meet Mr. Peleti physically?

10   A    I believe it was a couple of days before the grand

11   jury testimony.

12   Q    So it's fair to say it was probably around August 14?

13   A    I think that's right.

14   Q    And had you talked to him prior to the 14th?

15   A    I believe we chatted on the phone, yes.

16   Q    Did you talk to him on the phone regarding the

17   charges against him and his defenses or his appearance

18   before the grand jury?  Or the potential charges.  I

19   apologize.

20   A    I think when -- I don't recall what we talked about

21   on the telephone.  I recall meeting Mr. Peleti later in

22   the week personally in my office, but I couldn't tell you

23   what we talked about exactly over the phone.  I don't

24   recall that we talked that long over the phone before I

25   met him.

1    Q    So you first met him on the 14th and your initial

2    call with him was to set up that meeting, talk briefly

3    with him, correct?

4    A    Right.  I asked him to come to my office so we could

5    discuss matters.

6    Q    On the 14th was when you intended to get into a

7    substantive discussion with him about the case?

8    A    Right.

9    Q    Now I want to ask you, on the 14th was it arranged

10   that you and Mr. Peleti and Mr. Lang and a number of

11   federal law enforcement officers, some of whom may be here

12   in court, were to meet that day?

13   A    Yes.

14   Q    How did you make that arrangement prior to the 14th?

15   What occurred sequentially?

16   A    Well, I had conversations with Mr. Lang concerning

17   upcoming grand jury testimony.  He had given me this

18   package that's marked as Exhibit 2 and he asked me to

19   counsel with my client to see if he wished to cooperate

20   with the Government.  And that was of course the purpose

21   of the meeting with Mr. Peleti on the 14th.

22   Q    Okay.  And the purpose of the cooperation -- strike

23   that.  On the 14th did the Government and Mr. Peleti

24   actually enter into a cooperation agreement?

25   A    Yes.

1    Q     And that was part of your discussion with Mr. Lang

2    prior to that time?

3    A     Yes.

4    Q     But is it a fact though that at that time the

5    cooperation agreement and any other discussions with

6    Mr. Lang that you had did not mean that Mr. Lang was not

7    going to charge Mr. Peleti with these two criminal

8    charges, correct?

9    A     I'm sorry?

10    Q     I gave you a double negative and I apologize.  I

11    never like to do that.  Let me rephrase the question.

12    During all of this time it was the Government's intention,

13    even with the cooperation agreement, to charge Mr. Peleti

14    with criminal conduct, correct?

15    A     That was my understanding.

16    Q     The cooperation agreement wasn't for the purpose of

17    Mr. Lang not charging Mr. Peleti?

18    A     That's my understanding.

19    Q     Thank you.  So is it fair to say then that the

20    purpose of this cooperation agreement and the interview of

21    Mr. Peleti on that date, on August 14, was for him to

22    assist the Government regarding other people?

23    A     Yes.

24    Q     I don't want to put words in your mouth.

25    A     Yes.  That was my understanding.  It was -- I did not

1   view this differently than any other cooperation agreement

2   that I would enter into with a criminal defendant.  It was

3   the same agreement and I felt towards the same end, to

4   secure concessions for my client in a criminal prosecution

5   and that was my understanding.

6   Q    And those concessions would be then sentencing

7   concessions?

8   A    Yes, sir.

9   Q    Not a concession the Government would not charge

10  Mr. Peleti?

11  A    Absolutely.  That was not my understanding.

12  Q    Now prior -- going back to the date of your

13  appointment on August 4 and between that time and

14  August 16, what investigations did you do regarding the

15  evidence that the Government had against Mr. Peleti?

16  A    I had reviewed this packet.  I didn't review any

17  other evidence at the U.S. Attorney's Office.  I talked to

18  Mr. Lang about Mr. Peleti's statement.  I inquired of

19  Mr. Lang about the second count, the currency transaction,

20  because I didn't see that exhibit anywhere at that time

21  and I asked Mr. Lang about that and he allowed as to how

22  he had it and would provide it to me.

23  Q    Good.  When you say "this packet", you're referring

24  to Defendant's Exhibit 2?

25  A    That's correct.

1    Q    It seems that in that packet the documentary evidence

2    that the Government had consisted of the five-page

3    interview of Mr. Peleti by the Army criminal division on

4    July 25, correct?

5    A    Yes.

6    Q    Did Mr. Lang tell you that he had any other evidence

7    against Mr. Peleti besides this customs declaration?

8    A    Oh, yes.  We discussed the case preliminarily.  He

9    told me about statements from other military personnel

10   connected with this investigation, some officers, some

11   higher ranking enlisted people.  We discussed the

12   evidence.  It was a candid discussion, not unlike

13   discussions I've had before with other people in the

14   prosecutor's office.

15   Q    Okay.  When you talked about other military

16   personnel and high ranking people, were your discussions

17   with Mr. Lang then about crimes committed by other people

18   for which he wanted Mr. Peleti's cooperation?

19   A    There was some, yes, but there was also background.

20   And actually when you said "high ranking people", I don't

21   believe we discussed anybody over the rank of major or

22   lieutenant colonel.  I said higher ranking enlisted people

23   is what I discussed with Mr. Lang.

24   Q    Did Mr. Lang identify any other documentary evidence

25   that he had against Mr. Peleti besides the five-page

1  statement and a possible customs declaration?

2  A    I don't recall anything specific.

3  Q    Did Mr. Lang say that he had any witnesses to testify

4  against Mr. Peleti?

5  A    I don't know that we talked about trial witnesses.

6  We talked about people involved.  We talked about the

7  person that offered the money.  We talked about people

8  concerned with a thing called the party house.  We talked

9  about some associates, some military associates of

10  Mr. Peleti's.  I believe -- I do not recall if it was

11  during that initial week, but Mr. Lang indicated to me he

12  had some credit card statements from Mr. Peleti indicating

13  large payments that were made contemporaneous with

14  receiving the money in Iraq, things of that nature.  I

15  wouldn't refer to it as a trial prep-type thing by any

16  stretch of the imagination.

17  Q    Did you have an opportunity, once again within the

18  whole tenor of this particular progress of this case,

19  between August 4 and August 16 to do any research into the

20  elements of the offense of bribery that the Government was

21  focusing on?

22  A    Yes, I did.

23  Q    And what research did you do?

24  A    I looked at the statute.  I had never had a bribery

25  case before.  The other thing that I do with a case with

1    which I'm unfamiliar is, whether it's civil or criminal, I

2    look at jury instructions to try to get an idea of the

3    elements, what has to be proved or disproved or not

4    proven.

5    Q    Did you -- okay.  Did you review the Government's

6    interview of Mr. Peleti within that context?

7    A    Yes, I did.

8    Q    Did you review the elements of the statute regarding

9    the transportation of currency into the country or the

10   failure to report?

11   A    I don't recall independently looking up the elements

12   to that offense.  What I specifically recall is looking up

13   the elements in the jury instructions to the bribery

14   offense.  And I remember that because I was at the federal

15   courthouse and I didn't have the Seventh Circuit

16   instructions.  I couldn't find them in my office.  When I

17   was over at the clerk's office, I went into the room

18   that's used as the judge's chambers and got a Seventh

19   Circuit book from there and looked it up while I was over

20   there, and in fact I think I xeroxed that off, but I don't

21   think I did that with the bribery charge.

22   Q    With the currency charge?

23   A    Yes, the currency charge.

24   Q    If you look at the statement by Mr. Peleti, the

25   five-page statement, there's nothing in that statement

1 | that you can see, correct, that indicates that there

2 | was -- that the money he was given was in exchange for

3 | some official act, correct, in the statement itself?

4 | A    That's not how I read it.  Frankly, in this statement

5 | he admits -- well, this statement, I thought, was full of

6 | admissions that he had broken the law.  I felt that this

7 | particular piece of evidence, assuming it survived a

8 | motion to suppress -- it was my understanding that he had

9 | been fully Mirandized before the statement was given.  I

10 | felt this was a very, very damning piece of evidence.  I

11 | felt he admitted his guilt.  He refers to bribery in here,

12 | to receiving gifts, and describes a situation which I felt

13 | would make for, to say the least, a very difficult

14 | defense.

15 | Q    When you met with Mr. Peleti on August 14, did you go

16 | over the facts and circumstances of his statement with him

17 | prior to his appearing before the grand jury and prior to

18 | meeting with Mr. Lang?

19 | A    We reviewed the statement in my office and we also

20 | talked about -- we talked about a lot of things.  We

21 | talked about -- we talked about the statement.  We talked

22 | about the fact there was an upcoming grand jury

23 | investigation.  We looked at the sentencing guidelines in

24 | our first meeting.  When we met, Mr. Peleti expressed to

25 | me that he wished to cooperate fully with the Government

1   and to put this incident behind him.

2   Q    Without -- maybe we'll get there in a bit about

3   subsequently what his desire was.  I'm trying to

4   establish -- stay within the zone of the investigations

5   and your advice to him regarding those particular

6   offenses.  Now I realize that there was something bigger

7   going on in the grand jury, but let me ask you this.  I'm

8   sure Mr. Lang will ask you about that also.  Did

9   Mr. Peleti tell you what he told Judge Mihm at his plea

10  colloquy on August 14?  Not the plea colloquy, but did he

11  tell you on August 14 what he subsequently told Judge

12  Mihm, that Mr. Ibrihim had approached him regarding a

13  contract for utensils for the Iraqi troops?

14  A    Yes, he told me that.

15  Q    He told you that before you brought him to be

16  interviewed by Mr. Lang and the investigators, correct?

17  A    Yes.

18  Q    Did he tell you that Mr. Ibrihim made a presentation

19  to the board -- I believe they're called a merit board

20  or -- I forget if that's the correct designation.  Menu

21  board.  That Mr. Ibrihim made a presentation to individual

22  members of the menu board and then to a body of about 35

23  individuals on the menu board regarding his contract?

24  A    He didn't tell me that at our first meeting.

25  Q    Did he tell you that prior -- that he was advised by

1   the government that Mr. Ibrihim could not receive a

2   contract for his product because that contract had already

3   gone to a Halliburton subsidiary, Kellogg, Root & Brown?

4   A     I believe he told me he had informed Mr. Ibrihim of

5   that fact, not that -- he didn't tell me anecdotally that

6   Mr. Ibrihim had been informed by the government.  If he

7   did, I don't recall that.

8   Q     No?

9   A     But I recall Mr. Peleti telling me that he had

10  indicated to Ibrihim that the contract for the --

11  Q     Maybe my question was confusing.  My question was did

12  Mr. Peleti tell you that the government advised him that

13  Mr. Ibrihim could not get the contract for his utensils

14  because it had already been given to the Halliburton

15  subsidiary, Kellogg, Root & Brown?

16  A     Did the Government tell me that?

17  Q     Did Mr. Peleti tell you that the government told him?

18  In other words, did Mr. Peleti tell you he knew

19  Mr. Ibrihim was not going to get the contract for the

20  utensils?

