```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE CENTRAL DISTRICT OF ILLINOIS
 2

 3   UNITED STATES OF AMERICA,        )
                                      )
 4              Plaintiff,            ) Criminal No.
                                      ) 06-40117
 5        vs.                         ) Peoria, Illinois
                                      ) October 31, 2007
 6   PELETI PELETI, JR.               )
                                      )
 7              Defendant.            )

 8
         CONTINUED HEARING ON MOTION TO WITHDRAW GUILTY PLEA
 9
                              BEFORE:
10                   HONORABLE MICHAEL M. MIHM
                      United States District Judge
11

12             APPEARANCES: (By Telephone)

13                  JEFFREY LANG, ESQ.
                Assistant United States Attorney
14                   1830 Second Avenue
                 Rock Island, Illinois  61201
15           (Appeared on Behalf of the Government)

16
                     DAVID M. MICHAEL, ESQ.
17              Law Office of David M. Michael
                  414 Gough Street, Suite 2
18             San Francisco, California  94102
                          -- and --
19                  LEWIS O. ROMERO, ESQ.
                       ROMERO & ALAGA
20              885 Bryant Street, Suite 202
                  San Francisco, California
21           (Appeared on Behalf of the Defendant)

22

23
                    Karen S. Hanna, C.S.R.
24                U.S. District Court Reporter
                   Central District of Illinois
25   Proceedings recorded by mechanical stenography, transcript
     produced by computer
```

1               THE COURT: This is U.S. vs. Peleti, 06-40117.
2    We completed the evidentiary hearing on this case recently
3    and I said that I would take the matter under advisement
4    because I wanted to go over everything carefully and not
5    shoot from the hip on this. I am now ready to rule on
6    this motion and the bottom line I will indicate first is
7    that I am going to deny the motion to withdraw the plea of
8    guilty.
9               Rule 32(e) provides that the Court may permit a
10   plea to be withdrawn if the defendant shows any fair and
11   just reason. The law is also clear that a guilty plea is
12   not lightly set aside. My ultimate conclusion here is
13   that the totality of the circumstances do not create a
14   situation which to me would give rise to a fair and just
15   reason to withdraw the guilty plea.
16              The Strickland test covering this type of
17   situation has two components. One: Did the -- did
18   Attorney Robertson's representation fall below an
19   objective standard of reasonableness? And second: Would
20   Mr. Peleti have pled guilty but for Robertson's alleged
21   ineffective representation?
22              If I might jump ahead for a moment out of
23   sequence and address number two first briefly, I would say
24   that I believe this record establishes convincingly, to
25   the Court anyway, that the defendant would have pled

1    guilty in any event in this case and so I don't believe
2    that he has satisfied the second prong of Strickland.
3            But going back to the first consideration, let
4    me -- let me say this.  When the pleadings were filed on
5    this case, there were really two primary attacks on the
6    plea.  The first attack was a rather detailed assertion
7    that Robertson's representation of the defendant was just
8    totally inadequate in terms of time spent, things that
9    were not talked about and on and on.
10           I believe that Mr. Peleti's testimony concerning
11   what his contacts were with Mr. Robertson, what the
12   substance of those contacts were was, with all due
13   respect, totally lacking in credibility.  In fact, I don't
14   recall a case where at the end of the witness' testimony I
15   felt that the witness was so lacking in credibility, more
16   specifically in terms of his testimony concerning the
17   number of meetings, the length of the meetings, the
18   substance of the meetings, the number of phone calls, what
19   Robertson did or did not say to him, what he did or did
20   not advise him about.
21           I specifically reject the defendant's assertion
22   that he was misled by Robertson concerning whether
23   criminal charges were likely.  The October documents, the
24   letter, the plea agreement I think establish a great deal
25   in that regard.  Mr. Peleti's testimony that he doesn't

1    remember, that he didn't read it or he barely read it or,
2    if he did read it, he didn't understand it, I find to be
3    totally incredible.  I specifically reject the credibility
4    of his testimony that he told Robertson that he wanted a
5    trial and would only plead guilty if he was given complete
6    immunity.  Based on this record, I believe that the
7    defendant always knew during the course of his
8    representation by Mr. Robertson that there would be
9    criminal charges unless diversion was approved by the U.S.
10   Attorney's Office and that was ruled out weeks or months
11   before he entered his plea.  I don't believe that -- or I
12   should say contrary to his assertion, I don't believe that
13   there was anything surprising about the scheduling of the
14   plea of guilty.  I specifically reject the credibility of
15   his testimony that he did not read the plea agreement,
16   that he did not discuss it in detail with Robertson, that
17   is the terms of the agreement, the plea process, possible
18   sentences.  So the part of the defendant's motion and
19   brief and testimony that focused on that assertion is
20   simply, in the Court's view, totally without merit.
21           However, there is a second argument that was set
22   out in the briefs and I think greatly expanded during the
23   course of the hearing on the motion to withdraw the guilty
24   plea.  That is that Robertson did not conduct an
25   objectively adequate factual investigation regarding the

