E-FILED[1]
Thursday, 20 March, 2008  10:47:44 AM
Clerk, U.S. District Court, ILCD

1            IN THE UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF ILLINOIS

2

3   UNITED STATES OF AMERICA,        )
                                 )

4                 Plaintiff,     ) Criminal No.
                                 ) 06-40117

5        vs.                 ) Rock Island, Illinois
                                 ) February 20, 2008

6   PELETI PELETI, JR.           )
                                 )

7                 Defendant.     )

8

9                SENTENCING HEARING

10

11                   BEFORE:

12           HONORABLE MICHAEL M. MIHM
           United States District Judge

13

14              APPEARANCES:

15             JEFFREY LANG, ESQ.
        Assistant United States Attorney

16            1830 Second Avenue
         Rock Island, Illinois  61201

17     (Appeared on Behalf of the Government)

18

19           LEWIS O. ROMERO, ESQ.
          PAUL L. ALAGA, ESQ.

20            ROMERO & ALAGA
       885 Bryant Street, Suite 202

21        San Francisco, California
    (Appeared on Behalf of the Defendant)

22

23

24          Karen S. Hanna, C.S.R.
         U.S. District Court Reporter
         Central District of Illinois

25   Proceedings recorded by mechanical stenography, transcript
produced by computer

1          THE COURT:  Good morning.  This is the case of

2   the United States of America vs. Peleti Peleti, Jr.,

3   criminal number 06-40117.  The defendant is in court

4   represented by his attorneys, Lewis Romero and Paul Alaga.

5   The United States is represented by Jeff Lang.  The matter

6   is set today for sentencing.

7          The defendant previously entered a plea of

8   guilty to three counts of an indictment, Count 1 charging

9   receiving a bribe, Count 2 charging bulk cash smuggling,

10  Count 3 was a forfeiture count.  There was later a motion

11  to withdraw his guilty plea filed.  We had an evidentiary

12  hearing on that and that motion was denied, so we're here

13  today for sentencing.

14         I was just handed before I came out here a

15  document entitled "Preliminary Order of Forfeiture".  Has

16  defense counsel seen that?

17         MR. ROMERO:  Your Honor, good morning.  Yes, I

18  have.  I have briefly reviewed it.  It appears to embody

19  those items which have been previously discussed with

20  Mr. Peleti and otherwise contained in the plea agreement.

21         THE COURT:  Okay.  Thank you.  So I will execute

22  that document.  The Court had directed the probation

23  office to prepare a written pre-sentence report.  That was

24  done.  Copies were made available to everyone, including

25  the defendant.  Let me ask defense counsel, have you had a

1    reasonable opportunity to read the pre-sentence report and

2    review it with your client?

3              MR. ROMERO:  Yes, Your Honor.

4              THE COURT:  As I understand it, you have

5    identified three objections to the report, correct?

6              MR. ROMERO:  Yes.

7              THE COURT:  Do you have any additional evidence

8    to present on any of those objections?  I figure if there

9    is any evidence, we'll take that first.  I should say, let

10   me limit that to the first two objections because the

11   first objection is an objection to the obstruction and the

12   second objection is an objection to the failure to give

13   him the acceptance of responsibility points.  I would like

14   to start with those.  Do you have any evidence to present

15   on either of those points?

16             MR. ROMERO:  No, Your Honor.  The only thing I

17   would add with respect to the second of those objections,

18   the PSR refers to a three level departure.  Our request is

19   for a two level departure.

20             THE COURT:  I assume you mean adjustment rather

21   than departure.

22             MR. ROMERO:  Yes, Your Honor.

23             THE COURT:  But we are talking about acceptance

24   of responsibility, correct?

25             MR. ROMERO:  Correct.

```
 1              THE COURT:  All right.  Does the Government have

 2    any evidence to present on either of these first two

 3    objections?

 4              MR. LANG:  No, Judge.  We have one witness

 5    regarding the third.

 6              THE COURT:  Pardon?

 7              MR. LANG:  We'll have one witness, an agent, to

 8    talk about the third objection.

 9              THE COURT:  Well, let's start then with the

10    first objection, which is an objection to the obstruction

11    of justice adjustment.  It seems to me that there are two

12    parts to this -- and I would like to begin with defense

13    counsel since it is your objection, but ultimately of

14    course the burden is on the Government to establish the

15    existence of it by a preponderance of the evidence.

16              It seems to me there are two points.  One is --

17    the first point is did the defendant commit perjury and,

18    secondly, if he did, does it -- was it the kind of perjury

19    that would qualify for this adjustment.  So I would like

20    you to address both of those points if you would.

21              MR. ROMERO:  Your Honor, thank you.  Judge, I do

22    not want to -- your Honor, I don't want to regurgitate

23    that which has been expelled already in our papers and

24    here in the PSR, but I do want to say that it is not

25    uncommon for a Court, as he is expected to do, to make
```

1    findings adverse to one of the litigants before him and

2    often today many of the legal issues that this Court and

3    other Courts decide turn on a Court's finding of

4    credibility based on an affiant before him.

5              And what we had in the sentencing hearing, based

6    on the reading of the transcript, is the Court's finding

7    that Mr. Peleti was not credible.  The Court did not make

8    a factual finding that it was perjurious.  Most certainly

9    this Court has the power to make such findings today and,

10   even so, ostensibly the legal issue before the Court was

11   did Donovan Robertson perform as required under the Sixth

12   Amendment and the issues were entirely collateral to the

13   substance of the offense to which Mr. Peleti pled guilty

14   to.  I don't even think --

15             THE COURT:  Well, when you say they're

16   collateral, I mean I understand that may be relevant in

17   regard to the second prong of this.  But concerning the

18   issue of whether or not he committed perjury, it seems to

19   me that if the Court makes a finding today that there were

20   certain aspects of his testimony where he testified

21   falsely and in the opinion of the Court did so willfully

22   and intentionally and it was on a material matter, then

23   that's perjury.  And in terms of whether it was material

24   or not, it seems to me that in any event, if it was a

25   matter in front of the Court, which this was, that is

1    should he be allowed to withdraw his plea of guilty and

2    why, that that's clearly material.  And if the Court finds

3    that he testified falsely in that regard, with all due

4    respect, I don't believe that's a collateral matter in

5    that sense.

6            MR. ROMERO:  I think the Court raises a very

7    good issue and I suppose that one legal inquiry is whether

8    the materiality requirement goes to -- no question that

9    the testimony was material to the legal issue before the

10   Court at the time.  Perhaps the issue is does the law

11   require it to be material to the substantive offense.

12           THE COURT:  Well, I don't believe there's any

13   law that says that if I find that he testified falsely,

14   that you can do what he did and that's not perjury.  It

15   doesn't answer the question of whether or not there should

16   be an upward adjustment for obstruction of justice.

17   That's why I split this into two parts because it seems to

18   me you're really addressing the second part.

19           MR. ROMERO:  Yes, Your Honor, but given that I

20   would like to take prong one head on with Your Honor.

21           THE COURT:  Go ahead and do it, but do it

22   briefly, please.

23           MR. ROMERO:  Well, given the length of

24   Mr. Peleti's testimony, can't the Court identify the

25   aspects of the testimony with which it has concern in this

1       issue and I would like to address them succinctly.  Given

2       that there was a long hearing, I would like to know where

3       the Court's concerns are.

4               THE COURT:  Well, basically everything he said

5       in terms of what Mr. Robertson did or did not do, whether

6       he -- how often he met with him, how often he talked to

7       him on the phone, what happened during those

8       conversations, was he given information during those

9       conversations beginning in the fall and going through the

10      winter as to what the possibilities were, what the

11      probabilities were, what kind of sentence he was facing if

12      he pled guilty, where the sentencing guidelines come out.

13      I mean, I could go on and on.

14              I do believe I made the comment at the last

15      hearing something to the effect that I've been doing this

16      for 25 years and this was one of the most lacking in

17      credibility testimonies that I had heard in that period of

18      time.  Does that make the list that you're interested in?

19              MR. ROMERO:  Most certainly.  Thank you, Your

20      Honor.  Judge, I've been doing this for a short period of

21      time relative to Your Honor and perhaps my colleagues,

22      about a decade, and I want to tell Your Honor as an

23      officer of the Court and of this Court that Mr. Peleti has

24      struck me as an individual over the months, and

25      increasingly so as I get to know him even better, as

1  someone who processes information a little bit

2  differently.  I'm no expert, but in a variety of case I've

3  come to know similar information about, you know, learning

4  disabilities and auditory processing information.

5          For example, just a couple of nights ago -- and

6  I think this is illustrative of the point I want to make.

7  I was speaking with him on the telephone two days ago

8  about plane tickets and the abbreviation that was needed

9  in the computer for the Moline airplane, which is MLI.  He

10  says, "What's the code?"  I said, "MLI."  He said, "MIL?"

11  I said, "No.  MLI."  "MIL?"  And we went through this

12  about three or four times, Your Honor.

13          And I use you that as an example to demonstrate

14  to Your Honor that he's well intended, but often confused.

15  And I think that in my examination, Your Honor, of

16  Mr. Peleti, perhaps I was ineffective because I did not

17  properly anticipate the extent to which he would, in his

18  sort of expression of loyalty and trust in me, sort of

19  follow my lead.

20          THE COURT:  With all due respect, counsel, I

21  don't think that was the problem.  I mean, what I'm

22  focusing on here is not whether letters are arranged in

23  the right order.  It's whether conversations occurred at

24  all or not, whether there was any discussion of various

25  aspects of the events, of the realities of what he was

1    facing, what his objections were, things like that.  We're

2    not talking about the order in which letters are arranged.

3             MR. ROMERO:  Correct.  Let's take another

4    example with which the Government has taken much

5    exception, this discrepancy between Attorney Robertson

6    claim that he had made 30, perhaps up to 40 phone calls to

7    Mr. Peleti and Mr. Peleti's testimony under oath that he

8    had spoken with Donovan Robertson about 7 times concerning

9    the case.

10            I think the interesting distinction between the

11   two is that it may be true that both of them are true.

12   How can that be so?  Perhaps Donovan Robertson made 30 to

13   40 phone calls to Mr. Peleti and perhaps Mr. Peleti was

14   interpreting the question to be how many conversations did

15   you have with Mr. Robertson on the phone about the case.

16   It can't be said, Your Honor -- and I say this for

17   practical purposes -- that each time you make a call,

18   you're going to get through to your client.  I don't have

19   any question he made 30 or 40 phone calls.  Do I think

20   they had 30 to 40 substantive discussions about the case?

21   No.  There's a number of those phone calls -- and this was

22   not clarified by the Government at the hearing or

23   otherwise that each of those phone calls amounted to

24   substantive conversations.

25            And this goes to the willfulness of the

1   testimony, Your Honor, which is a necessary finding in

2   making your legal conclusions that it was perjurious.  And

3   I don't think that Mr. Peleti had any intention of

4   committing a perjury before Your Honor.  His perceptions

5   and memory of the event are confused still to this date.

6        Let me bring up another example.  When the Court

7   was inquiring of Mr. Peleti around particular

8   correspondence that went from Mr. Robertson to Mr. Peleti,

9   in Peleti's mind he is also considering the document that

10  was mailed to him by Mr. Robertson that pertained to a

11  drug case.  So when he's thinking of that letter and the

12  timing of that letter, you asked him, "Did you get that

13  letter on this date?"  He says, "No."  Well, are you

14  referring to the letter that was mailed to you in error

15  although it had your name on it and applied to a different

16  case or are you referring to the letter that referred to

17  your case?

18        And with respect to the follow-up inquiries by

19  this Court -- which, Judge, as an observer and attorney

20  who has examined hundreds of witnesses, I'm going to tell

21  you I was concerned as well.  "What do you mean you didn't

22  see this thing until the day of?"  Well, what you learn,

23  Your Honor, is that the final document wasn't presented to

24  him until the day of.  And so Pete is doing his best to

25  try to answer the questions in a way that was favorable to

1   | him and in a favorable light.  "Judge, I didn't get the

2   | final document that I was signing until the day of the

3   | hearing."  Did he get something in the mail prior?

4   | Absolutely.  When it came exactly, we don't know.  But I

5   | think that in the end, what's emerged from his testimony

6   | is, "Yes, Your Honor, I got the $50,000.  Yes, Your Honor,

7   | Donovan Robertson laid it out on paper what I was going to

8   | receive."  And he felt that it wasn't fair upon

9   | reflection.

10  |         And, Judge, his intention was not really

11  | motivated to deceive Your Honor, but just to share an

12  | aspect of him that otherwise hadn't been presented.  And

13  | later you'll hear, Your Honor, in our presentation we have

14  | a couple of decorated soldiers here to tell you that

15  | although Pete processes information a little differently,

16  | he's the last person on earth that would offend Your Honor

17  | or the law or the process that is before him.

18  |         So I don't think that -- well, while I

19  | appreciate the Court's concerns and I share them, Your

20  | Honor, I will tell you as an officer of the Court that the

21  | criminal intention, the mens rea, wasn't there.

22  |         THE COURT:  All right.  Thank you.  What's the

23  | response?  I would like you to be specific.

24  |         MR. LANG:  I will be specific, Judge.  We

25  | totally disagree.  Counsel just said that Mr. Peleti may

1  not have understood the question about how many phone

2  calls, Judge, because he may have felt that it was

3  attempts to call, whatever.  The Court may recall how I

4  had to ask several questions to clarify that point.

5          The question that I asked him after he said,

6  "There's more times I called than we made contact with, if

7  that's what you're referring to", what I said, quote:

8  "I'm referring to how many times your voice and your ears

9  communicated with Don Robertson's voice and ears."  Now I

10  don't know how one gets more specific than that and his

11  answer was:  "Probably seven times."

12          Your Honor, Mr. Robertson established through

13  his records, Exhibit 8, which is in the record from that

14  hearing, his documented number of calls was in the

15  vicinity of 30.  He testified that there were probably at

16  least 40 and described times when he didn't document when

17  he was at home or whatever.

18          Your Honor, obviously the Court had no reason to

19  make a perjury finding back in October during these

20  hearings.

21          THE COURT:  Actually, I thought that I did, but

22  I was mistaken.

23          MR. LANG:  Well, in terms of the elements of a

24  perjury offense, our position is that the defendant could

25  in fact be charged, tried and convicted of perjury.  The

1  evidence, as the Court has observed, suggests, reflects

2  that the defendant willfully lied and it was a material

3  matter.  After all, had the defendant been successful in

4  convincing Your Honor that Donovan Robertson was

5  ineffective, he would have gotten his way.  His plea would

6  have been set aside.  That is certainly as material as it

7  gets as far as the motion to withdraw the plea, at least

8  the first half.  It certainly was on October 5, 2007.  Of

9  course counsel then later in October said, "Well, never

10 mind.  We're going to argue something else and disregard,

11 Judge, the ineffective assistance."  And Your Honor even

12 mentioned that the counsel was shifting sands and moved on

13 to an alternative theory.

14        Your Honor, when it comes to perjury, we don't

15 get do-overs here.  The defendant took the stand and I can

16 go through the specific list of items that we identified.

17 Certainly in a general fashion, the defendant's whole

18 testimony was designed to convince this Court that he had

19 no effective communications with his counsel.

20        For example -- and the other -- and it's not

21 just his testimony, Judge.  Docket entry 32, which is the

22 statement, affidavit of Mr. Peleti attached to his motion

23 to withdraw filed well in advance of the October hearing,

24 in that it said that:  "At no time prior to entry of the

25 guilty plea on February 9 did Mr. Robertson ever explain

1        or even discuss with him the potential risks or benefits

2        of proceeding to trial."  That's paragraph 9 of docket

3        entry 32.   "Mr. Robertson never discussed with him

4        possible defenses to the charge he faced or the strengths

5        or weaknesses of the Government's case against him."

6        Paragraph 9.  "Mr. Robertson did not explain anything

7        about the contents of the plea agreement."  Paragraph 20

8        of that docket entry 32.  Mr. Peleti says in his

9        statement:  "And that Peleti did not have any substantive

10       or meaningful discussion with Mr. Robertson regarding the

11       contents of the plea agreement."  That's paragraph 22 of

12       his initial filing.