21  A     I don't recall that particularly at that time, but I

22  think that he did tell me that in perhaps a subsequent

23  discussion.  That was my understanding.

24  Q     And then you said that on August 14 that Mr. Peleti

25  told you that he told Mr. Ibrihim that Mr. Ibrihim was not

1  going to receive that contract, correct?

2  A    I think he did, yes.

3  Q    Did Mr. Peleti tell you that up to that point that

4  Mr. Ibrihim had never talked to Mr. Peleti about money?

5  A    He didn't tell me that.  No, I don't recall that.

6  Q    You don't know whether or not?

7  A    That's correct.  I don't know if Mr. Ibrihim had

8  talked to Mr. Peleti about money prior to that.

9  Q    So is it fair to say that at the time of the plea

10  colloquy, which was some months later before this Court,

11  that you were surprised when Mr. Peleti told the Court

12  that he had told Mr. Ibrihim that there was no contract

13  available to him prior to Mr. Ibrihim ever talking about

14  money?

15  A    No, that was not a surprise to me at all.  That was

16  my understanding.

17  Q    How did you learn that though if you didn't learn it

18  in the August 14 meeting with Mr. Peleti?

19  A    I learned it from Mr. Peleti.  It could have been on

20  August 14.  But at some point it was clear to me that --

21  what I understood from Mr. Peleti was that he had told me

22  that he was going to be leaving the theatre very shortly

23  after the money exchange took place between him and Mr.

24  Ibrihim and he was -- I think he was going back to Hawaii,

25  back to the 25th infantry division headquarters.  And I

1   was aware of that.  That did spark some curiosity in my

2   mind as to whether or not taking the money at that point

3   could constitute a bribe and I think the instructions or

4   the law that I read -- and I'm going to tell you what my

5   understanding of the law is.

6          My understanding of the law, and particularly

7   the mens rea element in the first count of the eventual

8   indictment, was it essentially had to do with what

9   Mr. Peleti thought Mr. Ibrihim thought Mr. Peleti would or

10  would not do.  In other words, if Mr. Ibrihim gave

11  Mr. Peleti money, then my understanding of the mental

12  state was that Mr. Peleti would have to think that in

13  taking that, Mr. Ibrihim thought he was going to get

14  something eventually.  That's my understanding.

15  Q    Okay.  I understand.  Isn't it fair to say that an

16  important concern that you had to have about the

17  representation is what evidence the Government has against

18  your client?  That goes without saying.

19  A    Absolutely.

20  Q    What is the evidence it had against your client?

21  A    The evidence against my client was his own admission.

22  Q    So the only evidence that you saw against your client

23  prior to August 14, and actually prior to even now, was

24  this five-page statement?

25          MR. LANG:  Your Honor, I object.  I don't think

1   the witness was done answering.

2          THE COURT:   I don't believe he was either.

3   Q     Did you have something else to add before I asked the

4   next question?

5   A     Would you ask your previous question?

6   Q     Thank you.  So the only evidence that you were aware

7   of that the Government had against your client all the way

8   up until the plea was this five-page statement?

9   A      No, that's not true.  As of the first day, the first

10  day I met Mr. Peleti and we had our first meeting, I had

11  previously talked to Mr. Lang and I had referred to one of

12  the things that I of course was interested in on the

13  currency transaction thing was, "Where is the form you

14  fill out?"  I've filled that form out myself coming into

15  country.  Mr. Lang says, "I have the form."  He didn't

16  give me the form, so I didn't see it, but I assumed if

17  Mr. Lang said he had it that he had it.  So I was relying

18  on that.

19          I was relying also on the conversation that I

20  had with Mr. Peleti on the first day we met.  We spent

21  several hours together.  He expressed to me -- told me

22  what was going on and --

23  Q     Without getting into your communications with

24  Mr. Peleti about it -- and, once again, I'm trying to

25  focus on the Government's evidence.

1          MR. LANG:  Your Honor, again I don't believe

2    Mr. Robertson was finished.

3          THE COURT:  Overruled.  Ask another question.

4    Q    Thank you.  With regards to the currency transaction,

5    since you just mentioned that, the form you're talking

6    about is the form that an individual fills out upon entry

7    into the country declaring whether or not they have a

8    certain amount of currency?

9    A    Right.

10   Q    That's the form you're talking about?

11   A    Right.

12   Q    Let's assume that form exists.  Did you have a chance

13   to research any of the cases that discuss a violation of

14   that report?

15   A    I didn't research that.

16   Q    Did you have any evidence from the Government that

17   Mr. Peleti brought in over $10,000 currency at the time he

18   entered the United States?

19   A    Only what I heard from Mr. Lang.  No.  If your

20   question is did I see evidence or documentary evidence,

21   no, I did not.

22   Q    So what you have is potentially -- let's concede that

23   there is probably one that exists, a form he filled out,

24   and you have him with $50,000 in Kuwait, correct?

25   A    Right.

1   Q    That's all the evidence you saw regarding the

2   currency report?

3   A    Correct.

4   Q    Now I'm still a little bit unclear.  Are you saying

5   that it's possible that as of August 14 you were aware

6   that Mr. Peleti had told Mr. Ibrihim that he could not get

7   that contract for him prior to Mr. Ibrihim giving him the

8   money?

9   A    Counsel, I don't remember if it was August 14, but if

10  it wasn't the 14th it was very shortly thereafter that I

11  was aware of that because I remember Mr. Peleti telling me

12  that.

13          MR. MICHAEL:  Thank you.  One second, Your

14  Honor, if I may.  I have no further questions at this

15  time, Your Honor.

16          THE COURT:  Thank you.  Mr. Lang?

17                    **DIRECT EXAMINATION**

18  BY MR. LANG:

19  Q    Mr. Robertson, where are you licensed to practice?

20  A    Illinois, Missouri, Iowa.  Federal courts would be

21  Southern, Central, Northern District of Illinois, Southern

22  District of Iowa, Eastern and Western District of

23  Missouri, Seventh Circuit and Eighth Circuit.

24  Q    How long have you been practicing law?

25  A    Twenty-five years.

1    Q    And where did you go to law school?

2    A    Vanderbilt University.

3    Q    What was your rank in law school?

4    A    I graduated towards the upper -- top 20 percent of my

5    class.

6    Q    Could you describe your current law practice?

7    A    Yes.  I have mostly a litigation based practice.

8    About 60 percent to 70 percent of my practice is devoted

9    to criminal law in the federal and state court.  I also do

10    some civil litigation including divorce, domestic, some

11    personal injury.  And then I do the things that I would

12    refer to as a general practitioner.  I write some wills

13    and things of that nature.

14    Q    With respect to your criminal practice, have you had

15    any trials?

16    A    Yes.

17    Q    Could you tell the Court how many trials you've had?

18         MR. MICHAEL:  Objection.  Objection as far as

19    time over his career is he asking him?

20         MR. LANG:  Yes.

21         MR. MICHAEL:  Fine.

22    A    I would assume pretty close to a hundred.

23    Q    Have you had trials in federal court?

24    A    Yes.

25    Q    Have you had trials in the U.S. District Court for

1  the Central District of Illinois?

2  A    Yes.

3  Q    How many trials have you had in federal court?

4  A    I think 8 or 10 criminal.

5  Q    How about appellate work?  Do you do appellate work?

6  A    I do.

7  Q    How many appeals have you litigated during your

8  career?

9  A    State and federal, I would say over a hundred.

10  Q    Have you handled suppression hearings?

11  A    Yes.

12  Q    Any idea how many suppression hearings you've

13  litigated?

14  A    State and federal, 25 to 50.  That's a rough

15  estimate.  I haven't really thought about that.

16  Q    With respect to federal court, are you familiar with

17  the U.S. sentencing guidelines?

18  A    Yes, sir.

19  Q    And how are you familiar with the sentencing

20  guidelines?

21  A    Well, I was practicing law when they became the law

22  and I've studied them over the years.  I've been to a

23  number of seminars.  I don't think it's -- you know, I

24  think it's pretty clear that a lot of federal cases in

25  federal court do end up in pleas, so a lot of what happens

1    is with the sentencing guidelines.  I think I'm very

2    familiar with the guidelines.

3    Q    So you've had sentencings, whether it's the result of

4    a plea or pleas or trials?

5    A    That's correct.

6    Q    Can you estimate how many federal sentencing hearings

7    you've had in your career?

8    A    I would say between 70 and a hundred.

9    Q    Now we've heard that you began representing

10   Mr. Peleti on August 4, 2006; is that correct?

11   A    That's correct.

12   Q    How did you learn of that appointment?

13   A    Denise Koester called me and asked me if I would be

14   available to come to court.

15   Q    And you hadn't met Mr. Peleti at that point; is that

16   correct?

17   A    No, not in person.

18   Q    When did you first know about this case?

19   A    Oh, first week in August of '06.

20   Q    When did you first learn the facts that were

21   surrounding this case?

22   A    I think you and I talked a day or two before you sent

23   me this letter under date of August 10 and you explained

24   to me what was going on and then I received this package

25   and reviewed that.

1    Q    You're talking about Defense Exhibit 2?

2    A    I am.

3    Q    You were told, weren't you, that there was more than

4    this, but we were sending this to begin discussions; is

5    that correct?

6    A    That's correct.

7    Q    In fact, you were told that the Government was

8    obtaining bank account information; isn't that correct?

9    A    That's correct.

10   Q    You were told the Government had the customs

11   declaration; is that correct?

12   A    Yes, you told me that.

13   Q    And you asked by phone -- after you received this

14   packet, we had a phone discussion after you received the

15   August 10 packet, right?

16   A    Yes.

17   Q    And then you and I had a lengthy telephone conference

18   after you received this; is that correct?

19   A    That's correct.

20   Q    And in fact, the letter said we looked forward to

21   speaking with you and we had a lengthy phone conference,

22   right?

23   A    That's correct.

24   Q    One of the topics was the customs declaration form;

25   is that correct?

1  A    Yes.

2  Q    And you asked me specifically --

3        THE COURT:  Why don't you -- I would prefer if

4  you avoid leading questions and have the witness testify,

5  please.

6  Q    All right.  Did we talk about details on the customs

7  declaration form?

8  A    Yes.

9  Q    Did you ask specific questions about what was noted

10  and what wasn't on the customs form?

11  A    Yes, I did.  To answer your question, I asked you

12  specifically about that because it seemed to me that that

13  would be a very important part of or, you know, the most

14  important part of the evidence regarding that charge.  And

15  I asked you -- I had seen the form before.  I was familiar

16  with the form.  I asked you if there was -- if there was a

17  declaration that he had brought in more than $10,000, if

18  the box was checked, and you said it was checked

19  negatively.  You also told me that there was some personal

20  property or something that was listed on the declaration

21  form and you told me it was signed by Mr. Peleti.  You

22  also told me that he had affirmed that he had signed it.

23  Q    All right.  Did you ask me to fax that over to you

24  during that conversation?