1   specifics of the Government's proof or lack thereof.  And
2   according to that theory, since his factual investigation
3   was inadequate, his advice to the defendant to cooperate
4   and to plead guilty was ineffective and ultimately that
5   the defendant would not have pled guilty if he had been
6   made aware of the inadequacies of the Government's proof
7   on both the bribery count and on the currency disclosure
8   count.
9           In looking at this issue, I must consider the
10  two counts separately.  Concerning the bribery count, I
11  don't think that there's any particular dispute about the
12  elements of that crime.  18 U.S.C. 201.  The Government
13  must prove that the defendant was a public official.
14  That's not in dispute here.  That the defendant personally
15  accepted or received something of value not provided by
16  law.  I don't actually believe that's in dispute.  Third:
17  That the defendant knew that what he accepted and received
18  was accepted and received because of an official act
19  performed or to be performed by him.  There certainly is
20  dispute on that.  I've already ruled on the adequacy of
21  the plea colloquy concerning that, but those are the
22  elements.
23          And in the Seventh Circuit jury instructions, it
24  also goes on to say that:  "An official act is any
25  decision or action on any question which may at any time

1   be pending or which may by law be brought before any
2   public official in his or her official capacity or in his
3   or her position of trust."
4       And then concerning the matter of the intent to
5   influence, the Seventh Circuit jury instructions go on to
6   say:  "It is not necessary that the public official had
7   the power" -- the public official being the defendant --
8   "had the power to or did perform the act for which he
9   received or agreed to receive something of value.  It is
10  sufficient if the matter was one that was before him in
11  his official capacity.  Nor is it necessary that the
12  defendant in fact intended to be influenced.  It is
13  sufficient if the defendant knew that the thing of value
14  was offered with the intent to influence official action."
15      All of that was certainly in Attorney
16  Robertson's mind soon after he became involved in the
17  case.  He testified under oath that he not only looked at
18  the statute, but that he carefully looked at the jury
19  instructions.  I believe that that testimony was credible.
20      So what did Robertson know of the evidence?
21  First of all, he knew of the defendant's handwritten
22  statement which is, I will say, not easy to read, but I
23  think in almost all respects it is ultimately readable.
24  And I just -- I'm not going to always quote word for word
25  here, but in reading over the statement carefully I have

made notes here.

He says in the statement that he had experienced numerous approaches from contractors themselves for bribery for money and gifts. He didn't pursue that. My guess is that perhaps that admission, assuming if it's correct, if he didn't report that, that in itself could even be possibly a crime.

In any event, that he was a member of the Food Advisory for Army Coalition Forces Land Component Command, that he made contact with service contractors. He mentions the party house, activities going on there. He names names. He talks about being approached by a particular person -- I think it looks like Khan -- regarding bribery in terms of both money and gifts, which I would suggest is probably separately, at least arguably, a confession to bribery in and of itself.

In the statement he also refers specifically to Mr. Ibrihim, who was the person specifically involved in the details of Count 1, that he met with him to discuss -- I thought this was interesting -- the possibility of selling a contract for all flatware and paper products for Iraq, that they initially intended to try to obtain a new contract, that they even energized the contract, developed working relationships, that he was given $50,000 in cash by Ibrihim. It wasn't argued here -- it seems to me

1   arguably one could even make the argument that the $50,000
2   could even have been payment for his unsuccessful efforts.
3            But, in any event, it says in the statement that
4   he was given the $50,000, that he stored it at his
5   barracks, that he did this because of financial
6   difficulties, and he indicates in the statement that he
7   will fully cooperate, that the $50,000 -- that of the
8   $50,000, $30,000 was spent on credit card bills, $10,000
9   was spent on jewelry for his wife, the rest vacations.
10           It's clear that he tried to get a contract for
11  Ibrihim, but was unsuccessful.  He did receive the money
12  after he told Ibrihim that he was not able to obtain the
13  contract.  After he returned to Hawaii he attempted to
14  call Ibrihim, but was unsuccessful.
15           It appears to the Court that the statement is
16  powerful proof that he accepted a bribe in his official
17  capacity.  Based just on the words that were in his
18  confession, I would suggest the clear meaning of why
19  Ibrihim gave him the $50,000 is to influence his official
20  conduct.  Frankly, any other explanation doesn't make
21  sense.
22           I would also note parenthetically here that the
23  defendant testified during the hearing that at some point,
24  if I recall correctly, after he met Mr. Robertson,
25  certainly long before he pled guilty, he had separately,