13                This wasn't a last minute slip of the mind

14       because of some inability to see letters in the right

15       order.  This was an intended plan to convince and deceive

16       this Court into believing Mr. Robertson was ineffective

17       and that Mr. Peleti had not knowingly or voluntarily

18       entered a plea.  It was knowing and intentional and --

19                THE COURT:  What about his actual testimony at

20       the hearing?

21                MR. LANG:  In terms of his actual testimony, he

22       falsely testified that he did not believe that he had seen

23       a plea agreement prior to February 9, 2007.  That's the

24       transcript, docket entry 40, page 66, lines 15 through 17.

25                He said he never had a discussion about the plea

1    agreement and the guidelines with Mr. Robertson until he

2    received the plea agreement one or two minutes before the

3    plea on February 9, 2007.  That's at page 67, lines 15

4    through 21.

5          Finally, that he only had probably seven

6    telephone calls with Mr. Robertson to discuss his case.

7    That's at page 78, lines 3 through 19.

8          In terms of -- again in terms of perjury, the

9    defendant could be charged and convicted of that based on

10   those statements, in the Government's opinion, so surely

11   it constitutes perjury for the purpose of a preponderance

12   of the evidence standard here for sentencing.

13         THE COURT:  What about the second prong that I

14   mentioned; that is the claim that even if it was perjury,

15   since it didn't focus on, quote, guilt or innocence,

16   unquote, that it was not the type of perjury that could

17   lawfully lead to an upward adjustment.

18         MR. LANG:  Your Honor, frankly we looked for

19   cases, Appellate Court cases, directly on point here.  We

20   didn't find any that are limited to this circumstance, but

21   we're very close.  In the Government's response we cited

22   several cases.  In Carroll, United States vs. Carroll, the

23   defendant claimed, testified that his attorney rendered

24   ineffective assistance by overstating the amount of time

25   Carroll would face if he went to trial and by

1    strong-arming him to accept the plea agreement.  He

2    testified that he claimed to his attorney that he was

3    innocent and he specifically testified that his attorney

4    told him he would receive an 85-year prison sentence if

5    convicted at trial but a relatively light sentence under a

6    plea agreement, so Carroll entered the plea agreement.

7    The District Court focused --

8          THE COURT:  But couldn't you make an argument,

9    at least in the part that's quoted at the bottom of page 5

10   of your brief, that he was also addressing issues relating

11   to guilt or innocence?

12         MR. LANG:  Your Honor, I guess the way the

13   Government reads that, if it was irrelevant to the issue

14   of the upward adjustment under 3C1.1, the Court wouldn't

15   have discussed it and the Seventh Circuit wouldn't have

16   chosen to quote it.  It's not dicta.  It's on point.  It's

17   perjury.  It has to do with his attorney's representation.

18   So, therefore, we believe that in the Seventh Circuit that

19   this establishes this principle.

20         I don't believe that the guidelines focus just

21   on directly related to the conviction or sentence.  In

22   fact, it's curious how the guidelines are laid out.  If

23   the Court looks at the beginning language, it seems to

24   suggest that it has to be related to conviction or

25   sentence.  Actually, in this case it is.  I mean the

1    defendant testified -- the defendant pled guilty to these

2    two offenses.  This does relate to his offense of

3    conviction.

4            And the interesting thing about the -- I believe

5    it's paragraph or commentary note 4(f) specifically says

6    "false statements to a judge or magistrate".  We believe

7    certainly that's what happened here and that there is a

8    tie to this issue, the defendant pleading guilty, getting

9    up before Your Honor under oath and saying I'm guilty of

10   these two offenses.  That is related to the offense of

11   conviction and I believe that's why the Seventh Circuit in

12   Carroll included that.  The bulk of the discussion is

13   about the ineffective assistance claim in Carroll.

14           Your Honor, there are a couple of other cases

15   out of other circuits that -- the Austin case in the First

16   Circuit is very close to what we have here.  In that case

17   the defendant did not assert that he was innocent and

18   essentially his whole argument was that previous counsel

19   had afforded him too little time and communications and

20   discussion for him to have properly pled guilty.

21           THE COURT:  What about the cases that the

22   defense relies on?

23           MR. LANG:  Your Honor, we recognize that those

24   cases exist.  We disagree with them.  We believe that

25   Austin in the First Circuit and Adam in the Fifth Circuit

 1 │ and the Carroll case stand for the principle that one who

 2 │ stands before a Court -- and especially in this case for

 3 │ the whole hearing, part of the hearing, half the hearing

 4 │ we'll say, half the claim was that Mr. Robertson was

 5 │ ineffective and that the defendant had entered -- claimed

 6 │ that he had entered an involuntary, unknowing plea, that

 7 │ this is the kind of perjury that should be counted.

 8 │         It doesn't make sense, Your Honor, that a

 9 │ defendant like Mr. Peleti could appear here and be tried

10 │ before a jury for perjury.  I don't believe there is any

11 │ doubt that this defendant, if the facts came out as they

12 │ did at the hearing, if the jury concluded the same as Your

13 │ Honor, that the defendant would be acquitted of perjury --

14 │ I mean he would be convicted, proof beyond a reasonable

15 │ doubt.

16 │         And it makes no sense that either the Sentencing

17 │ Commission and it would make no sense for us or frankly

18 │ for Courts to take a position that it's okay to get up

19 │ here and lie about your attorney's conduct and to make up

20 │ facts and try to deceive the Court into letting a

21 │ defendant withdraw his plea based on ineffective

22 │ assistance.  It makes no sense that that would be the

23 │ proper result.

24 │         Again, in United States vs. Adam, Fifth Circuit:

25 │ "The enhancement for obstruction of justice is proper any

1    time the defendant is aware of the action or investigation

2    against him and he conceals or attempts to conceal

3    information material to the investigation, prosecution or

4    sentencing of the instant offense."  This related directly

5    to his prosecution, so for that reason we believe that

6    obstruction of justice is appropriate.

7            THE COURT:  All right.  Thank you.  Do you have

8    a brief reply?

9            MR. ROMERO:  Yes, Your Honor.  Let me focus on

10   the testimonial aspects that were referenced first by the

11   U.S. Attorney with respect to prong one.  I can get into

12   the references to the affidavit if the Court asks me to,

13   but for the sake of brevity I'm going to focus on first of

14   all --

15           THE COURT:  Well, it's your opportunity to

16   argue.  If you're suggesting that the references he made

17   either to the affidavit or his testimony are not

18   perjurious, then you better address those briefly.

19           MR. ROMERO:  Thank you, Your Honor.  With

20   respect to his statement that he did not see the plea

21   agreement until the day of the hearing, that is actually

22   technically a truthful statement.  The agreement that was

23   entered into by this Court was presented to Mr. Peleti the

24   morning of.

25              With respect to his statement that he did not

1   have a meaningful discussion with Mr. Robertson until the

2   day of the plea with respect to the guidelines, I think

3   that is also a true statement.  Recall, Your Honor, that

4   on the day of the plea colloquy, Your Honor inquired of

5   Mr. Robertson directly, "What did you tell Mr. Peleti the

6   maximum exposure was on this case?"  That was a direct

7   question from Your Honor.  The answer was 36 months.

8          Two salient points emerge from this statement.

9   One:  That number is not supported by any of the

10  sentencing guidelines.  Two:  Let's accept it as a

11  truthful statement.  He told Mr. Peleti that by this

12  agreement that you're agreeing to plead guilty to today,

13  the most this Judge is going to sentence you to prison is

14  36 months.  But, Your Honor, on the morning --

15          THE COURT:  Well, with all due respect, I don't

16  believe the record reflects that.

17          MR. ROMERO:  It's clear, Judge, and --

18          THE COURT:  It's clear he says that the most

19  severe sentence the Court could impose is 36 months?  Then

20  I want to see this reference.

21          MR. ROMERO:  I will have my colleague pull it

22  out.

23          THE COURT:  Your client may have said that, but

24  I don't believe Donovan Robertson said that.

25          MR. ROMERO:  I appreciate the Court's concern,

 1  but that's why I'm referencing this very clear statement

 2  in the record which Mr. Alaga will pull up briefly.

 3           On the morning of, when he's signing the

 4  document that Your Honor is filing into the record, is

 5  when he learns for the first time that Your Honor has the

 6  power to sentence him actually, in spite of whatever

 7  agreement and in spite of his cooperative efforts over the

 8  last few months, that he's actually pleading to all three

 9  and he could be sentenced up to 20 years, 15 and 5.  This

10  is the shock that comes to him and this is the tentative

11  environment that he is feeling on that morning coupled

12  with Your Honor's own reservations.  If I might refer at

13  this time, Your Honor, to --

14           THE COURT:  I don't have a copy of that part of

15  the transcript with me I don't believe.

16           MR. ROMERO:  Your Honor, would you like me to

17  present it to the Court?

18           THE COURT:  You may, yes.  What page is it on?

19  Give it to me.

20           MR. ROMERO:  Page 22.  Your Honor's query begins

21  at line 10.

22           THE COURT:  I assume you have a copy of this.

23           MR. LANG:  Your Honor, I'm sure that when the

24  Court asked -- no, I don't have it in front of me.

25           THE COURT:  It says:  "What is the worst case

 1    scenario you have discussed with your client concerning

 2    the guidelines?"  I always ask that question.  That's why

 3    I attempted to clarify that with you before we went down

 4    this road any further.  This is asking him concerning the

 5    guideline range itself, what is the worst case scenario

 6    you have discussed with him.  He said 36 months.  This

 7    does not say that the most severe sentence I could impose

 8    was 36 months.  With all due respect --

 9            MR. ROMERO:  But let us assess that colloquy

10    from the perspective of the non-lawyer, first time

11    criminal defendant.  At all times this is the

12    representation that was made to Mr. Peleti in the process.

13    And, remember, he meets the lawyer on day one and after

14    his initial consultation is presented with this document

15    of cooperation.  And he's told from the inception under

16    the guidelines you're going to do no more than 36 months,

17    but probably you're going to do whatever.  This is the way

18    it's presented to him the whole time and it's on the

19    morning that he's signing this document that he -- Judge,

20    this happens with a lot of defendants.  You know it,

21    happens with a lot of defendants.

22            THE COURT:  If you have other points to make, go

23    on to those points.

24            MR. ROMERO:  I would ask the Court to consider

25    as it is reflecting studiously, as it always does on these

1    legal issues, how does a lawyer manifest 30 to 40

2    substantive phone calls with his client who is facing very

3    serious charges, with very serious implications for his

4    25-year military career and the family members, how does

5    he document this in his billing statement?  I would invite

6    the Court before issuing its ruling to look carefully at

7    that billing statement that was presented to the Court as

8    an accurate summary of his communications and work on this

9    case whether or not, one, there are 30 to 40 phone calls

10   documented there and, two, whether the --

11          THE COURT:  How many do you say are documented

12   in his bill?

13          MR. ROMERO:  I don't have it in front of me,

14   Your Honor.

15          THE COURT:  Then what am I supposed to do?

16          MR. ROMERO:  Well, I'm asking you to consider --

17          THE COURT:  Well, I would expect you would be

18   prepared to tell me that today.  That's why we're here for

19   sentencing.

20          MR. ROMERO:  True enough, Your Honor, and I

21   apologize, but I will say this, Your Honor.  That billing

22   statement does not reflect time that would substantiate

23   the notion that he had 30 substantive conversations.

24          THE COURT:  My recollection is that the question

25   was not posed in terms of 30 to 40 substantive

1    conversations.  The question was posed in terms of how

2    many conversations did he have at all, anytime, how many

3    times did he hear Donovan Robertson's voice or did he

4    speak to Donovan Robertson over the phone.  That's not the

5    same thing as saying they had substantive discussions.  Am

6    I missing something?

7              MR. ROMERO:  No, but you raise a good point,

8    which is the one that I was making.  It's my belief that

9    Mr. Peleti's representations to the Court were an honest

10   assessment from his memory at the time of his testimony as

11   to the number of substantive conversations.

12             And, you know, Judge, if you ask me whether I

13   had a conversation with my colleague yesterday, you know,

14   maybe I had one or two.  We probably called each other ten

15   times trying to get ahold of each other.  Does the five

16   second "I'll call you back" count as a conversation?  I

17   don't know.  And in the context of Mr. Peleti trying to

18   communicate in the best way he was capable of that he

19   didn't receive the time that was owed to him under the

20   constitution, he tells the Court he had about seven

21   substantive conversations.  And I think that's the message

22   and the point I'm making is as to the willfulness and

23   Mr. Peleti was doing the best he could to tell Your Honor

24   the number of times he had meaningful conversations with

25   Mr. Robertson.

1          Moving to the references cited by the Government

2   in Mr. Peleti's affidavit, he claims under penalty of

3   perjury in the affidavit that he did not have an

4   opportunity to meaningfully discuss his defenses.  And

5   while as an individual who is trained to, you know, confer

6   trust and loyalty to authority figures like Mr. Robertson,

7   he signs this agreement on day one but it's not until much

8   later, Your Honor, and I dare say until he seeks other

9   counsel, does he learn that it was the Government's

10  burden, for example, with the Count 2 bribery charge.

11         He learns later that the only basis for it comes

12  from his conversations that were immunized testimony.

13  That although they found a card where he checks the "no"

14  box, he learns later the Government would have to prove

15  before a jury, that they would have to tell those jurors

16  that Mr. Peleti could not have mailed this money and

17  there's no way based on the evidence that the Government

18  could prove this case beyond a reasonable doubt absent

19  Mr. Peleti's confessions.

20         And that's what he means when he says, "I didn't

21  have a meaningful discussion with Mr. Robertson about my

22  defenses."  It's not to say, Judge, and I don't suggest

23  that Mr. Robertson did not discuss the merits of the case.

24  But for an untutored lay person who is getting a different

25  perspective after the fact on what the defense is, he

1   absolutely has formed the opinion and will stand by it

2   today that he did not have a meaningful discussion with

3   Mr. Robertson about his defenses that he could pose at

4   trial.  He will tell you the same thing today.  So I don't

5   think that -- it's not contraindicated with the notion

6   that Mr. Robertson discussed defenses.  They are entirely

7   different conversations and they both could be true.  It

8   could be that Mr. Robertson discussed these things and it

9   could simultaneously be true that Mr. Peleti believes that

10   he did not have these meaningful discussions around

11   defenses and the risk of going to trial.  He has had a

12   different perspective.  It is our perspective this is a

13   very triable case.

14          And so I'm letting the Court know that so it can

15   bear this in mind in deciding whether Mr. Peleti was

16   intending to break the law when he was testifying before

17   you.  He was sharing his sentiment and his perceptions at

18   the time of his testimony.

19          THE COURT:  All right.  Thank you.

20          MR. LANG:  Your Honor, if I could just clarify

21   one thing.  This issue of whether or not the calls related

22   to the case, at page 78 of the transcript of the hearing I

23   asked the defendant:  "How many telephone calls did you

24   have with Mr. Robertson to discuss this case?"  They

25   weren't talking about the weather in Hawaii, Judge, in

1    these calls and Mr. Robertson did testify that he had

2    discussions with Mr. Peleti at least 30 times on this case

3    and probably 40.

4                THE COURT:  All right.  Thank you.

5                MR. ROMERO:  Judge, I understand that the Court

6    perhaps -- I do want to have a 30-second comment on the

7    second prong in response to the prosecutor's comments on

8    the --

9                THE COURT:  Keep it brief.  You had that

10   opportunity to begin with.  I'll give you some extra time

11   now, but get to that point, please.

12               MR. ROMERO:  The reason that the law requires --

13   assuming the testimony to be perjurious, the reason the

14   law requires it to relate to a material issue of the

15   substantive offense is to safeguard a very basic due

16   process protection.  It goes to procedural due process.

17   That is to say the following.  Otherwise defendants -- a

18   defendant's right to challenge his plea for IEC grounds or

19   otherwise would be chilled.

20               THE COURT:  I don't see why that would be

21   chilled.  The only thing that's chilled is the prohibition

22   that always exists that a person not take the stand and

23   commit perjury.  You know, committing perjury is not

24   protected speech.  Perjury is not encouraged speech.