25  A    Yes, I did.

1    Q    Did you ultimately see this form?

2    A    Yes, I did.

3    Q    Where did you see it?

4    A    I saw it in your office.

5            MR. LANG:  For the record, I'm going to offer

6    Exhibit 106.

7            MR. MICHAEL:  I assume that's the form.

8            MR. LANG:  It's the packet I gave to your

9    co-counsel at the last hearing.  They have all the

10   exhibits that we have here.  I'll give you another one.

11   BY MR. LANG:

12   Q    This form, Exhibit 106, is the information on it

13   consistent with what you knew in August of 2006?

14   A    Yes.

15   Q    You have already testified that you researched the

16   case law concerning -- I'm sorry -- the jury instructions,

17   the elements of the offense concerning the bribery

18   offense?

19   A    And I looked at the annotated statute on the bribery

20   offense.

21   Q    You also said that you didn't research the jury

22   instructions for the bulk cash smuggling count?

23   A    I don't recall doing that, no.

24   Q    Did you have a discussion with me concerning which of

25   the two possible charges would carry the highest

1   sentencing range under the guidelines?

2   A    I think I knew that before we talked about it.

3   Q    We did discuss it too?

4   A    Yes, we did.

5   Q    And did you discuss with me whether we believed the

6   second count, the bulk cash smuggling count, would be

7   grouped with the first count?

8   A    Yes, we discussed that.

9   Q    Did that have to do with which of the two counts you

10   researched?

11   A    Yes, it did.

12   Q    All right.  There came a time when you said you met

13   with Mr. Peleti; is that correct?

14   A    I met with Mr. Peleti in my office on August 14.

15   Q    During your direct testimony you began talking about

16   what all you discussed with Mr. Peleti during that

17   meeting.  Could you please tell the Court what all you

18   discussed with Mr. Peleti during the initial meeting?

19   A    We had a very wide-range discussion.

20         MR. MICHAEL:  Objection, Your Honor.  It asks

21   for a narrative.  It asks for a narrative, that question.

22         THE COURT:  Overruled.

23   A    We had a wide-range discussion.  We discussed

24   Mr. Peleti.  We discussed his career.  We discussed his

25   home, where he was from.  We discussed the case, the

 1    charges that you had talked about that he was facing.  We

 2    also discussed the idea that there was a grand jury

 3    meeting and that he was being asked to give testimony at

 4    the grand jury.

 5            It's my recollection that we talked about the

 6    potential penalties.  Mr. Peleti was concerned about that.

 7    He expressed to me remorse for what had happened,

 8    indicated to me that he wished to continue cooperation and

 9    wished to get this behind him and go on with his life.

10            We discussed things that had gone on pertaining

11    to the case and I discussed with him the idea of a

12    cooperation plea agreement, the steps we would go through

13    with that, the proffer, proffer letter.  We discussed full

14    and complete cooperation.  And I do that any time I'm

15    talking about a cooperation plea agreement.

16            And, frankly, Mr. Peleti was concerned about --

17    he was concerned about his career in the military.  He was

18    concerned about whether or not he would have to do prison

19    time.  We looked at the guidelines.  We looked at various

20    upward/downward departures or adjustments, if you will,

21    those sorts of things.

22    Q    Departures based on what?

23    A    Based on acceptance of responsibility, based on

24    cooperation.  We talked about -- we talked about how a

25    cooperation plea works in this district, how a judge -- if

1    a motion was made, how a judge would rule on that, those

2    sorts of things.

3    Q    Now you're talking about cooperation.  Why were you

4    talking to him about cooperation versus how are we going

5    to defend this case?

6    A    Because I had read his statement.  He affirmed his

7    statement to me, indicated that he wished to continue in

8    this mode, and I frankly felt that it was in his best

9    interests to do that based on what I had seen, based on

10   what my client told me.

11   Q    Based on the evidence that you either had in your

12   hands or you knew existed?

13          MR. MICHAEL:  Your Honor, objection.  The

14   Government is venturing into an area that we're not

15   inquiring about and I don't think it's proper for these

16   proceedings.

17          THE COURT:  What's that?

18          MR. MICHAEL:  The issue before this Court with

19   regards to ineffective assistance of counsel has to do

20   with what evidence the Government had against Mr. Peleti

21   at the time he entered into the plea agreement and if

22   Mr. Lang is attempting to venture into the confidential

23   communications between Mr. Peleti and Mr. Robertson --

24          THE COURT:  Concerning what?

25          MR. MICHAEL:  Regarding admissions he made or

1    statements he made that would potentially help the

2    Government's case, that's an improper inquiry.  There's no

3    waiver of the privilege as to those kinds --

4              THE COURT:  If you're telling me that in

5    considering a claim of ineffective assistance of counsel

6    that I am limited in my analysis to only what the

7    Government's evidence was and not what the defendant told

8    his attorney about his conduct or what he wanted to do in

9    relation to the proceeding, then I think you're absolutely

10   wrong.

11             MR. MICHAEL:  Our motion is only that --

12             THE COURT:  Well, your motion may couch the

13   issue in that term, but it's very clear to me that in

14   order to answer the questions concerning the effective or

15   ineffective assistance of this attorney in this case, this

16   is all part of the mosaic in this case and I don't believe

17   that you can limit the Court's consideration in the manner

18   that you're suggesting.

19             MR. MICHAEL:  Well, Your Honor, I agree there is

20   a mosaic.

21             THE COURT:  We'll show a continuing objection,

22   but the objection is overruled.

23   BY MR. LANG:

24   Q    I was actually done asking about what he was told,

25   Judge.  Mr. Robertson, based on --

 1              MR. MICHAEL:  Your Honor, excuse me for

 2    interrupting.  I apologize.  But just to continue on that,

 3    I'm not suggesting in my objection that there was any kind

 4    of information that Mr. Robertson has that is

 5    incriminating.  I just didn't want the Government to

 6    venture into that arena.

 7              THE COURT:  Whatever.  The objection is

 8    overruled.  Ask a question.

 9    BY MR. LANG:

10    Q    Based upon the information that you knew, the

11    evidence that you knew from the Government as well as

12    information that you had learned, did you decide that a

13    trial would or would not be in the best interests of

14    Mr. Peleti?

15    A    I decided it would not be in his best interests.

16    Q    Now what did you use as a measure of whether or not

17    this was a trial case?

18    A    Well, it started out with Mr. Peleti's statement.  I

19    was aware that he had been Mirandized.  I spoke with

20    Mr. Peleti and I certainly from my meetings with him

21    realized he was an intelligent individual.  I didn't think

22    that he lacked the capacity in any way to make the

23    statement that he did.

24              And I was largely guided by a couple of things

25    here.  Number one was my client's wish, which frankly if I

1  thought it was not in his best interests I would have told

2  him that, but I felt he was going down the right road.

3  Based on what I knew and what he had told me, I really

4  felt that.

5          And I was also guided by the fact that we had

6  discussed that there was a grand jury meeting a couple of

7  days or day or two after I met Mr. Peleti and I know the

8  value of testimony by someone like Mr. Peleti in a

9  cooperation sense and there was -- there was that idea

10  that I wanted Mr. Peleti to take advantage of an

11  opportunity that was there.

12  Q    And did you and I discuss the value of grand jury

13  testimony by Mr. Peleti and his cooperation later when it

14  came to sentencing time?

15  A    Of course we did.  Yes, we did.

16  Q    Have you in other cases had clients that came in with

17  confessions and you advised them to cooperate?

18  A    Yes.

19  Q    How often does this happen?

20  A    Frankly, not that often, but certainly -- well,

21  there's a very significant percentage of cases where there

22  are confessions and that always brings up the issue of can

23  we suppress it, can we somehow keep it out.  And so to

24  that extent, yes, a number of cases.  But where there are

25  cases where there's a confession and it appears to be

1    legally admissible, yeah, I certainly have been in that

2    position where I've advised a client that a trial is not

3    in their best interests.

4    Q    But did you consider and discuss with Mr. Peleti

5    taking this case to trial?

6    A    Yes.

7    Q    What discussions did you have about taking the case

8    to trial?

9    A    I would say that we discussed on no fewer than 15 to

10   20 occasions what the effect of taking the case to trial

11   would be versus a plea, both with regard to a substantive

12   finding of guilt by a jury and what it would mean to my

13   client at sentencing.  And Mr. Peleti asked me many, many

14   times -- and he did say this, I believe, in perhaps a

15   pejorative fashion.  A couple of times he said to me, more

16   than a couple, "I feel we have not explored all our

17   options in this regard."  And we talked about that a lot

18   and I felt -- I felt the options were, number one, that if

19   this case would go to trial, I felt he would be convicted.

20   I memorialized that to him as late as the late spring,

21   early summer of '06.

22            The other option was a plea.  We discussed that.

23   We discussed the ramifications.  We discussed guidelines.

24   I memorialized that to him again as late as the spring of

25   '06.

1          The other option which we didn't discuss after

2    November -- I'm sorry.  When I said '06, I meant '07.  The

3    other option that we talked about and we explored was I

4    wrote you and asked you to consider a diversionary result

5    in this case because Mr. Peleti, I felt, had a very long

6    and distinguished career in the military and I thought it

7    was worth pursuing.

8          And to relate back to what I was saying, those

9    were the three options we discussed.  And after you wrote

10   me in November and said that the United States Attorney

11   had considered our request for diversionary treatment and

12   denied it, there were only two options after that and we

13   discussed that a lot.

14   Q    All right.  Quickly I want to hand you what's marked

15   Exhibit 4 and offer that.  Do you recognize it?

16   A    Yes.

17   Q    What is it?

18   A    It's a letter I wrote to you at the end of last year,

19   November 27 of 2006, in which I asked the Government to

20   consider a diversionary sort of ending to this case.

21              MR. LANG:  I would offer this.

22              THE COURT:  Any objection?

23              MR. MICHAEL:  No objection.

24              THE COURT:  It's admitted.

25   Q    Now you were talking earlier about your discussions

1   of the ramifications of trial versus plea?

2   A    Yes.

3   Q    For the record, can you tell us what you advised

4   Mr. Peleti you predicted the bottom line would be if

5   Mr. Peleti went to trial and was convicted?

6   A    I told him he would be convicted on -- that it was my

7   opinion that he, nearly to a certainty, that he would be

8   convicted on both counts.

9            MR. MICHAEL:  Your Honor, I'm sorry.  Nearly

10  what?

11  A    Nearly to a certainty in my opinion.

12  Q    And did you explore or predict what that translated

13  into in terms of sentencing?

14  A    Yes.

15  Q    And for the record, what did you predict his sentence

16  would be if he was convicted at trial?

17  A    I don't remember.  I memorialized that.  I don't

18  remember.  I think I may have -- 24 to 30 months comes to

19  mind on the guidelines without assistance, but I

20  memorialized that both to my client and -- it's written

21  down, but I think that's what it was.

22  Q    All right.  On the other hand, did you also

23  explore -- you said you explored the ramifications.  What

24  ramifications -- if he pled guilty and cooperated, what

25  did you tell him that your prediction was of what his

1  ultimate sentence would be in that scenario?