1   without telling Mr. Robertson, talked to a JAG officer who
2   had advised him to take the Fifth Amendment.  In spite of
3   that, he gave -- when he went and talked to Robertson, I
4   think he made it clear to Robertson that he wanted to
5   fully cooperate.  Robertson also was told by the
6   Government that they had other persons who were involved
7   relating to the party house, what was going on there.
8            Could Robertson have done more factual
9   investigation concerning the existence or non-existence of
10  other evidence?  Yes.  He could have talked to witnesses
11  and the cases suggest that that is often something that
12  would be necessary.  But it seems to the Court that this
13  question of the adequacy of his investigation must be
14  considered in the context that when the defendant came to
15  him, he told Robertson he was guilty, that he regretted
16  what he had done, that he wanted to cooperate, that he
17  wanted to avoid criminal consequences if possible, that he
18  wanted to put it all behind him.  That is the context of
19  this case.
20           There is some interesting wording -- by the way,
21  there's a surprising lack of cases on this situation, that
22  is the situation where a person is attempting to withdraw
23  a guilty plea.  But one of the cases the Court finds
24  instructive is the case of U.S. vs. Raneri, 42 Fed. 3rd 36
25  at page -- looks like page 44.  In that case the Court is

1   saying: "Raneri's brief offers as the second instance of
2   alleged incompetence the asserted failure of the original
3   defense counsel to conduct a reasonable investigation into
4   a potential line of defense." They say: "Counsel's time
5   records might provide a basis for further inquiry, but the
6   records do not, standing alone, prove either that counsel
7   was incompetent or that the incompetence prejudiced the
8   defendant."
9           This is the part that I think is particularly
10  interesting. "Perhaps Raneri told his lawyer when they
11  first met that he was guilty as charged on all counts and
12  provided sufficient details so that the counsel knew or
13  that the counsel saw no point in further investigation of
14  the merits and turned his attention to securing a plea
15  agreement providing for a substantial downward departure
16  if Raneri provided substantial assistance." It says: "On
17  this record we know only that Raneri's counsel originally
18  negotiated what appears to be a favorable plea bargain."
19          Anyway, so I believe in this context the focus
20  of what Robertson was correctly focusing on was on cutting
21  the best deal that he could for his client. That was
22  grand jury cooperation, possible development of cases
23  against other people leading ultimately to the possibility
24  of a substantial downward adjustment for acceptance of
25  responsibility, at an earlier pointer in the proceedings

1   the possibility anyway of a diversion away from criminal
2   charges.  Later when it became clear that criminal charges
3   were going to be filed, the possibility of a light jail
4   sentence or at least a remote possibility of avoiding
5   jail.
6            If the defendant had come to him and said, as he
7   claims, "I won't plead guilty, I never will, I want a
8   trial", then my conclusion here might be different, but
9   that's not what this case is.  So the motion to withdraw
10  the plea of guilty regarding Count 1, the bribery count,
11  is denied.
12           Count 2, the false currency report, the elements
13  of that -- let's see -- transporting more than $10,000 to
14  a place in the United States from a place outside the
15  United States, a knowing failure to report, knowing that
16  the failure to report violated the law.
17           I think that the defendant's claim of an
18  inadequate factual investigation by Robertson regarding
19  this is very serious and the decision is a close call, but
20  in denying the motion, first of all, I adopt all the
21  comments I made above concerning the real context within
22  which this representation occurred.  That is that the
23  defendant came to Robertson wanting to cooperate,
24  admitting his guilt, wanting to avoid criminal
25  consequences to the extent possible, admitting the

1   bribery, admitting that he did bring approximately $40,000
2   into the country and falsely saying "no" on the entry
3   form.  In addition to this, what he learned from his
4   client, Robertson learned from the prosecutor, Mr. Lang,
5   two items of evidence.  Number one:  That Lang had the
6   currency form claiming no more than $10,000.  And number
7   two:  That Lang had proof that the defendant paid $15,000
8   on credit card debts shortly after his return to the
9   country.
10              There is certainly a reasonable inference from
11  the credit card payment that the money was used to pay the
12  credit card debt, that the money used to pay the credit
13  card debt was part of the $50,000 paid to the defendant by
14  Ibrihim, and in fact that is what the defendant had said
15  in his written statement to the authorities.
16              Could Robertson have done more?  Yes.  He
17  certainly could have obtained the form.  He certainly
18  could have taken a look at the evidence regarding the
19  credit card bill payment.  If he had done that, neither of
20  those items of evidence would have pointed towards the
21  defendant's innocence or the Government's inability to
22  prove the case.
23              Defense counsel suggests during the hearing,
24  well, maybe he brought the money in some other way, but I
25  don't think based on this record in the context of the