25               MR. ROMERO:  That is absolutely true, Your

1    Honor, but even in the cite referenced by the prosecutor,

2    3C1.1, materiality and wilfulness of statements, the

3    defendant's false statements must concern a material fact;

4    that is, must be relevant to an issue in the case and

5    capable of influencing the jury in its decision about

6    guilt.  And that didn't happen here, Judge.  Didn't happen

7    here.  And whether the prosecutor can sustain

8    independently a guilt finding for perjury is not ipso

9    facto telling on whether or not this adjustment should be

10   applied.  It must go to an issue that's capable of

11   influencing a jury in its decision about the guilt of the

12   case.  Not here, Judge.  And in the cases cited by the

13   people, we find there is this connection to a substantial

14   matter that goes to guilt.

15           MR. LANG:  Your Honor, that's a misreading of

16   the guidelines.  Comment note 6, material evidence is

17   defined.

18           THE COURT:  I can't hear you.

19           MR. LANG:  It's comment 6 in the guidelines.

20   I'm reading from the 2007 book.  It says:  "Material

21   evidence.  Material evidence, facts, statement or

22   information as used in this section means evidence, facts,

23   statement or information that, if believed, would tend to

24   influence or affect the issue under determination."  This

25   says nothing about a requirement that it be before the

1  jury.

2          THE COURT:  All right.  My ruling on this is

3  that I'm going to deny the objection.  First of all, I

4  believe that there are a number of different examples of

5  statements by the defendant under oath or in testimony

6  that were false.

7          Concerning the affidavit, the assertion is that

8  at no time had Mr. Robertson ever discussed the risk or

9  benefits.  I believe that is false and I believe that the

10  defendant knew that was false when he signed that

11  affidavit.

12          I believe that his assertion that he had

13  never -- that Mr. Robertson had never explained or

14  discussed his defenses, that that was false.  The strength

15  and weaknesses of the case, that was false.

16          The contents of the plea agreement.  I mean, we

17  know from the record in this case, if I'm not mistaken,

18  that he had sent some documents to him in, I think,

19  October or November that pretty much laid out what the

20  defendant could expect to see in the plea agreement, so I

21  think that was false.

22          His testimony about not seeing -- defense

23  counsel has done a nice job here this morning of trying to

24  parse this out, but with all due respect I don't

25  believe -- I'm not focusing on any belief that he said he

1    never saw the plea agreement, meaning the one he signed.

2    My understanding is that his testimony was that he never

3    saw a plea agreement.

4           He didn't understand what would be the contents

5    of the plea agreement before he signed that plea

6    agreement.  I think that's just patently false.

7           His testimony that he never discussed the plea

8    agreement, never discussed the real application of the

9    guidelines, only seven phone calls.  All of that, in my

10   opinion, was not only false, he knew it was false and I

11   think it was patently false.

12          Defense counsel said at the beginning of this

13   that he may process information differently, well intended

14   but often confused.  With all due respect, I do not

15   believe that's what we're dealing with here.  It's just

16   simply not what we're dealing with here.

17          I think that any fair reading of that record of

18   that hearing would indicate to a judge that all of the

19   elements of perjury have been met, that it was false, that

20   it was willful and intentional and that it was material.

21   The issue under dispute at that exact moment was should he

22   be allowed to withdraw his plea of guilty.  I can't

23   imagine too many things more material than that.  If I had

24   believed his testimony, I would have allowed him to

25   withdraw his plea.  And then I don't know what would have

1    happened, but what would have happened later is

2    substantially irrelevant as far as I'm concerned.  Those

3    false statements that he knew to be false were made in

4    relation to a matter that was related to the offenses that

5    he was charged with, those being receiving a bribe and

6    bulk cash smuggling.  The guideline itself says that

7    providing materially false information to a judge or

8    magistrate would constitute obstruction.

9         I would also point out the wording of the

10   guideline itself says:  "If the defendant willfully

11   obstructed or impeded or attempted to obstruct or impede

12   the administration of justice during the course of the

13   investigation, prosecution or sentencing."  And to me,

14   this is clearly an effort to attempt to affect the

15   prosecution of the case.  So for all those reasons, I

16   believe that the objection should be denied.

17        Objection number two addresses, I guess, what is

18   often a related matter, but the fact that I ruled one way

19   on the first objection in no way controls my ruling on the

20   second objection and that is whether or not he should have

21   been given a downward adjustment for acceptance of

22   responsibility.  What is your argument on that point,

23   please?

24        MR. ROMERO:  The day he met his lawyer is the

25   day he agreed to work with the United States Government.

1    The bulk of the time that Mr. Peleti spent engaged with

2    this case was with investigators of the United States

3    Government.  At all times he did what the Government asked

4    him to do.

5          Judge, I wasn't here the day he took the plea.

6    All I can do is make my own inferences from the

7    transcript.  I thought Your Honor's queries were astute

8    and respected the process, but this is the -- as a result

9    of what took place in court and what took place outside of

10   court before I ever met Mr. Peleti, that resulted in an

11   encouragement by his own counsel to check in with other

12   folks.  He was prodded to seek outside counsel, to be

13   quite candid with the Court, from a family member in

14   California in the area who had studied law who had put him

15   in contact with our office.

16         And the time of our filing of this motion to

17   withdraw, Your Honor, if you might recall, was about three

18   weeks or so before the original sentencing was scheduled

19   or sometime around then.  This Court was prepared to

20   sentence him at that time and I don't know what he did at

21   that time that would suggest that he was not taking

22   responsibility.

23         THE COURT:  Well, let me interrupt you a moment.

24   The Government in their brief on page 10 cites the case of

25   U.S. vs. Lopinsky, where as I understand it the Appellate

 1  Court reversed -- or indicated that the trial Court had

 2  committed error in granting acceptance of responsibility

 3  despite the fact that he filed a motion to withdraw his

 4  plea and gave false testimony in support of it.  That

 5  seems to be our exact situation.

 6          So my question to you is this.  And I don't mean

 7  to shut you off here.  But unless you can somehow tell me

 8  how the facts of this case are materially different from

 9  the facts in the Lopinsky case, then it seems to me that I

10  don't think we go any further than that.  Do you

11  understand what I'm saying?

12          MR. ROMERO:  Undoubtedly.  The distinction

13  between Lopinsky and Peleti is as follows.  In Lopinsky,

14  the defendant there used an inordinate amount of time of

15  the Court and required the prosecutor to prove up his

16  case, as the Court said, at least as much as he would have

17  needed to do at trial and even appeal, so --

18          THE COURT:  But they also say:  "The more

19  important point is that, as we have already suggested, the

20  law cannot tolerate a situation in which a criminal

21  defendant plays heads I win, tails you lose by combining a

22  perjurious attack on his guilty plea with an appeal for

23  mercy if the attack fails."  That's a quote from the case.

24  Isn't that what's happening here?

25          MR. ROMERO:  Well, Judge, I thought about that.

1  I think in this case it was heads I lose and tails I lose

2  and we need to distinguish the two.  Under the agreement

3  which he was challenging, there were no guarantees that he

4  would do any better if he went to trial, so he wasn't

5  trying to protect really an asset under the agreement.  It

6  struck me as a bit illusory from my end.

7        So I don't think that -- Judge, I think that if

8  we take Lopinsky for this very general proposition, then

9  we will lose almost each time the Court makes these

10  adverse findings on credibility and I don't think that's

11  what the Court is getting at in Lopinsky.  I think the

12  Court in Lopinsky is saying, "Judges, let's take a look at

13  the big picture here.  If this guy is making us run a

14  trial" -- and there's some benefits to that, right,

15  because then he has run the trial, he has examined all of

16  the witnesses and if he wins, he's got his depositions and

17  now he can try his case.  That's not what Pete did and

18  that's what happened in Lopinsky.  He ran depositions at

19  the motion to withdraw the plea.  And in that case, you

20  can't have your cake and eat it too.  In this case,

21  Mr. Peleti testified --

22        THE COURT:  So you would say the difference is

23  the amount of extra work that the Government went to?

24        MR. ROMERO:  That's one way of interpreting it,

25  yes.  I don't think it's the exhaustive way, but I think

1    that in terms of, you know, heads I win, tails you lose

2    kind of thing, I think if we examine the case in light of

3    the Court's policy considerations, it really is that.

4    What is the win for the defendant?

5              THE COURT:  But it would seem to me there is an

6    argument that in terms of the policy consideration, in

7    view of that quote that I just read, the policy

8    consideration is not substantially affected whether it was

9    a five day hearing or a one hour hearing.

10             MR. ROMERO:  Well, except that the criminal law

11   does not afford for pretrial depositions generally

12   speaking and I think that's the benefit that the defendant

13   was getting in Lopinsky, Judge, and he wasn't getting it

14   here.  I think the two cases are distinguishable on those

15   fronts.

16             THE COURT:  If you have any other points to

17   make, go ahead and make them briefly.

18             MR. ROMERO:  No, Judge.

19             THE COURT:  All right.  Do you have --

20             MR. LANG:  We stand on Lopinsky and its

21   predecessor, Stewart, Judge, which is quoted there.  The

22   second prong of acceptance is showing remorse, tending to

23   reflect the crime.  He sat on the witness stand and lied.

24   He committed a new federal crime.  And certainly Lopinsky

25   addresses and is concerned with what the defendant's state

1  of mind is.  He tried to deceive this Court.

2         THE COURT:  Well, I have mixed emotions about

3  this one.  I do ultimately believe that Lopinsky is

4  controlling.  I don't think that there's anything about

5  the facts of this case that would materially distinguish

6  it from Lopinsky and for that reason I'm going to deny the

7  objection, but I want to talk about this for a minute for

8  purposes of the record.

9         What happened here was the defendant came into

10  court and pled guilty.  Later there is a motion to

11  withdraw filed and the focus of the hearing on that motion

12  when we got down to it, in part, was that he didn't

13  receive effective assistance of counsel and he should be

14  allowed to withdraw the plea and then put him in the same

15  position as anyone else who is exercising their right to

16  go to trial and let a jury or a judge decide the issue of

17  guilt or innocence after hearing the facts.

18         In that context, it's not -- I mean, I'm a

19  little bit troubled from a policy point of view of saying

20  that when someone says I want to take advantage of the

21  process to determine whether I'm guilty or innocent rather

22  than admitting it, the policy of saying that you can't do

23  that without giving up this acceptance of responsibility.

24  That bothers me to some extent.

25         MR. LANG:  Your Honor, can I --

1              THE COURT:  But of course it wasn't just that.

2     We do have the additional element of his committing

3     perjury.  But the perjury that I have made findings on

4     here today concerning the testimony that occurred at that

5     hearing, again, they all focused on whether or not he

6     should in effect be allowed to withdraw his plea as

7     opposed to something else.  I mean, he didn't really

8     withdraw from the admissions he made at the time that he

9     tendered his plea.  Counsel made a legal argument that

10    that admission did not constitute a crime, but he didn't

11    withdraw any of the admissions concerning the alleged

12    criminal conduct, at least as far as I remember.  So that

13    part of it bothers me a little bit.

14             But having said that, it does seem to me that,

15    number one, that case is controlling.  And, number two,

16    where you have a combination of not just procedural

17    attempt to withdraw a plea but also perjured testimony,

18    then it seems to me that it is the right result in any

19    event.

20             MR. LANG:  My only comment that I was going to

21    make, Judge, is that obviously the distinction is on

22    July 20 he filed a false affidavit.  And, as the Court has

23    recognized, if it was just a matter of withdrawing a plea,

24    I'm not so sure what our position would be, Judge.

25             THE COURT:  I know, but he didn't withdraw --

1    the point I'm trying to make for the record here is he

2    didn't withdraw any of the admissions that he made when he

3    tendered his plea as I recall it.

4              MR. LANG:  Right.  We didn't get into it.

5              THE COURT:  I understand that, but my point is

6    the focus of the affidavit and the --

7              MR. LANG:  I guess our position would be if a

8    defendant simply for legal technical reasons moves to

9    withdraw his plea, we're not sure whether that would --

10             THE COURT:  In any event, I've made my ruling.

11             MR. LANG:  I appreciate that.

12             THE COURT:  Now concerning objection number

13   three, as I understand it counsel is asking the Court to

14   depart downward from the guideline range for the reasons

15   stated in the objection.  Is that correct?

16             MR. ROMERO:  Yes, Your Honor.

17             THE COURT:  As I understand it, you do have

18   evidence to present on that point?

19             MR. ROMERO:  Yes, Your Honor.  Judge, just to

20   give the Court --

21             THE COURT:  I can't hear you.

22             MR. ROMERO:  To give the Court a sense of our

23   intentions, there are three people that we would like to

24   speak to Your Honor today, Mr. Peleti himself and a couple

25   of his colleagues from the military which do relate to the

1    departure -- I'm sorry -- the adjustment and also 3553

2    factors and perhaps, for efficiency sake, maybe I can do

3    the three witnesses now.

4            THE COURT:  Do the three witnesses now and then

5    I'll ultimately make a decision at the time I impose

6    sentence.  But certainly the other side will have an

7    opportunity to present evidence also.

8            MR. LANG:  Can I speak to Mr. Romero for just

9    one second?

10            THE COURT:  Sure.

11                (Discussion held off record )

12            MR. ROMERO:  Your Honor, what I would like to do

13    is call --

14            THE COURT:  Do you want to take a five minute

15    recess?

16            MR. ROMERO:  That would be great.

17            THE COURT:  Fine.  We'll take a five minute

18    recess.  One thing, counsel, before we break, I want to

19    make you aware I talked to the probation officer over the

20    last couple of days.  When I read the pre-sentence

21    carefully, I had some questions frankly about the

22    defendant's assets and monthly payments and I think she

23    provided you with some information that I'm just seeing

24    for the first time today, but I wanted to make you aware

25    of what my issue is there.

1          I'm looking at this document that's telling me

2    that he receives net pay of $3,842 every two weeks, which

3    would mean at least $7,684 a month.  That comes to, what,

4    over 90,000.  And yet if you look at his W-2 form from

5    2007, it only shows wages of $60,291, which is quite a

6    difference.

7          And then the third thing, which is really what

8    prompted my curiosity to begin with, is that I know how

9    much I pay on a mortgage per month based on my salary and,

10   frankly, I do not understand how he can pay the amount

11   that he's paying per month based on the salary that he's

12   got.  What's the total monthly payment on his mortgages?

13         PROBATION OFFICER:  Your Honor, that amount is

14   $4,357.

15         THE COURT:  So at some point I'm going to want

16   to address that.  Okay.  We'll be in recess for five

17   minutes.

18              (Recess taken)

19         THE COURT:  Okay.  Are we ready to proceed?

20         MR. ROMERO:  Yes, Your Honor.  With respect to

21   our request for the downward departure, the third issue,

22   we would submit on the papers and not have additional

23   evidence to bring before the Court.

24         The last thing I wanted to achieve was to give

25   the Court some information for the 3553 factors and I'm

1    inquiring of the Court, because I am not often in Your

2    Honor's court, as to whether or not the two folks from the

3    military who are going to provide some support for that

4    issue, whether you would like them to make a brief

5    statement -- they have prepared statements they would like

6    to make to the Court -- or whether or not we would like to

7    subject them to cross-examination.

8            THE COURT:  Well --

9            MR. LANG:  I can tell the Court I have read the

10   letters.  We certainly have no dispute with their

11   observations.  We would allow Mr. Romero to proffer their

12   testimony.  We recognize they're here.  We recognize that

13   in their dealings with Chief Peleti, it has been nothing

14   but positive, and in their view I understand they believe

15   that he's an outstanding soldier.

16           THE COURT:  Well, if that's the case, if they

17   want to make the statement themselves, I have no problem

18   with that.  I'll leave it up to you to decide that.

19           MR. ROMERO:  Yes, Your Honor.  I would like to

20   initially have Sergeant Major Clinton Ford approach the

21   lectern.

22           THE COURT:  If you're comfortable standing

23   there, that's fine.  If you feel more comfortable sitting

24   down, that's fine too.

25           MR. FORD:  This is fine, sir.  Good morning,

1    Your Honor.

2               THE COURT:  Good morning.

3               MR. FORD:  I'm Sergeant Major Clinton Ford.  I'm

4    currently assigned to the United States Army Special

5    Forces Command out of Fort Bragg and I worked with Chief

6    Peleti from 2000 to mid-2004 and I have known him for

7    approximately 15 years.

8               Chief Peleti, he has given exceptional service

9    to the U.S. Government.  If I hadn't known this, if I

10   hadn't known he was an exceptional soldier, I wouldn't

11   have gotten permission from my command to come up here,

12   drive 19 hours and, you know, pay for everything ourselves

13   just to attend this hearing, sir.