2  A    I felt that he would -- I think the guidelines we

3  looked at at that point, I think we were down to maybe a

4  12 to 18 month guideline, maybe a little higher.  I felt

5  and advised Mr. Peleti that I did not think probation was

6  a likelihood.  I didn't think it was impossible, but I

7  didn't think it was a likelihood.

8  Q    And with mitigation for cooperation based on the

9  Government's recommendation, did that play into your

10 prediction?

11 A    Absolutely.  I thought that if we -- if we stood on

12 the ladder of acceptance of responsibility and got as much

13 as we could in that regard and then with cooperation, I

14 had hoped that at sentencing -- and certainly in a

15 post-Booker world, Judge Mihm is not -- or any federal

16 judge is not bound by the sentencing guidelines.  I had

17 hoped that with a client such as Mr. Peleti, with the

18 minimal criminal history and cooperation, that perhaps we

19 could make that reach to probation.  I mean, certainly I

20 hoped that.

21 Q    I want to show you what has been marked Government

22 Exhibit 107.  These are credit card statements.  Did you

23 and I discuss credit card -- the details of some credit

24 card statement evidence that the Government had with

25 respect to Mr. Peleti?

1   A    Yes, we did.

2   Q    Would you look at page 2?

3   A    Yes.

4   Q    Were you advised that there was a $15,000 payment on

5   his wife's credit card on December 31, 2005?

6   A    You told me that, but I don't recall seeing this when

7   you told me this.  I really don't.

8   Q    But you were told about it though?

9   A    Yes, you told me about that.

10  Q    Again, did that figure into your recommendation?

11  A    Yes.

12           THE COURT:  What was the date he returned?  It's

13  probably on --

14           MR. LANG:  December 15, 2005.  The 14th or 15th.

15  December 14, 2005.

16           THE COURT:  Is there any objection to this

17  exhibit by the way?

18           MR. MICHAEL:  No objection.

19           MR. LANG:  We'll offer it then.

20           THE COURT:  It's admitted.

21  BY MR. LANG:

22  Q    Mr. Robertson, did you send a plea agreement to

23  Mr. Peleti?

24  A    Yes.

25  Q    When did you send a plea agreement to Mr. Peleti?

1    A     It was about October 14.  It would have gone out from

2    my office on October 14.  I might have dictated that

3    letter a day or two before, but it would have left my

4    office the date on the letter.

5    Q     Handing you what's been admitted as Government

6    Exhibit 2 --

7              MR. MICHAEL:  No objection.

8    Q     Did you -- can you just summarize this letter

9    quickly?  What did you do in connection with this letter,

10   Mr. Robertson?

11   A     It appears this is a cover letter enclosing the plea

12   agreement that I received from you.  I asked Mr. Peleti to

13   look at it and I asked him to get together with me by

14   phone.  I then told him it was my plan to send you a

15   letter concerning his career in the military and life and

16   I then told him in the next paragraph -- and that was

17   about the diversionary treatment.  I told him that you

18   didn't seem terribly positive about that idea, which is

19   what you told me, but you told me that you would present

20   the letter to your superiors.  I informed him of that.

21              Then I also enclosed for Mr. Peleti relevant

22   guideline provisions, my best guess at the time.  We

23   talked about some of the application -- or I talked about

24   some of the application notes.  I then went through a

25   calculation of what I thought his guidelines would

1  eventually be.  Then I stated I thought that downward

2  departure would be considerable and I said we obviously

3  need a significant reduction to get you a split sentence,

4  alternative sentencing profile.  Then I discuss the cash,

5  the bulk cash thing.

6          And then I just said that I knew that he would

7  have some difficulties with the contents of the letter.  I

8  felt this was not probably what he wanted to hear as far

9  as, you know, thinking there probably wasn't going to be a

10  diversionary remedy here.  And then I asked him to give me

11  a call and take into account what the time difference was.

12  Q    Did you enclose the plea agreement with this letter?

13  A    Yes, I did.

14  Q    Did you subsequently speak to Mr. Peleti about

15  whether or not he received the plea agreement?

16  A    Yes.

17  Q    Did you discuss the plea agreement with him in

18  October of 2006?

19  A    Yes.

20  Q    For the record, the plea was February 19, 2007?

21  A    I think that's correct.

22  Q    February 9?

23  A    Yes.

24  Q    So four months?

25  A    Yeah.

1 Q You have referred to various contacts with Mr. Peleti

2 both in person and by phone?

3 A Yes.

4 Q Mr. Robertson, have you prepared a summary of your

5 contacts with Mr. Peleti as well as others --

6 A Yes.

7 Q -- in this case?

8 A Yes.

9 Q Let me show you what has been marked Government

10 Exhibit 8.  Do you recognize that?

11 A Yes, I do.

12 Q What is it?

13 A This is a compilation of the time that I recorded

14 spending on Mr. Peleti's file recorded either on time

15 slips or in the file or on my calendar.  This is a

16 compilation at the time that I devoted to his case that I

17 recorded.

18 Q Does it accurately reflect the time that you reported

19 to the Court?

20 A Yes.  It doesn't -- there are some things that are

21 not here.

22 Q But do these entries reflect either contact with

23 Mr. Peleti or contact with me or --

24 A They reflect what's on here with my shorthand, yes.

25    MR. LANG:  I would offer Government Exhibit 78.

1           MR. MICHAEL:  No objection.

2           THE COURT:  It's admitted.

3    BY MR. LANG:

4    Q    Mr. Robertson, how many actual telephone conferences

5    approximately did you have with Mr. Peleti beginning from

6    August 4, 2006 up through February 9, 2007?

7    A    I looked on Exhibit 8 and I think there are 31 on

8    here, but I didn't record all the telephone conversations.

9    Q    Are you saying you had approximately or at least 31

10   substantive telephone calls with Mr. Peleti concerning

11   your representation of him in this criminal case?

12   A    At least.

13   Q    You make reference to others that may not be on here.

14   Can you tell Judge Mihm what you're referring to?

15   A    Well, Mr. Peleti had my phone number at the office

16   and he was in Hawaii and I'm in Illinois, so I gave him my

17   cell phone number.  Mr. Peleti also had my home phone

18   number and also I called him and it came up on his caller

19   I.D. and he called me at home a couple of times and I

20   didn't write that down.  That just happened a couple of

21   times.  A couple of times he left messages for me on my

22   cell phone.  I can recall talking to him in the car

23   driving back from some things where he left me a message

24   and I don't think those got on here just simply because I

25   don't remember.

1  Q    As you sit here today, there's 31 documented in

2  Exhibit 8.  Approximately how many calls, substantive

3  discussions, I'm talking about actual discussions about

4  this case, did you have with Mr. Peleti on the phone?

5  A    30 to 40.

6  Q    At least 31?

7  A    Yes.  We talked a lot.

8  Q    How many in-person meetings did you have?

9  A    At my office we met when he would come in town.  I

10 would generally go see him at his hotel.  A lot of times

11 we would have coffee in the morning in the breakfast room,

12 talk about the case.

13 Q    Just number-wise, how many face-to-face meetings did

14 you have?

15 A    I'm guessing a half dozen.

16 Q    Mr. Robertson, if you had this case, the same set of

17 facts, same identical defendant, come to you today, what

18 would you do differently?  Anything?

19 A    No.

20        MR. LANG:  Those are my questions, Judge.

21        THE COURT:  All right.  Any additional cross?

22        MR. MICHAEL:  Yes, Your Honor.

23        THE COURT:  Let me interrupt a moment.  I think

24 we'll take a ten minute recess so I don't have to

25 interrupt cross-examination.  You may step down.

1                        (Recess taken)

2              THE COURT:  You may cross-examine.

3              MR. MICHAEL:  Thank you, Your Honor.  I suppose

4    it's more re-direct.

5              THE COURT:  Well, it doesn't make much sense to

6    call it direct when you're an adverse witness.

7                      **RE-CROSS EXAMINATION**

8    BY MR. MICHAEL:

9    Q    Mr. Robertson, you testified on inquiry by Mr. Lang

10   if there was no plea in this case that Mr. Peleti was

11   facing 24 to 30 months imprisonment by your calculation.

12   I think that's what you testified to, correct?  Are you

13   looking at your notes?

14   A    I'm looking at my letter.

15   Q    Well, I think that he inquired about a no plea, what

16   you felt his sentence would be if he didn't plead, and

17   your testimony was 24 to 30 months without acceptance of

18   responsibility?

19   A    Looking at my letter, it looks like that's with

20   acceptance of responsibility.

21   Q    24 to 30 months without a plea.  That's what I'm

22   asking.  I'm asking about your --

23   A    No.  By entering a plea, you're entitled to a three

24   point reduction pursuant to 3E1.1 for acceptance.  Your

25   overall offense level would be 17, criminal history

1    category I.  This results in an imprisonment range of 24

2    to 30 months prior to any downward departure.

3    Q    That's with a plea, correct?

4    A    Right.

5    Q    But I thought your testimony when Mr. Lang asked you

6    the questions about what you computed his sentence would

7    be without a plea, that you said 24 to 30 months.  That's

8    what my notes show.

9    A    I think I did say that.

10   Q    That was your belief, correct?

11   A    No.  That was wrong.  I was testifying from memory

12   and --

13   Q    But did you tell Mr. Peleti that without a plea his

14   sentencing range was 24 to 30 months?

15   A    I'm certain that I didn't because I would have had

16   the guidelines in front of me and I've worked with these

17   guidelines a lot, but I don't have them committed to

18   memory.

19   Q    What was the sentence if he did not have a plea and

20   he was convicted?  What would his sentencing range have

21   been?

22   A    Well, if we add 3 points to 17, it would be 20.  And

23   3 points up from that, my guess is you're probably looking

24   at 41 maybe on the bottom, maybe a little higher.

25   Q    So you saw him at a sentencing level 20 if he did not

1    plead and went to trial and was convicted, correct?

2    A    Yes, clearly.

3    Q    Because he would lose three points for acceptance of

4    responsibility?

5    A    Yes.

6    Q    Three level reduction actually is what it is?

7    A    Yes.

8    Q    Okay.  So if he's a public official his range is 24

9    to 30 with acceptance of responsibility?

10   A    Yes.

11   Q    So we're looking at 24 to 30 versus something maybe

12   in the 40 range or maybe 42 to something?

13   A    If we look at the guideline, criminal history I and

14   level 20, that's what I would have been advising him and I

15   don't have that committed to memory.

16   Q    You knew -- you always knew that the Government

17   intended to prosecute Mr. Peleti, correct?

18   A    Absolutely.

19   Q    And you were told by Mr. Lang that they would not

20   accept diversion, some form of diversion for him following

21   your letter, correct?

22   A    Yes.  That's right.

23   Q    You knew the Government wanted Mr. Peleti to plead to

24   two criminal charges and to be sentenced either pursuant

25   to the guidelines or what Judge Mihm would determine to be

1    an appropriate sentence, correct?