1    defendant's confession, which admittedly doesn't make any
2    specific reference to bringing the money, how he brought
3    the money into the country, but you still -- based on what
4    he did admit, you can't get to that without speculation.
5            Could the wife have taken the stand and
6    testified that the money came in another way?  Yes.  Could
7    the defendant himself have taken the stand and testified
8    as to another way?  Yes.  But we know from this record
9    that Mr. Robertson, based on his conversation with the
10   defendant, was on notice from the defendant directly that
11   he had brought the money in illegally.  And I don't
12   believe defense counsel was suggesting here that the
13   attorney would have allowed himself to be put into a
14   position of suborning perjury.
15           In any event, it's a close call, but based on
16   the totality of the circumstances the motion to withdraw
17   the plea of guilty on Count 2 is denied.
18           So I think that leaves us with rescheduling the
19   sentencing hearing in this case.  I'm trying to recall.
20   What was the status of the pre-sentence report?
21           MR. LANG:  The initial pre-sentence report,
22   Judge, has been prepared.
23           THE COURT:  Well, the clerk had handed me a note
24   here suggesting a sentencing date of Friday, February 15,
25   but that would be a date we would use if they hadn't

1  already created the pre-sentence report.  I don't think we
2  need to wait that long.  We certainly need to provide the
3  defendant from today forward a full opportunity to object
4  to the pre-sentence report.
5       In that regard, let me ask defense counsel,
6  Mr. Michael, Mr. Romero, from today forward how many days
7  would you feel you would reasonably need to file your
8  objections to the pre-sentence report?
9       MR. MICHAEL:  Thank you, Your Honor.  As is my
10 normal practice, I always believe in the assistance of a
11 sentencing specialist to assist us in analyzing the PSR
12 and filing our objections and filing our own sentencing
13 memorandum, so I would like us to have a reasonable time
14 in order to do that process.  I don't know if I had
15 mentioned to the Court before, but I am also going to be
16 out of the country through the month of December on a long
17 planned business trip and I'll be back on Christmas.  So I
18 would suggest to the Court that that date the clerk
19 suggested might be appropriate, even though I agree it's
20 out there a little bit, so that we can look at this, the
21 PSR, get everything to the specialist we use and get our
22 own objections and then our own sentencing memorandum to
23 the Court.
24      THE COURT:  Well, I'll willing to do that.  Does
25 the Government have any strong objection to that?

1               MR. LANG:  In light of Mr. Michael being out of
2     the country in December, I really don't have any objection
3     to that.
4               THE COURT:  All right.
5               MR. MICHAEL:  Thank you, Mr. Lang.
6               THE COURT:  Let me ask, I assume you would come
7     in the night before, so you probably would be better
8     served if we did it in the morning so you could fly out in
9     the afternoon.
10              MR. MICHAEL:  I have learned to come in the day
11    before, Your Honor.  I don't even know what the 15th of
12    February is.
13              THE COURT:  It's a Friday.  I'll be in Rock
14    Island that day.
15              MR. MICHAEL:  Is that your normal sentencing
16    calendar on Friday?
17              THE COURT:  Yes.
18              MR. LANG:  That's fine for the Government.
19              THE COURT:  Well, I have cases set already in
20    the morning, but because you're coming from a long
21    distance I'll -- what I'll do, I'm going to set this for
22    9:00 o'clock on that date, 9:00 o'clock on Friday,
23    February 15, and I would hope that we could do this in two
24    hours.  Does anyone believe that it would take longer than
25    that?

```
1              MR. MICHAEL:  How long is the PSR, Your Honor?
2              THE COURT:  I don't recall.
3              MR. LANG:  It's a straightforward pre-sentence
4    report.  There are not significant enhancements.  It's not
5    complicated at all.
6              MR. MICHAEL:  Has the Government filed a
7    sentencing memorandum yet?
8              MR. LANG:  The only thing we filed was -- the
9    only thing we notified probation is that we had no
10   objections to the report.
11             MR. MICHAEL:  Well, then I think two hours is
12   sufficient time, Your Honor.
13             THE COURT:  Well, if that changes, please let me
14   know immediately so that I can try to adjust the rest of
15   my schedule for that morning.
16             MR. LANG:  I can't imagine it taking two hours.
17             THE COURT:  I can't either.  I think that's it
18   for today then.
19             MR. MICHAEL:  Your Honor, are you going to
20   prepare a written order?
21             THE COURT:  No, I don't intend to, but the
22   transcript of course will be available.
23             MR. MICHAEL:  Okay.  Fine.  Thank you.
24
25                  * * * HEARING CONCLUDED * * *
```

**REPORTER'S CERTIFICATE**

    I, Karen S. Hanna, certify that the foregoing transcript constitutes a true and accurate transcript of the original shorthand notes of the proceedings had at the time and place aforesaid before the HONORABLE MICHAEL M. MIHM, U.S. District Judge.

    s/ Karen S. Hanna____
Karen S. Hanna, C.S.R.
License #084-001760