14              Chief Peleti constantly went above and beyond

15   the normal duty requirements of his job and positively

16   affected and improved thousands of soldiers' lives and

17   welfare and it was -- most of this was all behind the

18   scenes.  You know, food service job, you're not in the

19   line of a lot of things, but the persons in the trenches

20   are making things happen, bettering people's lives.  His

21   dedication, loyalty, and selfless service, he worked long

22   hours putting the mission first and his welfare second.

23              He was picked to fill the second ranking food

24   advisor spot in the elite 82nd Airborne Division and in

25   doing so Chief Peleti excelled every day on a demanding

1  job.  He didn't just do the status quo.  If he did, we

2  would have moved him out of the division.  We had no time

3  for personnel who just wanted to do their job.  Chief

4  Peleti was a stellar performer and an individual that

5  everybody could count on and he definitely did not have a

6  9:00 to 5:00 job.  Some people think, you know, food

7  advisor, you think that's behind a desk somewhere and that

8  wasn't the case.

9        He was responsible for food service support for

10 over a third of the 82nd Airborne Division, which is

11 roughly 5,000 paratroopers.  He oversaw feeding operations

12 3 meals a day, 7 days a week.  He frequently had at least

13 one unit in the field.  You know, one of his units was

14 always on something we called mission cycle, where at any

15 time you would be called in the middle of the night.

16 Within two hours, hundred percent personnel needed to get

17 our bag and baggage and equipment and load on planes and

18 within 18 hours you're wheels up going somewhere.  You

19 know, when something like that happens, we don't know if

20 we're going up in the air to jump or actually going to

21 war, but we had to stay prepared and ready all the time.

22       And, you know, in that respect, if we did have

23 an exercise like that, no matter what unit got called out,

24 normally it was his DISCOM units that was supporting it

25 and, you know, within a certain amount of time the

1    soldiers had to be fed every six hours and he was

2    proactive and he made it happen every time that it did

3    occur.  He would go above and beyond the command's intent

4    and enforce regulatory guidance.

5            Chief Peleti was a go-to guy in garrison.  And

6    that's what I mean.  We're not in the field.  When we were

7    out in the fort itself, you know, he was supportive to

8    subordinates and superiors.  You know, he would help

9    anybody out if anybody had any questions for anything.

10   And he was also an expert when he went to field.  So when

11   he went to the woods or on deployment, he was the food

12   advisor.  He was the man with the answers in the woods.

13   It could be a task force of 3500 people or division minus,

14   which would be about 6,000 people, or even in theater such

15   in Kuwait or Iraq.  He got nothing but laudatory remarks

16   for his efforts.

17           And after brigade size exercise -- like we would

18   go to Fort Polk and Fort Irwin, California for a month

19   long exercise, deploy.  You know, he'd go there and upon

20   completion come back and then the next brigade food

21   advisor would be going and he would go down to that

22   individual's office and, you know, go over the pros and

23   cons, see how we can better support the soldiers.

24           Then we also shared information on a monthly --

25   we had mandatory monthly service meetings where all the

1    food service personnel E7 and above would show up and he

2    would debrief them and he would share his knowledge to

3    help improve the food program.

4         He would be out in his units, as far as being at

5    field sites, consistently checking out the units,

6    mentoring soldiers, planning logistics for the next FDX

7    even though it might -- even though it meant staying up

8    late at night and working on weekends.  You know, it

9    didn't matter.  If he had to work the extra hours, he

10   would work the extra hours.  He always stayed on top of

11   every issue.  If he said he got it, he had it.  You didn't

12   have to go back and double-check on him.  Part of our job,

13   being the next level above him, we wouldn't have to go

14   down and check his units to make sure he was doing what he

15   was supposed to.  You know, if we had issues going on and

16   he said, "I got it", that's one thing we didn't have to

17   worry about.  We could go on and work on other issues to

18   better the Food Service Program.  And then if he was

19   working on something, he would always come back and give

20   us feedback, let us know where he was going until the

21   mission was complete.  Like I said, to be honest, he made

22   our job a lot easier and also gave his command time to

23   concentrate on their other issues.  They didn't have to

24   worry about the food service factor in there.

25        But as I said in my letter, being in food

 1  service, especially in the 82nd, is a lot of hard work.

 2  It's not uncommon when food service personnel get a PCS,

 3  permanent change of station, you know, you're sent away

 4  from the division.  And a lot of times when they do,

 5  they'll go on terminate, in other words get off jump

 6  status so you won't get sent back to the 82nd because of

 7  the hard work, dedication and discipline.  You have to go

 8  above and beyond to be in this unit.  And for all that we

 9  did in the division and still do in the division, it has

10  to be right.  No gray.  It has to be black and white.  No

11  gray areas.  Because if you do, there's a good chance

12  someone will get killed or someone will get hurt.  If you

13  mess up on airborne operations, there's no time for

14  errors.  You have to do what is correct all the time.

15          So, Your Honor, Chief Peleti is one of the most

16  dedicated, loyal and hard-working professionals that I've

17  worked with in my military career and I wouldn't be

18  standing in front of you today if I didn't believe so.

19  Subject to your questions, sir.

20          THE COURT:  No, I have no questions, but thank

21  you very much for coming.

22          MR. LANG:  Your Honor, I couldn't recall if he

23  was sworn.  I've got to ask a couple of questions if I

24  can.

25          THE COURT:  All right.  Do you have any

1    objection to this?

2              MR. FORD:  No, sir.

3                        **CLINTON FORD,**

4    Having been first duly sworn, was examined and

5    testified under oath as follows:

6                    **CROSS EXAMINATION**

7    BY MR. LANG:

8    Q    I believe you testified that you knew Chief Peleti or

9    worked with him through about 2004; is that correct?

10   A    Yes, sir.

11   Q    Did you have contact with him in 2003 when he was in

12   Camp Fallujah in Iraq?

13   A    Not that I'm aware of, no, sir, because they were

14   deployed.  When they were deployed forward, we wouldn't

15   get too much communication from them.

16   Q    Were you in Camp Fallujah in 2003?

17   A    No, sir.

18   Q    Do you know whether or not Chief Peleti was accepting

19   gifts and things of value from a company called ESS at

20   Camp Fallujah in 2003?

21   A    No, sir.

22   Q    All right.  In your line of work, is accepting gifts

23   and things of value from vendors proper under U.S. Army

24   laws and regulations?

25   A    No, sir.  Well, there is an ethics clause where I

1  think -- I have to check the regulation.  I think you can

2  get like $30, gifts totaling $30 throughout a whole year

3  period.

4  Q    Well, a $300 gift, is that improper for a soldier to

5  accept who was in food service and dealing with vendors?

6  A    Yes, I believe so, sir.

7  Q    It's not acceptable or it is?

8  A    No, sir.

9  Q    How about the use of a SUV vehicle to drive around

10  provided by a vendor?  Is that proper?

11  A    Not that I'm -- well, no, unless it was in the

12  contract.  If it was part of the contract and the vendor

13  was supposed to provide it, yes.

14  Q    Let me ask you if ESS came up to you and said, "Here,

15  I'll give you keys to an SUV to drive while you're over

16  here to make life easier for you", would that be proper or

17  not?

18  A    Not that I'm aware of.  Like I said, I would have to

19  check to see what the contract says.

20  Q    But if you were making recommendations concerning ESS

21  and someone from ESS came up to you and said, "Here, let's

22  make things easier for you, let me give you keys to an SUV

23  to drive while you're here", would that be proper?

24              MR. ROMERO:  Objection, beyond the scope, 403.

25              THE COURT:  I think it is beyond the scope.

1           MR. LANG:  I'll leave it at that.  Thank you.

2           THE COURT:  Do you have any questions you want

3    to ask?

4           MR. ROMERO:  No, Judge.

5           THE COURT:  Thank you very much.  You may step

6    down.  Do you have another witness?

7           MR. ROMERO:  Yes, Your Honor.  I would like to

8    at this time call CW5 Michael Gillis in support of

9    Mr. Peleti.

10                      **MICHAEL GILLIS,**

11   Having been first duly sworn, testified under oath

12   as follows:

13          THE COURT:  CW means Chief Warrant Officer?

14          MR. GILLIS:  Yes.

15          THE COURT:  Go ahead.

16          MR. GILLIS:  Good morning, Your Honor.  I'm CW5

17   Michael Gillis and I currently am assigned to the U.S.

18   Army Special Operations Command based at Fort Bragg, North

19   Carolina.  Forgive me if I'm reading this.  I couldn't

20   remember everything that I wrote down here.

21          I want to thank you for allowing me to appear

22   before you and your Court on behalf of CW3 Peleti and

23   enjoy the hospitality of your fine town and especially its

24   new coat of snow.  My purpose here is to speak on behalf

25   of the defendant's character during my close association

1   with him from July of 2001 to August 2003 while together

2   in the 82nd Airborne Division.

3          In my three plus decades of soldiering, only a

4   few have habitually committed to going above and beyond

5   the call of duty and I take personal responsibility for

6   ensuring that within our division that we had the best.

7   That was because our division had worldwide,

8   no-notice-response mission to all contingencies, both

9   domestic and foreign.  Remaining in our unit required

10  dedication, steadfastness and endurance because workloads,

11  especially in our field, seemed never ending and was

12  always demanding.

13         You can imagine feeding over 14,000 soldiers

14  three meals a day, 365 days a year is no small task or

15  seeing to the provision of safe facilities, good

16  equipment, trained personnel and adequate subsistence that

17  are all a part of preparing, cooking and serving those

18  meals to standard.

19         The fact that Chief Peleti had responsibility of

20  the majority of the division's missions was not merely by

21  chance.  It was, however, by careful selection.  He proved

22  to be one of our strongest leaders in the food service

23  field with a mission first, can do attitude of seeing to

24  the basic life support of our soldiers.

25         As second most important food service warrant

1  officer position in the division, all actions executed by

2  him and through him were on time and on target every time.

3  All phases of planning and preparation for each action was

4  flawless.  Out of that came earned trust and confidence of

5  his superiors, peers and subordinates that all missions

6  given to him would be accomplished dutifully.

7         In the aftermath of the fateful day in

8  September 2001, all Army units were called to full alert.

9  The 82nd had the lead mission.  We needed to ensure that

10 each food service element deployed had all the tools and

11 resources to perform their mission once on the ground in

12 their area of operation.  CW3 Peleti was the lead in

13 providing any and all assistance required by that

14 deploying brigade food advisor.  Without fail, he

15 accomplished each task and we had no worry when we had

16 wheels up, flying away into combat.

17        This proved only the beginning for him.  As time

18 went on, he was called to prepare numerous unit food

19 service sections, personnel and equipment, to include

20 himself, for deployment.  This he did through several

21 major field training exercises and finally going to war.

22 Soldier, yes, in the strongest sense, but any sacrifice

23 comes with a price.  For CW3 Peleti, it was the loss of

24 his family, yet he had a mission as a soldier and he was

25 called to put that first.  Fortunately, after some time,

1  his family life healed.

2          Sir, I could go on all day about this soldier's

3  abilities and accomplishments, but I do not need to do

4  that.  The badges of achievement and courage decorating

5  his chest attest to that.  I do invite, however, your

6  attention to one that stands out above the others and that

7  is the badge of master parachutist, jump master as we have

8  fondly called it.  To a paratrooper, it represents one who

9  has been directly entrusted with the welfare and safety of

10  thousands of soldiers during combat operations.  For that,

11  one must have a working knowledge of several types of

12  aircraft, parachutes, individual military equipment and

13  jumper responsibilities to say the least.  This soldier

14  earned that right to wear that.

15          In summation, Your Honor, there are but a few to

16  whom I would entrust the protection of my country and its

17  constitution.  CW3 Peleti Peleti, Jr. is one of them.  I

18  have in the past and would now place my life in his hands.

19  If I did not believe this to be true, in all good

20  conscience I would not be standing here in front of you

21  today.  Thank you, sir, for your time and your attention

22  and I'm subject to your questions.

23          THE COURT:  Thank you.  Do you have any

24  questions?

25          MR. LANG:  No questions.

1              THE COURT:  Any questions?

2              MR. ROMERO:  No, Your Honor.

3              THE COURT:  All right.  Thank you very much for

4      being here.  Thank you.

5              Let me ask counsel, other than the issues that

6      we've already addressed, is there anything else in the

7      report that, after discussion with your client, that you

8      feel is inaccurate or incomplete that you wish to

9      challenge?

10             MR. ROMERO:  Not at this time, Your Honor.

11             THE COURT:  Pardon?

12             MR. ROMERO:  Not at this time.

13             THE COURT:  Thank you.  Sergeant Peleti, have

14     you had a reasonable opportunity to read this report and

15     review it with your attorneys?

16             MR. PELETI:  Yes, Your Honor.

17             THE COURT:  Based on your reading and review,

18     other than the matters that we've already addressed -- and

19     I've ruled on two of them and the third matter I will be

20     ruling on -- other than those three issues, is there

21     anything else in the report that you feel is inaccurate or

22     incomplete that you wish to challenge?

23             MR. PELETI:  Your Honor, not at this time.

24             THE COURT:  Do you understand -- and we've

25     already seen some of this, but do you understand you have

1    the opportunity to present evidence in mitigation?  You

2    also have the right to make a statement to the Court on

3    your own behalf before I impose sentence.  Do you

4    understand?

5                MR. PELETI:  Yes, Your Honor.

6                THE COURT:  I might add in respect to evidence

7    that the sentencing memorandum that was filed by the

8    defense contains one, two, three, four, five letters of

9    support.  I have read those and they will be -- actually,

10   I think they're already part of the public record in this

11   case.  Does the Government have any additional evidence to

12   present?

13               MR. LANG:  Yes, one witness, Judge.

14               THE COURT:  Okay.

15               MR. LANG:  I call Special Agent Bishop.

16               MR. ROMERO:  Judge, the defendant would

17   respectfully request an offer of proof.

18               THE COURT:  I'm sorry?

19               MR. ROMERO:  The defense would respectfully

20   request an offer of proof.

21               THE COURT:  I'm not sure why we would do that.

22               MR. ROMERO:  Well, because I'm not absolutely

23   clear as to what this witness will testify to and as to

24   what legal issue is before the Court and, more

25   importantly, I am informed and believe that his testimony

1    will not be competent as it will be based upon multiple

2    layers of hearsay.

3              THE COURT:  Well, I think the fastest way to do

4    this is to just have him take the stand and testify.  If

5    you have objections to make, then make those objection

6    when we get to that point.  Swear the witness, please.

7                          **MICHAEL BISHOP,**

8    Having been first duly sworn, was examined and

9    testified under oath as follows:

10                      **DIRECT EXAMINATION**

11   BY MR. LANG:

12   Q    Could you please state your name and spell your last

13   name?

14   A    Michael T. Bishop.  B-I-S-H-O-P.

15   Q    How are you employed?

16   A    I'm a special agent with the Defense Criminal

17   Investigative Service, Rock Island post duty.

18   Q    How many years of law enforcement do you have?

19   A    Thirteen.

20   Q    And are you the case agent concerning the defendant

21   Peleti here?

22   A    Yes, I am.

23   Q    Have you conducted an investigation personally in

24   this case?

25   A    Yes, I have.

1   Q    Did you interview the defendant on July 25, 2006?

2   A    Yes, I did.

3   Q    And where was that?

4   A    Hawaii.  Schofield Barracks, Hawaii, at the CID

5   office.

6   Q    Were you by yourself or with another agent?

7   A    I was with Agent Joe St. Amat of the U.S. Army

8   Criminal Investigation Command, later the Defense Criminal

9   Investigative Service.

10  Q    Before you spoke with CW3 Peleti, did you advise him

11  of anything?

12  A    Yes.  We advised him of his Article 31 rights, which

13  is the military equivalent of Miranda.

14  Q    During your interview of him, did he admit personally

15  to you any receipt of anything of value while he was

16  stationed at Camp Fallujah, Iraq in or about 2003?

17  A    Yes, he did.

18  Q    Could you tell the Court what he acknowledged having

19  received from vendors?

20  A    Yes.  He acknowledged receiving from Roger Stringer

21  of ESS, a vendor, $300 in personal gifts, an SUV to use

22  while he was over there and $500 in souvenirs.