2    A    Yes.  That's correct.

3    Q    Assuming Booker and --

4    A    Right.  Right.

5    Q    You knew that there were -- from all your

6    conversations with Mr. Peleti, you knew that there were

7    very serious consequences to him of pleading to a felony

8    offense, federal felony offense?

9    A    Absolutely.

10    Q    Okay.  And you knew there were very serious

11    consequences to his future life, correct?

12    A    Absolutely.

13    Q    And not only were there future consequences of

14    imprisonment, but there were future consequences to his

15    retirement, correct?

16    A    Yes.

17    Q    And that he would lose his retirement from the

18    military after a distinguished career, correct?

19    A    I did not know that for certain at the time.

20    Q    Did you discuss it with him?

21    A    Yes.

22    Q    You knew it was possible then?

23    A    I would think so, yes.

24    Q    And did you know that Mr. Peleti might be denied an

25    opportunity to ever enter into any work efforts in that

 1    particular career area with the government in the future?

 2    A    I didn't know that, but I certainly wouldn't be

 3    surprised to learn that.

 4    Q    All right.  Let's go back.  Once again, I'm not

 5    questioning the discussions you had with Mr. Peleti and

 6    the Government regarding a plea.  My question goes to --

 7    but I'm looking at your billing, Government Exhibit 8.  If

 8    you do research regarding the Government's case and the

 9    elements of an offense and the cases that address it, do

10    you list that research on your billing statement?

11    A    I try to.

12    Q    Isn't it true that between August 8 and August 16

13    when the grand jury occurred, there's no indication that

14    you did any research regarding the particular charges in

15    this case?

16    A    No, I don't see any.

17    Q    Did you find any evidence in the Government's

18    evidence that they showed you or revealed to you

19    concerning the customs declaration or this credit card

20    charge of $15,000 late in December, did you find any

21    evidence that showed that Mr. Peleti in fact physically

22    transported any currency from Iraq or Kuwait where he was

23    stationed into the United States when he returned to the

24    United States?  Did you find any evidence that he had that

25    money physically on him?

1    A    Other than what he told me and the --

2    Q    I'm talking about in terms of the Government's

3    evidence.  I'm talking about you looking at the

4    Government's case.

5    A    No.  No.

6    Q    In your investigation did you determine that

7    Mr. Peleti was never stopped at the time he entered the

8    United States, correct?  You have no knowledge he was ever

9    stopped at the time he entered the United States?

10   A    Well, I assume he went through customs like anybody

11   else would.

12   Q    That's actually a vague question.  You don't know

13   that any -- when Mr. Peleti entered the United States that

14   anybody asked him whether or not he was carrying currency

15   and -- let me ask you that question.

16   A    That would be an assumption on my part based on the

17   document, yes.  That's correct.

18   Q    You don't know whether or not Mr. Peleti's belongings

19   were searched at the time he entered the United States?

20   A    Not independently of what he told me, no, I don't

21   know that.

22   Q    So is it fair to say the Government had no evidence

23   that Mr. Peleti physically transported any currency from

24   overseas, Kuwait or Iraq, into the United States when he

25   reentered on December 15?  Did they have any evidence that

1    you saw that he physically transported that?

2    A    Well, I would think the customs declaration would be

3    evidence of that.  I think it was competent evidence and

4    would have been admitted.  But beyond that, no.

5    Q    The customs declaration is a declaration he signed --

6    and that's in evidence here -- that admits I didn't

7    possess over $10,000 in U.S. currency?

8    A    Right.

9    Q    Did you know whether or not Mr. Peleti -- let me ask

10   you this.  Did you see -- strike that.  Withdraw that.

11   Did you see any other evidence from the Government

12   regarding the payment from Mr. Ibrihim to Mr. Peleti other

13   than the five-page statement of Mr. Peleti that he gave on

14   July 25?  Did the Government have any other evidence?

15   A    Yes, they did.

16   Q    In addition to that five-page statement?

17   A    If your question is did I look at any other evidence

18   other than his statement, my conversations with Mr. Lang

19   and my conversations with Mr. Peleti prior to the time we

20   went to the grand jury, the answer is no.

21   Q    Okay.  So is it fair to say that as the posture of

22   this case stands now, the evidence in possession of the

23   Government is the customs declaration, the billing

24   statement on his credit card and his five-page statement

25   as far as you know?

1   A    No.  There's a lot more evidence than that.

2   Q    Did you have a chance to look at that evidence?

3   A    Yes, in fact I did.

4   Q    There is other documentary evidence that exists?

5   A    Yes, there is.

6   Q    And when did you look at that evidence?

7   A    It was in -- during our subsequent meetings when we

8   continued to proffer after the initial meeting in August,

9   the case agents had a lot of the evidence regarding some

10  of the other people involved in this actually in the

11  library at the U.S. Attorney's Office and I looked at it

12  then.

13  Q    Okay.  And what evidence did you see regarding the

14  payment by Mr. Ibrihim to Mr. Peleti of $50,000 in that

15  discovery?

16  A    I don't recall anything of an actual hand-to-hand

17  transfer from Mr. Ibrihim to Mr. Peleti.

18  Q    What evidence did you see in that discovery of

19  anything regarding the relationship between Mr. Peleti and

20  Mr. Ibrihim?

21  A    I saw a little more in that regard.  There was some

22  evidence that the agents had shown me regarding contacts

23  Mr. Ibrihim had had with Mr. Peleti, evidence of

24  Mr. Peleti going to a thing called the party house, some

25  contacts with other persons involved in this, statements

1    of some other -- I don't remember the names offhand

2    without being refreshed.  There were statements from other

3    army officers, a couple of majors, there was some

4    sergeants, a couple of other warrant officers that were

5    involved, things of that nature.

6            THE COURT:  Regarding what?

7    A    Regarding conversations that Mr. -- regarding contact

8    with Mr. Ibrihim.

9    BY MR. MICHAEL:

10   Q    Did you see any evidence that Mr. Ibrihim made a

11   proposal to the menu board for his products to be used by

12   the U.S. military?

13   A    I don't recall that.

14   Q    Do you recall seeing any evidence about the efforts

15   of Mr. Peleti on behalf of Mr. Ibrihim and his company to

16   obtain approval for the use of his utensils by the

17   military?

18   A    I don't recall anything specific.

19   Q    You don't recall those?

20   A    No.

21   Q    And the evidence that you said that you looked at,

22   this additional evidence, did any of it refer to a payment

23   by Mr. Ibrihim of the $50,000 to Mr. Peleti?

24   A    I don't believe so.

25   Q    So it was other stuff?

1    A     Pardon me?

2    Q     It was other stuff?

3    A     Yeah.

4    Q     Now in regards to the entry and the customs form, did

5    you see any other evidence from the Government -- I

6    realize you didn't see this customs form at that early

7    time, but you subsequently saw it.  But accepting that,

8    besides this customs form and this billing statement which

9    Mr. Lang represented existed, did you see any other

10   evidence from the Government regarding Mr. Peleti

11   transporting currency into the United States?

12   A     No.  All I saw in addition to that related to that

13   form were some of the things that he had purchased that

14   the Government had taken possession of and that he had

15   referred -- or Mr. Peleti had referred to on the customs

16   declaration.

17   Q     Personal items?

18   A     Yes, that sort of thing.

19   Q     Those items had been purchased prior to his entry?

20   A     It's my understanding.

21   Q     Because they were listed on his entry?

22   A     Right.

23   Q     Of course in your letter to Mr. Peleti in Government

24   Exhibit 2, you have to agree that the letter discusses a

25   rather complicated subject that's even difficult for

1    attorneys to come to terms with, the sentencing

2    guidelines, correct?

3    A    Yes.

4    Q    And, quite frankly, you tell Mr. Peleti that he's

5    going to have some difficulties with the contents of that

6    letter, correct?

7    A    Yes.

8    Q    Now you also say in that letter, "Don't assume by

9    this approach I don't believe we should do everything

10   possible to attack and ameliorate the Government's

11   proposal."  Do you see that in the second page?

12   A    Yes.

13   Q    In your discussions -- I'm sorry if I'm repeating

14   myself.  I may be here.  In your discussions, all your

15   discussions with the Government regarding cooperation,

16   none of those discussions included Mr. Peleti not being

17   charged or not pleading guilty to a felony, correct?  At

18   all times the Government --

19   A    Absent -- absent my request for diversionary

20   treatment of my client, no, but that was predicated on

21   pleading to a felony charge.

22   Q    And of course the Government refused your offer for

23   some diversionary program, correct?

24   A    Yes.

25        MR. MICHAEL:  I have no further questions, Your

1    Honor.

2            THE COURT:   I'm sorry?

3            MR. MICHAEL:   I have no further questions, Your

4    Honor.

5            THE COURT:   Thank you.

6            MR. LANG:   I have three questions.

7                    **RE-DIRECT EXAMINATION**

8    BY MR. LANG:

9    Q    First, just to make sure the record is clear, you

10   testified there is a significant difference between the

11   plea as proposed and if Mr. Peleti had been convicted at

12   trial in terms of sentencing ramifications?

13   A    Yes.

14   Q    Based on your knowledge and experience with the U.S.

15   Attorney's Office for this district, would the U.S.

16   Attorney's Office have allowed Mr. Peleti to enter into a

17   cooperation agreement after he was convicted at trial?

18           MR. MICHAEL:   Objection, Your Honor.

19   Speculation.

20           THE COURT:   Well, if it's based on actual

21   experience, I'll allow him to answer.  But if it's not,

22   then it is speculation.

23   A    In my experience, the answer to that would be

24   absolutely not.

25   Q    All right.  Again --

1           MR. MICHAEL:  If I could get that clear, I don't

2    mean to interrupt, the question was would the Government

3    agree to a cooperation agreement after trial?

4    BY MR. LANG:

5    Q    After he was convicted.  If Mr. Peleti went to trial

6    and was convicted, would the Government have allowed him

7    or offered him a cooperation agreement so that he could

8    cooperate and possibly mitigate his sentence that way?

9    A    Absolutely not.

10   Q    You and I have had those discussions in the past

11   regarding other cases, haven't we?

12   A    Many times.

13   Q    Last question.  Just again for the record, this

14   Defense Exhibit 2, the letter that you sent to Mr. Peleti

15   -- Government Exhibit 2 -- did you discuss the contents of

16   that letter with Mr. Peleti after he got it?

17   A    Yes.

18           MR. LANG:  Thank you.

19           THE COURT:  Anything else?

20           MR. MICHAEL:  No, Your Honor.

21           THE COURT:  All right.  I have some questions.

22                  **E X A M I N A T I O N**

23   BY THE COURT:

24   Q    I think I'm going to start with your testimony and

25   then I want to cover some things specifically that he said

1    when he was testifying.  You were appointed in the case in

2    early August and you met with him for the first time on

3    the 14th?

4    A    That's right.

5    Q    When you had your first face-to-face meeting with

6    him, did you or did you not know what your client's

7    attitude was about the case, that is in terms of trial

8    versus cooperation and plea?