23  Q    Now --

24           THE COURT:  I'm sorry.  $500 in what?

25  A    In souvenirs, Your Honor.

1    Q     What is ESS?

2    A     It's a vendor, food vendor that does business with

3    the U.S. Army in Iraq.  I think it's a British company.

4    Q     Does ESS -- or did ESS at the time either hold or was

5    competing for contracts with the U.S. Army?

6               MR. ROMERO:  Objection.  Calls for speculation,

7    lack of foundation.

8               THE COURT:  I'm sorry?

9               MR. ROMERO:  Calls for speculation, lack of

10   foundation.

11              THE COURT:  Well, he can answer it "yes" or

12   "no".  But then if the answer is "yes", then he'll have to

13   tell us what his source of information is.

14   A     Yes.

15   Q     How do you know that?

16   A     Peleti told us.

17   Q     All right.  What did Peleti say about the business

18   between ESS and the Army?

19   A     He said they were competing for contracts for food

20   service.

21   Q     Did Peleti say why he received these items from ESS?

22   A     Yes.  He said that they were basically to help

23   influence contracts.

24   Q     I'm sorry?

25   A     For the influence on contracts.

1          MR. ROMERO:  Objection.  Speculation, form of

2    the answer.  The witness said "basically".  I think it's

3    improper hearsay.

4          THE COURT:  Well, it's not hearsay if it's an

5    admission by the defendant himself, but you may be correct

6    in one sense.  I don't want the witness at this point to

7    characterize what the defendant supposedly said.  I want

8    him to tell us as well as he can remember what the

9    defendant said.

10   Q    Could you answer that more specifically?  What did

11   Peleti say to you about why he received these items?

12   A    He said that ESS was trying to garner influence with

13   him.

14   Q    All right.  Now based on what Mr. Peleti told you --

15   strike that.  Are you familiar with Army regulations and

16   laws concerning the acceptance of things of value from

17   vendors with which Army personnel are doing business?

18   A    Yes, I am.

19   Q    How are you familiar with that?

20   A    I was in the Army for nine years myself.  As an

21   agent, I have investigated issues of unauthorized

22   acceptance of gratuities, bribes, kickbacks.  I have

23   received yearly training on that as part of our ongoing

24   training.  As part of the U.S. Government, we are required

25   to go online and do training as far as those issues.

1    Q    Based on all of that, do you know whether Peleti's

2    acceptance of $300 in gifts from ESS, the use of an SUV

3    while he was -- owned by or acquired by ESS for Peleti's

4    use while he was at Fallujah, Camp Fallujah, and $500 in

5    souvenirs was proper or improper under Army laws and

6    regulations?

7              MR. ROMERO:  Objection.  Assumes facts not in

8    evidence and is compound.

9              THE COURT:  Is what?

10             MR. ROMERO:  Compound.

11             THE COURT:  And what?

12             MR. ROMERO:  Compound.

13             THE COURT:  Well, as I understand it, you're

14   really asking him for a legal opinion.

15             MR. LANG:  I'm asking for an opinion as to what

16   he knows based on his experience.

17             THE COURT:  Do you have the regulations?

18             MR. LANG:  I don't have the regulations.  Is it

19   your understanding -- can I ask this, Judge?  Is it your

20   understanding that that constituted a violation of Army

21   laws and regulations?

22             MR. ROMERO:  Objection.  Calls for a legal

23   conclusion.

24             THE COURT:  It does.  Is there any dispute about

25   this?  Is there any dispute about this?  I mean --

```
 1              MR. ROMERO:  No, Judge.  It's relevance and --
 2              THE COURT:  Well, it's obviously relevant on the
 3      issue of sentencing.  I mean, we can --
 4   BY MR. LANG:
 5   Q    Let me -- did Mr. Peleti say anything about whether
 6   it was proper or improper for him to have accepted these
 7   items from ESS?
 8   A    He said it was improper.
 9   Q    Did he say anything else about the propriety?
10   A    Not about ESS.  He said about other issues.
11   Q    All right.  Let's move on.  When you spoke with
12   Mr. Peleti on July 25, 2007 in Hawaii -- or, I'm sorry,
13   2006 in Hawaii, did he say anything else about having
14   received anything of value from other vendors?
15   A    Yes, he did.
16   Q    What did he say?
17   A    He said that he received dinners from Shabbir Khan,
18   the operating director for Tamimi for Kuwait and Iraq.  He
19   also said that he exchanged money with Shabbir Khan, 800
20   U.S. dollars for 18,000 Iraqi dinars.  He also said that
21   he went to what was commonly referred to as the Tamimi
22   party house against military regulations where he again
23   violated a general order from the command there to engage
24   in alcoholic beverages which is against military orders.
25   Q    So did Mr. Peleti acknowledge that going to this
```

1    party house was against military rules?

2    A    Yes, he did.

3    Q    And what did he say about that?

4    A    He said that it was a general order that he was not

5    allowed to do it and he shouldn't have gone.

6    Q    Do you know who Shabbir Khan is?

7    A    Yes, I do.

8    Q    Who is Shabbir Khan?

9    A    As I said, he's the operating director of -- or was

10   the operating director for Tamimi for, I think, Kuwait and

11   Iraq and he is currently in prison.

12   Q    In prison in the United States?

13   A    Yes.

14   Q    For what charges?

15   A    He accepted a kickback and -- or was giving

16   kickbacks, I should say, to various U.S. persons.  I

17   didn't work that particular case.

18   Q    All right.  Could you describe what you know of the

19   Tamimi party house?

20   A    Yes.  The Tamimi party house was a villa that Tamimi

21   had the lease on or rented in Kuwait and what would be

22   allowed there is various U.S. personnel, against

23   regulations, would come over, engage in alcohol, there's

24   evidence of drug use, allegations of prostitution, stuff

25   like that, based on the --

 1              MR. ROMERO:  Objection, ask to strike that
 2    response as speculative.
 3    Q    How do you know that?
 4              THE COURT:  Well, the objection is overruled,
 5    but you must lay a foundation.
 6    Q    Yes.  How do you know what you just told the Court
 7    about the Tamimi party house?
 8    A    Interviews of approximately 20 witnesses or so during
 9    the course of our investigations.
10    Q    Are those witnesses who have been personally at the
11    party house?
12    A    Yes.
13              MR. ROMERO:  Renew my objection on hearsay
14    grounds.
15              THE COURT:  The objection is overruled.  Hearsay
16    is allowed at a hearing like this.  I realize that an item
17    of evidence that is presented which is hearsay obviously
18    doesn't necessarily have the same weight as other evidence
19    presented, but I think the law is pretty clear that it is
20    allowed.  Go ahead.
21    Q    When Mr. Peleti admitted to you that he had been to
22    the party house, what was the time frame that he was
23    talking about?
24    A    2005.
25    Q    Did Mr. Peleti tell you how many times he had visited

1  the party house or give you any indication of how regular

2  it was?

3  A    He did not give me a specific number.  We asked him

4  for that and he was not able to provide that.  He said it

5  was several times, but no specific number.

6  Q    Did Mr. Peleti say anything about whether this was

7  proper under military rules?

8  A    He admitted that it was improper.

9  Q    Did Mr. Peleti when you interviewed him on July 25,

10  2006 acknowledge any impropriety with a company called

11  PWC?

12  A    Yes, he did.

13  Q    What did he say?

14  A    He said that he had a personal relationship with one

15  of the officers of PWC or a Dan Crighton and that he and

16  Dan Crighton routinely would exchange gifts which is

17  improper under the aforementioned military regulations

18  regarding the receipt of gifts.

19         MR. ROMERO:  Objection, move to strike on

20  vagueness grounds.

21         THE COURT:  Overruled.

22  Q    Did you conduct an investigation based on this

23  information from Mr. Peleti as to other improprieties that

24  Mr. Peleti may have engaged in with other vendors?

25  A    Yes, I did.

1    Q    How did you go about doing that?

2    A    Based on the statement, we went and located witnesses

3    or individuals he named in the statement to corroborate

4    the information he provided.

5    Q    Did you interview anyone in connection with other

6    activities with Tamimi and Shabbir Khan that Mr. Peleti

7    had engaged in?

8    A    Yes, we did.

9    Q    And generally who did you interview?

10   A    We interviewed Peleti's ex-girlfriend at the time.

11            MR. LANG:  Unless there's a reason to name

12   names, the defense has the report, we'll stick with

13   girlfriend.  Is that okay?

14            THE COURT:  I'll leave that up to them.  If they

15   want her name in the record --

16            MR. LANG:  They have the report.

17   Q    You interviewed his girlfriend at the time -- or who

18   was his girlfriend at the time?

19   A    Yes, we did.

20   Q    And, again, what was the time frame of that?

21   A    The time frame of the interview or the time frame of

22   the relationship?

23   Q    The relationship.

24   A    It was approximately January of '05 through August of

25   '05.

1   Q    When did you interview the girlfriend?

2   A    I interviewed her in fall of 2007.  October of 2007.

3   Q    Did you --

4        THE COURT:  By the way, we'll show a continuing

5   objection of hearsay on this.  Go ahead.

6   Q    Did you personally participate in that interview?

7   A    Yes, I did.  I need to back up.  I'm not for certain

8   of the exact date of the interview with her.  It was in

9   '07.  I think I said October and I don't think that's

10  actually accurate.

11  Q    Late October or late 2007 you interviewed her?

12  A    That's correct.

13  Q    What did she say about the relationship between her

14  and Mr. Peleti?

15       THE COURT:  Can I interrupt for one second here?

16  Do I understand correctly this information that he's

17  testifying about was provided as part of the discovery in

18  the case?

19       MR. ROMERO:  Yes.

20       THE COURT:  Thank you.

21  Q    What did she say about the relationship with

22  Mr. Peleti?

23  A    She said against military regulations, she and

24  Mr. Peleti engaged in a consensual adult sexual

25  relationship which was a violation of the Uniform Code Of

1   Military Justice.

2   Q    What was the time period of this relationship?

3   A    January of '05 through August of '05.

4   Q    About seven months?

5   A    Yes, sir, about eight months.

6   Q    Did she say anything about contact with Tamimi Global

7   Company --

8   A    Yes, she did.

9   Q    -- in connection with her relationship with

10  Mr. Peleti?

11  A    Yes, she did.

12  Q    What did she say to you about that?

13  A    She said that she and Peleti would regularly attend

14  the party house where they, again against military

15  regulations, would engage in alcohol, they had sexual

16  relations in the party house, would stay there weekends in

17  the party house, personally spent time with Shabbir Khan

18  inside the party house.

19  Q    Did she say anything about Mr. Peleti obtaining

20  anything of value from Tamimi Global at the time?

21  A    She said that she recalled that after she had left

22  the military, because she redeployed earlier than he did,

23  he offered her a job -- or Tamimi offered her a job in

24  exchange or to try to garner favor with Peleti.

25  Q    How did she know that Peleti had anything to do with

1    Tamimi offering her a job?

2    A     Shabbir Khan wouldn't even talk to her at first until

3    she was known to be a close personal friend or a

4    relationship with Peleti.  Then when she left, Peleti --

5    according to her, Peleti used his influence to have

6    Shabbir Khan offer her a job and then they flew her back.

7    Q     She --

8              MR. ROMERO:  Objection.  Move to strike the

9    response.

10             THE COURT:  I'm sorry?

11             MR. ROMERO:  Move to strike the witness'

12   testimony as respects to the hearsay declarant's opinion

13   of what my client may have done, unknown specified time.

14   It's vague.  It's speculative.  It's 403.

15   Q     Stick with exactly what she said.  Did she --

16             THE COURT:  Just a moment.  The objection is

17   overruled.  But, I agree, you should stick to what she

18   said.  Don't characterize it.

19   Q     Did she say that Peleti told her that he had gotten a

20   job for her with Tamimi?

21   A     She didn't say that Peleti told her that he got her a

22   job.  She said that Peleti used his influence with Shabbir

23   Khan to get her basically a job or to help her get a job

24   with Tamimi.

25             MR. ROMERO:  Objection.  Speculative, calls

1    for -- lack of foundation.  Move to strike.

2          THE COURT:  Sustained if that's the whole

3    foundation.  There may be some other facts that you can

4    bring out, but --

5    Q    Did she say how she knew about that?

6    A    Yes.

7    Q    How did she know about that?

8    A    She basically --

9    Q    What did she say?

10   A    Again, sir, she said that Peleti used his influence

11   with Shabbir Khan to arrange for her to have a job with

12   Tamimi.

13         MR. ROMERO:  Same objection.  Move to strike

14   also as nonresponsive.

15         THE COURT:  Well, same ruling unless there's

16   something else.

17   Q    I'll move on.  Did she say whether she took a job

18   with Tamimi?

19   A    She said that Tamimi flew her over to Iraq -- to

20   Kuwait where they put her up in the party house for

21   approximately a month.  They offered her a job which she

22   turned down as her relationship with Peleti soured and she

23   decided it wasn't worth personally being in Iraq.

24   Q    Let me ask you this.  Before she took this job, had

25   she gone to Shabbir Khan and said, "I would like a job"?

1    A    She did not go to Shabbir Khan and say, "I would like

2    a job", but she did provide her resume to Shabbir Khan.

3    Q    Was Peleti present at the time?

4    A    I don't know, sir.

5    Q    Did she say whether she and Peleti were together at

6    the party house after she got the job?

7    A    Yes.  He would come over -- according to her

8    testimony, he would come over approximately twice a week

9    and they would spend the night at the party house

10   together.

11   Q    What did she say about what Peleti told her about the

12   relationship between Tamimi and Shabbir Khan and Peleti?

13   A    She said that Tamimi and -- or Shabbir Khan and

14   Peleti were close, that he again was trying to influence

15   him.

16           MR. ROMERO:  Objection.  Calls for speculation.

17           THE COURT:  Sustained.

18   Q    Did she -- you said that she flew to Kuwait for this

19   job and to be there?

20   A    Yes.

21   Q    And that Tamimi paid for the air fare?

22   A    That's correct.

23           MR. ROMERO:  Judge, may I lodge an objection on

24   cumulative and undue consumption of time.  I think we're

25   kind of far out as to the probative value at this point.

1           THE COURT:  Yes.  That objection is overruled.

2    Q    I guess I forgot the question, but --

3           THE COURT:  Something about her air fare.

4    Q    How were those arrangements for the air fare made

5    between her and Shabbir Khan or others?

6    A    She did not elaborate.  She said simply that the

7    plane ticket was prepaid for by Tamimi.

8    Q    Have you investigated whether or not the defendant,

9    Mr. Peleti, attended the Super Bowl in Detroit, Michigan

10   in early 2006?

11   A    Yes.

12   Q    What have you determined?

13   A    That he attended the Super Bowl in 2006 and that the

14   tickets were paid for or allegedly paid for by PWC.

15           MR. ROMERO:  Objection.  Calls for speculation.

16           THE COURT:  I don't know if it does or not.

17   Q    How do you know that?

18           THE COURT:  I'm sorry.  Who supposedly paid for

19   the tickets?

20   A    PWC.

21           THE COURT:  TWC?

22   A    PWC.

23           THE COURT:  PWC.  A company?

24   A    Yes, sir.

25

BY MR. LANG:

Q    What is PWC?

A    It's the prime food vendor for all of the Middle East
for the U.S. Army.

Q    How do you know that?

A    Peleti told us in the first interviews, but we also
know it from our investigation.  We have ongoing
investigations.

Q    Have you interviewed anyone in connection with
Mr. Peleti's attendance at the Super Bowl in 2006?

A    Yes.

Q    Who have you interviewed?

A    We interviewed Miss Karen Olstadt.

Q    You'll have to spell that.

A    O-L-S-T-A-D -- and there might be a T at the end.  I
would have to see the report.

Q    Who was Karen Olstadt?

A    She was a DLA representative who served with Peleti
over there.

        THE COURT:  I'm sorry.  DL what?

A    Defense Logistics Agency, Your Honor.  She served
over there with Peleti in Kuwait in August of '04 and
later on in '05.

Q    When did you interview her?

A    We interviewed her in October of '06.

1    Q    What did she say she knew about Peleti going to the

2    Super Bowl in 2006?

3    A    She said Peleti -- she knew that Peleti went to the

4    Super Bowl, that he had told her -- or she had -- she knew

5    that he had invited a Major Teich to the supper bowl, that

6    Teich did not go but that a Major Beckway (phonetic) went

7    to the Super Bowl with Peleti in 2006.