9    A    I found that out in the first meeting, Judge.

10   Q    So that was something you found out on the 14th

11   itself?

12   A    That's right.  I don't recall having what I would

13   consider a substantive discussion with Mr. Peleti prior to

14   my meeting in person with him on the 14th.

15   Q    What was it he told you in that regard?

16   A    He was very remorseful about this, indicated it

17   was -- indicated to me that he wanted to keep cooperating

18   along the lines that he had been and he wanted to put this

19   thing behind him.  He was concerned about possible

20   exposure to a prison sentence and the other things that

21   his lawyer asked about, you know, what would the effect be

22   on his military career, all that.  He asked all those

23   things.

24   Q    One of the themes of the defense in this proceeding

25   is that he was cooperating on the assumption, certain

 1   knowledge, although incorrect, that if he did cooperate

 2   that he would not be prosecuted.  Was there ever anything

 3   you said that you believe could have led him to such a

 4   belief?

 5   A     Absolutely not, Judge.  I do not know how that

 6   particular stance could have come about from anything we

 7   discussed.

 8   Q     You said you were aware and later saw the currency

 9   declaration, correct?

10   A     Right.

11   Q     The currency declaration basically contains a

12   statement by him that in effect he was not carrying more

13   than $10,000 U.S. currency?

14   A     That's right.

15   Q     As of the time of the plea, what additional -- what

16   evidence did you have from the Government that when he

17   came back and entered the country and signed that

18   declaration that he had more than $10,000?

19   A     I don't think I had any independent evidence other

20   than what Mr. Peleti had told me.  I don't think I did,

21   Judge.

22   Q     Did your client tell you that he had more than

23   $10,000?

24   A     He told me he had about --

25             MR. MICHAEL:  Your Honor, once again, that's --

1           THE COURT:  I'll show your continuing objection.

2    A    He told me he had about $40,000 in his backpack.

3    Q    I think that's actually what he said during the plea

4    colloquy also.  Anyway, so you didn't have any Government

5    evidence other than -- well, you did not have any

6    Government evidence at all then, as I understand it, that

7    would independently prove that he was carrying more than

8    $10,000?

9    A    I think that's a correct statement, Judge.

10   Q    At the time of the plea colloquy, there was of course

11   a rather extensive dialogue between the defendant and the

12   Court concerning whether his admissions satisfied the

13   elements of the offense.  If I understand your testimony,

14   what you're saying is that based on -- well, tell me what

15   your understanding was concerning what his conduct was

16   that made him guilty of this crime of bribery.

17   A    My understanding was that when he took the $50,000

18   from Ibrihim, that the Government would have to prove to

19   the jury that at the time that Mr. Peleti took that money

20   from Mr. Ibrihim that he, Mr. Peleti, felt that

21   Mr. Ibrihim expected something in return from Mr. Peleti

22   for that money.  That is my understanding.

23   Q    And what was it that you felt that your client

24   believed that Mr. Ibrihim expected of him at the time that

25   he gave him the $50,000?

1    A    It was my belief that Mr. Ibrihim would have expected

2    Mr. Peleti to use his position as the food services

3    advisor to his brigade, his organization, to get contracts

4    for Mr. Ibrihim for the sorts of things that he sold,

5    which were --

6    Q    But it's clear that, at least in the plea colloquy,

7    that at the time that he took the money, he had not long

8    before that told Ibrihim he could not do that, could not

9    help him on that because the decision had already been

10   made?

11   A    Judge, that's exactly right, and I knew that at the

12   time of the plea colloquy and I knew that before the time

13   of the plea colloquy and my advice to my client was based

14   on what I felt a jury in this district would or would not

15   believe, it was my belief then that he would be convicted

16   based upon the facts that the jury would hear and that's

17   still my belief.  But I was well aware that Mr. Peleti had

18   a very short time left in that theatre and was going to

19   leave very soon.  I did not think it was a good defense.

20   I didn't think it would work.

21   Q    In the various conversations that you had with him, I

22   know that you've told us here today that you recommended

23   that the case not go to trial and that he cooperate with

24   the Government and enter a plea of guilty if you couldn't

25   get diversion and then hope for the best under a

1    cooperation motion by the Government, correct?

2    A    Yes.

3    Q    But did you ever have any discussion with him to the

4    effect that in spite of your recommendation, if he wanted

5    to take this case to trial that you would do that and

6    aggressively represent him?

7    A    Yes, Judge, and I memorialized that to my client in

8    an e-mail that I sent him in the time frame -- well, I had

9    told him that more than once in fact and I memorialized

10   that.  Yes, I did say that and --

11   Q    What was his response to that?

12   A    His response to me up until -- up until May, early

13   May of 2007, of this year, his response to me a lot of

14   times was we would talk and we would go through the facts,

15   what I thought the evidence would show or not show, what I

16   thought the outcome would be.  Mr. Peleti told me a lot of

17   times, "Mr. Robertson, I don't think we're exploring all

18   our options."  And I didn't know what other options

19   existed other than trial or a plea.  And if the Court's

20   question is did he say "I want to take this case to

21   trial", he never said that to me.

22   Q    Well, as I understand it, you're saying to him that

23   long before he actually entered his plea, basically you

24   told him that he had two choices.  One was to plead guilty

25   and the other one was to go to trial.

1    A     Yeah, unless we could get a divisionary sort of

2    arrangement.

3    Q     Are you telling me -- is it your testimony under oath

4    that on multiple occasions you informed him that if he did

5    in fact want a trial, you would provide him an aggressive

6    defense?

7    A     Yes, Judge.

8    Q     When you wrote the letter to him in October along

9    with the plea agreement, you say, "I know you're going to

10   have some difficulties with the contents of this letter."

11   What did you mean by that?

12   A     What I meant by that specifically was Mr. Peleti was

13   hoping very much for a diversionary result.  I didn't

14   think it was going to happen and that put us face to face

15   with looking at a plea and I did not -- I don't want the

16   Court or anybody to think that when I said that that I

17   meant I didn't think he would understand the letter or

18   understand what I was talking about.  What I meant in that

19   regard was I thought he was going to have difficulty

20   personally with it by accepting the fact that he was

21   looking at not getting a divisionary disposition and there

22   was going to -- you know, that this is the actual plea

23   agreement and here we are facing, you know, what we talked

24   about.

25   Q     I don't recall exactly what the defendant's testimony

1    was on this point when he testified, but I know there was

2    some testimony to the effect that the day he pled guilty,

3    if I recall it correctly, that he basically had an

4    extremely short period of time to see and read the plea

5    agreement and that he basically signed it without reading

6    it.  Do you recall that?

7    A    Do I recall his testimony?

8    Q    Yes.

9    A    Yes, I do.

10   Q    The plea agreement that you sent him in October, is

11   that materially different from the one that was actually

12   used the day he entered his plea?

13   A    No, Judge, it wasn't.

14   Q    If I recall correctly, he said something to the

15   effect that he had hoped to meet with you the day before

16   the plea and that for whatever reasons that didn't work

17   out and then he really didn't get a chance to talk to you

18   the morning of the plea.  Do you agree with that?

19   A    I don't think we met the day before, but we met the

20   morning of the plea.

21   Q    Your bill that was submitted says that on February 9

22   you went to his hotel, met prior to the plea, discussed

23   same.  Did you do that?

24   A    Yes.

25   Q    And you said that that meeting took 1.6 hours?

1    A    Yes.  It was early in the morning.  He was staying in

2    Moline and I met him and for the first time I met his

3    brother.  We met in the coffee room at the hotel, had

4    several cups of coffee, went over the agreement, both in

5    the presence of his brother and outside the presence of

6    his brother.

7    Q    When you say you went over the agreement with him,

8    was that the agreement that he actually signed?

9    A    I believe it was, Judge, yes.

10   Q    In his testimony, if my notes are correct, he says

11   that his first meeting with you, which I guess we're all

12   saying or all the testimony suggests was on August 14,

13   that his first meeting with you lasted only 10 to 15

14   minutes.  Is that correct?

15   A    No.

16   Q    Your entry for that date claims a total of 5.4 hours,

17   but it does not indicate any further breakdown of that.

18   It says:  "Meet with client in office.  Discuss charges,

19   discuss guidelines, discuss cooperation.  To U.S.

20   Attorney's Office, review and execute proffer agreement,

21   commence debrief with agent, consult with client."  So all

22   of that happened in 5.4 hours, correct?

23   A    Yes.  That's correct.

24   Q    What is your best estimate as to how much time you

25   spent meeting with him in your office?

1    A    My best estimate before we went over to the U.S.

2    Attorney's Office would be an hour and a half to an hour

3    and 40 minutes, 45 minutes, something like that.

4    Q    Is that when you discussed this laundry list of

5    things we heard about?

6    A    That's correct.

7    Q    He says at that time there was no review of

8    documents.  Do you recall whether you showed him any

9    documents?

10   A    We reviewed his statement and the letter I had from

11   Mr. Lang.

12   Q    Did you have -- as I understand it, he signed the

13   proffer letter at the U.S. Attorney's Office?

14   A    That's right.  He signed it in the conference room at

15   the U.S. Attorney's Office.

16   Q    His testimony is that you did not privately discuss

17   the proffer letter with him.  Is that correct?

18   A    No.  That's not true.  We were in the conference room

19   at the U.S. Attorney's Office and we were sitting at --

20   sitting at the table.  Mr. Lang came in.  Agent St. Amat

21   and Agent Bishop were on the right-hand side of the table

22   and we had had some discussions and then Mr. Lang brought

23   the cooperation agreement in.  I asked the agents to

24   excuse us, which they did.  Then we went over the letter,

25   the proffer agreement.

1    Q    He also testified that he did not read the letter,

2    that he simply signed it and he said you didn't read it

3    either.

4    A    I'm sure he read it.  He looked at it.  I assumed he

5    read it.  I certainly read it and it was the standard

6    proffer letter that I've seen from the U.S. Attorney's

7    Office many times before.

8    Q    He also says that when he signed it, again it was his

9    belief that if he would assist the Government to capture

10   people that were paying these bribes, that in return for

11   that there would be no punishment.  Did you ever have such

12   a discussion with him?

13   A    No, Judge.

14   Q    Was there anything -- was there any discussion with

15   Mr. Lang and the agents that morning as to what would

16   happen to him in terms of charges being filed or

17   prosecution if he cooperated?  I mean, it would seem to me

18   that would not unusually be a component of such a

19   discussion.

20   A    Yes, and I think that -- I know Mr. Lang spoke with

21   Mr. Peleti in my presence about continued cooperation and

22   what this would result in in terms of sentencing down the

23   line.

24   Q    Meaning what?

25   A    Meaning when we was charged, when he was officially

1  charged.

2  Q    I mean, what it would mean at sentencing, I don't

3  know what -- what does that suggest he was told at that

4  time?

5  A    That by cooperating he would be able to get a

6  sentencing reduction.  I will say this, Judge.  If it was

7  my client's belief that he was not going to be charged and

8  that this wasn't going to wind up in a criminal

9  prosecution, that was not known to me and it would be the

10  furthest thing from my mind.