8    Q    How did she know that?

9    A    She said that was based on conversations with Peleti

10   and Teich.

11   Q    So Peleti told her?

12   A    I don't know if he told her specifically the Super

13   Bowl.  I know she said that she talked to Peleti and Teich

14   about it and that they -- they told her they went to the

15   Super Bowl.  She didn't say specifically "Peleti told me"

16   or "Teich told me".

17   Q    Did she say anything about how Peleti got to and from

18   Detroit for the Super Bowl?

19   A    She said that it was her understanding the tickets

20   were paid for by PWC.

21              MR. ROMERO:  Move to strike.

22   Q    Did she say how --

23              THE COURT:  Overruled.

24   Q    Did she say how she knew that?

25   A    She said that Teich told her that PWC paid for the

 1  | tickets.
 2  |         THE COURT:  I'm sorry.  I can't hear you.
 3  | A    She said that Teich told her that PWC paid for the
 4  | tickets or was going to pay for the tickets.
 5  |         THE COURT:  I'm going to continue to overrule
 6  | the objection, but again now we have hearsay on hearsay
 7  | and the value of that is diminished.
 8  |         MR. LANG:  I'm done, Judge.  I have no other
 9  | questions.
10  |         THE COURT:  Thank you.  Do you have any
11  | questions you want to ask?
12  |         MR. ROMERO:  Briefly, Your Honor.
13  |         THE COURT:  Before I forget it, there was one I
14  | had.
15  |                   **E X A M I N A T I O N**
16  | BY THE COURT:
17  | Q    You were talking about -- was it Shabbir Khan,
18  | something like that?
19  | A    Yes, Your Honor.
20  | Q    One of the items you mentioned was an exchange of
21  | money.  I read about that somewhere.  I don't remember.
22  | My recollection is that Sergeant Peleti believed that he
23  | ended up basically being taken advantage of in that?
24  | A    No, Your Honor.
25  | Q    Am I misremembering that?

1    A    That's incorrect, Your Honor.  He actually stated in

2    his statement that he took advantage of Shabbir Khan

3    because he knew that he was giving him the equivalent of

4    pennies on the dollar.

5    Q    The equivalent of what?

6    A    I would say the equivalent of pennies on the dollar.

7    That's my characterization.

8    Q    How much?

9    A    He said he gave him $800 in exchange for 18,000 Iraqi

10   dinars.

11   Q    And 18,000 dinars would be worth how much?

12   A    I have no idea, Your Honor, but he in his statement

13   characterized it as that he was taking advantage of

14   Tamimi.

15            THE COURT:  Go ahead and ask your questions.

16                        **CROSS EXAMINATION**

17   BY MR. ROMERO:

18   Q    Mr. Bishop, you read Mr. Peleti's grand jury

19   testimony?

20   A    No, I have not.

21   Q    Have you personally looked at the exchange rate for

22   dinars?

23   A    No.

24   Q    You met with Mr. Peleti for the first time on

25   August 26, correct?

1    A    No.  I met with him when we did the interview in

2    Hawaii, which was I think July if I'm not mistaken.

3    Q    When was the next meeting with him?

4    A    When he flew back here in the summer of '06 to meet

5    with us after meeting with his attorney.

6    Q    Do you know -- do you recall how long you met with

7    him on that date?

8    A    We met with him approximately a few hours the first

9    day, although we didn't really get into the heart of the

10   matter.  The first few hours was more legal exchanges

11   between the attorneys and such with Peleti and his

12   attorney present.

13   Q    After meeting with him for several hours on this

14   date, do you recall when you met with him next?

15   A    It was the next day.  He was here basically a couple

16   of days to assist in trying to do some consensually

17   monitored phone calls to other targets.

18   Q    So you met with him over the next two days or three

19   days or four days?

20   A    There was a weekend break in there.  I would have to

21   see the report for the exact dates.  But he was here for a

22   couple of days.  He met with his attorney almost an entire

23   day.  Then he met with us.  Then we started doing

24   consensually monitored phone calls.  Then we had a break

25   with the weekend and then I think there was another day or

1    half day that we put in.  Again, I would have to see the

2    report for the exact days.

3    Q    When you say -- when you testified that he met with

4    his attorney for almost the entire day, I'm having an

5    image of him being with his attorney for most of the day.

6    Is that what you're telling us?

7    A    I wasn't personally there, but we had an appointment

8    and I know the appointment was delayed so Peleti and his

9    attorney could go in and talk and meet and stuff like

10    that.  We were actually supposed to meet, I think,

11    somewhere around lunch time and we didn't meet until late

12    afternoon.

13    Q    When you met with him over the course of the next few

14    days, understanding there was a weekend break, these were

15    full day sessions you had with Mr. Peleti?

16    A    No, they weren't really full day sessions.  They were

17    maybe three or four days.  There was usually a large lunch

18    break involved.  They usually didn't get there until late

19    in the morning and left somewhere in the middle of the

20    afternoon.

21    Q    And at some point you let him know you were done with

22    that debriefing and then he goes back to Hawaii

23    presumably?

24    A    That's correct.

25    Q    Then you meet with him again?

1    A    Correct.

2    Q    When do you meet with him again?

3    A    Again, I don't remember without the report to be

4    honest with you.  I know we met to do some more

5    operations.  Again, we were trying to use him for

6    consensually monitored phone calls, but I don't remember

7    the dates without the report.

8    Q    Then you continued to meet with him after the plea,

9    correct?

10    A    After the plea?

11    Q    Uh-huh.

12    A    After he pled guilty?

13    Q    Correct.

14    A    No.

15    Q    Your testimony is that you did not meet with him

16    after the plea?  Just so I'm clear.

17    A    We had a post-plea interview and I think that was it

18    after the plea with his attorney present and I think that

19    was it.

20    Q    When you were in the military, did you ever have

21    occasion to receive a gift from someone, a nominal gift?

22    A    Yes.

23    Q    For example?

24    A    The exact details of the operation are classified,

25    but just say that I had locals trying to give me gifts.

1   Q    In your report, you talked about gifts that

2   Mr. Peleti had received.  For example, you referenced a

3   salt and pepper shaker and wire rack, correct?

4   A    Uh-huh.

5   Q    Did you make a determination as to when he received

6   that salt and pepper shaker?

7   A    It was very difficult to get as to when because your

8   client always claimed to have poor memory concerning the

9   whens and wheres of when he received or what he received.

10  Q    Your question to him really at the time was tell me

11  about all the gifts you have received while in the

12  military, correct?

13  A    No.  Specific from vendors.  We don't care all the

14  gifts he received, but specifically regarding the

15  allegations of accepting bribes and gratuities while he

16  was in a position to influence contractual actions.

17  Q    Did you come to learn through your course of

18  discussion with him that the wooden salt and pepper shaker

19  were gifts he received in the Horn of Africa?

20  A    Not that I'm aware of.

21  Q    Do you have a value, for example, on the wooden salt

22  and pepper shaker?

23  A    Since your client didn't give me exact details, it's

24  hard to obtain a value.

25  Q    But you formulated the opinion at the time you were

1    interviewing him this was in violation of Army

2    regulations?

3    A    He told us that he had received a certain dollar

4    amount and based on the dollar amount he received I knew

5    that was in violation of Army regulations.  It was my

6    understanding that he could accept up to $50 one time over

7    an entire year.  Anything more than that, he's supposed to

8    report to the Army command in accordance with Army

9    regulations, something which he received training on.

10   Q    But if he received, for example, as you referenced in

11   your report, an animal skin shield one year and a wooden

12   salt and pepper shaker the next --

13   A    If they are valued over $50, he is supposed to report

14   them every single time.  And he can't accept them.  He's

15   supposed to report just the fact that they tried to give

16   it to him and the Army will make a determination whether

17   or not he can accept it on behalf of the Army.  And

18   usually they won't let him keep it.  The Army will

19   actually keep it itself if they decide there's some valid

20   reason possible to even keep it.

21   Q    I want to spend a little more time on this because

22   the suggestion by the Government is that Peleti has a

23   habit of taking these things improperly.  Let me ask you,

24   for example, you talked about a quote/unquote Rolex watch,

25   right, in your report?

1    A    Correct.

2    Q    Did you ever verify whether that in fact was a Rolex?

3    A    We received it.

4    Q    I understand.  You look at a watch and it has --

5    A    I never collected the watch.  I didn't personally

6    verify anything because it wasn't collected by me.  It was

7    collected by the other agents on the investigation.  So

8    whether it's a Rolex or not, I don't know.  All I know is

9    your client told me it was a Rolex that he received and we

10    received a watch.  I have not personally ever seen the

11    watch.

12    Q    So after these two years of looking at this case and

13    investigating my client and examining the gifts he has

14    received, as you sit here today you can't tell this Judge

15    whether that's a $10 knock-off or a $300 Rolex, correct?

16    A    I personally can't, no.

17    Q    Just so we go down the list, same would go for the

18    imitation -- well, actually you identify it as an

19    imitation Cartier watch, correct?

20    A    I don't identify it as an imitation Cartier watch.

21    Q    You found a watch, Cartier?

22    A    Again, sir, I didn't collect the evidence in this

23    case.  What happened is your client, through his previous

24    attorney, was requested by the U.S. Attorney's Office to

25    provide that equipment to us.  They did.  It was collected

1    by the task force.  I personally did not collect it, so

2    you're asking me to testify to things I don't have

3    specific knowledge on.

4    Q    I appreciate your candor in this respect.  Your

5    report identifies nine items that he has received.

6    A    My report or is that somebody else's report?

7    Q    I'm referring to your report.

8    A    Which report?

9    Q    Your report that you took based on your interview of

10   Mr. Peleti.

11   A    I didn't write the report on Mr. Peleti.  I was

12   present for the interview.  But if my understanding is

13   correct, if you read the bottom line, the report should

14   have been written by Joe St. Amat.

15   Q    Fair enough.  During this interview process, you

16   learned that during Mr. Peleti's military career he has

17   received nine gifts, correct?

18   A    No.  He said that these are the gifts that he could

19   receive -- that he could recall receiving.  He didn't say

20   that these are the only gifts that he had received during

21   his entire career.  And he admitted that he shouldn't have

22   received those gifts during that same interview.

23   Q    In the course of your investigation, you never found

24   any documents to prove, for example, that Super Bowl

25   tickets that my client may have used were actually

1  purchased by a vendor?

2  A    No.  I can tell you there's another investigation

3  ongoing where they're looking at a certain company for

4  those types of issues, but that's not something that we

5  here are investigating, that particular company, and they

6  are in the process of looking at trying to obtain such

7  tickets.

8  Q    This talk about the party house, you relied a lot on

9  the statements of his estranged girlfriend, correct?

10  A    The party house?  No.  I relied on the statement of

11  about six witnesses, five or six witnesses:  Major Teich,

12  Karen Olstadt, your client, the girlfriend, Shabbir Khan

13  and multiple other witnesses, a Phil Parenti.  I can go on

14  and on and name the people who all will verify that he was

15  there at the party house on multiple occasions.  He seemed

16  to like it there.

17  Q    We're calling this a party house, but this is

18  someone's nice home who will have people over and feed

19  them and give them something to drink, correct?

20  A    This is somebody's nice home that has U.S. persons

21  who are prohibited being there by regulation and routinely

22  invites them over there and provides them alcohol against

23  military regulations and provides them food and gratuities

24  and such.  I assume it's pretty nice.  I mean, people

25  seemed to like to stay there.  I haven't actually been

 1   there.

 2   Q    A variety of military officials liked to visit this

 3   house?

 4   A    What?

 5   Q    A variety of United States military --

 6   A    Not a variety, but there has been multiple military

 7   people that have gone to that place.

 8   Q    And not a single one of those people you have spoken

 9   to have ever said my client has used drugs, correct?

10   A    No, nobody said he has used drugs.

11   Q    What you have found is that my client perhaps has

12   been there, by his own admission, right, that he's been

13   there and he has consumed alcohol there, correct?

14   A    By his own admission he has been there and consumed

15   alcohol, accepted improper gifts there and arranged to

16   accept a $50,000 bribe there.  Not at that particular

17   occasion, but --

18   Q    When you say receiving gifts there, you're talking

19   about food and drink, right?

20   A    Food, drink, some personal gifts too, but I'm trying

21   to think what he said.  It was minor stuff.  It wasn't

22   even valued over $50, so that wasn't an issue and so we

23   didn't make a report on minor stuff.

24   Q    And that wouldn't be a violation of the Army Code,

25   correct?

1    A    No.  Again, it has to be over $50 total.  Once you

2    receive over $50, regardless -- I mean, it's not like

3    somebody can give you like 50 one-dollar gifts or even 51

4    one-dollar gifts and you can say, "Oh, they're all one

5    dollar, so I haven't violated the code."  It's $50 or

6    whatever the current year is set.  It's set what you can

7    receive.

8                MR. ROMERO:  Nothing further, Your Honor.

9                THE COURT:  All right.  Thank you.  Anything

10   else?

11               MR. LANG:  Nothing else.

12               THE COURT:  Thank you, sir.  You may step down.

13   Any other evidence?

14               MR. LANG:  No other evidence.

15               THE COURT:  The advisory sentencing profile in

16   this case that results from the findings of the probation

17   officer is as follows:  A total offense level of 22, a

18   criminal history category of I, a custody range of 41 to

19   51 months, probation is not applicable, supervised release

20   term of two to three years.  As I understand it, there is

21   no specific element of restitution.  Then there's a fine

22   range of $7,500 to $500,000 and a special assessment of

23   $200.

24               Without waiving any objections that you have to

25   the Court's findings, do counsel agree that is the

 1    sentencing profile that results from those findings?

 2              MR. LANG:  We agree, Judge.

 3              MR. ROMERO:  Yes, Your Honor.

 4              THE COURT:  Also, before I hear your final

 5    statements, I did want to address this financial matter

 6    that I mentioned earlier.  It looks like based on what he

 7    was getting every two weeks, he was getting over $90,000 a

 8    year in pay and yet the W-2 shows that in '07 he only

 9    received 60,000.  And then if I add up all three of these

10    monthly payments for the three pieces of real estate --

11    the Hawaii house, $3,706 a month, the time share in

12    Hawaii, $265 a month, and then the home in North Carolina,

13    $650 a month -- that comes to $4,622 a month.  That seems

14    like an awful lot of monthly payments.  Am I missing

15    something?

16              MR. LANG:  Yes.  On the next page, page 18,

17    there's a second mortgage on the Hawaii house, which is

18    also $1,535.48 a month.

19              THE COURT:  Hold on a minute.  I missed that.

20    So that's over $6,000 a month in mortgage payments.

21    That's over $72,000 a year.  Am I missing something?

22              MR. ALAGA:  Yes, Your Honor.  The W-2 only

23    reflects his base salary.  He also receives the cost of

24    living allowance which is not reflected on the W-2 which

25    is about --

 1            THE COURT:  Why wouldn't that be reflected in

 2   his W-2 if he received it?

 3            MR. ALAGA:  My understanding is those are

 4   actually not taxable.

 5            THE COURT:  You mean because of the military

 6   status or something?

 7            MR. ALAGA:  That's my understanding.  He also

 8   rents out the property in North Carolina.

 9            THE COURT:  I thought his ex-wife was living

10   there.

11            MR. ALAGA:  He's renting it out to his ex-wife.

12            THE COURT:  I'm sorry?

13            MR. ALAGA:  His ex-wife is renting it.

14            THE COURT:  His ex-wife is renting it?  So that,

15   I assume, means she's getting the proceeds of that, not

16   him.  In any event, whether we take that -- whether we

17   take that money off or not and assuming that some of this

18   isn't taxable, he's paying over 70 -- looks like $72,000 a

19   year out in these mortgage payments.  I just don't see how

20   that's possible.  I'm not -- I mean, if that's the way it

21   is, I guess that's the way it is.  I just thought if there

22   was some clarification that I didn't understand, I would

23   want to know that.

24            MR. ROMERO:  Judge, not unlike many Americans,

25   he's operating in the red.  I can let the Court know that

1    he has -- I'm informed and believe that he has personal

2    financial problems and he readily borrows money from

3    family members to make it and he's -- if it means anything

4    to the Court, he's in arrearage with his legal bills as

5    well.