11  Q    He said under oath that he first knew that he was

12  going to be indicted or learned of the possibility of it

13  in late December or early January.

14  A    Again, I don't see how that can be possible.  I just

15  don't, Your Honor.

16  Q    As I understand it, you did in fact, no doubt, send

17  him that letter in October with the proposed plea

18  agreement?

19  A    There is no doubt, Judge.

20  Q    He also says that, if my notes are correct, that at

21  some meeting with you in approximately November at your

22  office -- I'm sorry.  Maybe at the hotel.  Anyway, when

23  you were discussing the status that he made the statement

24  to you that no way, no way in the world that he was going

25  to plead guilty if he was indicted.  Did he ever make such

1   a statement to you?

2   A    No.  No.  Not that I -- no.

3   Q    He also says that the day that he actually pled

4   guilty, when you met with him early in the morning at his

5   hotel that he thought that he was going to go to court and

6   plead not guilty.  Was there any discussion with him that

7   morning that that was going to happen?

8   A    No.

9   Q    What was the -- was the entire discussion what the

10  plea of guilty was going to be?

11  A    Absolutely.

12  Q    He also says that he only spent a minute or two

13  reading the 25-page plea agreement.  Do you know -- do you

14  have any --

15  A    We went over the plea agreement that morning and he

16  had had the plea agreement since October.

17  Q    He says under oath that he didn't discuss the

18  contents of the plea agreement with you for more than one

19  to two minutes.

20  A    That's just not true.

21  Q    He also said under oath that there was not more than

22  five to ten minutes between the time that he was handed

23  the plea agreement and the time that he entered his plea.

24  Is that correct?

25  A    No, it's not.

1            THE COURT:  All right.  Thank you.  Those are my

2     questions.  Those may have generated other questions.

3     Counsel, if you wish to ask other questions, you may.

4            MR. LANG:  I just have one question.

5                    **FURTHER RE-DIRECT EXAMINATION**

6     BY MR. LANG:

7     Q    Mr. Robertson, did you and I have one specific

8     discussion about your view of taking this case to trial?

9     A    Yes.

10    Q    Can you tell the Court what the discussion was about?

11    A    I thought it would be an interesting case to try.  It

12    was something different than the usual cases that we see

13    and I think I made the remark that in terms of trial, it

14    wasn't a situation where a client would be looking at a

15    life sentence if convicted, but I did say I thought it

16    would be an interesting case to try.

17            MR. LANG:  Thank you.

18            THE COURT:  Any questions?  Anybody else have

19    any other questions?

20            MR. MICHAEL:  Yes, Your Honor, I do.

21                    **FURTHER RE-CROSS EXAMINATION**

22    BY MR. MICHAEL:

23    Q    When the Court asked you when you met with Mr. Peleti

24    on August 14 what his attitude was regarding the case, you

25    indicated that he was very remorseful and he wanted to

1   cooperate, correct?

2   A    Yes.

3   Q    And isn't it true that Mr. Peleti felt guilty, felt

4   guilty, not legally guilty, but felt guilty about having

5   taken that money from Mr. Ibrihim?

6   A    Yes.

7   Q    He felt bad about it?

8   A    Yes.

9   Q    He had been a professional soldier all his life and

10  he felt like that was something that was sort of a tear in

11  the fabric --

12  A    Yes.

13  Q    -- of his existence?

14  A    I agree.

15  Q    Do you feel though that, fairly, that it's your duty

16  and your responsibility as a lawyer to make sure that you

17  look at the case in a completely different way than your

18  client, correct?

19  A    Yes.

20  Q    All right.  You've got to get through that guilt that

21  he may have or the bad feeling or the concern he has that

22  the Government is after him and really examine the case in

23  a very dispassionate, objective way, correct?

24  A    I would agree.

25  Q    And you've been doing this for 25 years and we

1   both -- your job, is it fair to say, is to examine the

2   Government's case initially and find out whether or not

3   they have sufficient evidence to convict your client at

4   trial?

5   A    Yes.

6   Q    Isn't it fair to say, Mr. Robertson -- I'm going to

7   ask you this question quite honestly and openly -- that

8   because this was somewhat of an unusual case, as you said,

9   you really didn't have a good handle on the strengths of

10  the Government's case regarding this bribery count and

11  what the elements necessarily were at the time you advised

12  Mr. Peleti on August 14?

13  A    No, I wouldn't agree with that.  I think I had a very

14  good handle on what the elements were on the bribery case.

15  I do feel I had a good handle on that.  What I -- what

16  I -- in looking back on it, based on the evidence that I

17  had from Mr. Lang and what I got from my client, you know,

18  hindsight is 20/20, but --

19  Q    Sure.

20  A    But, you know, sitting up here and saying that, yeah,

21  I didn't demand full access to the Government's discovery

22  at that point, yeah, now obviously it would probably look

23  better if I had.  But the fact of the matter is that there

24  was some time pressure involved here with the grand jury

25  and based on what I had seen and based on our

1   conversations, I felt I was acting in my client's best

2   interest and I still do.

3   Q    And I'm certainly not attacking that.  You believe

4   that?

5   A    Yes.

6   Q    Not at all in any of my questioning.  Okay.  That's

7   why the Court has to make an objective inquiry as you

8   understand.

9   A    Correct.

10  Q    When you said to Mr. Lang just now that in your

11  discussions with him that you thought it would be an

12  interesting case to try, isn't that really sort of a

13  statement that because it's of an unusual nature also,

14  that this case was triable?  This case was triable, was it

15  not?  Is it not?

16  A    You know, I suppose in that regard any case is

17  triable.  I don't think -- if I were sitting where

18  Mr. Peleti is sitting and I was listening to advice, I

19  would want the advice that I got from me.  It would be an

20  interesting case to try.  It would involve interesting --

21  yeah, interesting things that we don't usually have.  Do I

22  think it was a winnable case?  No, I don't.  I still

23  don't.  And I think the last communication I had with

24  Mr. Peleti was that I did not think that we would prevail

25  in front of a jury and that was that lengthy e-mail I sent

1    him in May and I said the reasons why and, you know, that

2    really is the sum and substance of what I feel and

3    continue to feel.

4              MR. MICHAEL:  I have nothing further, Your

5    Honor.

6              THE COURT:  All right.  Do you have anything

7    else?

8              MR. LANG:  No.

9              THE COURT:  Thank you.  You may step down.

10                  (Witness excused)

11             THE COURT:  Is there any other evidence?

12             MR. LANG:  None from the Government.

13             MR. MICHAEL:  We have nothing more to offer,

14    Your Honor.

15             THE COURT:  All right.  Are you prepared to

16    argue this now?

17             MR. MICHAEL:  Any exhibits that were not

18    admitted, we would move.

19             THE COURT:  Do you show every exhibit being

20    admitted.  Apparently they've all been admitted.  Are you

21    ready to give your arguments?

22             MR. MICHAEL:  I am, Your Honor.

23             THE COURT:  All right.

24             MR. MICHAEL:  Do you want me to do it from here?

25             THE COURT:  Please.

1          MR. MICHAEL:  Of course I have made my argument

2     at the beginning of this hearing about that first issue

3     before the Court regarding the factual basis for the plea,

4     so that's all submitted, Your Honor, and I appreciate the

5     Court giving me the opportunity to address that at the

6     beginning of this hearing.

7          My focus, which the Court may have perceived, is

8     not on the representation by Mr. Robertson in terms of the

9     time he spent working with him on the plea, working with

10    him on the grand jury presentation.  Our argument is that

11    Mr. Robertson failed the Strickland test because he did

12    not investigate, do a reasonable investigation as to the

13    Government's case and the operative law and the facts and

14    circumstances of the Government's case and advise

15    Mr. Peleti appropriately regarding that matter.  And the

16    cases say that effective representation includes effective

17    research, effective investigation, effective preparation

18    and all those things that go into giving proper advice to

19    your client.

20         I think the evidence in this case showed that by

21    August 14, with extremely scant evidence in the

22    Government's possession, and even now extremely scant

23    evidence in the Government's possession, Mr. Robertson

24    took Mr. Peleti down the path of cooperation, of

25    testifying before the grand jury, and, you know, took

1    him -- and I had a nice conversation with Mr. Robertson

2    this morning earlier -- in good faith I think took him

3    down that path hoping to mitigate against the danger of

4    going to trial and suffering a more adverse consequence,

5    but I think the evidence in this case is that he did so

6    without investigating this case properly.

7         If you investigate this case -- and this Court

8    is going to apply an objective and reasonable standard

9    here -- what the Government had was not sufficient to

10   establish the element of bribery.  Regarding the statement

11   by Mr. Peleti at the plea colloquy to establish his guilt

12   to the Court's satisfaction, at that time, you know, there

13   really was no evidence existing at that point.  That

14   statement by Mr. Peleti does not establish any of the

15   elements of bribery.  The elements of the criminal offense

16   to punish Mr. Peleti for a federal crime requires far more

17   than what is in the statements the Government had and the

18   Government had no other evidence to support that.

19         I won't argue too much about the other offense.

20   I think the Court asked some rather pointed questions of

21   Mr. Robertson and I think he honestly presented that there

22   was no independent evidence that he brought over $10,000

23   into the country when he returned on December 15 and I

24   think that's true.

25         Sure, it's always difficult for an attorney to

1   make that decision about go to trial or plea.  We know

2   that most attorneys, most other cases, they end up doing

3   dispositions with the Government, but that doesn't mean

4   that he's relieved of his responsibility to fully

5   investigate this case, to determine if in fact it is

6   defensible, if in fact the Government has sufficient

7   evidence to bring the prosecution and prevail at trial and

8   to advise Mr. Peleti accordingly, and we believe that the

9   evidence in this case is that he did not advise him

10  properly regarding the Government's evidence and what the

11  Government could prove against him, whether the Government

12  could make its case, and any reasonable attorney who would

13  have done that I believe would have come to the conclusion

14  that the Government would not have been successful in a

15  prosecution on either count.  They would not have been

16  successful.

17          There's no evidence to support the elements for

18  bribery, no sufficient evidence other than the fact

19  Mr. Ibrihim gave Mr. Peleti $50,000.  There's no evidence

20  to support the fact that he may not have reported more

21  than $10,000 other than the fact that he did spend

22  $15,000, but he could have transported that money in any

23  number of different ways -- by mailing it, by wiring it,

24  by having somebody else carry some of it.  Who knows?  But

25  there's no direct evidence that he did that.

```
 1              So I think that the focus -- and I heard the

 2    Court's inquiry now.  We're focusing on the amount of

 3    communication that existed between Mr. Peleti and

 4    Mr. Robertson and I don't really believe that's something

 5    to really dispute.

 6              THE COURT:  Well, your client disputed it --

 7              MR. MICHAEL:  I was going to address that.

 8              THE COURT:  -- when he testified.

 9              MR. MICHAEL:  I was going to address that, Your

10    Honor.  There is a difference in their testimony regarding

11    how much time they spent together.

12              THE COURT:  With all due respect, I don't think

13    it's just the amount of time.  He made -- your client made

14    some very pointed statements when he testified.  Was this

15    covered?  No.  Was that covered?  No.  Was this covered?

16    No.  Was that covered?  No.  I mean, there was certainly

17    the strong suggestion from his testimony that it wasn't

18    only a matter of how much time, but they really didn't --

19    never covered these things at all.

20              MR. MICHAEL:  Especially in regard --

21              THE COURT:  I don't believe I'm

22    mischaracterizing his testimony when I say that.

23              MR. MICHAEL:  Right.  And my argument, Your

24    Honor, is not as to those issues.  My argument is as to

25    whether or not Mr. Robertson fulfilled his responsibility
```

1    to determine whether or not the Government really had the

2    ability to successfully prosecute Mr. Peleti and that's

3    the most important focus.