6              THE COURT:  Well, I understand that.  I mean in

7    terms of what he said to the probation office, he did not

8    make them aware of loans from the family.  At least it's

9    not reflected in the pre-sentence report.  I don't want to

10   spend any more time on this.  Okay.  Mr. Lang, do you have

11   a statement to make regarding sentence?

12             MR. LANG:  Yes.  Your Honor, the guideline range

13   of 41 months to 51 months is appropriate in this case and,

14   accordingly, we recommend 41 months imprisonment.

15             I want to start with Mr. Peleti's contributions

16   to the military, etcetera.  We don't dispute that he was

17   an outstanding soldier, but I would say we're going to put

18   a limit on that to before 2003.  We have no reason to

19   doubt the impressive testimony and accounts of the two --

20   of Sergeant Major Ford and CW5 Gillis here today.  We have

21   no evidence to suggest that before about 2003, Mr. Peleti

22   was a good soldier.  But like a lot of white color

23   criminals, as the Court has heard from Agent Bishop, it

24   starts.

25             CW3 Peleti is the Army's chief food service

advisor, was keenly aware and was keenly in the limelight,
let's say, of the absolute prohibition of taking things
from food service vendors.  There are many companies and
individuals over in the Middle East and in the U.S.
competing for those food service and other contracts that
the U.S. Army was trying to award generally on a
competitive basis.

It started with him accepting gifts in 2003 from
ESS.  And, yes, it may be a small amount, $300 in gifts
and $500 in souvenirs, but the SUV, getting the keys to an
SUV to drive around over there, is a major luxury that he
wasn't entitled to except for military vehicles, but he
got this from a vendor and it started.

Then in 2005, the Tamimi party house stuff.
He's prohibited.  Again, he's at the top of this pyramid
in terms of people with impact on food service contracts
and what does he do?  He regularly visits the Tamimi party
house.  And whether or not he had anything to do with
arranging his girlfriend at the time to fly over to
Kuwait, live there for a month, he took advantage of that
situation.  And frankly, I think the Court can conclude by
a preponderance of the evidence that Peleti was behind
this and that Shabbir Khan, who is currently serving a
long federal prison term for bribery and money laundering,
tried to sew up a relationship with Peleti by employing,

1   lodging and paying for air fare and food and subsistence

2   expenses for Peleti's girlfriend.  It appears, Judge, from

3   the record -- and we have the Super Bowl early in 2006.

4   He started taking things from vendors and in December of

5   2005 it culminated with him receiving the $50,000 from the

6   company that was looking for the flatware contract.

7         And, Your Honor, I think it's telltale that it

8   then progressed into what do I do with the money.  He

9   didn't put it in a bank account or spend it or whatever.

10  He physically hid it on his body and in his stuff and he

11  smuggled it into the U.S. and then lied on the Customs

12  declaration form.  So, again, a continual progression.

13        The argument this was aberrant behavior in light

14  of this several year track record, it just doesn't wash.

15  This isn't the case of him walking into that office in

16  December of 2005 and being handed a bag of cash and him

17  for the first time realizing that, gee, there's an

18  opportunity here.  I really don't know what to do.  He had

19  done it before.  Smaller scale, but it's not unlike the

20  bank tellers who take $5 one week, 20 the next time and

21  something else.  It progressed to the point where he

22  accepted it and he violated the Army's trust and his oath

23  and his responsibilities by engaging in these kind of

24  activities with vendors.  It became corrupt.  His

25  relationship with vendors was corrupt.  Little or large,

1    it was corrupt.

2            Your Honor, I think the Court's concern about

3    his finances is very telling.  If the Court looks, he

4    incurred out of that amount of money, the $6,157.89 he was

5    paying per month according to the pre-sentence report,

6    $5,506.99 was new debt in February and March of 2006.

7    This is right after he got the $50,000.  He bought a

8    $700,000 house.  He's got -- he incurred total debt of

9    $738,509.29 in debt in early 2006.  He also ran up his

10   credit card.  And I don't know if the Court recalls that

11   bank statement from his USA credit card that we offered as

12   Government Exhibit 107, but I can tell the Court that just

13   in the time period of the statement period dated

14   January 20, 2006 -- from December 29, 2005 through

15   January 20, 2006, he incurred over $7,000 in charges on

16   that credit card for hotels, air fare, things like that.

17   Money became an issue with him and the pattern reflected

18   from 2003 through 2006 was what's in it for me.  If he

19   wanted to do that, he should have got out of the Army and

20   went into private business.  Instead he used his public

21   position, his position of high trust in the Army for

22   personal gain and that's what this case is about.  And

23   then of course it continued with his false statements up

24   through, I believe, October 5 of this year.  It's just a

25   pattern.  It's a mind set.  Therefore, we believe the

1    guidelines are applicable.

2            If this was an aberrant situation, if he took

3    $50,000 and felt overwhelmed and felt that this money was

4    pushed on him and he had no choice, he should have went

5    back and said, "Look, I don't know how this happened.

6    This guy shoved a bag of 50 grand in my lap.  And, you

7    know, I'm sorry.  It shouldn't have happened.  He's the

8    guy that did it."  He could have called the Army CID or

9    whoever and been part of an investigation.  He didn't give

10   it back.  He didn't report it.  He kept it.  He smuggled

11   the money.  As we stand here, we cannot support the notion

12   that his behavior was aberrant.

13           Your Honor, when we look at the 3553 factors, it

14   appears to us that 3553(A)(1) and (A)(2) are front and

15   center in this particular case.  The nature and

16   circumstances of the offense.  We believe it's an

17   aggravated offense.  He's the chief food service advisor

18   and taking 50 grand in cash from a vendor is absolutely

19   prohibited, wrong and deserves strong punishment.

20           And then (A)(2), the need for the sentence

21   imposed to reflect the seriousness of the offense.  This

22   is a serious offense.  To promote respect for the law.

23   There have been a series of prosecutions of Army officers

24   accepting bribes from foreign vendors recently.  This

25   sentence needs to promote respect for law.  It also needs

1 | to provide just punishment for this officer.  Again, it's
2 | a serious offense.
3 |         And, most importantly, 3553(A)(2)(b), to afford
4 | adequate deterrence to criminal conduct.  Again, if a
5 | soldier like Peleti is going to become involved in this
6 | kind of thing -- again, not a one-time thing, but as a
7 | pattern -- we believe that perhaps if he had heard about,
8 | read about, known somebody who got punished like
9 | Mr. Peleti deserves, he might not have done this.  It is a
10 | serious crime and a message needs to go well outside of
11 | this courtroom that this will not be tolerated.  Beware,
12 | don't do this.  And we believe the sentence really has to
13 | send a strong deterrence factor out there.
14 |         THE COURT:  All right.  Thank you.
15 |         MR. ROMERO:  Judge, I'm going to give the
16 | probation officer a document we pulled up from our file
17 | which is a more comprehensive finance and accounting
18 | statement which shows his gross earnings more consistent
19 | with what's in the record, if the Court would like to look
20 | at it.
21 |         THE COURT:  I'll take your word for it.
22 |         MR. ROMERO:  Thank you, Your Honor, for your
23 | attention and the dignity that you have afforded this
24 | process in this court.
25 |         It is truly my honor, Your Honor, to represent

 1   Chief Peleti who has served nearly a quarter century for

 2   all of us in the United States military.  When we are

 3   going to make judgments about an individual's character,

 4   as this wise Court understands, we cannot look at the

 5   action which brings us all here in a vacuum when making an

 6   assessment about whether or not one's conduct is aberrant

 7   from that character which makes up the core of the person.

 8          And in Mr. Peleti's case, Chief Warrant Officer

 9   Peleti's case, it's easy, Judge.  He's 45 years old.  He

10   has never seen a criminal court in his life.  He has never

11   been arrested in those 45 years prior to this event which

12   now concerns us.  He has an unblemished and unparalleled

13   military record.

14          I have always been struck by the Government's

15   disdain for this notion that military officers and

16   personnel might from time to time veer in petty ways from

17   their own mandates, such as going to a home where you

18   could have warmth in the midst of war, in the midst of

19   missiles, in the midst of being killed.  Your Honor, they

20   are concerned with Chief Peleti because he might have a

21   drink from time to time?  Well, shame on you for feeling

22   the pressure of battling the terrorists for us,

23   Mr. Peleti.

24          This is not the problem that we have here,

25   Judge, and to incarcerate this man, to put him in prison

1   for this small, minor deviation to which he atoned

2   immediately, Your Honor --

3           THE COURT:  I'm sorry?

4           MR. ROMERO:  To which he atoned immediately.

5   From the moment the Government came to him, his own

6   military, he said mia culpa immediately, Your Honor, and

7   entrusted himself with the Government's process throughout

8   the entirety of this.

9           Judge, the Courts, as you know, have spent much

10  time recently really requiring us all to reconsider

11  whether we should be using the guidelines in assessing

12  what an appropriate punishment is.  Certainly they are

13  advisory.  But when you have a middle-aged man whose wife

14  says in the middle of your combat that she's leaving you

15  because she can no longer handle the stresses of being a

16  military wife some 15,000 miles away, and you suffer the

17  loss of a brother two years before that and your sister

18  the next year and your mother the next, who cares if he

19  had a girlfriend?  Good for him.  Good for him.  Do we

20  want to paint him as some immoral figure to justify

21  putting him in prison?  He's not, Your Honor, and the

22  guidelines don't work in this case.

23          How many wars do we have to engage in to

24  understand that a good man is affected in bad ways by

25  being stuck in military theater?  How many veterans do we

1    have to incarcerate before we realize that what they do

2    for us changes who they are, Your Honor?  And I apologize

3    for my fervor, but I stand proudly on the laurels of the

4    constitution and the dignity of this federal law and the

5    power vested in you, Your Honor, to understand that what

6    you have before you, even accepting all of his ill deeds,

7    is somebody who doesn't need to spend a day in jail to

8    learn his lesson.

9              And let's talk for a moment about another

10   relevant concern that Your Honor is charged with, that of

11   general deterrence.  What is the message we want to convey

12   to others similarly situated and charged with incredible

13   responsibility with people who have the power to contract

14   and sway and corrupt another with money?  Do you know

15   what?  You will lose your 25-year pension.  What's that

16   worth?  We send him a letter, as he has received from the

17   United States Government, from the executive branch,

18   saying you are forever forbidden from contracting in any

19   capacity or doing business with us.

20             THE COURT:  I don't mind listening to this, but

21   I don't believe it's part of the record, although I'm

22   assuming that what you are saying is correct.

23             MR. LANG:  We have no objection.

24             THE COURT:  Pardon?

25             MR. LANG:  No objection.

1                    THE COURT:  Okay.

2                    MR. ROMERO:  Your Honor, thank you.  41 months

3      is too harsh.  3 years is too harsh.  I want to be a good

4      lawyer, I hope, and say that, Judge, if there is a middle

5      ground, let's find it.  And if you feel compelled to put

6      him in prison to achieve the goals that the law has asked

7      you to achieve, I respect that opinion, but would ask you

8      to consider sincerely the history that we have

9      collectively as a society and you, Your Honor, who have

10     seen much more than I in terms of the effects that the

11     battle zone has on good people.

12                    And his core is good, Your Honor.  He made a big

13     mistake.  He had a lot of stressors in his life to help us

14     understand the aberrance and I plead with you, Your Honor,

15     to exercise your discretion under the due process clause

16     of the United States Constitution and the statutory

17     authority that this Court is familiar with to be lenient.

18     If you're going to send him to prison, I think a year is

19     sufficient.  I would ask for a surrender date maybe two to

20     three months out so he can gather his affairs with his

21     family and --

22                    THE COURT:  Well, I wanted to raise a point

23     about that.  That is whether or not the defendant should

24     be allowed to remain on bond pending appeal.  What is the

25     Government's position?

1          MR. LANG:  The Government's position is no

2    because he lied at the hearing, Judge.

3          MR. ROMERO:  Judge, I think that the penalty for

4    that which the Court has great concern will be embedded

5    into your recommendation, but to deprive him of this other

6    procedural right I think would be unnecessary in this

7    case.  He has been loyal to Your Honor's orders to appear.

8    He's not going anywhere.  He has lots of eyes on him,

9    including the military itself.  He will be here any time

10   you want and I think bond pending appeal would be

11   appropriate in this case.  And I have personally gotten

12   information from elders in his community that are going to

13   support that process and it's in effect and I would

14   respectfully ask the Court to do so.  Thank you, Judge.

15         THE COURT:  All right.  Thank you.  Sergeant

16   Peleti, would you approach the podium with your attorneys,

17   please?  Sir, is there anything that you would like to say

18   to the Court on your own behalf before I impose sentence?

19         MR. PELETI:  Yes, Your Honor.

20         THE COURT:  Go ahead.

21         MR. PELETI:  Your Honor, I stand before you

22   today to convey my remorse and sincere regret for the

23   situation I placed my country, this courtroom, my family

24   itself in.  I am not proud of my behavior, but would like

25   to convey the circumstances which impacted on the last

1    several years of my life and my military career,

2    especially the last two years which affected lives not

3    only in my immediate family, but my external family as

4    well.  Before I begin, please understand that I'm not here

5    to seek vindication for my actions or behavior.  I'm only

6    here to express situations surrounding my decisions and to

7    express my sincere regrets.

8              Until recently, my military record of 24 years

9    has been unblemished.  It has never been my intent to

10   bring shame or disgrace to my flag, service, family or

11   self.  My entire career is linked to service in combat

12   type units with five tours in hostile environments, in war

13   zones, four of which were virtually back to back after

14   September 11, 2001, and totaling more than 33 months.

15             I have replayed events many times in my head and

16   can honestly say that I belive I was in a dysfunctional

17   state of mind at the time.  First of all, my wife had left

18   me and I received a Dear John letter while I was deployed

19   to Afghanistan.  She could not take the deployments prior

20   to Afghanistan, my excessive drinking which eased my pain.

21   I was separated from my children, youngest daughter 2 at

22   the time, a daughter 10, my son at the time 15 who was

23   diagnosed with AHD.

24             I went on my second deployment to Kuwait and

25   eventually to Iraq.  I came back home for two months and

was deployed right back to Iraq.  I had to come back home
to my sister's funeral, then went right back to Iraq to
complete my tour.  I later deployed home and had to get
things in order to clear my current duty station which was
at Fort Bragg in North Carolina.  I then had to report to
the warrant officer advanced course immediately and then
had to go back to Fort Bragg to clear my duty station and
report to Kuwait.

Upon completion of my advanced course, I had
planned to take my mother and three siblings on vacation
to Samoa.  Two days after I completed my advanced course,
I received a phone call that my mother had passed away.
Obviously I was devastated.  Instead of taking my mother
on vacation, I had to tend to her funeral arrangements.
To this day, I do not know how I held everything together.
My mother was my rock, especially after I lost my father
in 1992.  I also lost a brother while I was deployed to
Korea in 2000.  She was always there to ease my pain when
things were not going well.

As a good soldier, however, I had to press on
despite my loss.  I cleared Fort Bragg and reported to
Kuwait for duty.  I went to Kuwait and began working
anywhere from 14 to 18 hour days, 7 days a week.  So, as
you can see, the stress level day in and day out was
extreme, but, again, I pressed through.  I believe at the

1    time that I was going to these luxurious parties and not

2    thinking with a clear mind that this was something to ease

3    the pain.

4            Again, I'm not here to justify my actions.  I'm

5    here to just tell you my story.  Please understand I'm not

6    here to make excuses for my behavior.

7            In addition to my grueling schedule in Kuwait,

8    my job also required travel to Iraq, Afghanistan, Turkey,

9    Horn of Africa and other parts of the Middle East.  I

10    believe I tried to stay as busy as possible to keep my

11    mind off the pain of being separated from my wife,

12    children and the death of my mother, but I believe the

13    effort to ease my pain actually left me in worse shape.

14            During my military service, I received two

15    bronze stars which were awarded for meritorious service,

16    service medals, Army commendation medals and, most

17    importantly, several good conduct medals which were for

18    completing enlistment without receiving any nonjudicial

19    punishments, disciplinary infractions or court martial

20    offenses.

21            Again, Your Honor, I'm not here to boast and

22    present to you as a soldier that is perfect.  However,

23    without question I can say I have been blessed with a good

24    military career.  My performance inspired a lot of support

25    from general officers, former leaders and senior and

1   non-commissioned officers alike, just like the two

2   comrades that was here before you.