4            THE COURT:  I understand that and it certainly

5    is the earmark of a good lawyer to adjust to situations as

6    they develop.  I don't believe your statement is correct

7    in terms of the pleadings.  My recollection from your

8    pleadings is that there were all sorts of things that he

9    didn't do.  I had the sense -- I'm talking about

10   Mr. Robertson.  I have the sense now you're backing away

11   from that and focusing on what in any event the duty of a

12   lawyer would be to investigate whether or not the

13   Government can prove the elements of each charge before he

14   recommends to his client whether to cooperate or go to

15   trial or at least make the client aware that, look,

16   there's a problem of proof here.  If you want to plead

17   guilty, you can, but I haven't seen anything that would

18   indicate they can prove this element of the crime.  That

19   seems to be your major argument now.

20           MR. MICHAEL:  That is my major argument, yes.

21           THE COURT:  Thank you.

22           MR. MICHAEL:  It is and I have nothing further

23   to add, Your Honor.

24           THE COURT:  Thank you.  Mr. Lang?

25           MR. LANG:  I will be very brief, Your Honor.  I

1  │  believe the Court has recognized the credibility issue

2  │  here.

3  │          THE COURT:  There is a credibility issue here

4  │  and it's not going to fall very well on Mr. Peleti

5  │  frankly.  But the point he makes here is a very serious

6  │  point.  Even if I completely disregard the allegations of

7  │  Mr. Peleti, it still leaves the question of whether or

8  │  not, using an objective standard, Mr. Robertson gave

9  │  adequate representation to the defendant during this

10 │  process.

11 │          MR. LANG:  I understand.  It's a two-prong issue

12 │  now.  In the pleadings it was a one-prong issue, quite

13 │  frankly, Judge.  And I give no credibility to Mr. Peleti

14 │  and I'll say one thing that was a great indicator of that.

15 │  Mr. Peleti testified and I had to ask him a series of

16 │  questions and finally the Court may recall I had to ask

17 │  him -- I had to define what communication by phone was,

18 │  when his mouth talked to Mr. Robertson's and when

19 │  Mr. Robertson's mouth talked to his ears.  He finally

20 │  said, "I had seven discussions by phone."  And that's at

21 │  page 78 of the transcript.  And he did not equivocate.  He

22 │  said seven.  Mr. Robertson here with his records, his

23 │  records show 31 substantive discussions.  There are

24 │  several other issues, not seeing the plea agreement until

25 │  one or two minutes before the plea, things like that,

1    which absolutely contradict what the evidence is.  So when

2    it comes to his complaints about the number of contacts

3    and not having things explained to him, I believe

4    Mr. Peleti is totally incredible and I believe that

5    Mr. Robertson told us exactly how it was.

6           Now this issue of just this five-page statement,

7    I've heard it over and over.  That's all there was was

8    this five-page statement.  It wasn't.  It was more than

9    that.  But I think the Court -- I would ask the Court to

10   closely review this five-page statement.  The agents asked

11   him, "What did you do with this $50,000?"  I'm talking

12   about page 3 of his written statement as part of

13   Defendant's Exhibit 2.  "I spent about $30,000 on credit

14   card bills."  Well, we had the credit card bills.

15   Mr. Robertson saw that.  We got the customs declaration

16   where he came into the United States.  He says he spent

17   about $10,000 on jewelry for his wife.  We got the stuff

18   from Mr. Peleti.  We got the things he bought.  "And were

19   you able to influence any contracts for anyone that was

20   illegal?"  He says, "No, because I tried to get GCC a

21   contract, but I was unable."  Now this is a written

22   confession, Mirandized, not likely -- not any potential

23   for it to be suppressed.  That's what Mr. Robertson

24   started with.

25          Now he did investigate before we signed up the

1    plea agreement.  We did discuss in detail how a trial

2    would go.  We have to keep in mind that, as our response

3    indicates, this didn't happen in a vacuum, Judge.  There

4    were a number of investigations and a cooperating

5    defendant said he knew that Mr. Peleti had taken a bribe

6    and that's how this started.  Mr. Robertson knew there

7    were other witnesses if this case was indicted.

8             THE COURT:  This record is undeveloped in that

9    respect as to what other people were prepared to say about

10   Mr. Peleti.

11            MR. LANG:  I think Mr. Robertson talked about

12   the party house and about some other witnesses.  Well, my

13   only point --

14            THE COURT:  There was a reference to other

15   witnesses, but that was never fleshed out.

16            MR. LANG:  Well Mr. Robertson was aware of other

17   witnesses and the party house situation.

18            THE COURT:  I understand.

19            MR. LANG:  So that's very clear.  Judge, to say

20   that it was below an objectively reasonable standard to

21   not further investigate, basically this written statement

22   is almost the end game at the beginning.

23            THE COURT:  Even if I agree with you on the

24   bribery charge, I'm not sure that it's as evident

25   concerning the currency violation.

1          MR. LANG:  It may not be.  You heard testimony,

2     Judge, that Mr. Robertson didn't explore that count

3     because it would likely be grouped at sentencing and have

4     no impact on sentence.

5          THE COURT:  I understand.

6          MR. LANG:  But there was evidence concerning

7     this.  As the Court noted, Mr. Peleti came in on

8     December 14 and within a week or something he was making a

9     $15,000 payment on his wife's credit card.  Mr. Robertson

10     had that evidence.

11          THE COURT:  I'm not sure I've heard anything

12     here that would suggest that he had the credit card

13     evidence, the details of the credit card evidence, for

14     example when the credit card bill was paid in relation to

15     when he came back to the country.  I don't recall that

16     this record establishes that.

17          MR. LANG:  I believe Mr. Robertson testified

18     that he and I discussed those.

19          THE COURT:  That's correct.  He did.

20          MR. LANG:  Anyway, the notion here that the

21     record is so devoid or the evidence was so scant that a

22     defendant for his own purpose of entering into a plea

23     agreement -- which this plea agreement immunized him from

24     further prosecution.  This plea agreement contains an

25     immunity agreement saying he wouldn't be prosecuted for

1   anything further.  The benefits of the cooperation

2   agreement in a relatively low guideline range type of case

3   where the Court would have, especially post-Booker,

4   tremendous range and discretion in sentencing, with what

5   Mr. Robertson had to work with in terms of Mr. Peleti's

6   background, it's just unfathomable to me that, seeking

7   this agreement at that point in time, knowing that we

8   really wanted Mr. Peleti to cooperate with us because of

9   these other things that Mr. Robertson talked about, is

10  somehow below an objectively reasonable standard.

11          I would agree, Judge, if we -- if this was the

12  evidence we went to trial on, that we would have a

13  sufficiency claim, effective assistance, if this was all,

14  everything that we had at the time, but this was a plea

15  situation where Mr. Robertson is trying to get a bargain

16  for his client to protect him from being convicted on

17  other charges.  To say that was objectively unreasonable

18  based on trying to examine this evidence, now doing a post

19  mortum of a plea, saying that the Government should have

20  had more evidence and things like that, I think we're

21  comparing apples and oranges.  I believe that

22  Mr. Robertson acted in -- as he said today, he would do

23  the same thing again if he had this case all over again.

24  The deal that he got for Mr. Peleti protected Mr. Peleti,

25  was in his best interests.  He explored going to trial and

1    Mr. Robertson was satisfied through the evidence that

2    existed at the time.  Look at the potential consequences

3    of Count 2.  He made an absolutely objectively reasonable

4    recommendation and Mr. Peleti took it.  Now Mr. Peleti is

5    unhappy about it.  But, quite frankly, I don't believe

6    anything Mr. Peleti says.

7                THE COURT:  All right.  Thank you.

8                MR. MICHAEL:  May I briefly respond, just really

9    quick?

10                THE COURT:  Sure.

11                MR. MICHAEL:  I'm not sure about Mr. Lang's

12    representation about other evidence, secret evidence, but

13    I'm not going to address that.  I ask the Court to -- the

14    Court probably has it -- to review that five-page

15    statement.  I mean, there is nothing in there that

16    establishes the elements of bribery.  There is nothing.

17    In fact, if Mr. Peleti talked to those agents, he told

18    them the same thing he told the Court at the time of the

19    plea colloquy.  That he legitimately tried to get the

20    contract, that he legitimately made the effort, but there

21    never was any money involved.  That he did everything he

22    could for Mr. Ibrihim and told him there was no

23    possibility of getting the contract before Mr. Ibrihim

24    ever brought up any money.  So, if anything, that plea

25    colloquy gives meaning to that five-page statement and

1    that meaning is that the elements of bribery are not

2    there.  I have nothing further.

3              THE COURT:  Thank you.  I want to think about

4    this and take a look at the documents and prepare my

5    remarks before I rule on this.  What I would recommend is

6    perhaps a phone call sometime next week, if that's

7    agreeable to everyone.  I'm looking at maybe Wednesday of

8    next week, 1:00 o'clock on Wednesday, October 31.  Is

9    that --

10             MR. MICHAEL:  I'm in a trial in federal court

11   starting Monday afternoon, but I'm certainly available on

12   the Court's morning calendar if we can do it in the

13   morning, Your Honor, because that would be before our

14   trial starts.

15             THE COURT:  Well, you're two hours behind us.

16   We can do it at 10:00 o'clock.  We just need to know what

17   phone number you can be reached at.  Mr. Lang?

18             MR. LANG:  That's fine.

19             MR. MICHAEL:  Then I should give your clerk the

20   phone numbers?

21             THE COURT:  Right.

22             MR. MICHAEL:  We'll do that before we leave

23   right now, Your Honor.

24

25             * * * HEARING CONCLUDED * * *

1                           **REPORTER'S CERTIFICATE**

2

3           I, Karen S. Hanna, certify that the

4    foregoing transcript constitutes a true and accurate

5    transcript of the original shorthand notes of the

6    proceedings had at the time and place aforesaid

7    before the HONORABLE MICHAEL M. MIHM, U.S. District

8    Judge.

9

10                               s/ Karen S. Hanna____
                                 Karen S. Hanna, C.S.R.
11                               License #084-001760

12

13

14

15

16

17

18

19

20

21

22

23

24

25