3          Your Honor, in conclusion, I would just like to

4   say that if you could find it in your heart to allow me a

5   second chance by sentencing me to probation.  Probation

6   will allow me to be there for my two younger daughters in

7   a way my multiple deployments did not allow me to be there

8   for my son.  I have a lot to contribute to society and my

9   unblemished 24-year military record should be a testament

10  to my character.  First in battle and now during this

11  ordeal, I have long put my fate in God's hands.  Your

12  Honor, I now put my fate in yours and ask for your mercy.

13         THE COURT:  All right.  Thank you.  The Court

14  adopts the factual findings and guideline application as

15  contained in the pre-sentence report.

16         I used to think before I became a judge that

17  imposing sentence in criminal cases would be pretty easy,

18  but in the 25 years that I've been on the bench I've come

19  to understand, beginning with the first time up to this

20  time, that it's the most difficult job that I have.  But

21  then it should be because imposing sentence in criminal

22  cases is a very serious responsibility in a lot of

23  different ways.

24         This particular sentence is troublesome in a

25  number of ways, both good and bad.  There's a saying from

1    Shakespeare that, "The evil men do lives after them.  The

2    good is often interred with their bones."  And you can

3    certainly find a thousand examples of that.  Your record,

4    your career in the Army, may be the latest example of

5    that.

6            I have no way of knowing whether you were

7    engaging in corrupt conduct prior to the time these events

8    started other than what I've heard here today, so I'm

9    assuming that you were the exemplary officer that the

10   pre-sentence report suggests that you were and that means

11   a lot.

12           The 82nd Airborne, I've read a lot of history

13   over the years and I know the great honor with which the

14   82nd Airborne has always acquitted itself throughout its

15   existence.  And I do reflect in my thoughts here the fact

16   that you do have many years of exemplary service and that

17   should be taken into account in your sentence, in part the

18   fact of your service to the country in time of war.

19           That exemplary service ended, at least in part,

20   as of a certain date.  I don't know when that was.  And

21   I've seen enough of these situations over the years that I

22   know that that moment in time when you took that $50,000

23   and kept it, that dramatic moment did not just happen at

24   that moment.  There were other things that happened that

25   led up to that moment.  That's the way of life.  That's

1    the way of the world.

2          If we were just talking here about your going to

3    this party house and having drinks that weren't authorized

4    or taking more than $50 in gifts, that's one thing and

5    those might certainly indicate that perhaps this brightly

6    polished reputation was maybe getting a little bit

7    tarnished, but it was the receipt of this $50,000 that

8    really makes a difference here.  It's not a small amount

9    of money.  It's not an insignificant amount of money.

10          And it was only given to you because of who you

11    were, not -- by that, I don't mean that you were a nice

12    guy or that you were having problems or that you had had

13    all these years of faithful service to the military.  It

14    was given to you because of your position in the military,

15    an important position involved in food related contracts.

16          Bribery is -- in terms of the nature and

17    characteristics of the conduct here, bribery is a serious

18    matter.  It's more serious in my view, although maybe only

19    arguably so, that we're talking about bribery in a

20    situation in a theater of war, in a time of war, in

21    relation to matters that affect the troops.

22          Now there's no indication in this record that

23    the money you received, even if you had been successful in

24    influencing a specific contract, there's no evidence in

25    the record that the goods or services that would have been

1    provided in that manner would have been deficient.

2    There's no indication of that.  But the reason over

3    time -- I know from reading history that the reason that

4    that is a particularly serious situation is that when you

5    have corrupt practices in the military, especially in time

6    of war, when as one of your colleagues stated, you know,

7    people's lives may depend on it, we know from looking at

8    history from other wars that corrupt practices do lead to

9    dead soldiers where the ammunition doesn't work or the

10   shell explodes or the plane crashes or the food is

11   inedible or whatever.  Those are the ultimate dramatic

12   worst case scenario effects that can happen as the result

13   of corrupt practices.  There's no indication that that was

14   the situation here, but that's why this is serious because

15   these types of corrupt practices lead to that inevitably.

16              It seems clear in terms of who you are -- as I

17   said, every indication of many years of dedicated,

18   beyond-the-call-of-duty service for your country to the

19   point where it probably did very adversely affect your

20   marriage and perhaps other relationships.  As such, I

21   frankly have no interest, none, in whether or not you had

22   a girlfriend while you were over there.  I just want to

23   make that clear.  What I'm having trouble with is you did

24   have a series of bad things going on in your life.  You

25   get the Dear John letter from your wife.  You lose your

1    brother.  You lose your sister.  You lose your mother.

2    And all of those things are horrific things to have

3    happen.  I don't know how you get from that to taking

4    $50,000.  That's what I'm having trouble with.  I could

5    even understand how those things might lead you to start

6    drinking, and I guess arguably once you start drinking

7    regularly, too much too often, then maybe your judgment or

8    your inhibitions or whatever, all of that taken together

9    may have uninfluenced you in a way that would not have

10   occurred if these bad things had not happened.  But the

11   fact that those very sad things happened in your life does

12   not then on the other side of the equal sign somehow

13   explain corrupt conduct.  So I've got a problem with that.

14            It is correct that the sentence is to reflect

15   the seriousness of the offense, promote respect for law,

16   provide just punishment and certainly send a message from

17   this courtroom.  I recognize that general deterrence is

18   one of the specific factors set out in the statute and I

19   also -- I understand why it's there.  I'm not real sure

20   how effective it is because general deterrence means that

21   this Court is sending a message, "By the way, if you're

22   considering this kind of conduct, don't do it because

23   here's what's going to happen."

24            What very often is the case is that (a) people

25   think they're so smart they're not going to get caught, so

1  they really don't care what the consequences are; or

2  (b) they don't care.  I don't know how that applies to

3  you, but certainly there is some validity to the idea that

4  when a member of the military in a theater of war takes a

5  $50,000 bribe that the sentence imposed should say

6  something about that to others.  Don't do it.

7           I'm also supposed to consider the specific

8  deterrence necessary to get you to not do this again.

9  And, frankly, I don't think that's a particular problem.

10  I don't think you would do this again.  However, if your

11  pre-sentence report had stopped before this incident, who

12  would have guessed that you have would have done this?

13  You're not drinking too much now and you've apparently

14  adjusted to these things that have happened in your life,

15  so I don't really think that I need to be overly concerned

16  about the specific deterrence of your sentence.

17           The effect of this sentence is catastrophic and

18  for you personally on more than one level.  I assume --

19  there was some reference to it here.  I certainly wouldn't

20  be surprised if this affected your pension and probably

21  almost certainly whether you're even allowed to remain in

22  the military.  I don't know that for sure, but in a few

23  moments I'm going to be imposing sentence and part of that

24  sentence will be imposing conditions of supervised release

25  and one of those conditions of supervised release, a

1   standard condition of supervised release, is that you may

2   not possess a firearm.  And if you can't possess a

3   firearm, I don't know how you can be in the military

4   unless there's some sort of waiver.  So I'm well aware of

5   the fact that for you on an individual basis, the effect

6   of this judgment is going to go way beyond just whatever

7   the sentence is that I impose.

8           So taking all of these different things into

9   account, I'm going to be imposing sentence and I'll tell

10  you now I cannot put you on probation, sir.  I simply

11  cannot do that because if I did, I truly believe as a

12  matter of conscience I would deprecate the seriousness of

13  what you've done here, so I cannot do that.

14          The advisory guidelines are not unreasonable,

15  but I don't believe that the sentence at the bottom of the

16  guideline range is necessary.  I believe that there is a

17  sentence that's below that that is sufficient but not

18  greater than necessary to adequately reflect all of the

19  aspects, all of the factors set out in the sentencing

20  statute.

21          Pursuant to the Sentencing Reform Act, the

22  defendant is hereby committed to the custody of the Bureau

23  of Prisons for a period of 28 months on each of Counts 1

24  and 2 to run concurrently.  A $7,500 fine is ordered and

25  interest is waived on the fine.

1          Following your release from custody, you shall

2     serve two year terms of supervised release on Counts 1 and

3     2 to be served concurrently.  That sentence, by the way,

4     of 28 months, that's on Counts 1 and 2 to run

5     concurrently.

6          Within 72 hours of your release from custody,

7     you shall report in person to the probation office in the

8     district to which you are released.  While on supervision

9     you shall not commit another federal, state or local

10     crime.  You shall not possess a controlled substance.  You

11     shall submit to one drug test within 15 days of placement

12     on supervision and two drug tests thereafter as directed.

13          In addition, pursuant to the Justice For All

14     Act, you shall cooperate in the collection of DNA as

15     directed by the probation officer or the Bureau of

16     Prisons.  In addition to the standard conditions of

17     supervision, you shall abide by the following special

18     conditions.

19          Number one:  You shall not own, purchase or

20     possess a firearm, ammunition or other dangerous weapon.

21          Number two:  You shall provide the probation

22     officer access to any requested financial information,

23     including both your business and personal income tax

24     returns.

25          Number three:  You shall not incur any new debts

1    or open any additional lines of credit in excess of $250

2    without the prior approval of the probation office.

3              Let me ask the probation officer, I made

4    reference up here that he's not to possess a controlled

5    substance, but there's no indication -- just a moment.

6    There's no indication that he has a drug problem other

7    than alcohol.  Is that correct?

8              PROBATION OFFICER:  Correct, Your Honor.  He

9    just indicated that he --

10             THE COURT:  Well, then I don't know why we need

11   the "possess a controlled substance" part in there, but I

12   do think we need a provision that during supervision that

13   he not consume alcohol and that he submit to treatment and

14   testing concerning alcohol and I think that's what I'm

15   going to do unless you have some information that I'm not

16   aware of.

17             PROBATION OFFICER:  No, Your Honor.

18             THE COURT:  I don't think we need the general

19   drug provisions, so strike that.  So while on supervised

20   release, you shall not commit another federal, state or

21   local crime.  Take out the part about the drug testing.

22   The part about the Justice For All Act, DNA, that's in.

23   The special conditions of probation are in.  And also

24   while you're on supervision, you shall not consume alcohol

25   and you will submit to testing beginning within 15 days of

1    placement on supervision and then will be tested at the

2    direction of the probation office.  I think that's not to

3    exceed six times a month.  Is that correct?

4                 PROBATION OFFICER:  Yes, Your Honor.

5                 THE COURT:  And then that provision will also

6    include that you will receive whatever treatment is

7    directed by probation.

8                 A special assessment of $200 is imposed and

9    payable immediately.

10                Can I assume that you want to be -- you want to

11   serve your sentence in a facility as close to Hawaii as

12   possible?

13                MR. PELETI:  Yes, Your Honor, preferably

14   California.

15                THE COURT:  I will recommend that you serve your

16   sentence in a facility in California.

17                MR. ROMERO:  Lompoc, Your Honor.

18                THE COURT:  That's fine if that's what you want.

19   I certainly don't believe there's any need for it to be

20   anything other than a minimum security facility.  Anything

21   else on the sentence part of it?  I think there was a

22   waiver here.  Where are we on that?

23                MR. LANG:  In the plea agreement, there was a

24   waiver.  The plea agreement is still in effect.  We

25   haven't sought to have the Court set that aside, so I

1   believe it is still in effect.

2          THE COURT:  Well, let me just make a statement

3   about this.  And I'm assuming it's not a surprise.  I do

4   believe that there is -- I think I have made the right

5   decisions in this case or obviously I wouldn't have made

6   them, but I do think there is an arguable issue on this

7   matter of whether or not a crime was committed under

8   the -- counsel knows what I'm talking about.

9          MR. LANG:  Count 1, right, bribery.

10          THE COURT:  And so I certainly -- I believe that

11   he must have an opportunity to appeal that in spite of

12   what the plea agreement says.

13          MR. LANG:  I understand.

14          THE COURT:  Secondly, the law of this circuit

15   anyway is that in any event, he's allowed to appeal by

16   operation of case law the question of whether or not he

17   received effective assistance of counsel concerning the

18   negotiation of the plea agreement and I think that that

19   obviously should be allowed.

20          MR. LANG:  I totally understand the Court's

21   view.  Again, the Government's position, the plea

22   agreement is still in effect.  It hasn't been set aside.

23   And so that would be our position.

24          MR. ROMERO:  We concur with the Court.

25          THE COURT:  What I'm saying is this.  I don't

1    think as long as that provision in the plea agreement is

2    effective that he would be allowed to appeal the issue of

3    whether or not Count 1 constituted a crime.  So what I'm

4    saying to you now at this late moment is that I will not

5    accept this plea unless there is an agreement that he will

6    be allowed to appeal that issue.

7              MR. LANG:  Okay.  I mean that's fine, Judge.  I

8    understand.  I suppose what would have happened if we

9    didn't have this discussion is that the defendant would

10   file some kind of motion with the Court and the Court

11   would rule on it, but that's fine.  We're there now.

12   That's fine.  I understand.

13             THE COURT:  So, in any event, when you did enter

14   a plea of guilty in this case, you told me that in most

15   respects, almost all respects, you were giving up the

16   right to file an appeal.  Nonetheless, to the extent to

17   which you feel you have appeal rights that survive that

18   waiver and it is your wish to appeal, I inform you that

19   any notice of appeal must be filed with the Clerk of the

20   Court within ten days of today's date.  Your attorneys

21   have an absolute responsibility to file this notice for

22   you if that is your wish.  And as I've specifically

23   indicated, I believe that I'm accepting his plea of guilty

24   and sentencing you on the express understanding that you

25   will be allowed to appeal the issue of whether or not the

 1    facts here constitute a crime concerning Count 1 of the

 2    indictment.  Anything else?  Are you asking for bond

 3    pending appeal?

 4              MR. ROMERO:  Yes, Your Honor.

 5              THE COURT:  The Government's position, as I

 6    understand it, is that you're resisting that because of

 7    his perjury?

 8              MR. LANG:  Yes.

 9              THE COURT:  I'm certainly not retreating from my

10    findings that he committed perjury.  I certainly believe

11    that he did.  But, as I said, I think there is an arguable

12    issue here about Count 1.  I believe that my finding is

13    correct and I am confident that my findings will be

14    affirmed on appeal, but reasonable people could differ on

15    this and so I think in fairness to him, if he wishes to be

16    on bond pending appeal, that I will allow that.  And

17    whatever the conditions of bond are right now, unless I

18    hear differently from probation or the Government, I will

19    just leave those conditions in place.  Is there any

20    perceived need to change any of those conditions?

21              MR. LANG:  No.  We're fine with that.

22              MR. ROMERO:  No, Your Honor.

23              THE COURT:  All right.  Anything else?

24              MR. LANG:  Your Honor, in the event -- he hasn't

25    filed a notice of appeal of course yet and hasn't

1    discussed it.  In the event that he chooses not to file an

2    appeal and that's still something --

3              THE COURT:  In the event that he chooses not to

4    file an appeal, then we'll have an alternative finding

5    here that he will -- let's see.  He has ten days to make

6    that decision.  So March 31.  So if you do file an appeal,

7    you're out on bond pending appeal as long as you comply

8    with the conditions.  If you do not file an appeal, then

9    your surrender date is March 31.  And we don't know yet

10   where that would be, but you would be informed of that by

11   probation and then it would be your duty to get to that

12   place on your own at your own expense.  If you don't show

13   up there when you're supposed to, you would be considered

14   as being on escape status.  Do you understand?

15             MR. PELETI:  Yes.  I would just like to request

16   to push that to three months so I can get my stuff in

17   order in the event I do not appeal, if that's possible.

18             THE COURT:  You have until March 31.  Are you

19   saying that would not be long enough?

20             MR. PELETI:  Yes, sir.  I mean, that's to get

21   my, you know, my finances and my family situated prior to

22   me reporting.

23             THE COURT:  I'll give you two more weeks.

24   That's April 14.  All right.  We're in recess.

25                   * * * HEARING CONCLUDED * * *

1                    **REPORTER'S CERTIFICATE**

2

3            I, Karen S. Hanna, certify that the foregoing

4    transcript constitutes a true and accurate transcript of

5    the original shorthand notes of the proceedings had at the

6    time and place aforesaid before the HONORABLE MICHAEL M.

7    MIHM, U.S. District Judge.

8

9                              s/Karen S. Hanna
                              _____
10                            Karen S. Hanna, C.S.R.
                              License #084-001760
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25